James A. Goodman, State Bar No. 89715
EPSTEIN BECKER & GREEN, P.C.
1925 Century Park East, Suite 500
Los Angeles, California 90067-2506
Telephone: 310.556.8861
Facsimile: 310.553.2165
jgoodman@ebglaw.com

Attorneys for Defendant
TURNER CONSTRUCTION COMPANY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

THOMAS THOMPSON,

            Plaintiff,

    v.

TURNER CONSTRUCTION
COMPANY, a New York corporation
and DOES 1 through 20, inclusive,

            Defendants.

CASE NO.  07 CV 2412 JM (JMA)

**COMPENDIUM OF NON-FEDERAL AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PURSUANT TO FRCP 12(b)(6), OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT PURSUANT TO FRCP 56**

Honorable Jeffrey T. Miller

Date:   February 22, 2008
Time:   1:30 p.m.
Ctrm:  16

///
///
///
///
///
///
///
///

LA:468416v1

| CASE | TAB |
|---|---|

*Armendariz v. Foundation Health Psychare Services,*
    24 Cal.4th 83, 99 Cal. Rptr. 2d 745 (2000) ........................................... 1

*Craig v. Brown & Root, Inc.,*
    84 Cal. App. 4th 416, 100 Cal. Rptr. 2d 818 (2000) ............................. 2

*Graham v. Scissor-Tail, Inc.,*
    28 Cal. 3d 807, 171 Cal. Rptr. 604 (1981) ........................................... 3

*Lagatree v. Luce Forward Hamilton & Scripps,*
    74 Cal. App. 4th 1105, 88 Cal. Rptr. 2d 664 (2000) ............................ 4

*Little v. Auto Stiegler, Inc.,*
    29 Cal. App. 4th 1064, 130 Cal. Rptr. 2d 892 (2003) .......................... 5

*Mercuro v. Superior Court of Los Angeles County,*
    96 Cal. App. 4th 167, 116 Cal. Rptr. 2d 671 (2002) ........................... 6

*West v. Henderson,*
    227 Cal. App. 3d 1578, 278 Cal. Rptr. 570 (1991) .............................. 7

DATED:  January 3, 2008                    EPSTEIN BECKER & GREEN, P.C.


                                           By: _____
                                               JAMES A. GOODMAN

                                           Attorneys for Defendant,
                                           TURNER CONSTRUCTION
                                           COMPANY

# TAB 1

Westlaw.

6 P.3d 669                                                                          Page 1
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

▷
Briefs and Other Related Documents
MARYBETH ARMENDARIZ et al., Plaintiffs and
Respondents, v. FOUNDATION HEALTH
PSYCHCARE SERVICES, INC., Defendant and
Appellant.Cal. 2000.MARYBETH ARMENDARIZ
et al., Plaintiffs and Respondents,
v.
FOUNDATION HEALTH PSYCHCARE
SERVICES, INC., Defendant and Appellant.
**No. S075942.**


Supreme Court of California
Aug. 24, 2000.

SUMMARY

Two terminated employees brought a wrongful
termination action against their former employer,
alleging violation of the California Fair Employment
and Housing Act (FEHA) (Gov. Code, § 12900 et
seq.) and other causes of action. The employer
moved to compel arbitration under an arbitration
provision in plaintiffs' employment application forms
and in separate employment arbitration agreements.
The trial court denied the motion, finding that the
arbitration agreement was invalid in its entirety. The
court determined that the agreement was an adhesion
contract and that portions were unconscionable by
being one-sided, by limiting damages to backpay, and
by precluding discovery. (Superior Court of Marin
County, No. 170420, Lynn Duryee, Judge. FN* ) The
Court of Appeal, First Dist., Div. One, No. A080274,
reversed, concluding that the limit on damages was
unconscionable and contrary to public policy, but that
the remainder of the provision was enforceable.


FN* Judge of the former Municipal Court
for the Marin Judicial District, assigned by
the Chief Justice pursuant to article VI,
section 6 of the California Constitution.
The Supreme Court reversed the judgment of the
Court of Appeal upholding the employer's petition to
compel arbitration and remanded the cause to the
Court of Appeal with directions to affirm the
judgment of the trial court. The court held that FEHA
claims are arbitrable if the arbitration permits an
employee to vindicate his or her statutory rights. For

vindication to occur, the arbitration must meet certain
minimum requirements, including neutrality of the
arbitrator, the provision of adequate discovery, a
written decision that will permit a limited form of
judicial review, and limitations on the costs of
arbitration. As to the agreement in this case, the court
held that it was invalid, since it possessed a damages
limitation that was contrary to public policy, and it
was unconscionably unilateral. The court further held
that it was not possible to sever the unconscionable
portions of the agreement, and therefore the
agreement was unenforceable in its entirety. (Opinion
by Mosk, J., with George, C. J., Kennard, Baxter, and
Werdegar, JJ., concurring. Concurring opinion by
Brown, J., with Chin, J., concurring (see p. 127).)

HEADNOTES

Classified to California Digest of Official Reports


**(1)** Arbitration and Award §   5.5--Arbitration
Agreements--Enforceability-- Mandatory Agreement
in Employment Contract--Actions Under Fair
Employment and Housing Law:Civil Rights §   8--
Procedure.
Nothing in the federal Civil Rights Act of 1991 (1991
Act) prohibits mandatory employment arbitration
agreements that encompass state and federal
antidiscrimination claims. A Ninth Circuit Court of
Appeals decision, which determined that the 1991
Act prohibits the enforcement of mandatory
employment agreements to arbitrate claims under
title VII of the Civil Rights Act of 1964 (title VII) or
equivalent state antidiscrimination statutes such as
the California Fair Employment and Housing Act
(Gov. Code, § 12900 et seq.), is not persuasive.
Other circuit courts of appeals have reached the
contrary result. Further, the Ninth Circuit interpreted
a provision in the 1991 Act that generally encourages
arbitration to reach its conclusion. It is unlikely that
Congress would have chosen to ban mandatory
employment arbitration by means of a clause that
encourages the use of arbitration and has no explicit
prohibitory language, when it could have simply
proscribed mandatory employment arbitration of title
VII claims.
[See Knight et al., Cal. Practice Guide: Alternate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1

-3-

6 P.3d 669
Page 2
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202, 00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
(Cite as: 24 Cal.4th 83, 6 P.3d 669)

Dispute Resolution (The Rutter Group 1999) ¶ 5:245 et seq.]

(**2**) Arbitration and Award § 1--Federal Arbitration Act.

The Federal Arbitration Act (9 U.S.C. § 1 et seq.) incorporates a strong federal policy of enforcing arbitration agreements, including agreements to arbitrate statutory rights.

(**3a**, **3b**) Arbitration and Award § 5.5--Arbitration Agreements-- Enforceability--Employment Contracts:Employer and Employee § 4-- Employment Relationship.

Whether or not employment contracts are subject to the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.), the enforceability of an arbitration provision in an employment contract entails the same inquiry under the FAA as under Code Civ. Proc., § 1280 et seq. (arbitration). This inquiry is whether there are *85 reasons, based on general contract law principles, for refusing to enforce the arbitration agreement. California law, like federal law, favors enforcement of valid arbitration agreements, and under both federal and California law arbitration agreements are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the voiding of any contract. In other words, an arbitration agreement may only be invalidated for the same reasons as other contracts. Also, California law, unlike the FAA, contains no exemption for employment contracts. Indeed, California law does not prevent the Legislature from selectively prohibiting arbitration in certain areas, and the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) has no such prohibition.

(**4**) Arbitration and Award § 3--Arbitration Agreements--Effect on Statutory Rights.

By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute. The party only submits to their resolution in an arbitral, rather than a judicial, forum.

(**5a**, **5b**, **5c**, **5d**) Arbitration and Award § 5.5-- Arbitration Agreements--Enforceability--Mandatory Agreement in Employment Contract--Actions Under Fair Employment and Housing Law--Adequacy of Provisions:Civil Rights § 8--Procedure.

Although rights established by the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) are for a public purpose and therefore not waivable by individuals, an employee's FEHA claims are arbitrable if the arbitration permits the employee to vindicate his or her statutory rights.

The arbitration must meet certain minimum requirements, including neutrality of the arbitrator, the provision of adequate discovery, a written decision that will permit a limited form of judicial review, and limitations on the costs of arbitration. Also, an arbitration agreement may not limit statutorily imposed remedies such as punitive damages and attorney fees. Thus, a mandatory arbitration agreement in an employment contract is valid if it encompasses, expressly or impliedly, all of these requirements. As to discovery, although an employee pursuing an FEHA claim in arbitration may not be entitled to the full panoply of discovery granted in Code Civ. Proc., § 1283.05, the employee is entitled to sufficient discovery, and by agreeing to arbitrate an FEHA claim, the employer has impliedly consented to such discovery. As for judicial review, an arbitrator in a FEHA case must issue a written arbitration decision that will reveal, however briefly, the essential findings and conclusions on which the award is based. As to costs, *86 the arbitration agreement or arbitration process cannot generally require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court. An arbitration agreement that contains within its scope the arbitration of FEHA claims impliedly obliges the employer to pay all types of costs that are unique to arbitration.

(**6**) Arbitration and Award § 5.5--Arbitration Agreements--Enforceability-- Unwaivable Statutory Rights.

Certain statutory rights can be waived. But arbitration agreements that encompass unwaivable statutory rights must be subject to particular scrutiny. This unwaivability derives from two statutes that are themselves derived from public policy. First, Civ. Code, § 1668, provides that contracts that have for their object, directly or indirectly, to exempt anyone from responsibility for his or her own fraud, or willful injury to the person or property of another, or violation of law are against the policy of the law. Agreements whose object, directly or indirectly, is to exempt their parties from violation of the law are against public policy and may not be enforced. Second, Civ. Code, § 3513, provides that anyone may waive the advantage of a law intended solely for his or her benefit, but a law established for a public reason cannot be contravened by a private agreement.

(**7**) Arbitration and Award § 24--Judicial Action on Award--Review--Statutory Rights.

Although judicial scrutiny of arbitration awards

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1
-4-

6 P.3d 669

Page 3

24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202, 00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401

**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of any statute at issue. Judicial review of an award may be appropriate when granting finality to an arbitrator's decision would be inconsistent with the protection of a party's statutory rights.

**(8)** Arbitration and Award § 5.5--Arbitration Agreements--Enforceability-- Mandatory Agreement in Employment Contract--Actions Under Fair Employment and Housing Law--Arbitration Costs:Civil Rights § 8--Procedure.

When an employer imposes a mandatory arbitration agreement in an employment contract that encompasses claims under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), as a condition of employment, the agreement or arbitration process cannot require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court. This rule ensures that employees bringing FEHA claims will not be deterred by costs greater *87 than the usual costs incurred during litigation, costs that are essentially imposed on an employee by the employer. Imposition of costs on the employer will not compromise the neutrality of the arbitrator. There are sufficient institutional safeguards to protect against corrupt arbitrators. Also, although arbitration costs are generally smaller than litigation costs, the employee will not realize a net benefit from arbitration, since arbitration awards are generally smaller as well. Further, thus rule is not contrary to Code Civ. Proc., § 1284.2. This section is a default provision, and the agreement to arbitrate a statutory claim is implicitly an agreement to abide by the substantive remedial provisions of the statute. The Legislature did not intend that beneficiaries of the FEHA would be compelled to pay large arbitration costs for pursuing an antidiscrimination claim. The FEHA implicitly prohibits such costs.

**(9a, 9b, 9c)** Arbitration and Award § 5.5--Arbitration Agreements-- Enforceability--Mandatory Agreement in Employment Contract--Unconscionability.

A mandatory agreement in an employment contract was unenforceable as unconscionable, where the agreement possessed a damages limitation that was contrary to public policy, and was unjustifiably unilateral. As with other contracts, an arbitration agreement can be found unenforceable as unconscionable; this does not disfavor arbitration. In this case, the agreement was one of adhesion, as it

was imposed on the employees as a condition of employment and there was no opportunity to negotiate. Few employees are in a position to refuse a job because of an arbitration requirement, and courts must be attuned to claims that employers with superior bargaining power have imposed one-sided, substantively unconscionable terms in arbitration agreements. Also, the agreement provided that the employees' wrongful termination disputes were subject to mandatory arbitration, but disputes brought by the employer were not expressly subject to arbitration. Although lack of mutuality does not always render such an agreement invalid, there must be a business reality to justify the lack of mutuality; there must be a modicum of bilaterality. Further, the one-sidedness of this agreement was compounded by the fact that the agreement did not permit full recovery of damages for employees, limiting them to lost backpay without allowing for other contract damages, while placing no such restriction on the employer. The fact that the parties may not have deemed it likely that the employer would bring actions against its employees did not justify the lack of mutuality.

[See 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § § 494, 500; Knight et al., Cal. Practice Guide: Alternate Dispute Resolution (The Rutter Group 1999) ¶ 5:145 et seq.] *88

**(10)** Contracts § 13.2--Legality--Adhesion Contracts. An analysis whether an contract is unconscionable, and therefore unenforceable, begins with an inquiry into whether the contract is one of adhesion. The term, contract of adhesion, signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it. If the contract is adhesive, a court must then determine whether other factors are present that, under established legislative or judicial rules, operate to render it unenforceable. There are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that a contract or provision that does not fall within the reasonable expectations of the weaker or adhering party will not be enforced against him or her. The second, a principle of equity applicable to all contracts generally, is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or unconscionable.

**(11)** Contracts § 13.4--Legality--Unconscionable Contracts.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1

6 P.3d 669
Page 4
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
(Cite as: 24 Cal.4th 83, 6 P.3d 669)

As applied to contracts, unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results. Procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability. But they need not be present in the same degree. Essentially a sliding scale is invoked that disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves. In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.

**(12a, 12b)** Arbitration and Award § 5.5--Arbitration Agreements-- Enforceability--Mandatory Agreement in Employment Contract--Unconscionability-- Severability of Unconscionable Provisions.
A mandatory agreement in an employment contract, which was unenforceable as unconscionable, was not subject to the court's severing the unconscionable portions and enforcing the remainder of the agreement. First, the arbitration agreement contained more than one unlawful provision. It had both an unlawful damages provision and an unconscionably unilateral arbitration clause. Such multiple defects indicated **\*89** a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that worked to the employer's advantage. Second, in the case of the agreement's lack of mutuality, the permeation of unconscionability was indicated by the fact that there was no single provision a court could strike or restrict in order to remove the unconscionable taint. Rather, the court would have to reform the contract, not through severance or restriction, but by augmenting it with additional terms. Civ. Code, § 1670.5, does not authorize such reformation by augmentation, nor does the arbitration statute, Code Civ. Proc., § 1281.2, which authorizes the court to refuse arbitration if grounds for revocation exist, not to reform the agreement to make it lawful. Nor do courts have any such power under their inherent limited authority to reform contracts. Because the court was unable to cure this unconscionability through severance or restriction, and was not permitted to cure it through reformation and augmentation, the entire agreement was void.

**(13a, 13b)** Contracts § 13.4--Legality--Unconscionable Contracts-- Severability.
Civ. Code, § 1670.5, appears to give a trial court some discretion as to whether to sever or restrict an unconscionable provision of a contract or whether to refuse to enforce the entire agreement. But it also appears to contemplate the latter course only when an agreement is permeated by unconscionability. The basic principles of severability of illegal contracts appear fully applicable to the doctrine of unconscionability. Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate.

**(14)** Contracts § 13.2--Legality--Illegal Contracts--Severability.
With illegal contracts, there are two reasons for severing or restricting illegal terms rather than voiding the entire contract. The first is to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement, particularly when there has been full or partial performance of the contract. Second, more generally, the doctrine of severance attempts to conserve a contractual relationship if to do so would not be condoning an illegal scheme. The overarching inquiry is whether the interests of justice would be furthered by severance. Moreover, courts must have the capacity to cure the unlawful contract through severance or restriction of the offending clause, which is not invariably the case. **\*90**

COUNSEL
Pillsbury Madison & Sutro, William Gaus, Craig E. Stewart, Alice Kwong Ma Hayashi and Emily E. Flynn for Defendant and Appellant.
Paul, Hastings, Janofsky & Walker, Paul W. Cane, Jr., Leslie L. Abbott and Kristen L. McMichael for California Employment Law Council as Amicus Curiae on behalf of Defendant and Appellant.
Jones, Day, Reavis & Pogue, William J. Emanuel, Harry I. Johnson III, Holger G. Besch; Law Offices of Steven Drapkin and Steven Drapkin for Employers Group as Amicus Curiae on behalf of Defendant and Appellant.
Miller, Clark, Calvert & Raimondi, Glenn M. Clark, Allan C. Miller; Altshuler, Berzon, Nussbaum,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1

6 P.3d 669
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

Berzon & Rubin, Michael Rubin and Indira Talwani for Plaintiffs and Respondents.

McGuinn, Hillsman & Palefsky, Cliff Palefsky and Keith Ehrman for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Louis Verdugo, Jr, Assistant Attorney General, and Kathleen W. Mikkelson, Deputy Attorney General, for the State of California as Amicus Curiae on behalf of Plaintiffs and Respondents.

The Sturdevant Law Firm and James C. Sturdevant for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Respondents.

**MOSK, J.**

In this case, we consider a number of issues related to the validity of a mandatory employment arbitration agreement, i.e., an agreement by an employee to arbitrate wrongful termination or employment discrimination claims rather than filing suit in court, which an employer imposes on a prospective or current employee as a condition of employment. The employees in this case claim that employees may not be compelled to arbitrate antidiscrimination claims brought under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) We conclude that such claims are in fact arbitrable *if* the arbitration permits an employee to vindicate his or her statutory rights. As explained, in order for **\*91** such vindication to occur, the arbitration must meet certain minimum requirements, including neutrality of the arbitrator, the provision of adequate discovery, a written decision that will permit a limited form of judicial review, and limitations on the costs of arbitration.

The employees further claim that several provisions of the arbitration agreement are unconscionable, both because they fail to meet these minimum requirements and because the arbitration agreement is not bilateral. We conclude that the agreement possesses a damages limitation that is contrary to public policy, and that it is unconscionably unilateral.

Finally, the employees contend that the presence of these unconscionable provisions renders the entire arbitration agreement unenforceable. The employer argues that even if some of the provisions are unconscionable or contrary to public policy, the proper remedy is to strike or restrict those clauses pursuant to Civil Code section 1670.5, and to enforce the rest of the arbitration agreement. The trial court chose the employees' preferred solution of refusing to

enforce the arbitration agreement, but the Court of Appeal sided with the employer and enforced the agreement minus the one provision it found unconscionable. We conclude, for reasons explained below, that the arbitration agreement is unenforceable and that therefore the Court of Appeal's judgment must be reversed.

I. Statement of Facts and Procedural Issues

Marybeth Armendariz and Dolores Olague-Rodgers (hereafter the employees) filed a complaint for wrongful termination against their former employer, Foundation Health Psychcare Services, Inc. (hereafter the employer). The complaint and certain documents filed in support of the employer's petition to compel arbitration provide us with the basic factual background of this case. In July and August of 1995, the employer hired the employees in the "Provider Relations Group" and they were later given supervisory positions with annual salaries of $38,000. On June 20, 1996, they were informed that their positions were being eliminated and that they were being terminated. During their year of employment, they claim that their supervisors and coworkers engaged in sexually based harassment and discrimination. The employees alleged that they were "terminated ... because of their perceived and/or actual sexual orientation (heterosexual)."

Both employees had filled out and signed employment application forms, which included an arbitration clause pertaining to any future claim of wrongful termination. Later, they executed a separate employment arbitration agreement, containing the same arbitration clause. The clause states in **\*92** full: "I agree as a condition of my employment, that in the event my employment is terminated, and I contend that such termination was wrongful or otherwise in violation of the conditions of employment or was in violation of any express or implied condition, term or covenant of employment, whether founded in fact or in law, including but not limited to the covenant of good faith and fair dealing, or otherwise in violation of any of my rights, I and Employer agree to submit any such matter to binding arbitration pursuant to the provisions of title 9 of Part III of the California Code of Civil Procedure, commencing at section 1280 et seq. or any successor or replacement statutes. I and Employer further expressly agree that in any such arbitration, my exclusive remedies for violation of the terms, conditions or covenants of employment shall be limited to a sum equal to the wages I would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                                                    -7-

6 P.3d 669
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
(Cite as: 24 Cal.4th 83, 6 P.3d 669)

have earned from the date of any discharge until the date of the arbitration award. I understand that I shall not be entitled to any other remedy, at law or in equity, including but not limited to reinstatement and/or injunctive relief."

The employees' complaint against the employer alleges a cause of action for violation of the FEHA [FN1] and three additional causes of action for wrongful termination based on tort and contract theories of recovery. The complaint sought general damages, punitive damages, injunctive relief, and the recovery of attorney fees and costs of suit.

> FN1 Same-sex harassment has been held to be unlawful under the FEHA. (*Mogilefsky v. Superior Court* (1993) 20 Cal.App.4th 1409, 1418 [26 Cal.Rptr.2d 116].)

The employer countered by filing a motion for an order to compel arbitration pursuant to Code of Civil Procedure section 1281.2. The parties submitted declarations in support of, and in opposition to, the motion. Relying on *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519 [60 Cal.Rptr.2d 138], the trial court denied the motion on the ground that the arbitration provision in question was an unconscionable contract. The trial court first found that the arbitration agreement was an "adhesion contract." It also found that several of the provisions of the contract are "so one-sided as to 'shock the conscience.' " In particular, it singled out the fact that only employees who file claims against an employer are required to arbitrate their claims, but not vice versa. Second, the agreement limits damages to backpay, precluding damages available for statutory antidiscrimination claims and tort damages, such as punitive damages. The trial court also mentioned the supposed lack of discovery under the arbitration agreement. It concluded: "Given the overall unfairness of the provision," this was not an appropriate case for striking the unlawful provisions of the arbitration agreement; instead it invalidated the entire agreement. *93

After the employer filed a timely appeal, the Court of Appeal reversed. The court concluded that the contract was indeed one of adhesion and that the damages provision was unconscionable and contrary to public policy. But for reasons elaborated below, the Court of Appeal held, contrary to the trial court, that the rest of the arbitration agreement should be enforced. It also determined that because the

agreement incorporated the California Arbitration Act (CAA), adequate discovery, pursuant to Code of Civil Procedure section 1283.05, was available.

We granted review.

## II. Discussion

### A. *Arbitrability of FEHA Claims*

(1) The employees urge us to adopt the conclusion of the United States Court of Appeals for the Ninth Circuit in *Duffield v. Robertson Stephens & Co.* (9th Cir. 1998) 144 F.3d 1182 (*Duffield*), which held that the Civil Rights Act of 1991 (Pub.L. No. 102-166 (Nov. 21, 1991) 105 Stat. 1071, hereafter sometimes the 1991 Act) prohibits the enforcement of mandatory employment agreements to arbitrate claims under title VII of the Civil Rights Act of 1964 (Title VII) or equivalent state antidiscrimination statutes, such as the FEHA. *Duffield* involved a securities broker who sought to litigate Title VII and FEHA claims against her employer after alleged sexual discrimination and harassment, and who was subject to a mandatory arbitration agreement. The starting point for the *Duffield* court is the fact that the 1991 Act "was primarily designed to 'overrule' hostile Supreme Court decisions in order to make discrimination claims easier both to bring and to prove in federal courts ...." (*Duffield, supra,* 144 F.3d at p. 1189.) It is against this background that the court examined section 118 of the 1991 Act, which provides: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title." (Pub.L. No. 102-166, § 118, reprinted in notes foll. 42 U.S.C. § 1981.) The *Duffield* court found the language "[w]here appropriate and to the extent authorized by law" to be indicative of a congressional intent to outlaw compulsory arbitration of employee civil rights claims, despite the apparently proarbitration thrust of section 118. (*Duffield, supra,* 114 F.3d at p. 1195.) The court reasoned as follows: The term "[w]here appropriate," must be considered in the context of the statute as a whole, which provided "for a vast strengthening of employees' rights" (*Id.* at p. 1191); " 'Where appropriate,' as used in the Act, would appear to *94 mean where arbitration furthers the purpose and objective of the Act-by affording victims of discrimination an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                          -8-

6 P.3d 669                                                                                                    Page 7
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

opportunity to present their claims in an alternative forum, a forum that they find desirable-not by forcing an unwanted forum upon them." (*Id.* at p. 1194, italics omitted.)

Likewise, the *Duffield* court explained the phrase "to the extent authorized by law" in context: "As the Supreme Court has stated, we should 'examine initially' the statute 'with an eye toward determining Congress' perception of the law that it was shaping or reshaping.' [Citation.] The overwhelming weight of the law at the time Congress drafted [section] 118, and it was reported out of the House Education and Labor Committee, was to the effect that compulsory agreements to arbitrate Title VII claims were unenforceable. In other words, such agreements were not 'authorized by law.' To the contrary, the law at that time prohibited employers from compelling employees to arbitrate Title VII claims pursuant to collective bargaining agreements, 'in large part' because of the Court's recognition of the critical role that Congress envisioned for the independent federal judiciary in advancing Title VII's societal goal. (See *McDonald* [*v. West Branch* (1984)] 466 U.S. [284,] 289, 104 S.Ct. 1799 [, 1802-1803]; [*Alexander v.* ] *Gardner-Denver* [*Co.*] [(1974)] 415 U.S. [36,] 56, 94 S.Ct. 1011[, 1023-1024]." [FN2] (*Duffield, supra,* 144 F.3d at p. 1194, italics omitted.) This reading of the statute is especially supported by the legislative history, particularly the report of the House Committee on Education and Labor (the House report), which stated of the bill that was to become the 1991 Act: " 'The Committee emphasizes ... that the use of alternative dispute mechanisms is ... intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the committee believes that any agreement to submit disputed issues to arbitration, whether in the context of collective bargaining or in an employment contract, *does not preclude the affected person from seeking relief under the enforcement provisions of Title VII*. This view is consistent with the Supreme Court's interpretation of Title VII in *Alexander v. Gardner-Denver Co.*... The Committee does not intend this section to be used *95 to preclude rights and remedies that would otherwise be available.' H.R.Rep. No. 40(I) at 97." (*Duffield, supra,* 144 F.3d at p. 1195, italics added by the *Duffield* court.)

FN2 *Alexander v. Gardner-Denver Co., supra,* 415 U.S. 36 (*Gardner-Denver*), to which the *Duffield* court referred, was summarized thus by the United States Supreme Court: "In *Gardner-Denver*, the issue was whether a discharged employee whose grievance had been arbitrated pursuant to an arbitration clause in a collective-bargaining agreement was precluded from subsequently bringing a Title VII action based upon the conduct that was the subject of the grievance. In holding that the employee was not foreclosed from bringing [a] Title VII claim, we stressed that an employee's contractual rights under a collective-bargaining agreement are distinct from the employee's statutory Title VII rights." (*Gilmer v. Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20, 33-34 [111 S.Ct. 1647, 1656, 114 L.Ed.2d 26] (*Gilmer*).) *McDonald v. West Branch, supra,* 466 U.S. 284, involved a similar statutory claim submitted to arbitration pursuant to a collective bargaining agreement, with a similar holding.

Finally, the *Duffield* court reasoned that if the 1991 Act precluded the enforcement of mandatory employment arbitration agreements with respect to Title VII claims, the employee's FEHA claims must also be exempted from mandatory arbitration. Because " '[p]arallel state anti-discrimination laws are explicitly made part of Title VII's enforcement scheme,' FEHA claims are arbitrable to the same extent as Title VII claims." (*Duffield, supra,* 144 F.3d at p. 1187, fn. 3.) In support of this proposition, the *Duffield* court cited *Kremer v. Chemical Construction Corp.* (1982) 456 U.S. 461, 477-478 [102 S.Ct. 1883, 1894-1895, 72 L.Ed.2d 262], which held that because state antidiscrimination laws were intended by Congress to be part of the federal antidiscrimination enforcement scheme, a judgment under New York's anti-employment-discrimination statute precludes parties from relitigating the same issues in a Title VII action.

As the employer points out, the Ninth Circuit stands alone in its interpretation of the 1991 Act. (See *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith* (1st Cir. 1999) 170 F.3d 1, 10 [specifically considering and rejecting *Duffield*'s analysis]; *Seus v. John Nuveen & Co., Inc.* (3d Cir. 1998) 146 F.3d 175, 183 (*Seus*) [same]; *Koveleskie v. SBC Capital Markets, Inc.* (7th Cir. 1999) 167 F.3d 361, 365 [same].)

Aside from the fact that *Duffield* is a minority of one, we find its reasoning unpersuasive. First and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                                        -9-

6 P.3d 669

24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202, 00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401

(Cite as: 24 Cal.4th 83, 6 P.3d 669)

Page 8

foremost, it is difficult to believe that Congress would have chosen to ban mandatory employment arbitration by means of a clause that encourages the use of arbitration and has no explicit prohibitory language, when it could have simply and straightforwardly proscribed mandatory employment arbitration of Title VII claims. Second, the *Duffield* court's analysis of the phrase "to the extent authorized by law" would perhaps be credible but for the fact that, as the court acknowledged (*Duffield, supra,* 144 F.3d at p. 1189), the United States Supreme Court decided *Gilmer, supra,* 500 U.S. 20, shortly before the passage of the 1991 Act. *Gilmer* modified the *Gardner-Denver* decision referred to in the congressional legislative history quoted above. *Gilmer* held that an Age Discrimination in Employment Act (ADEA) claim was arbitrable under a preemployment arbitration agreement between the plaintiff, a securities broker, and the New York Stock Exchange, with which he was required by his employer to register. The *Gilmer* court, in distinguishing its decision from the *Gardner-Denver* line of cases, did not rely on the fact that the latter was a Title VII *96 case. Rather, the court emphasized that *Gardner-Denver* and its progeny were collective bargaining cases, and that there was "[a]n important concern [for] the tension between collective representation and individual statutory rights" that was not present outside the collective bargaining context. (*Gilmer, supra,* 500 U.S. at p. 35 [111 S.Ct. at p. 1657].) The court also noted that the scope of the collective bargaining agreements in the *Gardner-Denver* line of cases did not seem to encompass the arbitration of statutory claims, and that those cases "were not decided under the [Federal Arbitration Act], which ... reflects a 'liberal federal policy favoring arbitration agreements.' " (*Ibid.*)

The *Gilmer* court did not decide whether employment contracts are generally subject to the Federal Arbitration Act, as explained below, nor did it definitively rule on whether Title VII claims were arbitrable. But at the very least, it was not at all clear at the time the 1991 Act was enacted that mandatory arbitration of Title VII claims (outside the collective bargaining context) was prohibited according to judicial interpretation of Title VII, and in fact the contrary appeared to be more likely the case. The fact that the authors of the House report may have believed that section 118 of the 1991 Act was intended to incorporate a broad reading of the *Gardner-Denver* line of cases to preclude mandatory employment arbitration agreements of all types does not negate the fact that at the time Congress passed

the 1991 Act, *Gilmer* was the law. Congress must be presumed to have been aware of *Gilmer* when it used the phrase "to the extent authorized by law."

Nor can the phrase "[w]here appropriate" bear the weight given to it by the *Duffield* court. There is no reason to suppose that Congress believed mandatory arbitration agreements of civil rights claims to be inappropriate, provided that arbitration gives claimants the full opportunity to pursue such claims. Although the *Gilmer* court acknowledged that federal statutes may provide exceptions to the rule of arbitrability found in the FAA, it held that " 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.' " (*Gilmer, supra,* 500 U.S. at p. 26 [111 S.Ct. at p. 1652].) We cannot discern in the general phrase "[w]here appropriate and to the extent authorized by law" a specific congressional intent to ban mandatory employment arbitration agreements.

We therefore conclude that nothing in the 1991 Act prohibits mandatory employment arbitration agreements that encompass state and federal antidiscrimination claims.

B. *The Applicability of the FAA and the CAA*

(2) The Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.) incorporates a strong federal policy of enforcing arbitration agreements, including *97 agreements to arbitrate statutory rights. (See *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066, 1074-1075 [90 Cal.Rptr.2d 334, 988 P.2d 67] (*Broughton*), and cases cited therein.) (3a) The employees claim, however, that employment contracts are not subject to the FAA. Their position is based on a reading of section 1 of the FAA, which, in defining the term "commerce," provides that "nothing herein shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (9 U.S.C. § 1.) The employees contend that the language "engaged in foreign or interstate commerce" was intended to apply to all employees within the reach of the FAA. That is, section 1 effectively excludes all employment contracts because employees not engaged in interstate commerce would be beyond the legislative power of Congress and therefore beyond the FAA. This is essentially the position of the Ninth Circuit in *Craft v. Campbell Soup Co.* (9th Cir. 1998) 161 F.3d 1199. The *Craft* court, after reviewing the legislative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                    -10-

6 P.3d 669

Page 9

24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401

**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

history of <u>section 1</u> of the FAA, and the academic literature, rejected the position of the majority of courts that the phrase "engaged in foreign or interstate commerce" signifies only those directly engaged in interstate commerce, such as workers involved in the transportation industry. (*Craft, supra,* <u>161 F.3d at pp. 1202-1205;</u> see also Finkin, *"Workers' Contracts" Under the United States Arbitration Act: An Essay in Historical Clarification* (1996) 17 Berkeley J. Emp. & Lab. L. 282.) Several courts have since disagreed with *Craft* and sided with what continues to be the majority rule. (See <u>*Koveleskie v. SBC Capital Markets, Inc., supra,* 167 F.3d at pp. 363-364,</u> and cases cited therein.) FN3

> FN3 *Gilmer* did not address the issue of the applicability of the FAA to employment contracts, instead finding that Gilmer's arbitration agreement was not contained in an employment contract but in his security broker's registration application with the New York Stock Exchange, which falls outside the literal terms of <u>section 1</u> of the FAA. (*Gilmer, supra,* <u>500 U.S. at p. 25, fn. 2</u> [<u>111 S.Ct. at pp. 1651-1652</u>].) We note that the United States Supreme Court has recently granted a writ of certiorari in *Circuit City Stores, Inc. v. Adams* (9th Cir. 2000) <u>194 F.3d 1070,</u> certiorari granted May 22, 2000, <u>529 U.S. 1129 [120 S.Ct. 2004, 146 L.Ed.2d 955],</u> apparently to address this question.

Whether the FAA applies to employment contracts presents a substantial question, but one we need not decide here. California law, like federal law, favors enforcement of valid arbitration agreements. (*Broughton, supra,* <u>21 Cal.4th at p. 1074.</u>) As we have observed: "Two years after the FAA was enacted, this state adopted its first modern arbitration statute (Stats. 1927, ch. 225), declaring arbitration agreements to be irrevocable and enforceable in terms identical to those used in section 2 of the federal act, and since that time California courts and its Legislature have 'consistently reflected a friendly policy toward the arbitration process.' [Citation.] That policy was expanded and clarified in the current arbitration statute which was adopted *98 in 1961 (Stats. 1961, ch. 461, § 2 et seq.), and it continues to be the policy of this state." (<u>*Keating v. Superior Court* (1982) 31 Cal.3d 584, 601-602 [183 Cal.Rptr. 360, 645 P.2d 1192],</u> disapproved on other grounds <u>*sub nom. Southland Corp. v. Keating* (1984) 465 U.S.</u>

1 [<u>104 S.Ct. 852, 79 L.Ed.2d 1</u>].) Thus, under both federal and California law, arbitration agreements are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation FN4 of any contract. (<u>9 U.S.C. § 2;</u> see also, <u>Code Civ. Proc., § 1281.</u>) In other words, under California law, as under federal law, an arbitration agreement may only be invalidated for the same reasons as other contracts. Moreover, the CAA, unlike the FAA, contains no exemption for employment contracts. FN5 Indeed, <u>Code of Civil Procedure section 1280,</u> subdivision (a), defines the term "agreement," for purposes of the CAA, as including "agreements between employers and employees or between their respective representatives."

> FN4 "As has been pointed out, the 'revocation of a contract' ... is something of a misnomer. 'Offers are "revoked." ... Contracts are extinguished by rescission.' " (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 973 [64 Cal.Rptr.2d 843, 938 P.2d 903] (*Engalla*).) We will refer throughout to the "rescission" or, simply, the "voiding" of an arbitration agreement.

> FN5 Former Code of Civil Procedure section 1280 contained a provision exempting contracts pertaining to labor (Stats. 1927, ch. 225, § 1, p. 404), but this exemption was interpreted narrowly by courts and was omitted, pursuant to the California Law Revision Commission's recommendation, from the 1961 statute. (See Recommendation and Study Relating to Arbitration (Dec. 1960) 3 Cal. Law Revision Com. Rep. (1961) pp. G-32 to G-34.)

There is, of course, one major difference between the FAA and the CAA. The former generally preempts state legislation that would restrict the enforcement of arbitration agreements (see <u>*Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687-688 [116 S.Ct. 1652, 1656-1657, 134 L.Ed.2d 902]),</u> while the CAA obviously does not prevent our Legislature from selectively prohibiting arbitration in certain areas. But the statute in question in this case, the FEHA, contains no such prohibition. "The unsuitability of a statutory claim for arbitration turns on [legislative] intent, which can be discovered in the text of the statute in question, its legislative history or in an ' "inherent conflict" between arbitration and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1

-11-

6 P.3d 669

24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202, 00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401

**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

Page 10

[statute's] underlying purposes.' " (*Broughton, supra,* 21 Cal.4th at p. 1075, first bracketed text added, quoting *Gilmer, supra,* 500 U.S. at p. 26 [111 S.Ct. at p. 1652].) We find nothing in the language or the legislative history of the FEHA that suggests it was intended to prohibit arbitration, and the employees cite us to none. To be sure, the FEHA provides critically important protections against discrimination. But the imperative to enforce such protections does not, as a general matter, inherently conflict with arbitration. (4) Assuming an adequate arbitral forum, we agree with the Supreme Court that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights *99 afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." (*Mitsubishi Motors v. Soler Chrysler-Plymouth (1985) 473 U.S. 614, 628 [105 S.Ct. 3346, 3354, 87 L.Ed.2d 444] (Mitsubishi Motors).*) FN6

> FN6 Nothing in this opinion, however, should be interpreted as implying that an arbitration agreement can restrict an employee's resort to the Department of Fair Employment and Housing, the administrative agency charged with prosecuting complaints made under the FEHA, or that the department would be prevented from carrying out its statutory functions by an arbitration agreement to which it is not a party. (See *Gilmer, supra, 500 U.S. at p. 28 [111 S.Ct. at p. 1653]* [employment arbitration agreement does not preclude employee's complaint to the United States Equal Employment Opportunity Commission].)

(3b) In short, even assuming that the FAA does not apply to employment contracts, our inquiry into the enforceability of the arbitration agreement at issue in this case entails the same inquiry under the CAA as the FAA: Are there reasons, based on general contract law principles, for refusing to enforce the present arbitration agreement? In the present case, the answer turns on whether and to what extent the arbitration agreement was unconscionable or contrary to public policy, questions to which we now turn. FN7

> FN7 The employees also argue that the arbitration agreements did not clearly put them on notice that they would be required to arbitrate statutory as well as contractual

claims, and that they therefore did not knowingly waive the litigation of such claims. They point to the fact that the arbitration agreement refers principally to arbitration of wrongful termination claims "in violation of any express or implied condition, term or covenant of employment," which appears to refer to contractual rights, and only makes mention of encompassing a termination "otherwise in violation of any of my rights." (See *ante, at p. 92*.) The Ninth Circuit has held that an employee cannot be compelled to arbitrate a statutory antidiscrimination claim unless the arbitration agreement expressly puts the employees on notice that these claims are included. (*Renteria v. Prudential Ins. Co.of America* (9th Cir. 1997) 113 F.3d 1104.) Other courts have disagreed. (*Seus, supra, 146 F.3d at pp. 183-184 & fn. 2; Patterson v. Tenet Healthcare Inc.* (8th Cir. 1997) 113 F.3d 832, 838.) The question whether the arbitration agreement was sufficient to permit the employees to knowingly waive the right to a jury trial was not one of the issues on which the employees petitioned for review and is tangential to the principal claims on which we granted review. We decline to decide this issue. (See Cal. Rules of Court, rule 28(e)(2) ["Only the issues set forth in the petition [for review] and answer or fairly included in them need be considered by the court"].)

### C. Arbitration of FEHA Claims

(5a) The United States Supreme Court's dictum that a party, in agreeing to arbitrate a statutory claim, "does not forgo the substantive rights afforded by the statute [but] only submits to their resolution in an arbitral ... forum" (*Mitsubishi Motors, supra, 473 U.S. at p. 628 [105 S.Ct. at p. 3354]*) is as much prescriptive as it is descriptive. That is, it sets a standard by which arbitration agreements and practices are to be measured, and disallows forms *100 of arbitration that in fact compel claimants to forfeit certain substantive statutory rights.

(6) Of course, certain statutory rights can be waived. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1048-1049 [68 Cal.Rptr.2d 758, 946 P.2d 427], abrogated with regard to its construction of the Permit Streamlining Act [Stat. 1998, ch. 283, § 5].) But arbitration agreements that encompass

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                                    -12-

6 P.3d 669

Page 11

24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202, 00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
(Cite as: 24 Cal.4th 83, 6 P.3d 669)

*unwaivable* statutory rights must be subject to particular scrutiny. This unwaivability derives from two statutes that are themselves derived from public policy. First, Civil Code section 1668 states: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." "Agreements whose object, directly or indirectly, is to exempt [their] parties from violation of the law are against public policy and may not be enforced." (*In re Marriage of Fell* (1997) 55 Cal.App.4th 1058, 1065 [64 Cal.Rptr.2d 522].) Second, Civil Code section 3513 states, "Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement." (See *In re Marriage of Fell, supra*, 55 Cal.App.4th at 1064; *Bickel v. City of Piedmont, supra*, 16 Cal.4th at pp. 1048-1049 [rights under statute may be waived by agreement when public benefit is incidental to the legislation's primary purpose].)

(5b) There is no question that the statutory rights established by the FEHA are "for a public reason." "The broad goal of the FEHA is set forth at [Government Code] section 12920, which states in pertinent part: 'It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, sex or age.' " (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 72-73 [276 Cal.Rptr. 130, 801 P.2d 373].) As we stated in *Rojo*: "The public policy against sex discrimination and sexual harassment in employment, moreover, is plainly one that 'inures to the benefit of the public at large rather than to a particular employer or employee.' [Citation.] No extensive discussion is needed to establish the fundamental public interest in a workplace free from the pernicious influence of sexism. So long as it exists, we are all demeaned." (*Id.* at p. 90, italics omitted; see also *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 897 [66 Cal.Rptr.2d 888, 941 P.2d 1157] [recognizing that the FEHA's age discrimination provisions similarly incorporate fundamental public policy].) It is indisputable that an employment contract that required employees to waive their rights under the FEHA *101 to redress sexual harassment or discrimination would be contrary to public policy and unlawful.

In light of these principles, it is evident that an arbitration agreement cannot be made to serve as a vehicle for the waiver of statutory rights created by the FEHA. We suggested as much in our recent discussion of rights derived from the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.), which the Legislature had declared to be unwaivable. In determining that the attorney fees and cost-shifting provisions provided by that statute, which advanced the statute's goals, should be implicitly incorporated into the arbitration agreement at issue, we stated that parties agreeing to arbitrate statutory claims must be deemed to "consent to abide by the substantive and remedial provisions of the statute. [Citation.] Otherwise, a party would not be able to fully ' "vindicate [his or her] statutory cause of action in the arbitral forum." ' " (*Broughton, supra*, 21 Cal.4th at p. 1087, quoting *Gilmer, supra*, 500 U.S. at pp. 27-28 [111 S.Ct. at p. 1653].)

The employees argue that arbitration contains a number of shortcomings that will prevent the vindication of their rights under the FEHA. In determining whether arbitration is considered an adequate forum for securing an employee's rights under FEHA, we begin with the extensive discussion of this question in *Cole v. Burns Intern. Security Services* (D.C. Cir. 1997) 105 F.3d 1465 [323 App.D.C. 133] (*Cole*), in the context of Title VII claims. In that case, the employee, a security guard, filed Title VII claims against his former employer alleging racial discrimination and harassment. He had signed an arbitration form committing himself to arbitrate such claims.

The court began its analysis by acknowledging the difficulties inherent in arbitrating employees' statutory rights, difficulties not present in arbitrating disputes arising from employee rights under collective bargaining agreements. "The reasons for this hesitation to extend arbitral jurisprudence from the collective bargaining context are well-founded. The fundamental distinction between contractual rights, which are created, defined, and subject to modification by the same private parties participating in arbitration, and statutory rights, which are created, defined, and subject to modification only by Congress and the courts, suggests the need for a public, rather than private, mechanism of enforcement for statutory rights." (*Cole, supra*, 105 F.3d at p. 1476.) Although *Gilmer, supra*, 500 U.S. 20, as discussed above, had held that statutory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1

-13-

6 P.3d 669                                                                                    Page 12
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

employment rights outside of the collective bargaining context are arbitrable, the *Cole* court recognized that *Gilmer*, both explicitly and implicitly, placed limits on the arbitration of such rights. "Obviously, *Gilmer* cannot be read as holding that an arbitration agreement *102 is enforceable no matter what rights it waives or what burdens it imposes. [Citation.] Such a holding would be fundamentally at odds with our understanding of the rights accorded to persons protected by public statutes like the ADEA and Title VII. The beneficiaries of public statutes are entitled to the rights and protections provided by the law." (*Cole, supra,* 105 F.3d at p. 1482.)

The *Cole* court noted that "[i]n *Gilmer,* the employee raised four challenges to arbitration under the New York Stock Exchange Rules, claiming that arbitration impermissibly diminished his ability to effectively vindicate his statutory rights. First, Gilmer challenged the impartiality of the arbitrators. [Citation.] The Court rejected this challenge, finding that the NYSE Rules themselves provide protection against biased arbitrators and that judicial review under the FAA would allow the courts to set aside any decision in which there 'was evident partiality or corruption in the arbitrators.' [Citation.] Second, Gilmer objected that the limited discovery allowed in arbitration would unfairly hamper his ability to prove discrimination. [Citation.] Again, the Court rejected this claim, pointing out that the NYSE Rules provided for discovery and that agreements to arbitrate are desirable precisely because they trade the procedures of the federal courts for the simplicity, informality, and expedition of arbitration. [Citation.] Third, Gilmer objected that, because arbitrators do not always issue written awards, public knowledge of discrimination, appellate review, and the development of the law would be undermined by arbitration of his statutory claims. [Citation.] This claim too was rejected because, in fact, the NYSE Rules require that arbitration awards be in writing and allow public access to awards. [Citation.] Finally, Gilmer's objection that arbitration did not provide for equitable relief was rejected because the NYSE Rules did not restrict the types of relief available." (*Cole, supra,* 105 F.3d at pp. 1481-1482.)

Based on *Gilmer, supra,* 500 U.S. 20, and on the basic principle of nonwaivability of statutory civil rights in the workplace, the *Cole* court formulated five minimum requirements for the lawful arbitration of such rights pursuant to a mandatory employment arbitration agreement. Such an arbitration agreement

is lawful if it "(1) provides for neutral arbitrators, (2) provides for more than minimal discovery, (3) requires a written award, (4) provides for all of the types of relief that would otherwise be available in court, and (5) does not require employees to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum. Thus, an employee who is made to use arbitration as a condition of employment 'effectively may vindicate [his or her] statutory cause of action in the arbitral forum.' " (*Cole, supra,* 105 F.3d at p. 1482, italics omitted.) *103

Except for the neutral arbitrator requirement, which we have held is essential to ensuring the integrity of the arbitration process (*Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 825 [171 Cal.Rptr. 604, 623 P.2d 165] (*Scissor-Tail*), and is not at issue in this case, the employees claim that the present arbitration agreement fails to measure up to the *Cole* requirements enumerated above. We consider below the validity of those requirements and whether they are met by the employer's arbitration agreement. [FN8]

> FN8 We emphasize at the outset that our general endorsement of the *Cole* requirements occurs in the particular context of mandatory employment arbitration agreements, in order to ensure that such agreements are not used as a means of effectively curtailing an employee's FEHA rights. These requirements would generally not apply in situations in which an employer and an employee knowingly and voluntarily enter into an arbitration agreement after a dispute has arisen. In those cases, employees are free to determine what trade-offs between arbitral efficiency and formal procedural protections best safeguard their statutory rights. Absent such freely negotiated agreements, it is for the courts to ensure that the arbitration forum imposed on an employee is sufficient to vindicate his or her rights under the FEHA.

### 1. *Limitation of Remedies*

The principle that an arbitration agreement may not limit statutorily imposed remedies such as punitive damages and attorney fees appears to be undisputed. We suggested as much in *Broughton* when we held that an agreement to arbitrate a statutory claim implicitly incorporates "the substantive and remedial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                                    -14-

6 P.3d 669                                                                                                          Page 13
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
(Cite as: 24 Cal.4th 83, 6 P.3d 669)

provisions of the statute" so that parties to the arbitration would be able to vindicate their " ' "statutory cause of action in the arbitral forum. " ' " (*Broughton, supra,* 21 Cal.4th at p. 1087.) Similarly, in *Graham Oil v. ARCO Products Co.* (9th Cir. 1995) 43 F.3d 1244 (*Graham Oil*), the court refused to enforce an arbitration agreement between a petroleum franchiser and franchisee that did not allow for the punitive damages and attorney fees remedies available under the Petroleum Marketing Practices Act, because both of these remedies are "important to the effectuation of the PMPA's policies." (*Gaham Oil, supra,* 43 F.3d at p. 1248.)

As stated, the arbitration agreement in this case provides in part: "I and Employer further expressly agree that in any such arbitration, my exclusive remedies for violation of the terms, conditions or covenants of employment shall be limited to a sum equal to the wages I would have earned from the date of any discharge until the date of the arbitration award. I understand that I shall not be entitled to any other remedy, at law or in equity, including but not limited to reinstatement and/or injunctive relief." (See *ante,* at p. 92.) The employees claim that the agreement compels them to arbitrate statutory claims without affording the full range of statutory remedies, including punitive damages and attorney fees to a prevailing plaintiff, available under *104 the FEHA. (See *Commodore Home Systems Inc. v. Superior Court* (1982) 32 Cal.3d 211, 221 [185 Cal.Rptr. 270, 649 P.2d 912]; Gov. Code, § 12965, subd. (b).)

The employer does not contest that the damages limitation would be unlawful if applied to statutory claims, but instead contends that the limitation applies only to contract claims, pointing to the language in the penultimate sentence that refers to "my exclusive remedy for violation *of the terms, conditions or covenants of employment* ...." Both the trial court and the Court of Appeal correctly rejected this interpretation. While the above quoted language is susceptible to the employer's interpretation, the final sentence-"I understand that I shall not be entitled to any other remedy ...."-makes clear that the damages limitation was all-encompassing. We conclude this damages limitation is contrary to public policy and unlawful.

### 2. Adequate Discovery

The employees argue that employers typically have in their possession many of the documents relevant

for bringing an employment discrimination case, as well as having in their employ many of the relevant witnesses. The denial of adequate discovery in arbitration proceedings leads to the de facto frustration of the employee's statutory rights. They cite a report by the Department of Labor's Commission on the Future of Worker-Management Relations, chaired by former Secretary of Labor John Dunlop and including employee and employer representatives, which concludes that "if private arbitration is to serve as a legitimate form of private enforcement of public employment law," it must among other things provide "a fair and simple method by which the employee can secure the necessary information to present his or her claim." (Com. on the Future of Worker-Management Relations, Report and Recommendations (1994) p. 31 (hereafter Dunlop Commission Report).) [FN9]

FN9 The Dunlop Commission Report, anticipating the safeguards prescribed by *Cole, supra,* 105 F.3d 1465, stated that "both employers and employees agree that if private arbitration is to serve as a legitimate form of private enforcement of public employment law, these systems must provide: [¶] a neutral arbitrator who knows the laws in question and understands the concerns of the parties; [¶] a fair and simple method by which the employee can secure the necessary information to present his or her claim; [¶] a fair method of cost-sharing between the employer and employee to ensure affordable access to the system for all employees; [¶ ] the right to independent representation if the employee wants it; [¶ ] a range of remedies equal to those available through litigation; [¶ ] a written opinion by the arbitrator explaining the rationale for the result; and [¶ ] sufficient judicial review to ensure that the result is consistent with the governing laws." (Dunlop Com. Rep., *supra,* at pp. 30-31.)

We agree that adequate discovery is indispensable for the vindication of FEHA claims. The employer does not dispute the point, but contends that the *105 arbitration agreement at issue in this case does provide for adequate discovery by incorporating by reference all the rules set forth in the CAA. Adequate provisions for discovery are set forth in the CAA at Code of Civil Procedure section 1283.05, subdivision (a). [FN10]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                                                           -15-

6 P.3d 669
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
(Cite as: 24 Cal.4th 83, 6 P.3d 669)

Page 14

FN10 Code of Civil Procedure section 1283.05, subdivision (a), states: "To the extent provided in Section 1283.1 depositions may be taken and discovery obtained in arbitration proceedings as follows: [¶] (a) After the appointment of the arbitrator or arbitrators, the parties to the arbitration shall have the right to take depositions and to obtain discovery regarding the subject matter of the arbitration, and, to that end, to use and exercise all of the same rights, remedies, and procedures, and be subject to all of the same duties, liabilities, and obligations in the arbitration with respect to the subject matter thereof, as provided in Chapter 2 (commencing with Section 1985) of, and Article 3 (commencing with Section 2016) of Chapter 3 of, Title 3 of Part 4 of this code, as if the subject matter of the arbitration were pending before a superior court of this state in a civil action other than a limited civil case, subject to the limitations as to depositions set forth in subdivision (e) of this section." Subdivision (e) states that depositions may only be taken with the approval of the arbitrator.

The employees point out that the provisions of Code of Civil Procedure section 1283.05 are only "conclusively deemed to be incorporated into" (Code Civ. Proc., § 1283.1, subd. (a)) an agreement to arbitrate under section 1283.1 if the dispute arises "out of ... any injury to, or death of, a person caused by the wrongful act or neglect of another" (ibid.), and argues that this language does not apply to FEHA claims. They further argue that because adequate discovery is not guaranteed under the arbitration agreement, FEHA claims should not be deemed arbitrable.

We note that one Court of Appeal case has held that a FEHA sexual harassment claim is considered an "injury to ... a person" within the meaning of Code of Civil Procedure section 1283.1, subdivision (a). (Bihun v. AT&T Information Systems, Inc. (1993) 13 Cal.App.4th 976, 1005 [16 Cal.Rptr.2d 787], disapproved on other grounds in Lakin v. Watkins Associated Industries (1993) 6 Cal.4th 644, 664 [25 Cal.Rptr.2d 109, 863 P.2d 179]; but see Holmes v. General Dynamics Corp. (1993) 17 Cal.App.4th 1418, 1436-1437 [22 Cal.Rptr.2d 172] [contractual

wrongful termination action held not to be a "personal injury" within the meaning of Civ. Code, § 3291].) The scope of this provision is not before us. But even assuming that the claim in this case is not the sort of injury encompassed by section 1283.1, subdivision (a), subdivision (b) of that section permits parties to agree to incorporate Code of Civil Procedure section 1283.05. We infer from subdivision (b), and from the fundamentally contractual nature of arbitration itself (see Vandenberg v. Superior Court (1999) 21 Cal.4th 815, 831 [88 Cal.Rptr.2d 366, 982 P.2d 229]), that parties incorporating the CAA into their arbitration agreement are also permitted to agree to something less than the full panoply of discovery provided in *106Code of Civil Procedure section 1283.05. We further infer that when parties agree to arbitrate statutory claims, they also implicitly agree, absent express language to the contrary, to such procedures as are necessary to vindicate that claim. (See Broughton, supra, 21 Cal.4th at pp. 1086-1087.) As discussed above, it is undisputed that some discovery is often necessary for vindicating a FEHA claim. Accordingly, whether or not the employees in this case are entitled to the full range of discovery provided in Code of Civil Procedure section 1283.05, they are at least entitled to discovery sufficient to adequately arbitrate their statutory claim, including access to essential documents and witnesses, as determined by the arbitrator(s) and subject to limited judicial review pursuant to Code of Civil Procedure section 1286.2. FN11

FN11 We recognize, of course, that a limitation on discovery is one important component of the "simplicity, informality, and expedition of arbitration." (Gilmer, supra, 500 U.S. at p. 31 [111 S.Ct. at p. 1655].) The arbitrator and reviewing court must balance this desirable simplicity with the requirements of the FEHA in determining the appropriate discovery, absent more specific statutory or contractual provisions.

Therefore, although the employees are correct that they are entitled to sufficient discovery as a means of vindicating their sexual discrimination claims, we hold that the employer, by agreeing to arbitrate the FEHA claim, has already impliedly consented to such discovery. Therefore, lack of discovery is not grounds for holding a FEHA claim inarbitrable.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                    -16-

3. *Written Arbitration Award and Judicial Review*

The employees argue that lack of judicial review of arbitration awards makes the vindication of FEHA rights in arbitration illusory. They point to <u>Moncharsh v. Heily & Blase (1992) 3 Cal.4th 1, 27-28 [10 Cal.Rptr.2d 183, 832 P.2d 899]</u> (*Moncharsh*), in which we held that an arbitration award may not be vacated for errors of law on the face of the decision, even if these errors would cause substantial injustice. Arbitration, they argue, cannot be an adequate means of resolving a FEHA claim if the arbitrator is essentially free to disregard the law.

(7) As the United States Supreme Court has stated: "[A]lthough judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute" at issue. (*Shearson/American Express Inc. v. McMahon* (1987) 482 U.S. 220, 232 [107 S.Ct. 2332, 2340, 96 L.Ed.2d 185] (*McMahon*).) In *Moncharsh*, we acknowledged that judicial review may be appropriate when "granting finality to an arbitrator's decision would be inconsistent with the protection of a party's statutory rights." (*Moncharsh*, *supra*, <u>3 Cal.4th at p. 32</u>; see also <u>*Board of Education v. Round Valley Teachers Assn.* (1996) 13 Cal.4th 269, 276-277 [52 Cal.Rptr.2d 115, 914 P.2d 193].)</u> *107

(5c) We are not faced in this case with a petition to confirm an arbitration award, and therefore have no occasion to articulate precisely what standard of judicial review is "sufficient to ensure that arbitrators comply with the requirements of [a] statute." (*McMahon, supra*, <u>482 U.S. at p. 232 [107 S.Ct. at p. 2340].)</u> All we hold today is that in order for such judicial review to be successfully accomplished, an arbitrator in a FEHA case must issue a written arbitration decision that will reveal, however briefly, the essential findings and conclusions on which the award is based. While such written findings and conclusions are not required under the CAA (<u>Code Civ. Proc., § 1283.4</u>; <u>*Baldwin Co. v. Rainey Construction Co.* (1991) 229 Cal.App.3d 1053, 1058, fn. 3 [280 Cal.Rptr. 499]</u>), nothing in the present arbitration agreement precludes such written findings, and to the extent it applies to FEHA claims the agreement must be interpreted to provide for such findings. In all other respects, the employees' claim that they are unable to vindicate their FEHA rights because of inadequate judicial review of an arbitration award is premature. (See *Broughton*,

*supra*, <u>21 Cal.4th at p. 1086.)</u>

4. *Employee Not to Pay Unreasonable Costs and Arbitration Fees*

The employees point to the fact that the agreement is governed by Code of Civil Procedure section 1284.2, which provides that "each party to the arbitration shall pay his pro rata share of the expenses and fees of the neutral arbitrator, together with other expenses of the arbitration incurred or approved by the neutral arbitrator ...." They argue that requiring them to share the often substantial costs of arbitrators and arbitration effectively prevents them from vindicating their FEHA rights.

In considering the employees' claim, we start with the extensive discussion of this issue in *Cole, supra,* <u>105 F.3d at pages 1483-1485.</u> The *Cole* court held that it was unlawful to require an employee who is the subject of a mandatory employment arbitration agreement to have to pay the costs of arbitration. The issue in that case was an arbitration agreement that was to be governed by the rules of the American Arbitration Association (AAA). Under these rules, the court noted that the employee may well be obliged to pay arbitrators' fees ranging from $500 to $1,000 per day or more, a $500 filing fee, and administrative fees of $150 per day, in addition to room rental and court reporter fees. (*Cole, supra,* <u>105 F.3d at p. 1484 & fn. 12.)</u> The court's reasons for requiring employer-financed arbitration are worth quoting at length:

"[I]n *Gilmer* [*supra,* 500 U.S. 20], the Supreme Court endorsed a system of arbitration in which employees are not required to pay for the arbitrator *108 assigned to hear their statutory claims. There is no reason to think that the Court would have approved arbitration in the absence of this arrangement. Indeed, we are unaware of any situation in American jurisprudence in which a beneficiary of a federal statute has been required to pay for the services of the judge assigned to hear her or his case. Under *Gilmer*, arbitration is supposed to be a reasonable substitute for a judicial forum. Therefore, it would undermine Congress's intent to prevent employees who are seeking to vindicate statutory rights from gaining access to a judicial forum and then require them to pay for the services of an arbitrator when they would never be required to pay for a judge in court.

"There is no doubt that parties appearing in federal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1
-17-

6 P.3d 669
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
(Cite as: 24 Cal.4th 83, 6 P.3d 669)

Page 16

court may be required to assume the cost of filing fees and other administrative expenses, so any reasonable costs of this sort that accompany arbitration are not problematic. However, if an employee like Cole is required to pay arbitrators' fees ranging from $500 to $1,000 per day or more, ... in addition to administrative and attorney's fees, is it likely that he will be able to pursue his statutory claims? We think not. See David W. Ewing, Justice On the Job: Resolving Grievances in the Nonunion Workplace (Harvard Business School Press 1989) at 291 (quoting corporate director of industrial relations at Northrop explaining why Northrop pays arbitrators' fees: '[W]e bear the cost of the arbitration for the very practical reason that most of the employees who seek arbitration of their grievances simply couldn't afford it if we did not.'). There is no indication in AAA's rules that an arbitrator's fees may be reduced or waived in cases of financial hardship. These fees would be prohibitively expensive for an employee like Cole, especially after being fired from his job, and it is unacceptable to require Cole to pay arbitrators' fees, because such fees are unlike anything that he would have to pay to pursue his statutory claims in court.

"Arbitration will occur in this case only because it has been mandated by the employer as a condition of employment. Absent this requirement, the employee would be free to pursue his claims in court without having to pay for the services of a judge. In such a circumstance-where arbitration has been imposed by the employer and occurs only at the option of the employer-arbitrators' fees should be borne solely by the employer." (*Cole, supra,* 105 F.3d at pp. 1484-1485, fns. and italics omitted.)

The Tenth and Eleventh Circuit Courts of Appeals have adopted a position on arbitration fees for statutory employment claims essentially in accord with *Cole.* (*Shankle v. B-G Maintenance Management of Colorado* (10th Cir. 1999) 163 F.3d 1230, 1234-1235; *Paladino v. Avnet Computer Technologies,* *109 Inc.* (11th Cir. 1998) 134 F.3d 1054, 1062 (conc. opn. of Cox, J., joined by Tjoflat, J.).) In *Shankle,* the court estimated that the employee would have to pay between $1,875 and $5,000 in forum costs to resolve his claim. As the court stated: "Mr. Shankle could not afford such a fee, and it is unlikely other similarly situated employees could either. The Agreement thus placed Mr. Shankle between the proverbial rock and a hard place-it prohibited use of the judicial forum, where a litigant is not required to pay for a judge's services, and the

prohibitive cost substantially limited use of the arbitral forum. [Citation.] Essentially, B-G Maintenance required Mr. Shankle to agree to mandatory arbitration as a term of continued employment, yet failed to provide an accessible forum in which he could resolve his statutory rights. Such a result clearly undermines the remedial and deterrent functions of the federal anti-discrimination laws." (*Shankle, supra,* 163 F.3d at pp. 1234-1235.)

Although we have not addressed this issue, we quoted *Cole, supra,* 105 F.3d 1465, on this precise point in *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 355 [84 Cal.Rptr.2d 425, 975 P.2d 622] (*California Teachers Assn.*). We considered in that case whether it was constitutionally permissible to statutorily require a teacher who loses an administrative challenge to his dismissal to pay one-half of the administrative law judge's fees. As we stated: "Although the court's conclusion in *Cole* did not rest upon the requirements of procedural due process, the court was required to consider whether arbitration served as a reasonable substitute for a judicial forum. If employees in the private sector cannot be compelled to pay the cost of private arbitrators when seeking to vindicate statutory rights in the arbitral forum, then certainly public employees seeking to vindicate constitutionally based interests in an official quasi-judicial forum cannot be required to compensate the state for the cost of the administrative law judge. As in *Cole,* such fees would be unlike anything teachers would have to pay to protect their constitutional interests in court." (*Id.* at p. 356.) Our holding in *California Teachers Assn.* serves to confirm the principle inherent in *Cole* that statutory or constitutional rights may be transgressed as much by the imposition of undue costs as by outright denial.

The employer argues that at least two federal circuit courts of appeals have not followed what it terms *Cole's* "preemptive approach" to the question of arbitration costs. In *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith Inc., supra,* 170 F.3d 1 (*Rosenberg*), the court considered a challenge to an arbitration agreement encompassing Title VII claims, in which the New York Stock Exchange (NYSE) rules of arbitration were similar to those approved in *Gilmer.* Amici curiae for the employee argued that the NYSE *110 arbitration procedures were inadequate for Title VII claims because the arbitrators often refused to award statutory attorney fees and because of the possibility of charging forum fees as high as $3,000 per day. The court noted that it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                                    -18-

6 P.3d 669                                                                                    Page 17
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

was not "the usual situation that a plaintiff is asked to bear forum fees" under the NYSE arbitration system, and that under NYSE rules " 'it is standard practice ... for employers to pay all of the arbitrators' fees.' " (*Rosenberg, supra,* 170 F.3d at pp. 15-16.) The court further concluded that if unreasonable fees were imposed on the employees, this issue could be raised in a reviewing court after arbitration was completed. (*Ibid.*; accord, *Koveleskie v. SBC Capital Markets, Inc., supra,* 167 F.3d 361, 366; see also *Williams v. Cigna Financial Advisors Inc.* (5th Cir. 1999) 197 F.3d 752.)

The approaches of the courts in *Cole, supra,* 105 F.3d 1465, and *Rosenberg, supra,* 170 F.3d 1, are, for the most part, reconcilable. In *Rosenberg,* the arbitration system in question generally did not impose forum fees, and under those circumstances it was reasonable to conclude that imposition of costs that. were inconsistent with statutory protections could be corrected through judicial review. We disagree with the employer that *Rosenberg* should be broadly interpreted to mean that the question of whether an employee is charged excessive forum fees should be decided only after arbitration has been completed. As we held in *California Teachers Assn.,* it is not only the costs imposed on the claimant but the *risk* that the claimant may have to bear substantial costs that deters the exercise of the constitutional right of due process. (*California Teachers Assn., supra,* 20 Cal.4th at pp. 357-358.) So with the arbitration of statutory claims; if it is possible that the employee will be charged substantial forum costs, it is an insufficient judicial response to hold that he or she *may* be able to cancel these costs at the end of the process through judicial review. Such a system still poses a significant risk that employees will have to bear large costs to vindicate their statutory right against workplace discrimination, and therefore chills the exercise of that right. Because we conclude the imposition of substantial forum fees is contrary to public policy, and is therefore grounds for invalidating or revoking an arbitration agreement and denying a petition to compel arbitration under Code of Civil Procedure sections 1281 and 1281.2, we hold that the cost issues should be resolved not at the judicial review stage but when a court is petitioned to compel arbitration.

(8) Accordingly, consistent with the majority of jurisdictions to consider this issue, we conclude that when an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the

employee to bear any *type* of expense that the employee would not be required to bear if he or she were free to *111 bring the action in court. This rule will ensure that employees bringing FEHA claims will not be deterred by costs greater than the usual costs incurred during litigation, costs that are essentially imposed on an employee by the employer.

Three principal objections have been raised to imposing the forum costs of arbitration on the employer. The first is that such a system will compromise the neutrality of the arbitrator. (*Cole, supra,* 105 F.3d at p. 1485.) As the *Cole* court recognized, however, it is not the fact that the employer may pay an arbitrator that is most likely to induce bias, but rather the fact that the employer is a "repeat player" in the arbitration system that is more likely to be a source of business for the arbitrator. (*Ibid.*) Furthermore, as the *Cole* court recognized, there are sufficient institutional safeguards, such as scrutiny by the plaintiff's bar and appointing agencies like the AAA, to protect against corrupt arbitrators. (*Ibid.*)

The second objection is that although employees may have large forum costs, the cost of arbitration is generally smaller than litigation, so that the employee will realize a net benefit from arbitration. Although it is true that the costs of arbitration are on average smaller than those of litigation, it is also true that amount awarded is on average smaller as well. (See Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration,* 1997 Wis. L.Rev. 33, 60-61 (Schwartz).) The payment of large, fixed, forum costs, especially in the face of expected meager awards, serves as a significant deterrent to the pursuit of FEHA claims.

To be sure, it would be ideal to devise a method by which the employee is put in exactly the same position in arbitration, costwise, as he or she would be in litigation. But the factors going into that calculus refuse to admit ready quantification. Turning a motion to compel arbitration into a mini-trial on the comparative costs and benefits of arbitration and litigation for a particular employee would not only be burdensome on the trial court and the parties, but would likely yield speculative answers. Nor would there be an advantage to apportioning arbitration costs at the conclusion of the arbitration rather than at the outset. Without clearly articulated guidelines, such a postarbitration apportionment would create a sense of risk and uncertainty among employees that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                                                        -19-

6 P.3d 669

Page 18

24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202, 00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

could discourage the arbitration of meritorious claims.

Moreover, the above rule is fair, inasmuch as it places the cost of arbitration on the party that imposes it. Unlike the employee, the employer is *112 in a position to perform a cost/benefit calculus and decide whether arbitration is, overall, the most economical forum. Nor would this rule necessarily present an employer with a choice between paying all the forum costs of arbitration or forgoing arbitration altogether and defending itself in court. There is a third alternative. Because this proposed rule would only apply to mandatory predispute employment arbitration agreements, and because in many instances arbitration will be considered an efficient means of resolving a dispute both for the employer and the employee, the employer seeking to avoid both payment of all forum costs and litigation can attempt to negotiate postdispute arbitration agreements with its aggrieved employees.

The third objection to requiring the employer to shoulder most of the costs of arbitration is that it appears contrary to statute. As noted, Code of Civil Procedure section 1284.2 provides that unless the arbitration agreement provides otherwise, each party to the arbitration must pay his or her pro rata share of arbitration costs. But section 1284.2 is a default provision, and the agreement to arbitrate a statutory claim is implicitly an agreement to abide by the substantive remedial provisions of the statute. (Broughton, supra, 21 Cal.4th at pp. 1086-1087.) As noted, FEHA rights are unwaivable. Furthermore, under the FEHA, private civil actions by employees are the primary means of enforcing employees' rights to be free of unlawful discrimination, once the Department of Fair Employment and Housing determines it will not file a complaint against the employer. (Gov. Code, § 12965, subd. (b).) The statute further provides that "[t]he superior, municipal, and justice courts of the State of California shall have jurisdiction of such actions." (Ibid.) While we do not interpret this language providing access to courts as precluding arbitration of FEHA claims, or even the imposition of mandatory employment arbitration agreements, we do construe it as providing further support for the above stated principle that any such arbitration must be an adequate substitute for litigation. We do not believe the FEHA contemplates that employees may be compelled to resolve their antidiscrimination claims in a forum in which they must pay for what is the equivalent of the judge's time and the rental of the courtroom.

Moreover, at the time the arbitration statute was enacted in 1927, and revised and reenacted in 1961, statutory employment discrimination claims were virtually nonexistent. There is little reason to believe that the Legislature that passed Code of Civil Procedure section 1284.2 contemplated a situation in which the intended beneficiary of such an antidiscrimination statute would be compelled to pay large arbitration costs as a condition of pursuing a discrimination claim. Thus, we construe the FEHA as implicitly *113 prohibiting such costs, a prohibition which the default provisions of section 1284.2 do not displace. (See Broughton, supra, 21 Cal.4th at p. 1087.)

(5d) We therefore hold that a mandatory employment arbitration agreement that contains within its scope the arbitration of FEHA claims impliedly obliges the employer to pay all types of costs that are unique to arbitration. Accordingly, we interpret the arbitration agreement in the present case as providing, consistent with the above, that the employer must bear the arbitration forum costs. The absence of specific provisions on arbitration costs would therefore not be grounds for denying the enforcement of an arbitration agreement. (See Cole, supra, 105 F.3d at pp. 1485-1486.)

### D. Unconscionability of the Arbitration Agreement

#### 1. General Principles of Unconscionability

(9a) In the previous part of this opinion, we focused on the minimum requirements for the arbitration of unwaivable statutory claims. In this part, we will consider objections to arbitration that apply more generally to any type of arbitration imposed on the employee by the employer as a condition of employment, regardless of the type of claim being arbitrated. These objections fall under the rubric of unconscionability.

(10) We explained the judicially created doctrine of unconscionability in Scissor-Tail, supra, 28 Cal.3d 807. Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion. (Id. at pp. 817-819.) "The term [contract of adhesion] signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1

-20-

6 P.3d 669                                                                    Page 19
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
(Cite as: 24 Cal.4th 83, 6 P.3d 669)

opportunity to adhere to the contract or reject it." (*Neal v. State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781].) If the contract is adhesive, the court must then determine whether "other factors are present which, under established legal rules-legislative or judicial-operate to render it [unenforceable]." (*Scissor-Tail, supra,* 28 Cal.3d at p. 820, fn. omitted.) "Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. [Citations.] The second-a principle of equity applicable to all contracts generally-is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.' " (*Ibid.*) Subsequent cases have referred to both the "reasonable expectations" and the "oppressive" limitations as being aspects of unconscionability. (*A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 486-487 [186 Cal.Rptr. 114, 38 A.L.R.4th 1] (*A & M Produce Co.*).) *114

(9b) In 1979, the Legislature enacted Civil Code section 1670.5, which codified the principle that a court can refuse to enforce an unconscionable provision in a contract. (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 925 [216 Cal.Rptr. 345, 702 P.2d 503].) As section 1670.5, subdivision (a) states: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Because unconscionability is a reason for refusing to enforce contracts generally, it is also a valid reason for refusing to enforce an arbitration agreement under Code of Civil Procedure section 1281, which, as noted, provides that arbitration agreements are "valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." The United States Supreme Court, in interpreting the same language found in section 2 of the FAA (9 U.S.C. § 2), recognized that "generally applicable contract defenses, such as fraud, duress, or *unconscionability,* may be applied to invalidate arbitration agreements ...." (*Doctor's Associates, Inc. v. Casarotto, supra,*

517 U.S. 681, 687 [116 S.Ct. 1652, 1656], italics added.)

(11) As explained in *A & M Produce Co., supra,* 135 Cal.App.3d 473, "unconscionability has both a 'procedural' and a 'substantive' element," the former focusing on " 'oppression' " or " 'surprise' " due to unequal bargaining power, the latter on " 'overly harsh' " or " 'one-sided' " results. (*Id.* at pp. 486-487.) "The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." (*Stirlen v. Supercuts, Inc., supra,* 51 Cal.App.4th at p. 1533 (*Stirlen*).) But they need not be present in the same degree. "Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves." (15 Williston on Contracts (3d ed. 1972) § 1763A, pp. 226-227; see also *A & M Produce Co., supra,* 135 Cal.App.3d at p. 487.) In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.

### 2. *Unconscionability and Mandatory Employment Arbitration*

(9c) Applying the above principles to this case, we first determine whether the arbitration agreement is adhesive. There is little dispute that it *115 is. It was imposed on employees as a condition of employment and there was no opportunity to negotiate.

Moreover, in the case of preemployment arbitration contracts, the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement. While arbitration may have its advantages in terms of greater expedition, informality, and lower cost, it also has, from the employee's point of view, potential disadvantages: waiver of a right to a jury trial, limited discovery, and limited judicial review. Various studies show that arbitration is advantageous to employers not only because it reduces the costs of litigation, but also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                                          -21-

6 P.3d 669                                                                      Page 20
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

because it reduces the size of the award that an employee is likely to get, particularly if the employer is a "repeat player" in the arbitration system. (Bingham, *Employment Arbitration: The Repeat Player Effect* (1997) 1 Employee Rts. & Employment Poly. J. 189; Schwartz, *supra*, 1997 Wis. L.Rev. at pp. 60-61.) It is perhaps for this reason that it is almost invariably the employer who seeks to compel arbitration. (See Schwartz, *supra*, 1997 Wis. L.Rev. at pp. 60-63.)

Arbitration is favored in this state as a voluntary means of resolving disputes, and this voluntariness has been its bedrock justification. As we stated recently: "[P]olicies favoring the efficiency of private arbitration as a means of dispute resolution must sometimes yield to its fundamentally contractual nature, and to the attendant requirement that arbitration shall proceed as the parties themselves have agreed." (*Vandenberg v. Superior Court, supra*, 21 Cal.4th at p. 831, italics omitted.) Given the lack of choice and the potential disadvantages that even a fair arbitration system can harbor for employees, we must be particularly attuned to claims that employers with superior bargaining power have imposed one-sided, substantively unconscionable terms as part of an arbitration agreement. "Private arbitration may resolve disputes faster and cheaper than judicial proceedings. Private arbitration, however, may also become an instrument of injustice imposed on a 'take it or leave it' basis. The courts must distinguish the former from the latter, to ensure that private arbitration systems resolve disputes not only with speed and economy but also with fairness." (*Engalla, supra*, 15 Cal.4th at p. 989 (conc. opn. of Kennard, J.).) With this in mind, we turn to the employees' specific unconscionability claims.

Aside from FEHA issues discussed in the previous part of this opinion, the employees contend that the agreement is substantively unconscionable because it requires only employees to arbitrate their wrongful termination **\*116** claims against the employer, but does not require the employer to arbitrate claims it may have against the employees. In asserting that this lack of mutuality is unconscionable, they rely primarily on the opinion of the Court of Appeal in *Stirlen, supra*, 51 Cal.App.4th 1519. The employee in that case was hired as a vice-president and chief financial officer; his employment contract provided for arbitration " 'in the event there is any dispute arising out of [the employee's] employment with the Company,' " including "the termination of that employment." (*Stirlen, supra*, 51 Cal.App.4th at p.

1528.) The agreement specifically excluded certain types of disputes from the scope of arbitration, including those relating to the protection of the employer's intellectual and other property and the enforcement of a postemployment covenant not to compete, which were to be litigated in state or federal court. (*Ibid.*) The employee was to waive the right to challenge the jurisdiction of such a court. (*Ibid.*) The arbitration agreement further provided that the damages available would be limited to " 'the amount of actual damages for breach of contract, less any proper offset for mitigation of such damages.' " (*Id.* at p. 1529.) When an arbitration claim was filed, payments of any salary or benefits were to cease " 'without penalty to the Company,' " pending the outcome of the arbitration. (*Id.* at p. 1528.)

The *Stirlen* court concluded that the agreement was one of adhesion, even though the employee in question was a high-level executive, because of the lack of opportunity to negotiate. (*Stirlen, supra*, 51 Cal.App.4th at pp. 1533-1534.) The court then concluded that the arbitration agreement was substantively unconscionable. (*Id.* at p. 1541.) The court relied in part on *Saika v. Gold* (1996) 49 Cal.App.4th 1074 [56 Cal.Rptr.2d 922] (*Saika*)), in which the court had refused to enforce a provision in an arbitration agreement between a doctor and a patient that would allow a "trial de novo" if the arbitrator's award was $25,000 or greater. The *Saika* court reasoned that such a clause was tantamount to making arbitration binding when the patient lost the arbitration but not binding if the patient won a significant money judgment. (*Saika, supra*, 49 Cal.App.4th at pp. 1079-1080.) *Stirlen* concluded that the Supercuts agreement lacked even the "modicum of bilaterality" that was present in *Saika*. (*Stirlen, supra*, 51 Cal.App.4th at p. 1541.) The employee pursuing claims against the employer had to bear not only with the inherent shortcomings of arbitration-limited discovery, limited judicial review, limited procedural protections-but also significant damage limitations imposed by the arbitration agreement. (*Id.* at pp. 1537-1540.) The employer, on the other hand, in pursuing its claims, was not subject to these disadvantageous limitations and had written into the agreement special advantages, such as a waiver of jurisdictional objections by the employee if sued by the employer. (*Id.* at pp. 1541-1542.) **\*117**

The *Stirlen* court did not hold that all lack of mutuality in a contract of adhesion was invalid. "We agree a contract can provide a 'margin of safety' that provides the party with superior bargaining strength a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                                          -22-

6 P.3d 669
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
(Cite as: 24 Cal.4th 83, 6 P.3d 669)

Page 21

type of extra protection for which it has a legitimate commercial need without being unconscionable. [Citation.] However, unless the 'business realities' that create the special need for such an advantage are explained in the contract itself, which is not the case here, it must be factually established." (*Stirlen, supra,* 51 Cal.App.4th at p. 1536.) The *Stirlen* court found no "business reality" to justify the lack of mutuality, concluding that the terms of the arbitration clause were " ' "so extreme as to appear unconscionable according to the mores and business practices of the time and place." ' " (*Id.* at p. 1542.)

The court in *Kinney v. United HealthCare Services, Inc.* (1999) 70 Cal.App.4th 1322 [83 Cal.Rptr.2d 348] (*Kinney*), came to the same conclusion with respect to an arbitration agreement to compel the employee, but not the employer, to submit claims to arbitration. As the *Kinney* court stated: "Faced with the issue of whether a unilateral obligation to arbitrate is unconscionable, we conclude that it is. The party who is required to submit his or her claims to arbitration [forgoes] the right, otherwise guaranteed by the federal and state Constitutions, to have those claims tried before a jury. (U.S. Const., Amend. VII; Cal. Const., art. I, § 16.) Further, except in extraordinary circumstances, that party has no avenue of review for an adverse decision, even if that decision is based on an error of fact or law that appears on the face of the ruling and results in substantial injustice to that party. [Citation.] By contrast, the party requiring the other to waive these rights retains all of the benefits and protections the right to a judicial forum provides. Given the basic and substantial nature of the rights at issue, we find that the unilateral obligation to arbitrate is itself so one-sided as to be substantively unconscionable." (*Kinney, supra,* 70 Cal.App.4th at p. 1332.) The court also found that certain terms of the arbitration agreement-limits to discovery and caps on compensatory and punitive damages-"heightened" its unconscionability. (*Ibid.*)

We conclude that *Stirlen* and *Kinney* are correct in requiring this "modicum of bilaterality" in an arbitration agreement. Given the disadvantages that may exist for plaintiffs arbitrating disputes, it is unfairly one-sided for an employer with superior bargaining power to impose arbitration on the employee as plaintiff but not to accept such limitations when it seeks to prosecute a claim against the employee, without at least some reasonable justification for such one-sidedness based on "business realities." As has been recognized "

'unconscionability turns not only on a "one-sided" result, *118 but also on an absence of "justification" for it.' " (*A & M Produce Co., supra,* 135 Cal.App.3d at p. 487.) If the arbitration system established by the employer is indeed fair, then the employer as well as the employee should be willing to submit claims to arbitration. Without reasonable justification for this lack of mutuality, arbitration appears less as a forum for neutral dispute resolution and more as a means of maximizing employer advantage. Arbitration was not intended for this purpose. (See *Engalla, supra,* 15 Cal.4th at p. 976.)

The employer cites a number of cases that have held that a lack of mutuality in an arbitration agreement does not render the contract illusory as long as the employer agrees to be bound by the arbitration of employment disputes. (*Michalski v. Circuit City Stores, Inc.* (7th Cir. 1999) 177 F.3d 634; *Johnson v. Circuit City Stores* (4th Cir. 1998) 148 F.3d 373, 378.) We agree that such lack of mutuality does not render the contract illusory, i.e., lacking in mutual consideration. We conclude, rather, that in the context of an arbitration agreement imposed by the employer on the employee, such a one-sided term is unconscionable. Although parties are free to contract for asymmetrical remedies and arbitration clauses of varying scope, *Stirlen* and *Kinney* are correct that the doctrine of unconscionability limits the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum on the weaker party without accepting that forum for itself.

A contrary conclusion was reached by the Alabama Supreme Court in *Ex Parte McNaughton* (Ala. 1998) 728 So.2d 592, 598-599. In that case, the employer required the employee to submit claims to arbitration, but expressly reserved for itself a choice of the arbitral or judicial forum. Two justices of the Alabama Supreme Court had stated in *Northcom, Ltd. v. James* (Ala. 1997) 694 So.2d 1329, 1338, that such arrangement would be invalid under Alabama's "mutuality of remedy" doctrine as well as the doctrine of unconscionability. The *McNaughton* court repudiated that view. It criticized the *Northcom* dictum as singling out arbitration for disfavor: "Although the doctrine of unconscionability/mutuality of remedy purportedly could apply in the nonarbitration context, as suggested in the main opinion in *Northcom*, it directly depends on arbitration for its application: 'The element of unconscionability in the context of an arbitration clause is supplied by the fact that, by agreeing to arbitrate, a party waives his right to "a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1

6 P.3d 669
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
(Cite as: 24 Cal.4th 83, 6 P.3d 669)

Page 22

remedy by due process of law" ... and his "right of trial by jury" ....' *Northcom, 694 So.2d at 1338-39* (citations omitted). [Citation.] ('[W]hile paying lip-service to the notion that [the doctrine of unconscionability/mutuality of remedy] "is equally true as to any unconscionable term of a contract of adhesion," ... the [lead opinion in *Northcom*] relies on the uniqueness of the concept of *119 arbitration under Alabama law to support the [doctrine].') At bottom, this approach assigns a suspect status to arbitration agreements. Doing so flies in the face of *Doctor's Associates, 517 U.S. at 687, 116 S.Ct. 1652,* where the Supreme Court of the United States explicitly stated that '[c]ourts may not ... invalidate arbitration agreements under state laws applicable only to arbitration provisions.' (Emphasis omitted.) Accordingly, we expressly reject the *Northcom* dictum regarding the doctrine of unconscionability/mutuality of remedy." (*McNaughton, supra, 728 So.2d at pp. 598-599,* bracketed text in internal quote added in *McNaughton.*)

We disagree that enforcing "a modicum of bilaterality" in arbitration agreements singles out arbitration for suspect status. The *Stirlen* court correctly rejected a similar criticism: "Some California courts have been [loath] to apply the doctrine of unconscionability articulated in *Scissor-Tail, supra, 28 Cal.3d 807* to arbitration agreements subject to the FAA on the ground that the opinion in that case 'weav[es] together principles of adhesion contracts and state statutes governing the neutrality of arbitrators,' and the United States Supreme Court has taught 'that a court may not rely upon anything that is unique to an agreement to arbitrate when assessing unconscionability of an agreement governed by the FAA.' (*Heily v. Superior Court* (1988) 202 Cal.App.3d 255, 260 [248 Cal.Rptr. 673].) However, while the *form* of unconscionability involved in *Scissor-Tail* related to arbitration-the nonneutrality of the arbitrator-the fundamental principles set forth by the Supreme Court in that case relate to unconscionability in general, not simply to arbitration agreements." (*Stirlen, supra, 51 Cal.App.4th at p. 1551.*)

We agree with the *Stirlen* court that the ordinary principles of unconscionability may manifest themselves in forms peculiar to the arbitration context. One such form is an agreement requiring arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party. The application of this principle to arbitration does not disfavor arbitration. It is no disparagement of arbitration to acknowledge that it has, as noted, both advantages and disadvantages. The perceived advantages of the judicial forum for plaintiffs include the availability of discovery and the fact that courts and juries are viewed as more likely to adhere to the law and less likely than arbitrators to "split the difference" between the two sides, thereby lowering damages awards for plaintiffs. (See Haig, *Corporate Counsel's Guide: Legal Development Report on Cost-Effective Management of Corporate Litigation* (1999) 610 PLI/Lit. 177, 186-187 ["a company that believes it has a strong legal and factual position may want to avoid arbitration, with its tendency to 'split the difference,' in favor of a judicial forum where it may be more likely to win a clear-cut victory"]; see also Schwartz, *supra, *1201997 Wis. L.Rev. at pp. 64-65.) An employer may accordingly consider a court to be a forum superior to arbitration when it comes to vindicating its own contractual and statutory rights, or may consider it advantageous to have a choice of arbitration or litigation when determining how best to pursue a claim against an employee. It does not disfavor arbitration to hold that an employer may not impose a system of arbitration on an employee that seeks to maximize the advantages and minimize the disadvantages of arbitration for itself at the employee's expense. On the contrary, a unilateral arbitration agreement imposed by the employer without reasonable justification reflects the very mistrust of arbitration that has been repudiated by the United States Supreme Court in *Doctors' Associates, Inc. v. Casarotto, supra, 517 U.S. 681,* and other cases. We emphasize that if an employer does have reasonable justification for the arrangement-i.e., a justification grounded in something other than the employer's desire to maximize its advantage based on the perceived superiority of the judicial forum-such an agreement would not be unconscionable. Without such justification, we must assume that it is.

Applying these principles to the present case, we note the arbitration agreement was limited in scope to employee claims regarding wrongful termination. Although it did not expressly authorize litigation of the employer's claims against the employee, as was the case in *Stirlen* and *Kinney*, such was the clear implication of the agreement. Obviously, the lack of mutuality can be manifested as much by what the agreement does not provide as by what it does. (Cf. *24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1205, 1212-1213 [78 Cal.Rptr.2d 533] [employee arbitration clause in personnel handbook found not to be unconscionable where it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                                    -24-

6 P.3d 669
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
(Cite as: 24 Cal.4th 83, 6 P.3d 669)

pertains to " 'any dispute aris[ing] from your employment' "].)

This is not to say that an arbitration clause must mandate the arbitration of all claims between employer and employee in order to avoid invalidation on grounds of unconscionability. Indeed, as the employer points out, the present arbitration agreement does not require arbitration of all conceivable claims that an employee might have against an employer, only wrongful termination claims. But an arbitration agreement imposed in an adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences. The arbitration agreement in this case lacks mutuality in this sense because it requires the arbitration of employee-but not employer-claims arising out of a wrongful termination. An employee terminated for stealing trade secrets, for example, must arbitrate his or her wrongful termination claim under the agreement while the employer has no corresponding obligation to arbitrate its trade secrets claim against the employee. **121

The unconscionable one-sidedness of the arbitration agreement is compounded in this case by the fact that it does not permit the full recovery of damages for employees, while placing no such restriction on the employer. Even if the limitation on FEHA damages is severed as contrary to public policy, the arbitration clause in the present case still does not permit full recovery of ordinary contract damages. The arbitration agreement specifies that damages are to be limited to the amount of backpay lost up until the time of arbitration. This provision excludes damages for prospective future earnings, so-called front pay, a common and often substantial component of contractual damages in a wrongful termination case. (See 4 Wilcox, Cal. Employment Law (2000) § 60.08 [3] [b], p. 60-102; id., § 60.08[2][b][iii], p. 60-97.) The employer, on the other hand, is bound by no comparable limitation should it pursue a claim against its employees.

The employer in this case, as well as the Court of Appeal, claim the lack of mutuality was based on the realities of the employees' place in the organizational hierarchy. As the Court of Appeal stated: "We ... observe that the wording of the agreement most likely resulted from the employees' position within the organization and may reflect the fact that the parties did not foresee the possibility of any dispute

arising from employment that was not initiated by the employee. Plaintiffs were lower-level supervisory employees, without the sort of access to proprietary information or control over corporate finances that might lead to an employer suit against them."

The fact that it is unlikely an employer will bring claims against a particular type of employee is not, ultimately, a justification for a unilateral arbitration agreement. It provides no reason for categorically exempting employer claims, however rare, from mandatory arbitration. Although an employer may be able, in a future case, to justify a unilateral arbitration agreement, the employer in the present case has not done so.

E. *Severability of Unconscionable Provisions*

(12a) The employees contend that the presence of various unconscionable provisions or provisions contrary to public policy leads to the conclusion that the arbitration agreement as a whole cannot be enforced. The employer contends that, insofar as there are unconscionable provisions, they should be severed and the rest of the agreement enforced.

As noted, Civil Code section 1670.5, subdivision (a) provides that "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without **122 the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Comment 2 of the Legislative Committee comment on section 1670.5, incorporating the comments from the Uniform Commercial Code, states: "Under this section the court, in its discretion, may refuse to enforce the contract as a whole if it is permeated by the unconscionability, or it may strike any single clause or group of clauses which are so tainted or which are contrary to the essential purpose of the agreement, or it may simply limit unconscionable clauses so as to avoid unconscionable results." (Legis. Com. com., 9 West's Ann. Civ. Code (1985 ed.) foll. § 1670.5, p. 494 (Legislative Committee comment).)

(13a) Thus, the statute appears to give a trial court some discretion as to whether to sever or restrict the unconscionable provision or whether to refuse to enforce the entire agreement. But it also appears to contemplate the latter course only when an agreement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1

6 P.3d 669

Page 24

24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202, 00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401

**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

is "permeated" by unconscionability. We could discover no published cases in California that address directly the question of when a trial court abuses its discretion by refusing to enforce an entire agreement, as the trial court did in this case, nor precisely what it means for an agreement to be permeated by unconscionability. But there is a good deal of statutory and case law discussing the related question of when it is proper to sever *illegal* contract terms-a subject to which we will now turn.

Civil Code section 1598 states that "[w]here a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void." Civil Code section 1599 states that "[w]here a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." In *Keene v. Harling* (1964) 61 Cal.2d 318, 320-321 [38 Cal.Rptr. 513, 392 P.2d 273] (*Keene*), we elaborated on those provisions: " 'Whether a contract is entire or separable depends upon its language and subject matter, and this question is one of construction to be determined by the court according to the intention of the parties. If the contract is divisible, the first part may stand, although the latter is illegal. [Citation.]' [Citations.] It has long been the rule in this state that ' "When the transaction is of such a nature that the good part of the consideration can be separated from that which is bad, the Courts will make the distinction, for the . . . law . . . divides according to common reason; and having made that void that is against law, lets the rest stand." ' " (Fn. omitted; see also *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119, 137-139 [70 Cal.Rptr.2d 304, 949 P.2d 1] (*Birbrower*) [holding severable legal from illegal portions of attorney fee agreement].) *123

In *Keene*, the plaintiffs contended that a transaction to buy coin-operated machines should be voided in its entirety because a small number of those machines were illegal " 'bingo-type' pinball machines." (*Keene, supra*, 61 Cal.2d at p. 320.) Instead, we held that because the value of the illegal machines could be quantified, the legal and illegal consideration could be apportioned and the latter severed from the contract. (*Id.* at pp. 322-323.)

This was applied in *Werner v. Knoll* (1948) 89 Cal.App.2d 474, 476-477 [201 P.2d 45], to hold that

the valid portion of an exculpatory damages provision in a landlord-tenant contract should be severed from the part that was invalid under Civil Code section 1668, and separately enforced. So, too, overbroad covenants not to compete may be restricted temporally and geographically. (See *General Paint Corp. v. Seymour* (1932) 124 Cal.App. 611, 614-615 [12 P.2d 990].) In out-of-state cases in jurisdictions in which covenants not to compete are more accepted legally, [FN12] such restrictions are common. (See, e.g., *Central Adjustment Bureau, Inc. v. Ingram* (Tenn. 1984) 678 S.W.2d 28, 37; *Karlin v. Weinberg* (1978) 77 N.J. 408 [390 A.2d 1161].)

FN12 Such covenants are largely illegal in this state. (Bus. & Prof. Code, § 16600.)

The *Keene* court also cited several examples in which the illegality was not severable. (See *Keene, supra*, 61 Cal.2d at pp. 321-322.) In *Mill and Lumber Co. v. Hayes* (1888) 76 Cal. 387 [18 P. 391], the defendant agreed to sell the plaintiff 2,000,000 feet of lumber at a certain price and to refrain from selling to any other buyer. The court, in invalidating the agreement, stated: "The very essence and mainspring of the agreement-the illegal object-' was to form a combination among all the manufacturers of lumber at or near Felton for the sole purpose of increasing the price of lumber, limiting the amount thereof to be manufactured, and give plaintiff control of all lumber manufactured,' etc. [¶] This being the inducement to the agreement, and the *sole object* in view, it cannot be separated and leave any subject-matter capable of enforcement.... [¶] ... [¶] The good cannot be separated from the bad, or rather the bad enters into and permeates the whole contract, so that none of it can be said to be good, and therefore the subject of an action." (*Id.* at p. 393.) Similarly, in *Teachout v. Bogy* (1917) 175 Cal. 481 [166 P. 319], the court voided a contract for purchase of a lease, a liquor license, and the sale of a quantity of alcoholic beverages because sale of the license was both an integral part of the transaction and illegal. (*Id.* at p. 488.)

(14) Two reasons for severing or restricting illegal terms rather than voiding the entire contract appear implicit in case law. The first is to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement-particularly when there has been *124 full or partial performance of the contract. (See *Keene, supra*, 6 Cal.2d at pp. 320-321; *Birbrower, supra*, 17

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1

-26-

6 P.3d 669                                                                                          Page 25
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

Cal.4th at pp. 137-139; *Saika, supra*, 49 Cal.App.4th at p. 1082 [enforcing arbitration agreement already performed, while severing illegal trial de novo clause].) Second, more generally, the doctrine of severance attempts to conserve a contractual relationship if to do so would not be condoning an illegal scheme. (See e.g., *Werner v. Knoll, supra*, 89 Cal.App.2d at pp. 476-477; *General Paint Corp. v. Seymour, supra*, 124 Cal.App. at pp. 614-615.) The overarching inquiry is whether " 'the interests of justice ... would be furthered' " by severance. (*Benyon v. Garden Grove Medical Group* (1980) 100 Cal.App.3d 698, 713 [161 Cal.Rptr. 146].) Moreover, courts must have the *capacity* to cure the unlawful contract through severance or restriction of the offending clause, which, as discussed below, is not invariably the case.

(13b) The basic principles of severability that emerge from Civil Code section 1599 and the case law of illegal contracts appear fully applicable to the doctrine of unconscionability. Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate. That Civil Code section 1670.5 follows this basic model is suggested by the Legislative Committee comment quoted above, which talks in terms of contracts not being enforced if "permeated" by unconscionability, and of clauses being severed if "so tainted or ... contrary to the essential purpose of the agreement." (Leg. Com. com., 9 West's Ann Civ. Code, *supra*, foll. § 1670.5, p. 494.)

(12b) In this case, two factors weigh against severance of the unlawful provisions. First, the arbitration agreement contains more than one unlawful provision; it has both an unlawful damages provision and an unconscionably unilateral arbitration clause. Such multiple defects indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage. In other words, given the multiple unlawful provisions, the trial court did not abuse its discretion in concluding that the arbitration agreement is permeated by an unlawful purpose. (See *Graham Oil, supra*, 43 F.3d at p. 124.) [FN13]

FN13 We need not decide whether the unlawful damages provision in this arbitration agreement, by itself, would be sufficient to warrant a court's refusal to enforce that agreement. We note, however, that in the analogous case of overly broad covenants not to compete, courts have tended to invalidate rather than restrict such covenants when it appears they were drafted in bad faith, i.e., with a knowledge of their illegality. (See, e.g., *Data Management, Inc. v. Greene* (Alaska 1988) 757 P.2d 62, 64-65; see also Farnsworth on Contracts (2d ed. 1988) § 5.8, p. 86, fn. 23, and cases cited therein.) The reason for this rule is that if such bad faith restrictive covenants are enforced, then "employers are encouraged to overreach; if the covenant they draft is overbroad then the court [will redraft] it for them." (*Data Management, Inc. v. Greene, supra*, 757 P.2d at p. 65.) This reasoning applies with equal force to arbitration agreements that limit damages to be obtained from challenging the violation of unwaivable statutory rights. An employer will not be deterred from routinely inserting such a deliberately illegal clause into the arbitration agreements it mandates for its employees if it knows that the worst penalty for such illegality is the severance of the clause after the employee has litigated the matter. In that sense, the enforcement of a form arbitration agreement containing such a clause drafted in bad faith would be condoning, or at least not discouraging, an illegal scheme, and severance would be disfavored unless it were for some other reason in the interests of justice. (See *Keene, supra*, 61 Cal.2d at pp. 321-322.) The refusal to enforce such a clause is also consistent with the rule that a party may waive its right to arbitration through bad faith or willful misconduct. (*Engalla, supra*, 15 Cal.4th at p. 983.) Because we resolve this case on other grounds, we need not decide whether the state of the law with respect to damages limitations was sufficiently clear at the time the arbitration agreement was signed to lead to the conclusion that this damages clause was drafted in bad faith.

Second, in the case of the agreement's lack of mutuality, such permeation is indicated by the fact

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                                                          -27-

6 P.3d 669                                                                                              Page 26
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

that there is no single provision a court can strike or *125 restrict in order to remove the unconscionable taint from the agreement. Rather, the court would have to, in effect, reform the contract, not through severance or restriction, but by augmenting it with additional terms. Civil Code section 1670.5 does not authorize such reformation by augmentation, nor does the arbitration statute. Code of Civil Procedure section 1281.2 authorizes the court to refuse arbitration if grounds for revocation exist, not to reform the agreement to make it lawful. Nor do courts have any such power under their inherent limited authority to reform contracts. (See Kolani v. Gluska (1998) 64 Cal.App.4th 402, 407-408 [75 Cal.Rptr.2d 257] [power to reform limited to instances in which parties make mistakes, not to correct illegal provisions]; see also Getty v. Getty (1986) 187 Cal.App.3d 1159,1178-1179 [232 Cal.Rptr. 603].) Because a court is unable to cure this unconscionability through severance or restriction and is not permitted to cure it through reformation and augmentation, it must void the entire agreement. (See Stirlen, supra, 51 Cal.App.4th at p. 1552.)

Moreover, whether an employer is willing, now that the employment relationship has ended, to allow the arbitration provision to be mutually applicable, or to encompass the full range of remedies, does not change the fact that the arbitration agreement as written is unconscionable and contrary to public policy. Such a willingness "can be seen, at most, as an offer to modify the contract; an offer that was never accepted. No existing rule of contract law permits a party to resuscitate a legally defective contract merely by offering to change it." (Stirlen, supra, 51 Cal.App.4th at pp. 1535-1536, fn. omitted.)

The approach described above is consistent with our holding in Scissor-Tail, supra, 28 Cal.3d at page 831. In that case, we found an arbitration *126 agreement to be unconscionable because the agreement provided for an arbitrator likely to be biased in favor of the party imposing the agreement. (Ibid.) We nonetheless recognized that "[t]he parties have indeed agreed to arbitrate" and that there is a "strong public policy of this state in favor of resolving disputes by arbitration." (Ibid.) The court found a way out of this dilemma through the CAA, specifically Code of Civil Procedure section 1281.6, which provides in part: "If the arbitration agreement does not provide a method for appointing an arbitrator, the parties to the agreement who seek arbitration and against whom arbitration is sought may agree on a method of appointing an arbitrator

and that method shall be followed. In the absence of an agreed method, or if the agreed method fails or for any reason cannot be followed, or when an arbitrator appointed fails to act and his or her successor has not been appointed, the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator." Citing this provision, the court stated: "We therefore conclude that upon remand the trial court should afford the parties a reasonable opportunity to agree on a suitable arbitrator and, failing such agreement, the court should on petition of either party appoint the arbitrator." (Scissor-Tail, supra, 28 Cal.3d at p. 831.) Other cases, both before and after Scissor-Tail, have also held that the part of an arbitration clause providing for a less-than-neutral arbitration forum is severable from the rest of the clause. (See Lewis v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (1986) 183 Cal.App.3d 1097, 1107 [228 Cal.Rptr.345]; Richards v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (1976) 64 Cal.App.3d 899, 906 [135 Cal.Rptr. 26].)

Thus, in Scissor-Tail and the other cases cited above, the arbitration statute itself gave the court the power to reform an arbitration agreement with respect to the method of selecting arbitrators. There is no comparable provision in the arbitration statute that permits courts to reform an unconscionably one-sided agreement.

We further note that Scissor-Tail did not construe Civil Code section 1670.5, because the actions in the trial court in that case predated the enactment of that statute. (See Scissor-Tail, supra, 28 Cal.3d at p. 816.) Civil Code section 1670.5 makes clear what Scissor-Tail may have left ambiguous: that an arbitration agreement permeated by unconscionability, or one that contains unconscionable aspects that cannot be cured by severance, restriction, or duly authorized reformation, should not be enforced. Furthermore, although we have spoken of a "strong public policy of this state in favor of resolving disputes by arbitration" (Scissor-Tail, supra, 28 Cal.3d at p. 831), Code of Civil Procedure section 1281 makes clear that an arbitration agreement is to be rescinded on the same grounds as other contracts or *127 contract terms. In this respect, arbitration agreements are neither favored nor disfavored, but simply placed on an equal footing with other contracts.

The employer also points to two cases in which unconscionably one-sided provisions in arbitration agreements were severed and the agreement enforced. Saika, supra, 49 Cal.App.4th 1074, as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1
                                                                                        -28-

6 P.3d 669                                                                                                          Page 27
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

discussed, involved an arbitration agreement with a provision that would make the arbitration nonbinding if the arbitration award were $25,000 or greater. In *Benyon v. Garden Grove Medical Group, supra,* 100 Cal.App.3d 698, 712-713, a provision of the arbitration agreement gave one party, but not the other, the option of rejecting the arbitrator's decision. The courts in both instances concluded, in *Saika* implicitly, in *Benyon* explicitly, that the offending clause was severable from the rest of the arbitration agreement.

The provisions in these two cases are different from the one-sided arbitration provision at issue in this case in at least two important respects. First, the one-sidedness in the above two cases was confined to a single provision regarding the rights of the parties after an arbitration award was made, not a provision affecting the scope of the arbitration. As such, the unconscionability could be cured by severing the unlawful provision. Second, in both cases, the arguments against severance were made by the party that had imposed the unconscionable provision in order to prevent enforcement of an arbitration award against it, and the failure to sever would have had the effect of accomplishing the precise unlawful purpose of that provision-the invalidation of the arbitration award. As discussed, courts will generally sever illegal provisions and enforce a contract when nonenforcement will lead to an undeserved benefit or detriment to one of the parties that would not further the interests of justice. (See *Benyon v. Garden Grove Medical Group, supra,* 100 Cal.App.3d at p. 713.) In *Benyon* and *Saika,* the interests of justice would obviously not have been furthered by nonenforcement. The same considerations are not found in the present case.

### III. Disposition

The judgment of the Court of Appeal upholding the employer's petition to compel arbitration is reversed, and the cause is remanded to the Court of Appeal with directions to affirm the judgment of the trial court.

George, C. J., Kennard, J., Baxter, J., and Werdegar, J., concurred.**BROWN, J.,** Concurring.
Although I agree with most of the majority's reasoning, I write separately on the issue of apportioning arbitral costs. The majority takes the simple approach: where the employer imposes mandatory *128 arbitration and the employee asserts

a statutory claim, the employer must bear all costs "unique to arbitration." (Maj. opn., *ante,* at p. 113.) Simplicity, however, is not a proxy for correctness. As explained below, I do not believe that the possible imposition of arbitration forum costs automatically undermines an employee's statutory rights. Accordingly, I see no reason to adopt the majority's preemptive approach. Instead, the issue of apportionment is better left to the arbitrator, and any problems with the arbitrator's decision should be resolved at the judicial review stage.

In adopting the bright-line approach advocated by *Cole v. Burns Intern. Security Services* (D.C. Cir. 1997) 105 F.3d 1465, 1484-1485 [323 App.D.C. 133] (*Cole*), the majority argues that the mere risk that an employee may have to bear certain arbitral costs necessarily "chills the exercise" of her statutory rights. (Maj. opn., *ante,* at p. 110.) Thus, arbitration is not a reasonable substitute for a court if arbitral costs, such as the arbitrator's fees, may be imposed on the employee. (See *Cole, supra,* 105 F.3d at p. 1484.) The majority, however, assumes too much. "[A]rbitration is often far more affordable to plaintiffs and defendants alike than is pursuing a claim in court." (*Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith* (1st Cir. 1999) 170 F.3d 1, 16 (*Rosenberg*); see also *Koveleskie v. SBC Capital Markets, Inc.* (7th Cir. 1999) 167 F.3d 361, 366 (*Koveleskie*).) Because employees may incur fewer costs and attorney fees in arbitration than in court, the potential imposition of arbitration forum costs does not automatically render the arbitral forum more expensive than-and therefore inferior to-the judicial forum. (See *Arakawa v. Japan Network Group* (S.D.N.Y. 1999) 56 F.Supp.2d 349, 354 (*Arakawa*).)

The majority's approach also ignores the unique circumstances of each case. Not all arbitrations are costly, and not all employees are unable to afford the unique costs of arbitration. Thus, the imposition of some arbitral costs does not deter or discourage employees from pursuing their statutory claims *in every case.* (See, e.g., *Williams v. Cigna Financial Advisors Inc.* (5th Cir. 1999) 197 F.3d 752, 763-765 (*Williams*) [compelling arbitration because the employee did not show that he was unable to pay the arbitral costs or that these costs would deter him from pursuing his claims]; *McCaskill v. SCI Management Corp.* (N.D.Ill. June 22, 2000, No. 00C1543) 2000 WL 875396 at p. *3 (*McCaskill*) [compelling arbitration because there was no evidence that the costs of arbitration would be prohibitively expensive for the employee]; *Cline v. H.E. Butt Grocery Co.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                                                           -29-

6 P.3d 669
Page 28
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202,
00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401
**(Cite as: 24 Cal.4th 83, 6 P.3d 669)**

(S.D.Tex. 1999) 79 F.Supp.2d 730, 733 (Cline) [compelling arbitration because there was no evidence that the employee would have to pay any costs or that the employee could not afford to do so].) Indeed, the uniqueness of each case makes it *129 impossible for any court to "conclude that the payment of fees will constitute a barrier to the vindication of ... statutory rights" without knowing the exact amount the employee must pay. (Arakawa, supra, 56 F.Supp.2d at p. 355.)

Accordingly, I would reject the majority's approach and follow the approach suggested by courts in several other jurisdictions. (See, e.g., Rosenberg, supra, 170 F.3d at p. 16; McCaskill, supra, 2000 WL 875396 at p. *3; Cline, supra, 79 F.Supp.2d at p. 733; Arakawa, supra, 56 F.Supp.2d at pp. 354-355; see also Williams, supra, 197 F.3d at pp. 763-765.) As long as the mandatory arbitration agreement does not require the employee to front the arbitration forum costs or to pay a certain share of these costs, apportionment should be left to the arbitrator. When apportioning costs, the arbitrator should consider the magnitude of the costs unique to arbitration, the ability of the employee to pay a share of these costs, and the overall expense of the arbitration as compared to a court proceeding. Ultimately, any apportionment should ensure that the costs imposed on the employee, if known at the onset of litigation, would *not* have deterred her from enforcing her statutory rights or stopped her from effectively vindicating these rights. (See Mitsubishi Motors v. Soler Chrysler-Plymouth (1985) 473 U.S. 614, 637 [105 S.Ct. 3346, 3359, 87 L.Ed.2d 444] ["[S]o long as the prospective litigant effectively may vindicate [her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function."]; Arakawa, supra, 56 F.Supp.2d at p. 355.)

If the employee feels that the arbitrator's apportionment of costs is unreasonable, then she can raise the issue during judicial review of the arbitration award. (See Rosenberg, supra, 170 F.3d at p. 16 [judicial review is sufficient to guard against the imposition of unreasonable fees]; Koveleskie, supra, 167 F.3d at p. 366 [same].) I believe such an approach is preferable because it accounts for the particular circumstances of each case without sacrificing the employee's statutory rights.

Chin, J., concurred. *130

Cal. 2000.

Armendariz v. Foundation Health Psychcare Services, Inc.
24 Cal.4th 83, 6 P.3d 669, 99 Cal.Rptr.2d 745, 83 Fair Empl.Prac.Cas. (BNA) 1172, 78 Empl. Prac. Dec. P 40,202, 00 Cal. Daily Op. Serv. 7127, 2000 Daily Journal D.A.R. 9401

Briefs and Other Related Documents (Back to top)

• 1999 WL 652081 (Appellate Brief) REPLY BRIEF OF PLAINTIFFS/RESPONDENTS/PETITIONERS (Aug. 02, 1999)
• 1999 WL 597260 (Appellate Brief) BRIEF OF DEFENDANT/APPELLANT/RESPONDENT (Jul. 12, 1999)
• 1999 WL 459804 (Appellate Brief) OPENING BRIEF OF PLAINTIFFS and RESPONDENTS (May. 10, 1999)
• 1999 WL 33737175 (Appellate Petition, Motion and Filing) Petition for Review (Jan. 13, 1999) Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 1                                                    -30-

TAB 2

Westlaw.

84 Cal.App.4th 416                                                                                    Page 1
84 Cal.App.4th 416, 100 Cal.Rptr.2d 818, 16 IER Cases 1591, 00 Cal. Daily Op. Serv. 8651, 2000 Daily Journal
D.A.R. 11,469
**(Cite as: 84 Cal.App.4th 416)**

▷Craig v. Brown & Root, Inc.
Cal.App. 2 Dist.,2000.

Court of Appeal, Second District, Division 1,
California.
Christine CRAIG, Plaintiff and Appellant,
v.
BROWN & ROOT, INC., et al., Defendants and
Respondents.
No. B136651.

Oct. 26, 2000.

Female former employee brought action against her
former employer and her former supervisor, alleging
wrongful termination, sexual harassment, gender
discrimination and other claims. The Superior Court,
Los Angeles County, No. BC179031,Richard P.
Kalustian, J., granted former employer's petition to
compel arbitration and subsequently confirmed
arbitration award in favor of former employer.
Former employee appealed. The Court of Appeal,
Miriam A. Vogel, J., held that: (1) evidence
established existence of arbitration agreement
between former employer and former employee, and
(2) such agreement was enforceable.

Affirmed.
West Headnotes
[1] T ⟨⟩137

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk136 Construction
                25Tk137 k. In General. Most Cited
Cases
    (Formerly 33k6.2 Arbitration)
Existence of arbitration agreement between employee
and employer was established by evidence that
employer twice mailed copies of memorandum and
brochure concerning dispute resolution program to
employee's home, that employee continued to work
for employer and that employee thereby agreed to be
bound by terms of dispute resolution program,
including its provision for binding arbitration.

[2] T ⟨⟩116

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk116 k. What Law Governs. Most
Cited Cases
    (Formerly 33k6.2 Arbitration)
General principles of contract law determine whether
the parties have entered a binding agreement to
arbitrate.

[3] T ⟨⟩133(1)

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk133 Formal Requisites
                    25Tk133(1) k. In General. Most
Cited Cases
    (Formerly 33k6.2 Arbitration)
An employee's acceptance of an agreement to
arbitrate may be express, or implied-in-fact where the
employee's continued employment constitutes her
acceptance of an agreement proposed by her
employer.

[4] Evidence 157 ⟨⟩71

157 Evidence
    157II Presumptions
        157k71 k. Mailing, and Delivery of Mail
Matter. Most Cited Cases

**Evidence 157 ⟨⟩87**

157 Evidence
    157II Presumptions
        157k85 Operation and Effect
            157k87 k. Presumptions of Fact. Most
Cited Cases

**Evidence 157 ⟨⟩89**

157 Evidence
    157II Presumptions
        157k89 k. Rebuttal of Presumptions of Fact.
Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 2                                                                                    -31-

84 Cal.App.4th 416
84 Cal.App.4th 416, 100 Cal.Rptr.2d 818, 16 IER Cases 1591, 00 Cal. Daily Op. Serv. 8651, 2000 Daily Journal
D.A.R. 11,469
**(Cite as: 84 Cal.App.4th 416)**

Evidence that copies of employer's memorandum and brochure concerning dispute resolution program were twice mailed to employee's home address created a presumption that employee received the documents, and that presumption disappeared as a result of employee's unequivocal denial that she received the documents; however, employer's declarations and documents regarding the mailing were circumstantial evidence from which court was entitled to infer that employee received the memorandum and brochure. West's Ann.Cal.Evid.Code §§ 604, 641.

**[5] Evidence 157 ☞85.1**

157 Evidence
    157II Presumptions
        157k85 Operation and Effect
            157k85.1 k. In General. Most Cited Cases
Although a presumption affecting the burden of proving evidence disappears where it is met with contradictory evidence, inferences may nevertheless be drawn from the same circumstances that gave rise to the presumption in the first place. West's Ann.Cal.Evid.Code § 604.

**[6] Evidence 157 ☞71**

157 Evidence
    157II Presumptions
        157k71 k. Mailing, and Delivery of Mail Matter. Most Cited Cases

**Evidence 157 ☞87**

157 Evidence
    157II Presumptions
        157k85 Operation and Effect
            157k87 k. Presumptions of Fact. Most Cited Cases

**Evidence 157 ☞89**

157 Evidence
    157II Presumptions
        157k89 k. Rebuttal of Presumptions of Fact. Most Cited Cases
If a party proves that a letter was mailed, the trier of fact is required to find that the letter was received in the absence of any believable contrary evidence, but if the adverse party denies receipt, the presumption is gone from the case; the trier of fact must then weigh the denial of receipt against the inference of receipt

arising from proof of mailing and decide whether or not the letter was received. West's Ann.Cal.Evid.Code §§ 604, 641.

**[7] T ☞134(1)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk134 Validity
                    25Tk134(1) k. In General. Most Cited Cases
    (Formerly 33k6.2 Arbitration)
Mandatory arbitration agreement between employee and employer was enforceable, where employer's arbitration program provided for a neutral arbitrator, cost to employee was only $50, employee who chose to be represented by lawyer could receive up to $2,500 from employer for that purpose, adequate discovery was available, all remedies that were available in court were available in arbitration, arbitrator was required to issue written award that was subject to judicial review, and all claims had to be arbitrated.

**\*\*819\*418** Law Offices of Richard J. Wynne and Richard J. Wynne, for Plaintiff and Appellant.
O'Melveny & Myers, Scott H. Dunham and Jeffrey A. Wortman, for Defendants and Respondents.
MIRIAM A. VOGEL, J.
The trial court compelled arbitration of this wrongful termination action, which was then arbitrated and decided in favor of the employer. The employer's petition to confirm the arbitrator's award was granted. The employee appeals, claiming she never agreed to arbitrate and, in the alternative, that the arbitration agreement is unfair, unconscionable and unenforceable. We affirm.

**FACTS**

**A.**

In 1981, Christine Craig went to work for a company that was later acquired by Brown & Root, Inc., a construction firm. In 1993, Brown & **\*419** Root established a four-step Dispute Resolution Program to resolve "all employee disputes." In a memorandum sent to all employees, Brown & Root explained the purpose of the Dispute Resolution Program and emphasized (in the following form) that everyone

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

84 Cal.App.4th 416                                                                                    Page 3
84 Cal.App.4th 416, 100 Cal.Rptr.2d 818, 16 IER Cases 1591, 00 Cal. Daily Op. Serv. 8651, 2000 Daily Journal
D.A.R. 11,469
(Cite as: 84 Cal.App.4th 416)

would be bound by it:
The enclosed brochure explains the procedures as well as how the Dispute Resolution Program works as a whole. Please take the time to read the material. IT APPLIES TO YOU. It will govern all future legal disputes between you and the Company that are related in any way to your employment.

The "enclosed brochure" explained the Program's four-step progression-from open access to management, to an informal conference, to mediation, to arbitration. "Arbitration" is explained this way: "Arbitration is a process in which a dispute is presented to a neutral third party, the arbitrator, for a final and binding decision. The arbitrator makes this decision after both sides present their arguments at the arbitration hearing. There is no jury. If you win, you can be awarded anything you might seek through a court of law. [¶] The neutral party, AAA, runs the proceedings which are held privately. Since 1926, AAA has handled hundreds of thousands of cases. Though arbitration is much less formal than a court trial, it is an orderly proceeding, governed by rules of procedure and legal standards of conduct."

**820 The brochure explains the procedure for requesting arbitration, and makes it clear that the maximum cost to the employee is $50. The "role of lawyers" in the arbitration process is described in refreshingly candid language: "The Company has access to legal advice through its law department and outside lawyers. You may consult with a lawyer or any other adviser of your choice. Upon approval of the Program Administrator, Brown & Root will pay the major part of your legal fees through the Legal Consultation Plan, up to a maximum of $2,500.... [¶] You are not required, however, to hire a lawyer to participate in arbitration. If you choose not to bring a lawyer to arbitration, the Company will also participate without a lawyer."

### B.

In April 1997, Brown & Root terminated Craig's employment. In October, Craig sued Brown & Root and Daniel Banks (Craig's immediate supervisor), alleging a variety of tort and contract theories (wrongful termination, sexual harassment, gender discrimination, and so on). Banks answered, alleging an agreement to arbitrate as an affirmative defense; Brown & Root filed a petition to compel arbitration supported by declarations and other evidence *420 establishing the facts summarized above. In addition,

Brown & Root's evidence showed that, in May 1993 and again in the fall of 1994, copies of the memorandum and the Dispute Resolution Program brochure had been sent to Craig's home address (and that this mail had not been returned to Brown & Root).

Craig (who was and is represented by counsel) opposed the petition, claiming "[t]here exists no evidence that [she] expressly agreed to arbitrate her claims, signed an acknowledgment of receipt of any the [sic ] materials constitution [sic] the Program prior to the time her claims arose, or had actual knowledge of the Program...." Her declaration says this about the items mailed to her: "I have carefully read [the memorandum and brochure] and can affirmatively state that I did not receive any of these documents at my residence in Baldwin Park during the years 1993 or 1994."

The trial court granted Brown & Root's petition and dismissed Craig's action with prejudice. Craig appealed, contending the action should have been stayed pending conclusion of the arbitration. Brown & Root conceded the point and we reversed the order of dismissal. (*Craig v. Brown & Root, Inc.,* (June 22, 1999, B124425) [nonpub. opn.].) The dispute was thereafter arbitrated and decided in favor of Brown & Root, after which the trial court confirmed the arbitration award. Craig appeals.

### DISCUSSION

### I.

[1] Craig contends the evidence is insufficient to prove the existence of an agreement to arbitrate. She is wrong.

[2][3] General principles of contract law determine whether the parties have entered a binding agreement to arbitrate. (*Chan v. Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 640-641, 223 Cal.Rptr. 838.) This means that a party's acceptance of an agreement to arbitrate may be express (e.g., *Mago v. Shearson Lehman Hutton Inc.* (9th Cir.1992) 956 F.2d 932 [agreement to arbitrate included in job application]; *Nghiem v. NEC Electronic, Inc.* (9th Cir.1994) 25 F.3d 1437 [agreement to arbitrate included in handbook executed by employee]; *Lagatree v. Luce, Forward, Hamilton & Scripps* (1999) 74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 2                                                                                                    -33-

84 Cal.App.4th 416

84 Cal.App.4th 416, 100 Cal.Rptr.2d 818, 16 IER Cases 1591, 00 Cal. Daily Op. Serv. 8651, 2000 Daily Journal
D.A.R. 11,469

(Cite as: 84 Cal.App.4th 416)

Page 4

[employer may terminate employee who refuses to sign agreement to arbitrate] ) or implied-in-fact where, as here, the employee's continued employment constitutes her acceptance of an agreement proposed by her employer (*Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 11, 96 Cal.Rptr.2d 179, 999 P.2d 71 [implied acceptance**821 of changed rules regarding job security]; *DiGiacinto v. Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 635, 69 Cal.Rptr.2d 300 [implied acceptance of changed compensation rules] ).

[4]*421 Brown & Root's evidence shows that copies of its memorandum and brochure were twice sent to Craig, once in 1993, then again in 1994. This evidence created a presumption that Craig received the items that were sent, and shifted the burden of producing evidence to her. (Evid.Code, § 641 [a letter correctly addressed and properly mailed is presumed to have been received in the ordinary course of mail]; 1 Witkin, Cal. Evidence (4th ed. 2000) Burden of Proof and Presumptions, §§ 67, 78, pp. 216, 219.)^FN1 As is true of most presumptions affecting the burden of producing evidence, this one is an expression of common experience, one in which the presumed fact (receipt of that which was mailed) is so likely to be true that the law requires it to be assumed in the absence of contrary evidence. (Witkin, Cal.Evidence, *supra*, § 54, p. 203.)

>      FN1. All section references are to the
>      Evidence Code.

[5] When the foundational facts are established, a presumption affecting the burden of producing evidence obligates the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced to support a finding of its nonexistence-in which event the trier of fact determines the existence or nonexistence of the fact from the evidence and without regard to the presumption. (§ 604.) Although the presumption disappears where, as here, it is met with contradictory evidence, inferences may nevertheless be drawn from the same circumstances that gave rise to the presumption in the first place. (*Ibid.* ["Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate"]; see *Bonzer v. City of Huntington Park* (1993) 20 Cal.App.4th 1474, 1481, 25 Cal.Rptr.2d 278.)

On this appeal, the disappearance of the presumption is moot. Its only relevance was in the trial court,

where the trier of fact (in this context, the court) was required to determine the contested fact (whether the memorandum and brochure were received by Craig) without regard to the presumption and solely on the basis of the conflicting evidence-Brown & Root's declarations and documents showing that the items were mailed to Craig at her home address and not returned, and Craig's equivocal denial of receipt. The trial court decided that issue in favor of Brown & Root, and its credibility call is binding on this appeal. (*Estate of Joslyn* (1995) 38 Cal.App.4th 1428, 1434, 45 Cal.Rptr.2d 616).

[6] The disappearance of the presumption does *not* mean there is insufficient evidence to support the trial court's finding. Brown & Root's declarations and documents (mailing lists) are circumstantial evidence from which the court was entitled to infer that Craig had received the memorandum and brochure. " '[I]f a party proves that a letter was mailed, the trier of fact is required to find that the letter was received in the absence of any *422 believable contrary evidence. However, if the adverse party denies receipt, the presumption is gone from the case. *The trier of fact must then weigh the denial of receipt against the inference of receipt arising from proof of mailing and decide whether or not the letter was received.*' "(*Slater v. Kehoe* (1974) 38 Cal.App.3d 819, 832, fn. 12, 113 Cal.Rptr. 790, italics added.)

Accordingly, there is substantial evidence (1) that the memorandum and brochure were received by Craig in 1993 and again in 1994; (2) that she continued to work for Brown & Root until 1997; and (3) that she thereby agreed to be bound by the terms of the Dispute Resolution Program, including its provision for binding arbitration.

**822II.

[7] Craig contends the arbitration agreement is in any event an unenforceable adhesion contract. We disagree.

In *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, our Supreme Court held that mandatory employment arbitration agreements are enforceable if the arbitration permits the employees to vindicate their statutory rights; that is, "the arbitration must meet certain minimum requirements, including neutrality of the arbitrator, the provision of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 2                                                    -34-

84 Cal.App.4th 416, 100 Cal.Rptr.2d 818, 16 IER Cases 1591, 00 Cal. Daily Op. Serv. 8651, 2000 Daily Journal D.A.R. 11,469
**(Cite as: 84 Cal.App.4th 416)**

adequate discovery, a written decision that will permit a limited form of judicial review, and limitations on the costs of arbitration." (*Id.* at p. 91, 99 Cal.Rptr.2d 745, 6 P.3d 669.) Craig does not contend that Brown & Root's arbitration procedure fails to meet these requirements.[FN2] We don't see how she could.

> FN2. Although *Armendariz* was decided before Craig's reply brief was due, Craig did not file a reply brief.

Brown & Root's arbitration program provides for a neutral arbitrator. (*Armendariz v. Foundation Health Psychcare Services, Inc., supra,* 24 Cal.4th at p. 103, 99 Cal.Rptr.2d 745, 6 P.3d 669 [the neutral arbitrator requirement is essential to ensuring the integrity of the arbitration process].) The cost to the employee is a mere $50, substantially less than the filing fee for a superior court action. The balance is paid by Brown & Root. (*Id.* at pp. 107-113, 99 Cal.Rptr.2d 745, 6 P.3d 669.) Those employees who choose to have a lawyer involved in the process can receive up to $2,500 from Brown & Root for that purpose. Adequate discovery is available. (*Id.* at pp. 104-106, 99 Cal.Rptr.2d 745, 6 P.3d 669 [the employer, by agreeing to arbitrate, has by implication consented to permit adequate discovery when the employee asserts a statutory discrimination claim].) All remedies (punitive damages, attorney's fees, injunctive relief, and so on) that would be available in court are available in the arbitration ("If you win, you can be awarded anything you might seek **\*423** through a court of law"). (*Id.* at pp. 103-104, 99 Cal.Rptr.2d 745, 6 P.3d 669.) The arbitrator is required to issue a written award that is subject to judicial review. (*Id.* at pp. 106-107, 99 Cal.Rptr.2d 745, 6 P.3d 669.) All claims must be arbitrated. (*Id.* at p. 120, 99 Cal.Rptr.2d 745, 6 P.3d 669.)

Brown & Root's arbitration program satisfies *Armendariz.*

### DISPOSITION

The judgment is affirmed. Brown & Root is entitled to its costs of appeal.

SPENCER, P.J., and ORTEGA, J., concur.
Cal.App. 2 Dist.,2000.
Craig v. Brown & Root, Inc.
84 Cal.App.4th 416, 100 Cal.Rptr.2d 818, 16 IER Cases 1591, 00 Cal. Daily Op. Serv. 8651, 2000 Daily Journal D.A.R. 11,469

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 2                                                                    -35-

TAB 3

623 P.2d 165                                                                                                 Page 1
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330
**(Cite as: 28 Cal.3d 807, 623 P.2d 165)**

▷Graham v. Scissor-Tail, Inc.
Cal., 1981.

Supreme Court of California, In Bank
Bill GRAHAM, Plaintiff and Appellant,
v.
SCISSOR-TAIL, INC., Defendant and Appellant.
**L.A. 31261.**

Feb. 5, 1981.
Review Denied July 25, 1990.

Nonunion member promoter of concerts brought suit against musician, his wholly-owned corporation, and its booking agent for breac h of contract, declaratory relief, and rescission. Corporation filed cross comp laint to compel arbitration. The Superior Court of Los Angeles County, Alfred L. Margolis, J., ordered parties to arbitrate, and following arbitration award a gainst promoter in amount of $53,290.32 confirmed award and granted promoter's motion to tax costs, and both parties appealed. The Supreme Court held that: (1) form contract between music promoter and musical group was adhesive and provi sion requiring arbitration of disputes before musicians' union, because it desi gnated an arbitrator who, by reason of its status and identity, was presumptive ly biased in favor of one party, was unconscionable and unenforceable; (2) fede ral labor law, even if applicable, did not require a different result; and (3) upon remand, parties were entitled to reasonable opportunity to agree on suitab le arbitrator.

Reversed and remanded with directions; corporation's appeal dismissed.

Opinion, 103 Cal.App.3d 66,162 Cal.Rptr. 798, vacated.
West Headnotes
**[1] Alternative Dispute Resolution 25T ⟐213(5)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement, and Contest
            25Tk204 Remedies and Proceedings for Enforcement in General
                25Tk213 Review
                    25Tk213(5) k. Scope and Standards

of Review. Most Cited Cases
        (Formerly 33k23.20, 33k23.17 Arbitration)
Although order compelling arbitration is nonappealable, validity of order may be reviewed on appeal from judgment confirming award of arbitrator.

**[2] Labor and Employment 231H ⟐1542**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)3 Arbitration Agreements
                231Hk1542 k. Requisites and Validity.
Most Cited Cases
        (Formerly 232Ak432 Labor Relations)
Form contract between music promoter and musical group was adhesive since members of musicians union were not permitted to sign any other form of contract other than that issued by union and all concert artists and groups of any significance or prominence were members of union, and provision requiring arbitration of disputes before musicians' union, because it designated an arbitrator who, by reason of its status and identity, was presumptively biased in favor of one party, was unconscionable and unenforceable. West's Ann.Code Civ.Proc. § 1280 et seq.

**[3] Contracts 95 ⟐1**

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
Contract of adhesion is enforceable according to its terms unless certain other factors are present which, under established legal rules, legislative or judicial, operate to render it otherwise. West's Ann.Civ.Code, § 1670; West's Ann. Insurance Code, § 11580.2(f).

**[4] Contracts 95 ⟐155**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k151 Language of Instrument
                95k155 k. Construction Against Party
Using Words. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3                                                                                         -36-

623 P.2d 165
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330
(Cite as: 28 Cal.3d 807, 623 P.2d 165)

Rule requiring resolution of ambiguities against drafting party applies with peculiar force in case of contract of adhesion.

**[5] Contracts 95 🔑1**

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
Generally, there are two judicially-imposed limitations on enforcement of adhesion contracts or provisions thereof: such contract or provision which does not fall within reasonable expectations of weaker or "adhering" party will not be enforced against him; and contract or provision, even if consistent with reasonable expectation of parties, will be denied enforcement if, considered in its context, it is unduly oppressive or "unconscionable."

**[6] Alternative Dispute Resolution 25T 🔑134(6)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk134 Validity
                    25Tk134(6) k. Unconscionability. Most Cited Cases
    (Formerly 33k6.2, 33k6 Arbitration)
When contract designates as arbitrator a person or entity who, by reason of relationship to a party or some similar factor, can be expected to adopt something other than a "neutral" stance in determining disputes, and contract is also product of circumstances suggestive of adhesion, possibility or overreaching by dominant party looms large; contracts concluded in such circumstances, then, must be scrutinized with particular care to insure that party of lesser bargaining power, in agreeing thereto, is not left in a position depriving him of any realistic and fair opportunity to prevail in dispute under its terms. West's Ann.Code Civ.Proc. § 1280 et seq.

**[7] Alternative Dispute Resolution 25T 🔑178**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement, and Contest
            25Tk177 Right to Enforcement and

Defenses in General
            25Tk178 k. In General. Most Cited Cases
    (Formerly 33k23 Arbitration)
If party resisting arbitration can show that rules under which arbitration is to proceed will operate to deprive him of common-law right of fair procedure, agreement to arbitrate should not be enforced.

**[8] Alternative Dispute Resolution 25T 🔑222**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(E) Arbitrators
            25Tk222 k. Competency. Most Cited Cases
    (Formerly 33k27 Arbitration)
Because arbitration contemplates a fair and reasoned decision, based on the evidence presented, contracting party may not act in capacity of arbitrator, and contractual provision which designates him to serve in that capacity is to be denied enforcement on grounds of unconscionability; same result would follow, and for the same reasons, when designated arbitrator is not party himself but one whose interests are so allied with those of the party that, for all practical purposes, he is subject to same disabilities which prevent party himself from serving.

**[9] Labor and Employment 231H 🔑1542**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)3 Arbitration Agreements
                231Hk1542 k. Requisites and Validity. Most Cited Cases
    (Formerly 232Ak432 Labor Relations)
Contractual provision designating union of one party to contract as arbitrator of all disputes arising thereunder, including those concerning compensation due under contract, does not achieve "minimum levels of integrity" which are demanded of contractually-structured substitute for judicial proceedings; such provision, being inimical to concept of arbitration, would be denied enforcement in any circumstances.

**[10] Courts 106 🔑97(5)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3

623 P.2d 165
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330
**(Cite as: 28 Cal.3d 807, 623 P.2d 165)**

106k88 Previous Decisions as Controlling or as Precedents
106k97 Decisions of United States Courts as Authority in State Courts
106k97(5) k. Construction of Federal Constitution, Statutes, and Treaties. Most Cited Cases
Supreme Court of California is under no obligation to follow federal court precedents interpreting acts of Congress when those precedents are found unpersuasive.

**[11] Labor and Employment 231H ⟷1542**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
           231HXII(H)3 Arbitration Agreements
              231Hk1542 k. Requisites and Validity.
Most Cited Cases
    (Formerly 232Ak436 Labor Relations)
Even if validity of contract between music promoter and musical group requiring arbitration of disputes before musicians union was governed by federal labor law, federal law of collective bargaining agreements did not require any result different from determination that such provision was unconscionable and unenforceable. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[12] Labor and Employment 231H ⟷1576**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
           231HXII(H)4 Proceedings
              231Hk1576 k. Appointment and Competency of Arbitrators. Most Cited Cases
    (Formerly 232Ak453 Labor Relations)
Even though provision of contract between music promoter and musical group requiring arbitration of disputes before musicians union was unconscionable and unenforceable, parties were not precluded from attempting to agree on arbitrator who was not subject to the same disabilities and, upon remand, were entitled to reasonable opportunity to agree on suitable arbitrator. West's Ann.Code Civ.Proc. § 1281.6.

***606**167*811 Mitchell, Silberberg & Knupp and Thomas P. Lambert, Los Angeles, for plaintiff and appellant.
Schwartz & Dreifus and Jordan A. Dreifus, Los Angeles, as amici curiae on behalf of plaintiff and appellant.
Fierstein & Sturman, Harvey Fierstein and Mark J. Linder, Los Angeles, for defendant and appellant.
Levy & Goldman, Abe F. Levy, Gerald Goldman and Elizabeth Garfield, Los Angeles, as amici curiae on behalf of defendant and appellant.
THE COURT:
[1] These are two consolidated appeals. Plaintiff Graham appeals from a judgment confirming the award of an arbitrator.[FN1](Code Civ.Proc., ss 1287.4, 1294, subd. (d), 1294.2.) Defendant Scissor-Tail, Inc., appeals from a special order after judgment taxing costs relating to attorney's fees. (Code Civ.Proc., s 1294, subd. (e).) We will reverse the judgment confirming the award, directing the trial court to vacate its order compelling arbitration (see fn. 1, ante ) and conduct further proceedings. We will dismiss the appeal from the special order after judgment as moot, 103 Cal.App.3d 66,162 Cal.Rptr. 798.

    FN1. Plaintiff also purports to appeal from the order compelling arbitration, a nonappealable order. He is entitled, however, to have the validity of this order reviewed on his appeal from the judgment of confirmation. (See La Pietra v. Freed (1978) 87 Cal.App.3d 1025, 1030-1031, 151 Cal.Rptr. 554;Atlas Plastering, Inc. v. Superior Court (1977) 72 Cal.App.3d 63, 67-68, 140 Cal.Rptr. 59;Wheeler v. St. Joseph Hospital (1976) 63 Cal.App.3d 345, 353, 133 Cal.Rptr. 775;Maddy v. Castle (1976) 58 Cal.App.3d 716, 719-720, 130 Cal.Rptr. 160.)

**\*812 I**

Plaintiff Bill Graham is an experienced promoter and producer of musical concerts. Defendant C. Russell Bridges, also known as Leon Russell (Russell), is a successful performer and recording artist and the leader of a musical group; he is also a member of the American Federation of Musicians (A.F. of M.). Defendant Scissor-Tail, Inc. (Scissor-Tail) is a California corporation, wholly owned by Russell, which serves as the vehicle by which the services of Russell and his group are marketed. Defendant David Forest Agency, Ltd. (Forest) was, at the time here relevant, acting in the capacity of booking agent for Scissor-Tail.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3    -38-

623 P.2d 165
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330
**(Cite as: 28 Cal.3d 807, 623 P.2d 165)**

Page 4

Early in 1973, Scissor-Tail and Russell decided to formulate and structure a personal appearance tour for the latter and his group. Forest was engaged to assist in this project, and at the suggestion of Dennis Cordell, Russell's personal manager and an officer of Scissor-Tail, contacted plaintiff Graham, who had previously promoted a number of Russell concerts, to request that he provide his services for four of the twelve concerts on the projected tour. A series of four contracts was prepared covering, respectively, concerts at Ontario, Oakland,***607 Long Island, and Philadelphia. Graham signed all four contracts; Scissor-Tail (per Dennis Cordell), for reasons to appear, signed only those relating to the Ontario and Oakland concerts, which were to occur on July 29 and August 5, 1973.

The four contracts in question were all prepared on an identical form known in the industry as an A.F. of M. Form B Contract; **168 in this case each bore the heading of the Forest agency. Aside from matters such as date and time, they differed from one another in only two areas i. e., the contents of the blanks designated "hours of employment" and "wage agreed upon." The former dealt with matters such as hours of performance and the provision of a guest artist to appear on the program prior to the Russell group. The latter provided that payment was to be "applicable A.F. of M. scale" or a specified percentage (85 percent in the case of Ontario, Oakland, and Philadelphia; 90 percent in the case of Long Island) "of the gross receipts after bonafide, receipted, sanctioned expenses and taxes, whichever is greater."Also here indicated in each case was the capacity of the concert site, the price of tickets, and the potential gross.

The contracts designated Graham as the "purchaser of music" or "employer," the seven members of the group as "musicians." They did *813 not speak explicitly to the question of who was to bear any eventual net losses. The contract forms also provided: "9. In accordance with the Constitution, By-laws, Rules and Regulations of the Federation, the parties will submit every claim, dispute, controversy or difference involving the musical services arising out of or connected with this contract and the engagement covered thereby for determination by the International Executive Board of the Federation or a similar board of an appropriate local thereof and such determination shall be conclusive, final and binding upon the parties."FN2

FN2. The contracts further provided: "FOR CALIFORNIA ENGAGEMENTS: It is expressly agreed by all parties hereto that all controversies involving any matter within the sole competence of the Federation pursuant to its Constitution, By-laws, rules or resolutions (as distinguished from matters within the competence of the Locals) arising out of this contract shall be submitted to, heard, arbitrated and determined by the International Executive Board of the American Federation of Musicians pursuant to and in accordance with the laws, rules and regulations of the said Federation. All controversies involving matters within the competence of Locals of the Federation arising out of this contract, shall be submitted to, heard, arbitrated and determined by the person, persons, or body specified by the rules, By-laws, or practices of the Local in whose jurisdiction the services have been or are to be performed in accordance with the procedures in such rules or By-laws. The parties hereto agree that when applicable pursuant to Section 1647.5 (now repealed) or section 1700.45 of the Labor Code of California, to provide reasonable notice to the Labor Commissioner of the time and place of any hearing which he shall be entitled to attend."(The parties are agreed that this last provision is not here applicable.)

As indicated above, all four contracts were signed by plaintiff Graham, his signature appearing below his typed name on a blank designated "signature of employer." Only those contracts relating to the Ontario and Oakland concerts bore a corresponding signature; on those contracts, below the typed name "Scissor-Tail, Inc. by C. Russell Bridges aka Leon Russell" and on a blank designated "signature of leader," is the signature of Dennis Cordell, who as above indicated was Russell's personal manager and an officer of Scissor-Tail.

On the second page of each contract is a list of the seven musicians involved (including Russell), together with an indication of the A.F. of M. local of each.

The Ontario concert took place as scheduled and had gross receipts of $173,000 (out of a potential gross reflected in the contract of "$450,000 plus"), with

623 P.2d 165
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330
**(Cite as: 28 Cal.3d 807, 623 P.2d 165)**

Page 5

expenses of $236,000, resulting in a net loss of some $63,000. The Oakland concert also took place, resulting in a net profit of some $98,000. Following this second concert a dispute arose among the parties over who was to bear the loss sustained in the Ontario concert and whether that loss could be offset against the profits of *814 the Oakland concert Scissor-Tail and Forest taking the position that ***608 under the contract Graham was to bear all losses from any concert without offset, Graham urging that under standard industry practice and custom relating to 8 5/15 and 9 0/10 contracts such losses should accrue without offset to Scissor-Tail, et al. This dispute remaining unresolved,[FN3] Scissor-Tail declined **169 to execute the contracts for the Long Island and Philadelphia concerts; apparently these concerts took place as scheduled, but some party other than Graham performed the promotional services.

> FN3. It appears that in the course of discussions relating to this dispute the question of arbitration before the A.F. of M. was prominently raised by both parties. Graham, in a telegram to Forest dated August 7, 1973, indicated that unless defendants agreed to a compromise suggested by him "we will have to file charges with A.F. of M. based on Leon's breach of these four contracts."

In October 1973, Graham filed an action for breach of contract, declaratory relief, and rescission against all defendants. Scissor-Tail responded with a petition to compel arbitration. After once ordering arbitration, the trial court in 1974 granted reconsideration in order to permit discovery "limited to the issues of whether an agreement to arbitrate was entered into and whether grounds exist to rescind such agreement ...."[FN4] Following such discovery, and in light of resulting depositions lodged with it, the court in March of 1976 finally granted the petition and ordered arbitration. Along with its order, and at Graham's request, the court filed formal findings of fact and conclusions of law.[FN5]

> FN4. Section 1281.2 of the Code of Civil Procedure, as here relevant, provides: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the

petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that: (a) The right to compel arbitration has been waived by the petitioner; or (b) Grounds exist for the revocation of the agreement. (c) ...."

> FN5. The court made the following specific findings: "A. Scissor-Tail has not waived its right to compel arbitration; B. Plaintiff Graham did not enter into the arbitration agreements under mistake and no grounds exist for the rescission or revocation of the arbitration agreements, or any of them; and C. That all of the issues which are raised by the Complaint and First Amended Complaint of Graham, are subject to arbitration."

By letter dated April 12, 1976, the A.F. of M. was advised of the court's order. By late June, however, no hearing date had been set and counsel for Scissor-Tail wrote to the union requesting that a date be set and suggesting certain dates convenient to him. Rather than comply with this request, however, the union, through its International Executive Board, on July 6 issued its decision awarding the full amount of *815 Scissor-Tail's claim against Graham, or some $53,000.[FN6] Counsel for Graham, protesting against this procedure, was informed by the A.F. of M. that it conformed with normal practice, which contemplated the entry of award without hearing. Thereupon counsel for Graham enlisted the assistance of Scissor-Tail's counsel in the matter and, upon securing the latter's consent, was successful in reopening the matter and having it set for hearing.

> FN6. This amount represented 85 percent of the net receipts from the Oakland concert less an advance by Graham to Scissor-Tail prior to the concert. (Apparently Graham had retained the net proceeds of the Oakland concert as an offset against the loss sustained in the Ontario concert.)

In the meantime, on August 10, 1976, Graham had been placed on the union's "defaulter's list" apparently a list of persons with whom union members may not do business.

On September 10, 1976, Scissor-Tail [FN7] increased

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3

623 P.2d 165
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330
(Cite as: 28 Cal.3d 807, 623 P.2d 165)

the claim by $20,000 to a total of some $73,000, urging that some of the expenses claimed by Graham with respect to the two concerts were improper. Scissor-Tail further requested interest on the award and $15,000 as attorney's fees.

> FN7. The formal claimant before the A.F. of M. was Forest. For convenience we refer to all parties representing the Russell interests as Scissor-Tail.

On October 29, 1976, a hearing was held at the union's western (Hollywood) office \*\*\*609 before a "referee" appointed by the union president. The referee was a former executive officer and a long-time member of the union; he had acted as a hearing officer in many previous union matters. All parties (excluding Russell himself) and counsel were present. Graham sought to have the proceedings transcribed by a court reporter brought by him; the request was denied and the reporter excused. The hearing \*\*170 thereupon proceeded. Graham produced considerable evidence consisting of his own testimony, the testimony of another promoter, the stipulated testimony of a third promoter, and three sworn statements by others engaged in the popular music concert field to the effect that under common and widely held custom and practice in the industry, the promoter under a 9 0/10 or 8 5/15 contract was understood to bear no risk of loss because his share of the profits under such contracts was considerably smaller than under the "normal" contract, under which the promoter takes a larger percentage of the profits but is understood to bear the risk of loss; no contrary evidence was offered by Scissor-Tail. The referee also heard evidence regarding the propriety of certain expenses claimed by Graham and questioned by Scissor-Tail.

\*816 On November 5, 1976, in his report to the union's International Executive Board, the referee recommended that Graham be ordered to pay to Scissor-Tail the amount of its original claim (some $53,000; see fn. 6, ante ). The balance of the claim consisting of the items added by Scissor-Tail's September 10 request was denied, the referee noting that the union had issued no directions to him regarding it.

On February 22, 1977, the union's International Executive Board made its award in conformity with the recommendation of the referee.

Scissor-Tail thereupon filed a petition in the superior court to confirm the award; Graham filed a petition to vacate it. (See Code Civ.Proc., s 1285.) The court granted the former petition and denied the latter; judgment was entered accordingly. (Code Civ.Proc., s 1287.4.) [FN8]

> FN8. The court's findings of fact and conclusions of law specifically incorporated and affirmed the findings and conclusions previously filed in support of the order compelling arbitration. (See fn. 5, ante, and accompanying text.) The court also found, with respect to the confirmed award: "8. Said award in favor of SCISSOR-TAIL, INC. was not procured by fraud, nor corruption, nor by any other undue means; there was no corruption in the Arbitrator, and further, rights of BILL GRAHAM were not substantially prejudiced, or prejudiced at all, by any conduct of the Arbitrators; further that there was no misconduct of the Arbitrator or any bias or prejudice against BILL GRAHAM. 9. The written contracts which are the subject of this litigation and which were executed by Plaintiff, BILL GRAHAM, specifically contained a provision for arbitration; said arbitration provision clearly designated the American Federation of Musicians as the Arbitrator. Therefore, any appearance of bias, nonneutrality or lack of impartiality of the designated arbitrator was known to Plaintiff, BILL GRAHAM, at the time of the execution of the agreement containing a provision for arbitration. This finding does not infer that the Court has found or determined that said American Federation of Musicians was biased or prejudiced or nonneutral or partial. 10. The aforesaid arbitration did not exceed its powers and there was no mistake of law on the face of the arbitration award."

After entry of judgment Scissor-Tail filed a cost bill which included an item of some $16,000 for attorney's fees. The court granted Graham's motion to tax costs, striking this item on the basis of the arbitrator's (referee's) determination.

Graham appeals from the judgment confirming the arbitrator's award. Scissor-Tail appeals from the order

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3                                                    -41-

623 P.2d 165

28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330

**(Cite as: 28 Cal.3d 807, 623 P.2d 165)**

taxing costs.

## II

We first turn our attention to the validity of the order compelling arbitration. Plaintiff, as we have indicated, is entitled to challenge this order on the instant appeal. (See fn. 1, ante.)

**\*817** Plaintiff's basic contention in this respect is that the order compelling arbitration was in error because the underlying agreement [FN9] **\*\*\*610** at least insofar as it required arbitration of disputes before the A.F. of M. was an unenforceable contract of adhesion. Two separate questions are thus presented, each of which requires separate consideration: (1) Is this a contract of adhesion? (2) If so, is it unenforceable?

> FN9. As we have indicated, there are actually four agreements, or at least two, involved in this controversy. Since they are all identical in the respect we here consider, we shall sometimes hereafter refer to them in the singular.

### **\*\*171** A.

The term "contract of adhesion," now long a part of our legal vocabulary, [FN10] has been variously defined in the cases and other legal literature. [FN11] The serviceable general definition first suggested by Justice Tobriner in 1961, however, has well stood the test of time and will bear little improvement: "The term signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it."(Neal v. State Farm Ins. Cos. (1961) 188 Cal.App.2d 690, 694, 10 Cal.Rptr. 781.)

> FN10. The term, apparently resting upon concepts in the French civil law, was first introduced into the common law vocabulary by Professor Patterson over 60 years ago: "Life-insurance contracts are contracts of 'adhesion.' The contract is drawn up by the insurer and the insured, who merely 'adheres' to it, has little choice as to its terms."(Patterson, The Delivery of a Life-Insurance Policy (1919) 33 Harv.L.Rev. 198, 222, fn. omitted.)

> FN11. For a representative sampling, with an emphasis on California, see cases and authorities collected in Sybert, Adhesion Theory in California: A Suggested Redefinition and its Application to Banking (1978) 11 Loyola L.A.L.Rev. 297, 301-305 (hereafter Sybert ).

Such contracts are, of course, a familiar part of the modern legal landscape, in which the classical model of "free" contracting by parties of equal or near-equal bargaining strength is often found to be unresponsive to the realities brought about by increasing concentrations of economic and other power. [FN12] They are an inevitable fact of life for **\*818** all citizens businessman [FN13] and consumer alike. [FN14] While not lacking in social advantages, [FN15] they bear within them the clear danger of oppression and overreaching. It is in the context of this tension between social advantage in the light of modern conditions on the one hand, and the danger of oppression on the other that courts and legislatures have sometimes acted to prevent perceived abuses.

> FN12. See generally Friedmann, Law in a Changing Society (1959) chapter 4; Wilson, Freedom of Contract and Adhesion Contracts (1965) 14 Int. & Comp.L. 172, 172-175; Kessler, Contracts of Adhesion Some Thoughts About Freedom of Contract (1943) 43 Colum.L.Rev. 629, 640-642 (hereafter Kessler ).

> FN13. Although most of the cases have arisen in the consumer context, adhesion contracts are also found in a commercial setting. (See, e. g., Player v. Geo. M. Brewster & Son, Inc. (1971) 18 Cal.App.3d 526, 96 Cal.Rptr. 149;Windsor Mills, Inc. v. Collins & Aikman Corp. (1972) 25 Cal.App.3d 987, 995, fn. 6,101 Cal.Rptr. 347; see generally Domke, The Law and Practice of Commercial Arbitration (1968) s 5.04; Llewellyn, Book Review (1939) 52 Harv.L.Rev. 700 (hereafter Llewellyn ). The inquiry is simply whether the requisite characteristics (e. g., inequality of bargaining power) are present.

> FN14. For a colorful depiction of the ubiquity of adhesive contracts in daily life, see Wheeler v. St. Joseph Hospital, supra, 63 Cal.App.3d 345, 378, 133 Cal.Rptr. 775

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3

623 P.2d 165
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330
(Cite as: 28 Cal.3d 807, 623 P.2d 165)

(dis. opn. of Gardner, P. J.). For an indication of the range of circumstances in which the California cases have found contracts to be adhesive see Sybert, supra, at page 303.

FN15."Through advance knowledge on the part of the enterprise offering the contract that its relationship with each individual consumer or offeree will be uniform, standard and fixed, the device of form contracts introduces a degree of efficiency, simplicity, and stability. When such contracts are used widely, the savings in cost and energy can be substantial. An additional benefit is that the goods and services which are covered by these contracts are put within the reach of the general public, whose sheer size might prohibit widespread distribution if the necessary contractual relationships had to be individualized. Transactional costs, and therefore the possible prices of these goods and services, are reduced. (P) In short, form contracts appear to be a necessary concomitant of a sophisticated, mass-consumption economy. They have social and economic utility."(Sybert, supra, at pp. 297-298, fns. omitted; see also, e. g., Kessler, supra, at p. 632; Llewellyn, supra, at pp. 701-702.)

[2] We believe that the contract here in question, in light of all of the circumstances presented, may be fairly described as adhesive. Although defendant and its supporting***611 amicus curiae are strenuous in their insistence that Graham's prominence and success in the promotion of popular music concerts afforded him considerable bargaining strength in the subject negotiations, the record before us fairly establishes that he, for all his asserted stature in the industry, was here reduced to the humble role of **172 "adherent." It appears that all concert artists and groups of any significance or prominence are members of the A.F. of M.; that pursuant to express provision of the A.F. of M.'s constitution and bylaws members are not permitted to sign any form of contract other than that issued by the union; that the A.F. of M. Form B. Contract in use at the time here relevant included the arbitration provisions here in question (see fn. 2, ante, and accompanying text); and that Scissor-Tail insisted upon the use of 8 5/15 and 9 0/10 contractual arrangements. In these circumstances it must be concluded that Graham,

whatever his asserted prominence in the industry, was required by *819 the realities of his business as a concert promoter to sign A.F. of M. form contracts with any concert artist with whom he wished to do business and that in the case before us he, wishing to promote the Russell concerts, was presented with the nonnegotiable option of accepting such contracts on an 8 5/15 or 9 0/10 basis or not at all.

It is argued, however, that other provisions of the contract e. g., those relating to the length, time, and date of the concert and the selection of a special guest artist to appear on the program preceding the Russell group were subject to negotiation and that this consideration operated to mitigate or remove all adhesive characteristics from the contract. We do not agree. Although there may be circumstances in which the parties to a contract, negotiating in the context of certain "nonnegotiable" provisions insisted upon by one of them, may yet achieve an agreement of nonadhesive character through accommodation and bargaining with respect to other significant terms, we do not believe that the instant case involves such a situation. The terms here asserted to be subject to negotiation, assuming that they were in fact so, were of relatively minor significance in comparison to those imposed by Scissor-Tail, which included not only the provision concerning the manner and rate of compensation but that dictating a union forum for the resolution of any disputes. In these circumstances we cannot conclude that the presence of other assertedly negotiable terms acted to remove the taint of adhesion.

B.

[3][4] To describe a contract as adhesive in character is not to indicate its legal effect. It is, rather, "the beginning and not the end of the analysis insofar as enforceability of its terms is concerned."(Wheeler v. St. Joseph Hospital, supra, 63 Cal.App.3d 345, 357, 133 Cal.Rptr. 775.)Thus, a contract of adhesion is fully enforceable according to its terms FN16 (see Meyers v. Guarantee Sav. & Loan Assn. (1978) 79 Cal.App.3d 307, 312, 144 Cal.Rptr. 616;*820Yeng Sue Chow v. Levi Strauss & Co. (1975) 49 Cal.App.3d 315, 325, 122 Cal.Rptr. 816;Schmidt v. Pacific Mut. Life Ins. Co. (1969) 268 Cal.App.2d 735, 737, 74 Cal.Rptr. 367;Neal v. State Farm Ins. Cos., supra, 188 Cal.App.2d 690, 694, 10 Cal.Rptr. 781) unless certain other factors are present which, under established legal rules legislative FN17 or judicial operate to render it otherwise.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3

623 P.2d 165
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330
**(Cite as: 28 Cal.3d 807, 623 P.2d 165)**

Page 9

FN16. Such terms, of course, are subject to interpretation under established principles. The rule requiring the resolution of ambiguities against the drafting party "applies with peculiar force in the case of a contract of adhesion. Here the party of superior bargaining power not only prescribes the words of the instrument but the party who subscribes to it lacks the economic strength to change such language."(Neal v. State Farm Ins. Cos., supra, 188 Cal.App.2d 690, 695, 10 Cal.Rptr. 781.)In the absence of such ambiguity, however, the question of enforceability is determined wholly in light of the principles about to be discussed.

FN17. An example of legislative action is to be found in the recently enacted section 1670 of the Civil Code, which essentially renders unenforceable provisions in public-agency construction contracts appointing a party or his agent as arbitrator of disputes arising under the contract. (See also Ins.Code, s 11580.2, subd. (f).)

***612[5] Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or "adhering" party will not be enforced against him. (See, e.g., **173Gray v. Zurich Insurance (1966) 65 Cal.2d 263, 271-272, 54 Cal.Rptr. 104, 419 P.2d 168;Steven v. Fidelity & Casualty Co. (1962) 58 Cal.2d 862, 869-870, 27 Cal.Rptr. 172, 377 P.2d 284;Wheeler v. St. Joseph Hospital, supra, 63 Cal.App.3d 345, 357, 133 Cal.Rptr. 775; see generally Sybert, supra, at pp. 305-306, and cases there cited.) [FN18]The second a principle of equity applicable to all contracts generally is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or "unconscionable." (See e. g., Steven, supra, at pp. 878-879,54 Cal.Rptr. 104, 419 P.2d 168;Jacklich v. Baer (1943) 57 Cal.App.2d 684, 135 P.2d 179.)[FN19]We proceed to examine whether the instant contract, and especially that provision thereof requiring the arbitration of disputes before the A.F. of M., should have been denied enforcement under either of these two principles.

FN18. A number of the cases, including those cited immediately above, have emphasized the aspect of notice, indicating that provisions contrary to the reasonable expectations of the "adhering" party will be denied enforcement in the absence of "plain and clear notification" and "an understanding consent." (Steven, supra, at p. 883, 54 Cal.Rptr. 104, 419 P.2d 168.)The effect of an adequate notice, of course, is simply to alter preexisting expectations. Notice, in other words, is simply one of the factors albeit an extremely significant one to be weighed in assessing the reasonable expectations of the "adhering" party. (See also Madden v. Kaiser Foundation Hospitals (1976) 17 Cal.3d 699, 710, 131 Cal.Rptr. 882, 552 P.2d 1178.)

Another factor which may have a profound and decisive effect on the reasonable expectations of the "adhering" party is the extent to which the contract in question may be said to be one affecting the public interest. (See Tunkl v. Regents of University of California (1963) 60 Cal.2d 92, 101, 32 Cal.Rptr. 33, 383 P.2d 441; see generally Tobriner & Grodin, The Individual and the Public Service Enterprise in the New Industrial State (1967) 55 Cal.L.Rev. 1247.)The instant contract is not claimed to be nor we find it to be such a contract.

FN19. The judicially developed concept of unconscionability has recently become a part of our statutory law. (See Civ.Code, s 1670.5, and legislative committee comment.)

*821 We cannot conclude on the record before us that the contractual provision requiring arbitration of disputes before the A.F. of M. was in any way contrary to the reasonable expectations of plaintiff Graham. By his own declarations and testimony, he had been a party to literally thousands of A.F. of M. contracts containing a similar provision; indeed it appears that during the 3 years preceding the instant contracts he had promoted 15 or more concerts with Scissor-Tail, on each occasion signing a contract containing arbitration provisions similar to those here in question. It also appears that he had been involved in prior proceedings before the A.F. of M. regarding disputes with other musical groups arising under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3

-44-

prior contracts. Finally, the discussions taking place following the Oakland concert, together with his telegram indicating that he himself would file charges with the A.F. of M. if the matter were not settled to his satisfaction (see fn. 3, ante ), all strongly suggest an abiding awareness on his part that all disputes arising under the contracts were to be resolved by arbitration before the A.F. of M. For all of these reasons it must be concluded that the provisions requiring such arbitration (see fn. 2, ante, and accompanying text) were wholly consistent with Graham's reasonable expectations upon entering into the contract.

We are thus brought to the question whether the contract provision requiring the arbitration of disputes before the A.F. of M. because it designates an arbitrator who, by reason of its status and identity, is presumptively biased in favor of one party is for that reason [FN20] to be deemed unconscionable***613 and unenforceable. Graham, although couching his arguments in other terminology, essentially maintains that it is the thrust of his position being that to **174 allow the A.F. of M. to sit in judgment of a dispute arising between one of its members and a contracting nonmember is so inimical to fundamental notions of fairness as to require nonenforcement. We proceed to a consideration of this contention.

> FN20. In addressing the plaintiff's specific contention, of course, we should not be understood to delimit the scope of the judicial concept of unconscionability. Contracts having a demonstrable public service aspect (see Tunkl v. Regents of University of California, supra, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441), for example, may be deemed unconscionable on broad grounds of public policy.

We are met at the outset of our inquiry with certain provisions of the California Arbitration Act which, it would seem, contemplate complete contractual autonomy in the choice of an arbitrator. Section 1281.6 of the Code of Civil Procedure provides that "(i)f the arbitration agreement provides a method of appointing an arbitrator, such method shall *822 be followed."Section 1282 of the same code states that "(u)nless the arbitration agreement otherwise provides " (italics added) arbitration shall be by a neutral arbitrator either alone or in combination with other neutral and/or nonneutral arbitrators. Subsection (d) of the same section provides: "If there

is no neutral arbitrator, the powers and duties of a neutral arbitrator may be exercised by a majority of the arbitrators."(Italics added.)

In Federico v. Frick (1970) 3 Cal.App.3d 872, 84 Cal.Rptr. 74, a case factually similar to that here before us, it was held that these provisions "expressly permit( ) the parties to an arbitration to agree to the conduct of arbitration proceedings by a nonneutral arbitrator.... (A)rbitration being a creature of statute, the statute controls."(3 Cal.App.3d at p. 876, fn. omitted.) This result followed, the court concluded, even though "(e)lementary fairness may seem to demand that arbitration proceedings be under the control of a neutral and impartial arbitrator, ..."(Id.) The court noted by way of footnote that "many government contracts customarily provide that all disputes arising under them shall be arbitrated by a specified official of the governmental entity which is one of the contracting parties. (See Domke, Commercial Arbitration, s 11.03, pp. 93-96.)"[FN21](Id., at fn. 4.)

> FN21. It should be noted that the cited treatise also states: "The so-called government disputes clause has long been an issue of policy and discussion. Consideration of the propriety of such settlement machinery is beyond the consideration of this volume concerned with private commercial arbitration."(Domke, supra, s 11.03, at p. 94.)

The case of Gear v. Webster (1968) 258 Cal.App.2d 57, 65 Cal.Rptr. 255 reached a similar result on the same statutory grounds. It should be noted, however, that this case, concerning a dispute between a salesman and a broker, both members of the arbitrating local board of realtors, was intra-organizational in nature. Federico and the instant case, of course, are not.

There have been a substantial number of California cases involving the compulsion of unwilling contractual parties (both employees and customers) to arbitrate disputes with members of the New York Stock Exchange before the latter body. (See, e. g., Richards v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (1976) 64 Cal.App.3d 899, 135 Cal.Rptr. 26;Arrieta v. Paine, Webber, Jackson & Curtis, Inc. (1976) 59 Cal.App.3d 322, 130 Cal.Rptr. 534;Vernon v. Drexel Burnham & Co. (1974) 52 Cal.App.3d 706, 125 Cal.Rptr. 147;Berman v. Dean Witter & Co., Inc.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3    -45-

623 P.2d 165
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330                    Page 11
**(Cite as: 28 Cal.3d 807, 623 P.2d 165)**

(1975) 44 Cal.App.3d 999, 119 Cal.Rptr. 130;*823Lewsadder v. Mitchum, Jones & Templeton, Inc. (1973) 36 Cal.App.3d 255, 111 Cal.Rptr. 405;Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (1971) 20 Cal.App.3d 668, 97 Cal.Rptr. 811.)All but one have ordered arbitration before that body, but only the two first cited have given explicit attention to the issue we now consider i. e., whether potential bias said to arise from the composition of the arbitral body should preclude enforcement of a contractual provision requiring arbitration before it. Even in these cases the issue was clouded by other factors. Thus, in the Arrieta***614 case the court, citing Federico, stated that "(p)otential unfairness from the non-neutral nature of an arbitrator is not a ground for vacation of the arbitration award," but it was noted that under the applicable arbitration rules there existed procedures for the disqualification of biased arbitrators a factor not here present. (59 Cal.App.3d at p. 330, 130 Cal.Rptr. 534.)In Richards, on the other hand, the court refused to compel arbitration on the ground, **175 inter alia, that there was "basic apparent unfairness in requiring the nonmember to submit to arbitrators, all of whom have been appointed by the Exchange of which Merrill Lynch is a member."(64 Cal.App.3d at p. 903, 135 Cal.Rptr. 26, fn. omitted.) It was made clear, however, that it was this factor in combination with others which required the result reached.[FN22]

> FN22. It appears that following Richards certain relevant changes were made in stock exchange arbitration rules and the legal requirements relating to them. (See N.Y. Stock Exch., const., art. VIII; N.Y. Stock Exch., Rules of Arbitration, rules 607 ff.; 15 U.S.C.A. s 78s(b).)

There are, of course, a host of cases from other jurisdictions which bear upon the problem. We here note only one, which we consider of particular interest. In the Matter of Cross & Brown Company (1957) 4 A.D.2d 501, 167 N.Y.S.2d 573, the court considered the validity of a contractual provision in an employment contract which provided that any dispute under the contract was to be arbitrated before the employer, whose decision was to be final. The court, in essence, found the provision unconscionable; enforcement was denied. "A well-recognized principle of 'natural justice,' " the court stated, "is that a man may not be a judge in his own cause. Irrespective of any proof of actual bias or

prejudice, the law presumes that a party to a dispute cannot have that disinterestedness and impartiality necessary to act in a judicial or quasi-judicial capacity regarding that controversy. This absolute disqualification to act rests upon sound public policy. Any other rule would be repugnant to a proper sense of justice."(Id., at p. 575.) The court went on, however, to explain the limits of its holding in the following terms: "As a general rule, since arbitration is a contractual method of settling disputes, whom the parties choose to act as an arbitrator is a matter of *824 their own judgment. An interest in the dispute or a relationship with a party, if known to the parties to the agreement when the arbitrator is chosen, will not disqualify the arbitrator from acting. In Lipschutz v. Gutwirth, 304 N.Y. 58, 61-62, 106 N.E.2d 8, 10, the Court said: 'The spirit of the arbitration law being the fuller effectuation of contractual rights, the method for selecting arbitrators and the composition of the arbitral tribunal have been left to the contract of the parties.'(P) ... By our decision herein we do not intend to limit the power of contracting parties to designate arbitrators who, with the knowledge of the parties, may have an interest in the dispute or who sustain some relationship to a party which would otherwise disqualify the arbitrator from serving. What we do hold is that no party to a contract, or someone so identified with the party as to be in fact, even though not in name, the party, can be designated as an arbitrator to decide disputes under it. Apart from outraging public policy, such an agreement is illusory; for while in form it provides for arbitration, in substance it yields the power to an adverse party to decide disputes under the contract."(Id., at p. 576.)

[6] We believe that what was said in the Cross & Brown case, viewed against the provisions of our arbitration act, provides an instructive framework for the consideration of cases such as that now confronting us. The arbitration act, as we read it, expressly recognizes the right of contractual parties to provide for the resolution of contractual disputes by arbitral machinery of their own design and composition. "The policy of the law in recognizing arbitration agreements and in providing by statute for their enforcement is to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing."(***615Utah Const. Co. v. Western Pac. Ry. Co. (1916) 174 Cal. 156, 159, 162 P. 631; see also Delta Lines, Inc. v. International Brotherhood of Teamsters (1977) 66 Cal.App.3d 960, 965, 136 Cal.Rptr. 345;Vernon v. Drexel Burnham &

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3                                                                          -46-

Case 3:07-cv-02412-JM-JMA    Document 7    Filed 01/03/2008    Page 50 of 50

623 P.2d 165                                                                                           Page 12
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330
**(Cite as: 28 Cal.3d 807, 623 P.2d 165)**

Co., supra, 52 Cal.App.3d 706, 715, 125 Cal.Rptr. 147;Player v. Geo. M. Brewster & Son, Inc., supra, 18 Cal.App.3d 526, 534, 96 Cal.Rptr. 149.)In so doing we do not believe and the Arbitration Act does not require that the parties are or should be strictly precluded from **176 designating as arbitrator a person or entity who, by reason of relationship to a party or some similar factor, can be expected to adopt something other than a "neutral" stance in determining disputes. At the same time we must note that when as here the contract designating such an arbitrator is the product of circumstances suggestive of adhesion, the possibility of overreaching by the dominant party looms large; contracts concluded in such circumstances, then, must be scrutinized with particular care to insure that the party of *825 lesser bargaining power, in agreeing thereto, is not left in a position depriving him of any realistic and fair opportunity to prevail in a dispute under its terms.

As the United States Supreme Court has said in a related context, "Congress has put its blessing on private dispute settlement arrangements ..., but it was anticipated, we are sure, that the contractual machinery would operate within some minimum levels of integrity."(Hines v. Anchor Motor Freight (1976) 424 U.S. 554, 571, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231.)By the same token it appears that the Legislature has determined that the parties shall have considerable leeway in structuring the dispute settlement arrangements by which they are bound; while recognizing that the leeway may permit the establishment of arrangements which vary to some extent from the dead-center of "neutrality," we at the same time must insist and most especially in circumstances smacking of adhesion that certain "minimum levels of integrity" be achieved if the arrangement in question is to pass judicial muster.

It is for the courts of course to determine largely on a case by case basis what these "minimum levels of integrity" shall be. In doing so it must not be lost sight of that the "contractual machinery" of the parties is intended by them to serve as a substitute for although of course not a duplicate of formal judicial proceedings. What is contemplated, then, is a tribunal i. e., an entity or body which "hears and decides" disputes. (See Webster's New Internat. Dict. (2d ed. 1941) p. 2707.) As the Cross & Brown case indicates, an entity or body which by its nature is incapable of "deciding" on the basis of what it has "heard" as, in that case, one of the principal parties to the contract does not qualify. "Unless we close our eyes to

realities," the court there said, "the agreement here becomes, not a contract to arbitrate, but an engagement to capitulate."(167 N.Y.S.2d at p. 576.)The same result would follow, the court there suggests, when one "so identified with the party as to be in fact, even though not in name, the party" is designated. (Id.) In such cases as this, the agreement to arbitrate is essentially illusory. Here, clearly, "minimum levels of integrity" are not achieved, and the "agreement to arbitrate" should be denied enforcement on grounds of unconscionability.

[7] There is we think a second basis, related to that just discussed, for denying enforcement on such grounds. The fact that an entity or body designated by contract to act as arbitrator of contractual disputes *826 is one capable of acting as a tribunal i. e., in the sense of hearing a dispute and deciding fairly and rationally on the basis of what it has heard is of little consequence if it proceeds under rules which deny a party the fair opportunity to present his side of the dispute. Thus, if a party resisting arbitration can show that the rules under which arbitration is to proceed will operate to deprive him of what we in other contexts have termed the common law right of fair procedure, the agreement to arbitrate should not be enforced. In this respect it is well to reiterate, adapting it to the present context, what we said in the seminal case on this subject. "The common law requirement of a fair procedure does ***616 not compel formal proceedings with all the embellishments of a court trial (citation), nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for (a disputant) to present his position. As such, this court should not attempt to fix a rigid procedure that must invariably be observed."(Pinsker v. Pacific Coast Society of Orthodontists (1974) 12 Cal.3d 541, 555, 116 Cal.Rptr. 245.)When it can be **177 demonstrated, however, that the clear effect of the established procedure of the arbitrator will be to deny the resisting party a fair opportunity to present his position, the court should refuse to compel arbitration.[FN23]

FN23. Enforcement of an agreement to arbitrate should be denied on this ground, we think, only in the clearest of cases, i. e., when the applicable procedures essentially preclude the possibility of a fair hearing. In all other cases the matter should be permitted to proceed to arbitration. If, in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3                                                                                                          -47-