623 P.2d 165
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330
(Cite as: 28 Cal.3d 807, 623 P.2d 165)

Page 13

course of arbitration proceedings, the resisting party is actually denied a fair opportunity to present his position, ample means for relief are available through a subsequent petition to vacate the award. (See Code Civ.Proc., ss 1285.8, 1286.2, subd. (e).) (See and cf. California State Council of Carpenters v. Superior Court (1970) 11 Cal.App.3d 144, 162-163, 89 Cal.Rptr. 625.)

We thus return to the narrow question here before us: Is the contract we here consider, insofar as it requires the arbitration of all disputes arising thereunder before the A.F. of M., to be deemed unconscionable and unenforceable?

The answer to this question, we have concluded, must clearly be yes. Although our review of the record has disclosed nothing which would indicate that A.F. of M. procedures operate to deny any party a fair opportunity to present his position prior to decision,[FN24] we are of the view *827 that the "minimum levels of integrity" which are requisite to a contractual arrangement for the nonjudicial resolution of disputes are not achieved by an arrangement which designates the union of one of the parties as the arbitrator of disputes arising out of employment especially when, as here, the arrangement is the product of circumstances indicative of adhesion.

> FN24. The union's Constitution and By-Laws, which was before the court when it ruled on the motion to compel arbitration, provides inter alia that each party "consents to the introduction and submission of evidence to the Board in the form of unsworn written statements, and waives the taking of oral testimony and the presentation of oral argument before the Board." We find nothing to indicate therein that the union member, but not the other party, has the right to an oral hearing.

[8] As we have indicated above, drawing from the teaching of the Cross & Brown case, a contract which purports to designate one of the parties as the arbitrator of all disputes arising thereunder is to this extent illusory the reason being that the party so designated will have an interest in the outcome which, in the view of the law, will render fair and reasoned decision, based on the evidence presented, a

virtual impossibility. Because, as we have explained, arbitration (as a contractually structured substitute for formal judicial proceedings) contemplates just such a decision, a contractual party may not act in the capacity of arbitrator and a contractual provision which designates him to serve in that capacity is to be denied enforcement on grounds of unconscionability. We have also indicated that the same result would follow, and for the same reasons, when the designated arbitrator is not the party himself but one whose interests are so allied with those of the party that, for all practical purposes, he is subject to the same disabilities which prevent the party himself from serving. Again, a contractual provision designating such an entity as arbitrator must be denied enforcement on the ground that it would be unconscionable to permit that entity to so serve.

A labor union is an association or combination of workers organized for the purpose of securing through united action the most favorable conditions as regards wages or rates of pay, hours, and conditions of employment for its members; the primary function of such an organization is that of ***617 bargaining with employers on behalf of its membership in order to achieve these objectives. (See cases collected at 48 Am.Jur.2d., Labor and Labor Relations, ss 46, 48, pp. 108-111; 51 C.J.S., Labor Relations, ss 43, 51, pp. 661-662, 672-674; 41 Cal.Jur.3d, Labor, s 1, pp. 154-155; see also Rest., Torts, s 778, p. 104; Lab.Code, ss 1117, 1140.4, subd. (f), 1413, subd. (c).) By its very nature, therefore, a labor union addresses disputes concerning compensation arrangements**178 between its members and third parties with interests identical to those of the affected members; to suppose that it would do otherwise is to suppose that it would act in a manner inconsistent with its reason for being.

*828[9] In the view of these considerations we think it must be concluded that a contractual provision designating the union of one of the parties to the contract as the arbitrator of all disputes arising thereunder including those concerning the compensation due under the contract does not achieve the "minimum levels of integrity" which we must demand of a contractually structured substitute for judicial proceedings. Such a provision, being inimical to the concept of arbitration as we understand it, would be denied enforcement in any circumstances; clearly it cannot stand in a case which, like that before us, requires the careful and searching scrutiny appropriate to a contract with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3

-48-

623 P.2d 165
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330
**(Cite as: 28 Cal.3d 807, 623 P.2d 165)**

Page 14

manifestly adhesive characteristics. The trial court's order compelling arbitration in the instant case was therefore in error and must be reversed.

To the extent it is inconsistent herewith, the case of Federico v. Frick, supra, 3 Cal.App.3d 872, 84 Cal.Rptr. 74, is disapproved.

### III

It is urged by Scissor-Tail and amicus curiae supporting it, however, that regardless of the validity of the contractual provision at issue under state law, it must be enforced as a matter of federal labor law. Their argument, as we understand it, is: (1) that the contract we here consider is, or is equivalent to, a collective bargaining agreement between Graham and the A.F. of M., each of which is involved in activities involving interstate commerce; (2) that the instant action is a dispute arising under this agreement and therefore could have been brought in federal court under section 301 of the federal Labor-Management Relations Act (see 29 U.S.C.A. s 185); (3) that such an action, if brought in state court, must nevertheless be governed by federal substantive law (Teamsters Union v. Lucas Flour Co. (1962) 369 U.S. 95, 102-103, 82 S.Ct. 571, 7 L.Ed.2d 593;Charles J. Rounds Co. v. Joint Council of Teamsters No. 42 (1971) 4 Cal.3d 888, 892, 95 Cal.Rptr. 53;McCarroll v. L. A. County etc. Carpenters (1957) 49 Cal.2d 45, 60, 315 P.2d 322); and (4) that applicable federal law, as definitively declared and applied in recent cases, requires that the instant provision for arbitration of contractual disputes before the A.F. of M. be applied and enforced according to its terms.

While we have no reason to question the primacy of federal substantive law in areas of paramount federal concern under national labor legislation, we have considerable doubt whether the instant case may be *829 said to be within such an area. Moreover, and assuming that it is, we do not believe that the applicable federal law has been established or elaborated to an extent which would require us to conclude that it is contrary to our significant and uniform rule of state policy applicable to arbitration clauses generally.

Section 301 of the federal Labor-Management Relations Act concerns itself with "(s)uits for violation of contracts between an employer and a labor organization representing employees in an

industry affecting commerce...." (29 U.S.C.A. s 185(a).) We have grave doubts whether the contract we here consider may be characterized as one falling within this description. In the first place, although the contract designates Graham as the "employer" of Scissor-Tail, the circumstances under which it was solicited, executed, and carried out would seem to suggest that this designation was one of convenience rather than one describing the facts of the relationship. Secondly, and ***618 assuming that the A.F. of M. is "a labor organization representing employees in an industry affecting commerce," the A.F. of M. was not a signatory to the contract nor did it, as such, participate in any of the negotiations preceding its execution. Indeed, the contract was not even signed by a member of the A.F. of M. but rather by Dennis Cordell, an officer in a corporate entity formed by a member (Russell).

**179 It is suggested, however, that general principles of agency, which are expressly made applicable to section 301 contracts (see 29 U.S.C.A. s 185(e)), require that the union be considered a party to the instant contract. In so urging, Scissor-Tail and its supporting amicus curiae place heavy reliance on two federal district court cases, unreported in the Federal Reporter System: Musicians, Local 336 v. Bonatz (D.N.J.1974) 90 L.R.R.M. 2956, and JOT Corp. v. GCS, Inc. (E.D.Pa.1976) 94 L.R.R.M. 2038.These cases, involving the use of the A.F. of M. Form B contract, hold under their facts that the signatory musicians and union members were to be considered agents of the union for the purpose of negotiating and executing the contracts; the resulting agreements, it was held, although not collective bargaining agreements strictly speaking (see Federation of Musicians v. Carroll (1968) 391 U.S. 99, 104, 88 S.Ct. 1562, 1566, 20 L.Ed.2d 460), were nevertheless to be considered agreements "between an employer and a labor organization representing employees in an industry affecting commerce ..." within the meaning of section 301. It is to be noted, however, that the contracts involved in Bonatz and JOT each bore the caption "Contract *830 Blank, American Federation of Musicians of the United States and Canada," the courts concluding on this basis among others that the affected "employer" should have known or expected that he was bargaining with the union through its agent-member. Even if it be assumed that Bonatz and JOT are correct on this point, it by no means follows that the instant contract, captioned with the name of the booking agency and signed by a person unaffiliated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3
-49-

with the union, should be viewed in an identical light.

[10][11] We do not, however, rest our conclusion on this narrow ground. Even if we assume this to be a contract of the type described in section 301 and therefore to be viewed in light of federal substantive law the question remains whether that law requires enforcement of an arbitration clause such as that we here consider. Scissor-Tail and its supporting amicus, relying primarily on the Bonatz and JOT cases, urge that the answer to that question must be yes. The insistence on union arbitration of contractual disputes, they argue, is simply one of the "economic weapons" which labor may legitimately wield in its negotiations with management. While the indicated cases may be read to lend some support to this position, we by no means consider them dispositive. In the first place, they fail to consider the illusory aspects of a provision calling for exclusive union arbitration of disputes arising in a labor context. More significantly, this court is in any event under no obligation to follow federal lower court precedents interpreting acts of Congress when we find those precedents unpersuasive. "Any rule which would require the state courts to follow in all cases the decisions of one or more lower federal courts would be undesirable, as it would have the effect of binding the state courts where neither the reasoning nor the number of federal cases is found persuasive. Such a rule would not significantly promote uniformity in federal law, for the interpretation of an act of Congress by a lower federal court does not bind other federal courts except those directly subordinate to it. (Citations.)" (Rohr Aircraft Corp. v. County of San Diego (1959) 51 Cal.2d 759, 764-765, 336 P.2d 521, revd. without comment on this point, 362 U.S. 628, 80 S.Ct. 1050, 4 L.Ed.2d 1002; see also People v. Bradley (1969) 1 Cal.3d 80, 86, 81 Cal.Rptr. 475,460 P.2d 129;Central Bank v. Superior Court (1973) 30 Cal.App.3d 962, 967, 106 Cal.Rptr. 910; see generally 6 Witkin, Cal.Procedure (2d ed. 1971), s 673, p. 4587.) In short, we decline to find on the basis of the Bonatz and JOT cases that the substantive federal law of collective bargaining agreements***619 requires any result different from that which we have reached. Until that law, in its application to circumstances such as that before us, is further elaborated by *831 the federal courts, we assume that it does not differ significantly from our own. (See McCarroll v. L.A. County etc. Carpenters, supra, 49 Cal.2d 45, 60, 315 P.2d 322.)We have held today, as a matter of state law and policy, that arbitration provisions which **180 designate as sole

arbitrator either an affected contractual party or one with identical interests in the outcome of the dispute fail to achieve the level of basic integrity which we require of a contractually structured substitute for formal judicial proceedings. The fact that the instant case arises in the context of what may be considered a labor dispute should not, in our view, render this rule any the less applicable.

IV

[12] We have held that the provision of the instant contract requiring arbitration of disputes arising thereunder before the A.F. of M. is unconscionable and unenforceable, and that the order compelling arbitration pursuant to it was in error. In light of the strong public policy of this state in favor of resolving disputes by arbitration, however, we do not believe that the parties herein should for this reason be precluded from availing themselves of nonjudicial means of settling their differences. The parties have indeed agreed to arbitrate, but in so doing they have named as sole and exclusive arbitrator an entity which we cannot permit to serve in that broad capacity. In these circumstances we do not believe that the parties should now be precluded from attempting to agree on an arbitrator who is not subject to the disabilities we have discussed. We therefore conclude that upon remand the trial court should afford the parties a reasonable opportunity to agree on a suitable arbitrator and, failing such agreement, the court should on petition of either party appoint the arbitrator. (See and cf. Code Civ.Proc., s 1281.6.) In the absence of an agreement or petition to appoint, the court should proceed to a judicial determination of the controversy.

The judgment is reversed and the cause remanded to the trial court with directions to vacate its order compelling arbitration and undertake further proceedings in conformity with the views expressed in this opinion. Scissor-Tail's appeal from the special order after judgment taxing costs relating to attorney's fees is dismissed as moot.

Cal., 1981.
Graham v. Scissor-Tail, Inc.
28 Cal.3d 807, 623 P.2d 165, 171 Cal.Rptr. 604, 106 L.R.R.M. (BNA) 2914, 93 Lab.Cas. P 55,330

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3                                                                                    -50-

TAB 4

Westlaw.

74 Cal.App.4th 1105                                                     Page 1
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559
(Cite as: 74 Cal.App.4th 1105)

▷Lagatree v. Luce, Forward, Hamilton & Scripps
Cal.App. 2 Dist.,1999.

Court of Appeal, Second District, Division 1,
California.
Donald LAGATREE, Plaintiff and Appellant,
v.
LUCE, FORWARD, HAMILTON & SCRIPPS LLP,
Defendant and Respondent.
Donald Lagatree, Plaintiff and Appellant,
v.
Keesal, Young & Logan, Defendant and Respondent.
Nos. B124263, B125272.

Sept. 13, 1999.
Review Denied Jan. 19, 2000.FN*

FN*Mosk, J., dissented.

Legal secretary formerly employed by two different law firms filed separate suits against each firm, claiming wrongful discharge. The Superior Court, Los Angeles County, Nos. BC185963, BC185962, Wendell Mortimer, Jr., and Alexander H. Williams III, JJ., sustained firms' demurrers, and secretary appealed. The Court of Appeal, Masterson, J., held that: (1) discharge of employee for refusing to sign a predispute arbitration agreement requiring that work-related disputes be resolved through binding arbitration did not violate public policy, and (2) predispute arbitration provisions were not invalid exculpatory clauses.

Affirmed.
West Headnotes
[1] Labor and Employment 231H ⬅40(2)

231H Labor and Employment
    231HI In General
        231Hk37 Term, Duration, and Termination
            231Hk40 Definite or Indefinite Term; Employment At-Will
                231Hk40(2) k. Termination; Cause or Reason in General. Most Cited Cases
    (Formerly 255k4, 255k3(.5) Master and Servant)
Presumption of at-will employment may be superseded by a contract, express or implied, limiting the employer's right to discharge the employee. West's Ann.Cal.Labor Code § 2922.

[2] Labor and Employment 231H ⬅40(2)

231H Labor and Employment
    231HI In General
        231Hk37 Term, Duration, and Termination
            231Hk40 Definite or Indefinite Term; Employment At-Will
                231Hk40(2) k. Termination; Cause or Reason in General. Most Cited Cases
    (Formerly 255k30(1.5), 255k20 Master and Servant)

Labor and Employment 231H ⬅759

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk759 k. Public Policy Considerations in General. Most Cited Cases
    (Formerly 255k30(1.10) Master and Servant)
Absent any contract, employment is at will, and the employee can be fired with or without good cause, though the employer's right to discharge an at will employee is still subject to limits imposed by public policy, since otherwise the threat of discharge could be used to coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal. West's Ann.Cal.Labor Code § 2922.

[3] Labor and Employment 231H ⬅759

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk759 k. Public Policy Considerations in General. Most Cited Cases
    (Formerly 255k30(1.10) Master and Servant)

Labor and Employment 231H ⬅761

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk760 Reasons or Grounds for Adverse Action
                231Hk761 k. In General. Most Cited

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4                                                                   -51-

74 Cal.App.4th 1105
Page 2
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559
**(Cite as: 74 Cal.App.4th 1105)**

Cases
While an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy.

**[4] Labor and Employment 231H ☜759**

231H Labor and Employment
   231HVIII Adverse Employment Action
     231HVIII(A) In General
      231Hk759 k. Public Policy Considerations in General. Most Cited Cases
      (Formerly 255k30(1.10) Master and Servant)
There are four requirements that a policy must satisfy to support a tortious discharge claim: first, the policy must be supported by either constitutional or statutory provisions or regulations enacted under statutory authority; second, the policy must be "public" in the sense that it inures to the benefit of the public rather than serving merely the interests of the individual; third, the policy must have been articulated at the time of the discharge; and fourth, the policy must be fundamental and substantial. West's Ann.Cal.Labor Code § 2922.

**[5] Labor and Employment 231H ☜759**

231H Labor and Employment
   231HVIII Adverse Employment Action
     231HVIII(A) In General
      231Hk759 k. Public Policy Considerations in General. Most Cited Cases
      (Formerly 255k30(1.10) Master and Servant)
In determining whether "substantial public policy" has been violated, as required to support a claim of wrongful termination in violation of public policy, courts consider whether an employer and employee could circumvent the policy by way of agreement; the fact that a duty or right can be modified or waived by agreement suggests that it does not confer a substantial benefit on the public. West's Ann.Cal.Labor Code § 2922.

**[6] Labor and Employment 231H ☜819**

231H Labor and Employment
   231HVIII Adverse Employment Action
     231HVIII(A) In General
      231Hk817 k. Other Particular Rights or Contexts

231Hk819 k. Particular Cases in General. Most Cited Cases
      (Formerly 255k30(1.10) Master and Servant)
Discharge of employee for refusing to sign a predispute arbitration agreement requiring that work-related disputes be resolved through binding arbitration did not violate public policy; employee's rights to a jury trial and a judicial forum could be validly waived by agreement, even where the waiver was required as a condition of employment, public policy favored resolution of disputes through arbitration, arbitrator could reduce administrative fees, and in June 1997, State had no well-established policy against imposing arbitrator fees on the losing party. West's Ann.Cal. Const. Art. 1, § 16; West's Ann.Cal.Labor Code §2922; West's Ann.Cal.C.C.P. § 631(a).

**[7] Jury 230 ☜29(2)**

230 Jury
   230II Right to Trial by Jury
     230k27 Waiver of Right
      230k29 In Criminal Cases
       230k29(2) k. Right to Waive Jury in General. Most Cited Cases
In criminal cases, even where the defendant's life is at stake, a jury can be waived.

**[8] Alternative Dispute Resolution 25T ☜113**

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(A) Nature and Form of Proceeding
      25Tk113 k. Arbitration Favored; Public Policy. Most Cited Cases
      (Formerly 33k1.2 Arbitration)
Federal Arbitration Act (FAA) establishes a federal policy favoring arbitration, requiring that courts rigorously enforce agreements to arbitrate. 9 U.S.C.A. §§ 1-16.

**[9] Courts 106 ☜489(1)**

106 Courts
   106VII Concurrent and Conflicting Jurisdiction
     106VII(B) State Courts and United States Courts
      106k489 Exclusive or Concurrent Jurisdiction
       106k489(1) k. In General. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

74 Cal.App.4th 1105
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal
D.A.R. 9559
**(Cite as: 74 Cal.App.4th 1105)**

Page 3

(Formerly 33k23.8 Arbitration)
State courts have concurrent jurisdiction to enforce the Federal Arbitration Act (FAA). 9 U.S.C.A. § 2.

**[10] Alternative Dispute Resolution 25T ☞114**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(A) Nature and Form of Proceeding
         25Tk114 k. Constitutional and Statutory
Provisions and Rules of Court. Most Cited Cases
      (Formerly 33k3.1 Arbitration)

**Commerce 83 ☞80.5**

83 Commerce
   83II Application to Particular Subjects and Methods of Regulation
      83II(I) Civil Remedies
         83k80.5 k. Arbitration. Most Cited Cases
      (Formerly 33k3.1 Arbitration)
Words "involving commerce," within the meaning of the Federal Arbitration Act (FAA) section rendering valid and enforceable arbitration provisions in contracts evidencing a transaction involving commerce, are to be interpreted broadly, since the FAA embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause. U.S.C.A. Const. Art. 1, § 8, cl. 3; 9 U.S.C.A. § 2.

**[11] Alternative Dispute Resolution 25T ☞114**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(A) Nature and Form of Proceeding
         25Tk114 k. Constitutional and Statutory
Provisions and Rules of Court. Most Cited Cases
      (Formerly 33k3.1 Arbitration)

**Commerce 83 ☞80.5**

83 Commerce
   83II Application to Particular Subjects and Methods of Regulation
      83II(I) Civil Remedies
         83k80.5 k. Arbitration. Most Cited Cases
      (Formerly 33k3.1 Arbitration)
Phrase "evidencing a transaction," within the meaning of the Federal Arbitration Act (FAA) section rendering valid and enforceable arbitration provisions in contracts evidencing a transaction

involving commerce, simply means that the transaction in fact involves interstate commerce, even if the parties did not contemplate an interstate commerce connection. U.S.C.A. Const. Art. 1, § 8, cl. 3; 9 U.S.C.A. § 2.

**[12] Alternative Dispute Resolution 25T ☞114**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(A) Nature and Form of Proceeding
         25Tk114 k. Constitutional and Statutory
Provisions and Rules of Court. Most Cited Cases
      (Formerly 33k2.2 Arbitration)

**Alternative Dispute Resolution 25T ☞134(1)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk131 Requisites and Validity
            25Tk134 Validity
               25Tk134(1) k. In General. Most
Cited Cases
      (Formerly 33k6.2 Arbitration)
An agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law, save upon such grounds as exist at law or in equity for the revocation of any contract, and thus, state law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. 9 U.S.C.A. § 2.

**[13] Alternative Dispute Resolution 25T ☞134(6)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk131 Requisites and Validity
            25Tk134 Validity
               25Tk134(6) k. Unconscionability.
Most Cited Cases
      (Formerly 33k6.2 Arbitration)

**Alternative Dispute Resolution 25T ☞137**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk136 Construction

74 Cal.App.4th 1105
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559
(Cite as: 74 Cal.App.4th 1105)

Page 4

25Tk137 k. In General. Most Cited Cases
(Formerly 33k7 Arbitration)
Court may not, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law, nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable. 9 U.S.C.A. § 2.

**[14]** Alternative Dispute Resolution 25T ⌐139

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk136 Construction
                25Tk139 k. Construction in Favor of Arbitration. Most Cited Cases
            (Formerly 33k3.1 Arbitration)
In applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Federal Arbitration Act (FAA), due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration. 9 U.S.C.A. § 2.

**[15]** Alternative Dispute Resolution 25T ⌐117

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk117 k. Preemption. Most Cited Cases
        (Formerly 33k2.2 Arbitration)

**Alternative Dispute Resolution 25T ⌐134(1)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk134 Validity
                    25Tk134(1) k. In General. Most Cited Cases
            (Formerly 33k6.2 Arbitration)

**States 360 ⌐18.15**

360 States
    360I Political Status and Relations

360I(B) Federal Supremacy; Preemption
    360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
(Formerly 33k2.2 Arbitration)
Generally applicable state law contract defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements without contravening Federal Arbitration Act (FAA). 9 U.S.C.A. § 2.

**[16]** Alternative Dispute Resolution 25T ⌐117

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk117 k. Preemption. Most Cited Cases
        (Formerly 33k2.2 Arbitration)

**States 360 ⌐18.15**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
        (Formerly 33k2.2 Arbitration)
Federal Arbitration Act (FAA) preempts state laws which require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration. 9 U.S.C.A. § 2.

**[17]** Alternative Dispute Resolution 25T ⌐117

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk117 k. Preemption. Most Cited Cases
        (Formerly 33k8, 33k2.2 Arbitration)

**Alternative Dispute Resolution 25T ⌐152**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk150 Operation and Effect
                25Tk152 k. As Ousting Jurisdiction of or Precluding Resort to Courts. Most Cited Cases
            (Formerly 33k8 Arbitration)

**States 360 ⌐18.15**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

74 Cal.App.4th 1105
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal
D.A.R. 9559
**(Cite as: 74 Cal.App.4th 1105)**

Page 5

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
            (Formerly 33k2.2 Arbitration)
Federal Arbitration Act (FAA) preempts a state statute that permits wage claims to be brought in court even though the claimant agreed to arbitrate them. West's Ann.Cal.Labor Code § 229.

**[18] Alternative Dispute Resolution 25T ☞114**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk114 k. Constitutional and Statutory Provisions and Rules of Court. Most Cited Cases
            (Formerly 33k2.2 Arbitration)

**Alternative Dispute Resolution 25T ☞133(1)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk133 Formal Requisites
                    25Tk133(1) k. In General. Most Cited Cases
                    (Formerly 33k6.2 Arbitration)
Federal Arbitration Act (FAA) prevents state laws from mandating that arbitration agreements bear special notice provisions. 9 U.S.C.A. § 2.

**[19] Alternative Dispute Resolution 25T ☞143**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk142 Disputes and Matters Arbitrable Under Agreement
                25Tk143 k. In General. Most Cited Cases
                (Formerly 33k7.5 Arbitration)
Typically, courts look to the parties' contract and business operations in determining whether the contract falls within the scope of the Federal Arbitration Act (FAA). 9 U.S.C.A. § 2.

**[20] Contracts 95 ☞1**

95 Contracts

    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
There is a sliding scale relationship between the two concepts of procedural and substantive unconscionability: the greater the degree of substantive unconscionability, the less the degree of procedural unconscionability that is required to annul a contract or clause.

**[21] Labor and Employment 231H ☞759**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk759 k. Public Policy Considerations in General. Most Cited Cases
            (Formerly 255k30(1.10) Master and Servant)
For a successful claim of wrongful discharge in violation of public policy, the public policy at issue must be tethered to specific constitutional or statutory provisions to ensure that employers have adequate notice of the conduct that will subject them to tort liability to the employees they discharge; the determination of whether an employer has violated public policy depends in large part on whether the public policy alleged is sufficiently clear to provide the basis for such a potent remedy. West's Ann.Cal.Labor Code § 2922.

**[22] Courts 106 ☞97(1)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k88 Previous Decisions as Controlling or as Precedents
                106k97 Decisions of United States Courts as Authority in State Courts
                    106k97(1) k. In General. Most Cited Cases
Although decisions of the United States Supreme Court are not binding with respect to state law, they are entitled to respectful consideration.

**[23] Appeal and Error 30 ☞763**

30 Appeal and Error
    30XII Briefs
        30k763 k. Additional or Supplemental Briefs. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4                                                                                          -55-

74 Cal.App.4th 1105
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal
D.A.R. 9559
(Cite as: 74 Cal.App.4th 1105)

Page 6

Claim that the arbitration agreement was invalid because it was silent as to the allocation of arbitrator fees and the availability of prehearing discovery could not be raised for the first time in a letter brief.

**[24]** **Alternative Dispute Resolution 25T** ☞134(1)

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk134 Validity
                    25Tk134(1) k. In General. Most Cited Cases
    (Formerly 33k6.2 Arbitration)
Arbitration agreement that is silent on an issue is still valid because it can be interpreted in favor of the employee.

**[25]** **Alternative Dispute Resolution 25T** ☞134(1)

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk134 Validity
                    25Tk134(1) k. In General. Most Cited Cases
    (Formerly 33k6.2 Arbitration)
Predispute arbitration provision imposed as a condition of employment did not have the purpose or effect of lessening an employer's liability for its future wrongful conduct, so as to constitute an invalid exculpatory clause. West's Ann.Cal.Civ.Code § 1668.

**\*\*667\*1108** ACLU Foundation of Southern California, David S. Schwartz and Mark D. Rosenbaum, Los Angeles, for Plaintiff and Appellant. Luce, Forward, Hamilton & Scripps, Charles A. Bird and Kelly Capen Douglas, San Diego, for Defendant and Respondent Luce, Forward, Hamilton & Scripps. Keesal, Young & Logan, Ben R. Suter, San Francisco, Dawn M. Schock, Long Beach, and Lisa M. Bertain, San Francisco, for Defendant and Respondent Keesal, Young & Logan.
Sidley & Austin, Jeffrey A. Berman, Los Angeles, and Octavio A. Pedroza, for Employers Group as Amicus Curiae on behalf of Defendants and Respondents.
**\*1109** MASTERSON, J.

This appeal presents the question of whether an employee can state a cause of action for wrongful termination in violation of public policy where he was discharged in 1997 for refusing to sign a predispute arbitration agreement requiring that work-related disputes be resolved through binding arbitration. We conclude that the termination did not violate public policy.

**BACKGROUND**

In September 1993, plaintiff Donald Lagatree, a legal secretary, commenced temporary employment with the law firm of Keesal, Young & Logan in Long Beach. On March 14, 1994, Lagatree became a full-time employee of the firm. Throughout his employment with Keesal Young, Lagatree's job performance was rated satisfactory or better. He received pay raises and bonuses.

In early June 1997, Keesal Young asked Lagatree to sign an arbitration agreement, which stated: "I agree that any claims arising out of or relating to my employment or the termination of my employment with Keesal, Young & Logan ("KY & L") that KY & L may have against me or that I may have against KY & L or its present or former employees or agents shall be resolved by final and binding arbitration.... Notwithstanding the above, I understand that I am not required to arbitrate the following claims: discrimination claims, wage and hour claims, and other related statutory claims." The agreement provided that disputes would be heard by a panel of three retired superior court judges and that the arbitration would be conducted pursuant to the commercial arbitration rules of the American Arbitration Association. The agreement also provided that "the entire cost of the arbitration, including legal fees, shall be borne by the losing party."

Lagatree informed Keesal Young's managing partner that he did not want to submit disputes to arbitration. On or about June 30, 1997, Lagatree was discharged for refusing to sign the agreement.

Lagatree searched for another secretarial job. On September 12, 1997, he was offered a full-time position at the law firm of Luce, Forward, Hamilton & Scripps LLP. He accepted the offer. On September 16, 1997, Lagatree reported to Luce Forward's Los Angeles office for his first day of work. Later that day, Lagatree was given a "Letter of Employment,"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4
-56-

74 Cal.App.4th 1105

74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

Page 7

**(Cite as: 74 Cal.App.4th 1105)**

which purported to "confirm [ ] our offer of employment to you in the position as a non-exempt legal secretary ..., should you accept." The **\*1110** letter further stated: "In the event of any dispute or claim between you and the firm (including employees, partners, agents, successors and assigns), including, but not limited to claims arising from or related to your employment or the termination of your employment, we jointly**\*\*668** agree to submit all such disputes or claims to confidential binding arbitration, under the Federal Arbitration Act."

On September 18, 1997, his third day at Luce Forward, Lagatree told his superiors that he would not agree to arbitrate disputes. Lagatree was advised that the arbitration provision was "not negotiable" and that his continued employment was contingent upon signing the agreement. Lagatree declined to sign the agreement and was discharged.

On February 13, 1998, Lagatree filed separate actions against Keesal Young and Luce Forward. Both complaints alleged that Lagatree had been terminated in violation of public policy for refusing to waive his constitutional rights to a jury trial and a judicial forum (U.S. Const., 1st & 7th Amends.; Cal. Const., art. I, §§ 3, 16). Lagatree also alleged that his discharge violated the California Unfair Competition Law (Bus. & Prof.Code, §§ 17200-17209)<sup>FN1</sup> and Civil Code section 1668.<sup>FN2</sup> The law firms demurred to the complaints, arguing that an employer does not violate public policy by discharging employees who refuse to sign a predispute arbitration agreement as a condition of employment. The demurrers were sustained without leave to amend. Lagatree filed timely appeals from the dismissals. We ordered the cases consolidated for purposes of appeal.<sup>FN3</sup>

FN1. "Section 17200 of the Business and Professions Code broadly defines 'unfair competition' as, inter alia, any 'unlawful, unfair or fraudulent business [act or] practice....' 'Unlawful business activity' proscribed under section 17200 includes ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' ...'[I]n essence, an action based on Business and Professions Code section 17200 to redress an unlawful business practice "borrows" violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable

under section 17200 et seq. and subject to the distinct remedies provided thereunder.' " (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383, 6 Cal.Rptr.2d 487, 826 P.2d 730.)

FN2.Section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

FN3. Lagatree is represented by the same counsel in both cases. Because of differences in their procedural history, the cases were separately briefed on appeal.

## DISCUSSION

In reviewing the ruling on a demurrer, "we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.... **\*1111** We also consider matters which may be judicially noticed.' ...Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.... When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action.... And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.... The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58, citations omitted.)

### A. Overview of Wrongful Termination Law

[1][2][3] "Labor Code section 2922 provides in relevant part, 'An employment, having no specified term, may be terminated at the will of either party on notice to the other....' This presumption may be superseded by a contract, express or implied, limiting the employer's right to discharge the employee.... Absent any contract, the employment is 'at will,' and the employee can be fired with or **\*\*669** without good cause. But the employer's right to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4                                                      -57-

74 Cal.App.4th 1105

74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

Page 8

**(Cite as: 74 Cal.App.4th 1105)**

discharge an 'at will' employee is still subject to limits imposed by public policy, since otherwise the threat of discharge could be used to coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 665, 254 Cal.Rptr. 211, 765 P.2d 373, citations and fn. omitted (*"Foley "*).) "Accordingly, while an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy." (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1094, 4 Cal.Rptr.2d 874, 824 P.2d 680,overruled on other grounds in *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80, fn. 6, 78 Cal.Rptr.2d 16, 960 P.2d 1046.)[FN4]

> FN4. Lagatree does not dispute that he was an at-will employee.

[4] Our Supreme Court "[has] established a set of requirements that a policy must satisfy to support a tortious discharge claim. First, the policy must be supported by either constitutional or statutory provisions [or regulations enacted under statutory authority]. Second, the policy must be 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual. Third, the policy must have been articulated at the time of the discharge. Fourth, the policy must be 'fundamental' and 'substantial.' " (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890, 66 Cal.Rptr.2d 888, 941 P.2d 1157; see *Green v. Ralee Engineering Co., supra,* 19 Cal.4th at pp. 75-76, 79-80, 89-90, 78 Cal.Rptr.2d 16, 960 P.2d 1046.)

*1112 "The cases in which California courts have recognized a separate tort cause of action for wrongful termination in violation of public policy generally fall into four categories, where the employee is discharged for: (1) refusal to violate a statute ...; (2) performing a statutory obligation ...; (3) exercising (or refusing to waive) a statutory or constitutional right or privilege ...; or (4) reporting an alleged violation of a statute of public importance...." (*Pettus v. Cole* (1996) 49 Cal.App.4th 402, 454, 57 Cal.Rptr.2d 46, citations and fn. omitted; accord, *Green v. Ralee Engineering Co., supra,* 19 Cal.4th at p. 76, 78 Cal.Rptr.2d 16, 960 P.2d 1046.)

" 'Yet despite its broad acceptance, the principle underlying the public policy exception is more easily

stated than applied. The difficulty, of course, lies in determining where and how to draw the line between claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee.' " (*Stevenson v. Superior Court, supra,* 16 Cal.4th at p. 889, 66 Cal.Rptr.2d 888, 941 P.2d 1157.) Unfortunately, " '[t]he term "public policy" is inherently not subject to precise definition.' " (*Gantt v. Sentry Insurance, supra,* 1 Cal.4th at p. 1094, 4 Cal.Rptr.2d 874, 824 P.2d 680.) Thus, "it is generally agreed that ... courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, 'lest they mistake their own predilections for public policy....' ... [C]ourts 'should proceed cautiously' if called upon to declare public policy absent some prior legislative expression on the subject." (*Id.* at p. 1095, 4 Cal.Rptr.2d 874, 824 P.2d 680.)

[5] A claim of wrongful termination in violation of public policy must be based on a "substantial public" policy. (See *Green v. Ralee Engineering Co., supra,* 19 Cal.4th at pp. 75-76, 89-90, 78 Cal.Rptr.2d 16, 960 P.2d 1046.) In determining whether such a policy has been violated, the courts consider whether an employer and employee could circumvent the policy by way of agreement. Plainly, not all of an employer's duties nor all of an employee's rights "inure to the benefit of the public at large rather than to a particular employer **670 or employee." (*Foley, supra,* 47 Cal.3d at p. 669, 254 Cal.Rptr. 211, 765 P.2d 373.) The fact that a duty or right can be modified or waived by agreement suggests that it does not confer a substantial benefit on the public.

In *Foley, supra,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, the plaintiff learned that his immediate supervisor was being investigated by the Federal Bureau of Investigation for embezzlement in connection with his prior employment. The plaintiff told a company officer about the investigation. Shortly thereafter, the plaintiff was terminated. In his wrongful termination action, the plaintiff asserted that his discharge violated the "public policy that imposes a legal duty on employees to report relevant business information to management." (*Id.* at p. 669, 254 Cal.Rptr. 211, 765 P.2d 373.) The Supreme Court disagreed, finding that the plaintiff's termination did not *1113 violate a substantial public policy. (*Id.* at p. 670, 254 Cal.Rptr. 211, 765 P.2d 373.) As the court explained in footnote 12 of its opinion:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

74 Cal.App.4th 1105
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal
D.A.R. 9559
**(Cite as: 74 Cal.App.4th 1105)**

"The absence of a distinctly 'public' interest in this case is apparent when we consider that if an employer and employee were *expressly* to agree that the employee has no obligation to, and should not, inform the employer of any adverse information the employee learns about a fellow employee's background, nothing in the state's public policy would render such an agreement void. By contrast, in the previous cases asserting a discharge in violation of public policy, the public interest at stake was invariably one which could not properly be circumvented by agreement of the parties. For example, in *Tameny* [ v. *Atlantic Richfield Co.* (1980) ] 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330, a contract provision purporting to obligate the employee to comply with an order of the employer directing the employee to violate the antitrust laws would clearly have been void as against public policy, and in *Petermann* [ v. *International Brotherhood of Teamsters* (1959) ] 174 Cal.App.2d 184, 344 P.2d 25, a contract provision which purported to obligate the employee to commit perjury at the employer's behest would just as obviously have been invalid. Because here the employer and employee could have agreed that the employee had no duty to disclose such information, it cannot be said that an employer, in discharging an employee on this basis, violates a fundamental duty imposed on all employers for the protection of the public interest." (*Foley, supra,* 47 Cal.3d at p. 670, fn. 12, 254 Cal.Rptr. 211, 765 P.2d 373, italics in original.)

Similarly, in *Gantt v. Sentry Insurance, supra,* 1 Cal.4th 1083, 4 Cal.Rptr.2d 874, 824 P.2d 680, the court noted that "[t]he obligation to refrain from ... conduct [that violates public policy] is a 'duty imposed by law upon all employers to implement the fundamental public policies' of the state ...; *it cannot be bargained away* ...." (*Id.* at p. 1100, 4 Cal.Rptr.2d 874, 824 P.2d 680, citing *Foley, supra,* 47 Cal.3d at p. 670, fn. 12, 254 Cal.Rptr. 211, 765 P.2d 373, italics added.)

More recently, in *Green v. Ralee Engineering Co., supra,* 19 Cal.4th 66, 78 Cal.Rptr.2d 16, 960 P.2d 1046, the plaintiff, a quality control inspector for a manufacturer of aircraft parts, alleged that he had been discharged for complaining internally that his employer was shipping defective parts to aircraft assembly companies. Relying on footnote 12 in *Foley,* the employer argued that the employee's claim did not concern a public benefit or interest. (19 Cal.4th at p. 84, 78 Cal.Rptr.2d 16, 960 P.2d 1046.) The Supreme Court rejected that argument, stating:

"The critical distinction between the facts here and those at issue in *Foley, supra,* 47 Cal.3d at pages 670-671, footnote 12, 254 Cal.Rptr. 211, 765 P.2d 373, is that there the violations of internal practices affected only the employer's interest, while here defendant's alleged misconduct potentially jeopardized airline passenger safety. Protecting airline passengers, therefore, is the relevant fundamental public**671 policy at issue. Promoting airline safety-the subject of the federal regulations-constitutes *1114 a policy of sufficient public importance. As plaintiff points out, travel by any common carrier inevitably concerns the public, because a common carrier's mistake or a manufacturer's defective part can cause multiple casualties." (19 Cal.4th at p. 85, 78 Cal.Rptr.2d 16, 960 P.2d 1046.)

Post-*Foley* decisions of the Courts of Appeal have been faithful to the analysis in *Foley* 's footnote 12. In *Collier v. Superior Court* (1991) 228 Cal.App.3d 1117, 279 Cal.Rptr. 453, the plaintiff alleged that he had been discharged for notifying upper management that other employees were possibly engaged in illegal conduct on the job, including bribery, embezzlement, tax evasion, drug trafficking, and violations of federal antitrust laws. In holding that the employee had adequately pleaded a public policy claim, the court stated:

"The public nature of the interest at stake in this case becomes apparent under the hypothetical test suggested in the margin of the *Foley* decision. (47 Cal.3d at p. 670, fn. 12, 254 Cal.Rptr. 211, 765 P.2d 373.) In explaining why there was no public interest in the case before it, the court [in *Foley* ] noted that if an employer and employee expressly agreed that the employee had no obligation to, and should not, inform the employer of any adverse information the employee learned about a fellow employee's background, nothing in the state's public policy would render such an agreement void.... This is because the adverse information in *Foley* served only the employer's interest, not the public's interest, and thus there was no public interest at stake in preventing such report.

"That is a critical distinction between the facts alleged in *Foley* and those in this case.... [T]he burden of suspected misconduct in this case was not

74 Cal.App.4th 1105
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal
D.A.R. 9559
**(Cite as: 74 Cal.App.4th 1105)**

confined to the interests of the employer alone. An agreement prohibiting an employee from informing anyone in the employer's organization about reasonably based suspicions of ongoing criminal conduct by coworkers would be a disservice not only to the employer's interests, but also to the interests of the public and would therefore present serious public policy concerns not present in *Foley*." (*Collier v. Superior Court, supra,* 228 Cal.App.3d at pp. 1124-1125, 279 Cal.Rptr. 453, followed in *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1149-1150, 37 Cal.Rptr.2d 718 [employer violates public policy by terminating employee for reporting to management that company was violating wage and hour laws].)

In *Holmes v. General Dynamics Corp.* (1993) 17 Cal.App.4th 1418, 22 Cal.Rptr.2d 172, the plaintiff, who worked for a defense contractor, informed his superiors that the company was overbilling the government. Despite a commendable work record, the plaintiff was discharged. He sued **\*1115** for wrongful termination, alleging that he had been discharged for reporting violations of the federal False Statements Act (18 U.S.C. § 1001), which prohibits the making of knowingly false statements to any federal department or agency.

In affirming a jury verdict in the plaintiff's favor, the Court of Appeal acknowledged that, in *Foley*, "the court explained [that] the absence of a substantial public interest was 'apparent' because the employer and employee could have properly agreed the employee should not inform the employer of any such adverse information about a co-employee's background.... Here, by contrast, it would be clearly improper for [the employer] to prohibit employees, particularly employees such as [the plaintiff,] whose job was to monitor contract performance, from reporting or disclosing suspected violations of governmental contracts." (17 Cal.App.4th at p. 1433, 22 Cal.Rptr.2d 172.)

Finally, in a pair of cases addressing whether workplace drug-testing programs violate an employee's right of privacy under the state Constitution (Cal. Const., art. I, § 1), two Courts of Appeal, although **\*672** reaching opposite conclusions, are noteworthy because they both applied the analysis set forth in *Foley*'s footnote 12.

In *Semore v. Pool* (1990) 217 Cal.App.3d 1087, 266 Cal.Rptr. 280, the plaintiff was discharged for

refusing to take a random drug test (a pupillary reaction eye test). He filed suit for wrongful termination, alleging a violation of his right of privacy. The trial court sustained the employer's demurrer without leave to amend, finding that the employer had a compelling interest in a drug-free workplace, that the drug test at issue was nonintrusive, and that employees should expect to be tested in such a manner to determine their fitness for work. (*Id.* at p. 1093, 266 Cal.Rptr. 280.)

The Fourth District Court of Appeal reversed. In doing so, the court found that the employer and employee could not have entered into a valid contract obligating the employee to take a drug test. The court stated: "While plaintiff could contractually agree not to assert his right to privacy, we think it clear that the employer could not use such an agreement to circumvent the public policy favoring privacy, and the employer could not successfully enforce such a contractual agreement if it intruded on plaintiff's right to privacy.... If the intrusion violates the right to privacy, it is illegal whether or not it is pursuant to an agreement. If pursuant to such an agreement, the agreement would be unenforceable because it would be against public policy." (217 Cal.App.3d at p. 1097, 266 Cal.Rptr. 280, citation and fn. omitted.)

In *Luck v. Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 267 Cal.Rptr. 618, the plaintiff was terminated for refusing to submit a **\*1116** urine sample as part of an unannounced drug test. She, too, based her public policy claim on the state constitutional right of privacy. A jury returned a verdict in her favor, and the employer appealed. The First District Court of Appeal held that the public policy claim was without merit. The court relied in part on *Foley*'s footnote 12, as follows: "Measured against the *Foley* standard, [the plaintiff] did not state a cause of action for wrongful termination in violation of public policy. The right to privacy is, by its very name, a private right, not a public one. The parties could have lawfully agreed that [the plaintiff] would submit to urinalysis without violating any public interest. Such an agreement between [the plaintiff] and [the employer] would not have been against public policy.... Therefore, under *Foley*, there was no violation of *public* policy." (218 Cal.App.3d at p. 28, 267 Cal.Rptr. 618, italics in original.)[FN5]

FN5. In *Luck*, the plaintiff sued not only for wrongful termination but also for breach of the covenant of good faith and fair dealing.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

74 Cal.App.4th 1105

74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

(Cite as: 74 Cal.App.4th 1105)

Page 11

In reviewing the covenant claim, the court held that a private employer must have a "compelling interest" to justify an invasion of its employees' privacy. (218 Cal.App.3d at pp. 17-24 & fn. 13, 267 Cal.Rptr. 618.) The California Supreme Court subsequently disapproved *Luck* on that point. (See *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 56-57, 26 Cal.Rptr.2d 834, 865 P.2d 633.)

[6] In accordance with the foregoing authorities, we first identify the alleged rights underlying Lagatree's wrongful termination claim. We then determine whether those rights can be "bargained away" (*Gantt v. Sentry Insurance, supra,* 1 Cal.4th at p. 1100, 4 Cal.Rptr.2d 874, 824 P.2d 680) or "circumvented by agreement of the parties"(*Foley, supra,* 47 Cal.3d at p. 670, fn. 12, 254 Cal.Rptr. 211, 765 P.2d 373). If so, we consider other factors, if any, bearing on whether Lagatree's claim is supported by a substantial public policy. Applying that analysis here, we ultimately conclude that the rights at issue are subject to waiver by agreement and that additional factors weigh against the recognition of a public policy claim. As a result, the demurrers were properly sustained without leave to amend. (See **673*Foley, supra,* 47 Cal.3d at p. 670 & fn. 12, 254 Cal.Rptr. 211, 765 P.2d 373;*Green v. Ralee Engineering Co., supra,* 19 Cal.4th at pp. 75-76, 89-90, 78 Cal.Rptr.2d 16, 960 P.2d 1046.)

The rights underlying Lagatree's claim are easily identified: an individual's constitutional rights to a jury trial and a judicial forum for the resolution of disputes. The question thus becomes whether those rights can be waived by agreement. As a general rule, they are subject to waiver.

With respect to the right to trial by jury, our Constitution provides: "A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel. In a civil cause a jury may be waived by the consent of the parties expressed as prescribed by statute." (Cal. Const., art. I, § 16.) Under the Code of Civil *1117 Procedure, "[t]rial by jury may be waived ... by the ... parties to an issue of fact in any of [several] ways." (Code Civ. Proc., § 631, subd. (a).)[FN6]

FN6.Section 631, subdivision (a), of the Code of Civil Procedure lists the ways in which a jury trial can be waived, including the filing of a written consent with the court, the making of an oral statement in open court which is entered in the minutes or docket, the failure to appear at trial, the failure to announce in a timely manner that a jury is required, and the failure to make a timely deposit of jury fees.

[7] Indeed, in criminal cases, even where the defendant's life is at stake, a jury can be waived. (See, e.g., *People v. Scott* (1997) 15 Cal.4th 1188, 1207-1210, 65 Cal.Rptr.2d 240, 939 P.2d 354.) As for waiver in civil actions, one court has noted: "[T]he California Constitution cannot be read to prohibit individuals from waiving, in advance of any pending action, the right to trial by jury in a civil case. [¶] Our conclusion is supported by those cases upholding the validity of arbitration agreements." (*Trizec Properties, Inc. v. Superior Court* (1991) 229 Cal.App.3d 1616, 1618, 280 Cal.Rptr. 885.) It therefore appears that, as a general matter, the right to a jury trial can be bargained away.[FN7]

FN7. Inherent in an arbitration agreement is a waiver of trial by jury-a waiver that is not precluded by the Constitution or the Code of Civil Procedure. (See *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 712-714, 131 Cal.Rptr. 882, 552 P.2d 1178, construing Cal. Const., art. I, § 16, and Code Civ. Proc., § 631, subd. (a).)

Similarly, the right to a judicial forum can generally be waived by contract: "[I]t has always been understood without question that parties could eschew [a] jury trial ... by agreeing to a method of resolving [a] controversy, such as arbitration, which does not invoke a judicial forum.... [¶] ... [¶] When parties agree to submit their disputes to arbitration they select a forum that is alternative to, and independent of, the judicial...." (*Madden v. Kaiser Foundation Hospitals, supra,* 17 Cal.3d at pp. 713-714, 131 Cal.Rptr. 882, 552 P.2d 1178.)

While helpful, these general observations do not end our analysis. More specifically, we examine whether a predispute arbitration agreement is valid where (1) an employer insists on such an agreement as a condition of employment, and (2) an employee signs the agreement to avoid being discharged. That question, in turn, requires an understanding of the Federal Arbitration Act ("FAA") (9 U.S.C. §§ 1-16)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

74 Cal.App.4th 1105

Page 12

74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

(Cite as: 74 Cal.App.4th 1105)

and its California counterpart.

## B. Enforcement of Arbitration Agreements

[8][9] "The FAA was designed 'to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate,'... and to place such agreements ' "upon the same footing as other contracts[.]" ' ... While Congress was no **1118** doubt aware that the Act would encourage the expeditious resolution of disputes, its passage 'was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered.' " (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488, citations omitted.) "The Arbitration **674** Act thus establishes a 'federal policy favoring arbitration,' ... requiring that 'we rigorously enforce agreements to arbitrate.' " (*Shearson/American Express, Inc. v. McMahon* (1987) 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185.)[FN8]

> FN8. State courts have concurrent jurisdiction to enforce the FAA.(*Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 25, 103 S.Ct. 927, 74 L.Ed.2d 765.)

[10][11]Section 2 of the FAA provides that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) The words "involving commerce" are to be interpreted broadly since the FAA "embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause." (*Perry v. Thomas* (1987) 482 U.S. 483, 490, 107 S.Ct. 2520, 96 L.Ed.2d 426; accord, *Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265, 273-275, 115 S.Ct. 834, 130 L.Ed.2d 753.) The phrase "evidencing a transaction" simply means that "the 'transaction' in fact 'involv[es]' interstate commerce, even if the parties did not contemplate an interstate commerce connection." (*Allied-Bruce Terminix Cos. v. Dobson, supra,* 513 U.S. at p. 281, 115 S.Ct. 834, 130 L.Ed.2d 753.)

In determining whether a predispute arbitration agreement is enforceable under the FAA, the Supreme Court has, on occasion, indicated that substantive federal law-a federal common law of contracts-should apply. (See, e.g., *Mitsubishi Motors v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 625-626, 105 S.Ct. 3346, 87 L.Ed.2d 444;*Southland Corp. v. Keating* (1984) 465 U.S. 1, 10-16 & fn. 9, 104 S.Ct. 852, 79 L.Ed.2d 1;*id.* at pp. 19-21, 104 S.Ct. 852 (conc. and dis. opn. of Stevens, J.); *Moses H. Cone Hospital v. Mercury Constr. Corp., supra,* 460 U.S. at pp. 24-25, 103 S.Ct. 927.) More recently, however, the court has stated that "[w]hen deciding whether the parties agreed to arbitrate a certain matter ..., courts generally ... should apply ordinary state-law principles that govern the formation of contracts." (*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985.) But the applicability of state law is not without limits:

[12][13] "We note ... the choice-of-law issue that arises when defenses such as ... unconscionability ... are **1119** asserted. In instances such as these, the text of § 2 [of the FAA] provides the touchstone for choosing between state-law principles and the principles of federal common law envisioned by the passage of that statute: An agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law ..., 'save upon such grounds as exist at law or in equity for the revocation of any contract.' ...Thus state law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2.... A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law. Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable...." (*Perry v. Thomas, supra,* 482 U.S. at p. 492, fn. 9, 107 S.Ct. 2520, citations and italics omitted.)

[14][15][16] "[I]n applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Act ..., due **675** regard must be given to the federal policy favoring arbitration, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4                                                                    -62-

74 Cal.App.4th 1105
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

Page 13

(Cite as: 74 Cal.App.4th 1105)

ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." (*Volt Info. Sciences v. Leland Stanford Jr. U., supra,* 489 U.S. at pp. 475-476, 109 S.Ct. 1248, citation omitted.) "[G]enerally applicable [state law] contract defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." (*Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902.) However, "the FAA pre-empts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.' " (*Volt Info. Sciences v. Leland Stanford Jr. U., supra,* 489 U.S. at p. 478, 109 S.Ct. 1248.)

[17][18] "We discern only two limitations on the enforceability of arbitration [clauses] governed by the Federal Arbitration Act: [ (1) ] they must be part of a written maritime contract or a contract 'evidencing a transaction involving commerce' and [ (2) ] such clauses may be revoked upon 'grounds as exist at law or in equity for the revocation of any contract.' We see nothing in the Act indicating that the broad principle of enforceability is subject to any *1120 additional limitations under State law." (*Southland Corp. v. Keating, supra,* 465 U.S. at pp. 10-11, 104 S.Ct. 852.)[FN9]

> FN9. Thus, the FAA preempts a state statute that permits wage claims to be brought in court even though the claimant agreed to arbitrate them. (*Perry v. Thomas, supra,* 482 U.S., at pp. 489-491, 107 S.Ct. 2520 [California Labor Code section 229 is preempted].) Further, state laws cannot mandate that arbitration agreements bear special notice provisions. (*Doctor's Associates, Inc. v. Casarotto, supra,* 517 U.S. at pp. 684, 686-688, 116 S.Ct. 1652 [FAA preempts Montana statute requiring that notice of arbitration clause be typed in underlined capital letters on first page of contract].)

[19] As stated, the FAA applies to "a contract evidencing a transaction involving commerce." (9 U.S.C. § 2.) Typically, courts look to the parties' contract and business operations in determining whether the contract falls within the scope of the FAA. (*Ideal Unlimited Services v. Swift-Eckrich, Inc.* (D.P.R.1989) 727 F.Supp. 75, 76.) Here, "[t]here is no showing that [Lagatree,] while performing his

duties under the employment contract[,] was working 'in' commerce, was producing goods for commerce, or was engaging in activity that affected commerce, within the meaning of [the FAA]."(*Bernhardt v. Polygraphic Co.* (1956) 350 U.S. 198, 200-201, 76 S.Ct. 273, 100 L.Ed. 199.)[FN10] Nevertheless, the parties in this case have relied on decisions construing the FAA and so shall we. (See *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971-972, 64 Cal.Rptr.2d 843, 938 P.2d 903.)[FN11]

> FN10. The Luce Forward agreement explicitly provides that it is to be governed by the FAA, while the Keesal Young agreement is silent on the matter. We express no opinion on the effect, if any, of the provision in the Luce Forward agreement.

> FN11.Section 1 of the FAA provides that the act does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (9 U.S.C. § 1.) Lagatree argues that this exemption covers *all* types of employment, such that the FAA does not apply to *any* employment contracts. That position is not without support. The Ninth Circuit recently adopted it. (*Craft v. Campbell Soup Co.* (9th Cir.1998) 161 F.3d 1199.) However, nine other circuits have construed the exemption narrowly, finding that it applies only to employees actually engaged in the transportation of goods in commerce. (See *id.* at p. 1202, fn. 5 [listing circuits]; *Koveleskie v. SBC Capital Markets, Inc.* (7th Cir.1999) 167 F.3d 361, 363-364 [same].) Under the majority view, Lagatree would not be exempt from the FAA (assuming he satisfies the commerce requirement). In any event, given the basis for our decision, we need not construe or apply the section 1 exemption.

Moreover, the question of the FAA's applicability appears to be academic. As one court has recognized: "[I]t is unclear what difference it would make if this case were deemed to be outside the scope of the **676 FAA. The parties' agreement would still be a contract that waives [the employee's] right to a judicial forum for employment-related claims and agrees to submit those claims to arbitration. [The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

74 Cal.App.4th 1105

74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

Page 14

(Cite as: 74 Cal.App.4th 1105)

employer] would still have the right to seek enforcement of that contract. Although the applicability of the FAA may be significant in the sense that the statute prescribes certain procedural rules that might not otherwise obtain, we have little doubt that, even if an *1121 arbitration agreement is outside the FAA, the agreement still may be enforced...." (*Cole v. Burns Intern. Security Services* (D.C.Cir.1997) 323 App.D.C. 133, 105 F.3d 1465, 1472.)

Assuming arguendo that the FAA does not apply, we would assess the validity of the parties' arbitration agreements under the California Arbitration Act ("CAA") (Code Civ. Proc., §§ 1280-1294.2). Like the FAA, the CAA provides: "A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." (Code Civ. Proc., § 1281.)[FN12] "California law incorporates many of the basic policy objectives contained in the Federal Arbitration Act, including a presumption in favor of arbitrability ... and a requirement that an arbitration agreement must be enforced on the basis of state law standards that apply to contracts in general...." (*Engalla v. Permanente Medical Group, Inc., supra*, 15 Cal.4th at pp. 971-972, 64 Cal.Rptr.2d 843, 938 P.2d 903, citations omitted.)

> FN12. As our Supreme Court has commented, the phrase "revocation of any contract" is "something of a misnomer. 'Offers are "revoked." ...Contracts are extinguished by rescission.' " (*Engalla v. Permanente Medical Group, Inc., supra*, 15 Cal.4th at p. 973, 64 Cal.Rptr.2d 843, 938 P.2d 903.)

Consequently, we need not decide whether the FAA applies. Even if it does not, we would reach the same result under the virtually identical provision of the CAA. "In most important respects, the California statutory scheme on enforcement of private arbitration agreements is similar to the [FAA]; the similarity is not surprising, as the two share origins in the earlier statutes of New York and New Jersey.... Code of Civil Procedure section 1281, like section 2 of the [FAA], provides that predispute arbitration agreements are 'valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract.' " (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 406, 58

Cal.Rptr.2d 875, 926 P.2d 1061, citations omitted.)[FN13]

> FN13. As originally drafted, Assembly Bill No. 858 (1999-2000 Reg. Sess.) would have prohibited employers from requesting or requiring employees to enter into a predispute arbitration agreement. The Assembly passed the bill on June 4, 1999. In the Senate, the bill was amended several times before it was passed and returned to the Assembly on September 10, 1999. The Assembly did not concur in the Senate amendments and sent the bill to a conference committee on the last day of the 1999 legislative calendar. The bill, or a similar one, may be considered next year. However, even if the bill becomes law, it would not have any bearing on this appeal: "[T]o support a tort action for wrongful discharge, 'the policy in question ...' ... must be ... 'well established' *at the time of the discharge.*" (*Stevenson v. Superior Court, supra*, 16 Cal.4th at p. 889, 66 Cal.Rptr.2d 888, 941 P.2d 1157, italics added; accord, *Foley, supra*, 47 Cal.3d at p. 668, 254 Cal.Rptr. 211, 765 P.2d 373.)

**C. Compulsory Arbitration Agreements**

We now turn to the question of the enforceability of predispute arbitration agreements imposed as a condition of employment. As noted, if they are *1122 enforceable, then an employee's rights to a jury trial and a judicial forum can be bargained away. And if a right or duty can be waived by agreement, it is not rooted in a substantial public policy, absent other factors to the contrary.

In *Gilmer v. Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 ("*Gilmer*"), the plaintiff **677 was required by his employer to register as a securities representative with the New York Stock Exchange ("NYSE"). His registration application, entitled "Uniform Application for Securities Industry Registration or Transfer," commonly known as a "Form U-4," provided for the arbitration of disputes in accordance with the rules of the NYSE. Those rules mandated the arbitration of " '[a]ny controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

74 Cal.App.4th 1105

74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal
D.A.R. 9559

**(Cite as: 74 Cal.App.4th 1105)**

representative.' " (*Id.* at p. 23, 111 S.Ct. 1647.) A Form U-4 is a standardized form, and its execution is a condition of employment for securities broker-dealers. (*Ibid.;Halligan v. Piper Jaffray, Inc.* (2d Cir.1998) 148 F.3d 197, 198 & fn. 1;*Seus v. John Nuveen & Co., Inc.* (3d Cir.1998) 146 F.3d 175, 177-178.)

The plaintiff in *Gilmer* was discharged at age 62. He filed an action in United States District Court, alleging a violation of the Age Discrimination in Employment Act of 1967 ("ADEA") (29 U.S.C. § 621 et seq.). The Supreme Court held that, despite the compulsory nature of the Form U-4, the plaintiff could not pursue a civil action and was required to arbitrate his ADEA claim. As the court stated:

"Mere inequality in bargaining power ... is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context.... [T]he FAA's purpose was to place arbitration agreements on the same footing as other contracts. Thus, arbitration agreements are enforceable 'save upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2. 'Of course, courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds "for the revocation of any contract." ' ... There is no indication in this case, however, that [the plaintiff,] an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause in his registration application.... [T]his claim of unequal bargaining power is best left for resolution in specific cases." (500 U.S. at p. 33, 111 S.Ct. 1647, citation omitted.)

As we read *Gilmer,* a predispute arbitration agreement is not invalid merely because it is imposed as a condition of employment. By directing that claims of economic coercion be decided on a case-by-case basis, the court in *Gilmer* necessarily concluded that compulsory arbitration agreements are not *1123 invalid per se. Put another way, under *Gilmer,* the mandatory nature of an arbitration agreement does not, by itself, render the agreement unenforceable. This conclusion finds support in post-*Gilmer* cases.

In *Seus v. John Nuveen & Co., Inc., supra,* 146 F.3d 175, the court rejected the plaintiff's assertion that a Form U-4 is an invalid contract of adhesion. As the court put it, "This very argument was rejected in

*Gilmer* ...." (*Id.* at p. 184.) The court continued: "In order for a contract to be invalidated as a contract of adhesion, the plaintiff 'must allege both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so onesided as to be oppressive.' ...The district court found ... that the terms of [the] Form U-4 were neither oppressive nor unconscionable.... We agree." (*Ibid.;* accord, *Koveleskie v. SBC Capital Markets, Inc., supra,* 167 F.3d at pp. 366-367 [Form U-4 not an unconscionable contract of adhesion because it was offered on "take it or leave it" basis]; *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith* (1st Cir.1999) 170 F.3d 1, 17 [Form U-4 not invalid even though arbitration provision was nonnegotiable, and employer would not hire person who refused to sign form].) [FN14]

> FN14. In *Duffield v. Robertson Stephens & Co.* (9th Cir.1998) 144 F.3d 1182, the Ninth Circuit held that the Civil Rights Act of 1991 (Pub.L. No. 102-166, 105 Stat. 1071) invalidates compulsory arbitration agreements with respect to statutory discrimination claims. Because the Civil Rights Act of 1991 does not apply to common law actions for wrongful termination, *Duffield* is not applicable here.

**678 Similarly, in *Beauchamp v. Great West Life Assur. Co.* (E.D.Mich.1996) 918 F.Supp. 1091, the court held that a Form U-4 was not an invalid contract of adhesion. Citing *Gilmer,* the court concluded that the form was not unconscionable. (*Id.* at pp. 1098-1099.) The court also commented that "[u]nder plaintiff's theory, practically every condition of employment would be an 'adhesion contract' which could not be enforced because it would have been presented to the employee by the employer in a situation of unequal bargaining power on a 'take it or leave it' basis." (*Id.* at p. 1098.)

Nor is *Gilmer* limited to employment in the securities industry. In *Kelly v. UHC Management Co., Inc.* (N.D.Ala.1997) 967 F.Supp. 1240, the plaintiff employees, who worked for United HealthCare Corporation, signed an acknowledgment form and received an employee handbook mandating the arbitration of employment-related disputes. When the employees filed an action alleging race discrimination, the employer moved to stay the proceedings so that the parties could proceed with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4                                                                                    -65-

74 Cal.App.4th 1105
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

Page 16

**(Cite as: 74 Cal.App.4th 1105)**

arbitration. In attempting to avoid arbitration, the employees asserted that the arbitration provisions had been offered on a "take it or leave it" basis. (*Id.* at p. 1257.) They also claimed *1124 that "the arbitration policy was a mandatory condition of employment [since] an employee's choice was to accept the agreement to arbitrate employment disputes or discontinue his or her employment...." (*Id.* at p. 1257, fn. 17.) The court enforced the arbitration clause, stating:

"[A]ssuming *arguendo* that the arbitration agreements are adhesive-i.e., that they were offered on a take it or leave it basis with no opportunity for bargaining on the part of the plaintiffs-the agreements to arbitrate are nonetheless valid and enforceable.... '[T]here is nothing inherently unfair or oppressive about arbitration clauses.' ...In fact, ... the FAA shows a strong federal policy in favor of arbitration.... Second, nothing about the present agreement is unconscionable or overbearing. It simply requires the plaintiffs to submit their employment claims to arbitration rather than sue in court. In light of the strong federal policy in favor of arbitration, this agreement is not unconscionable." (*967 F.Supp. at p. 1257*, citations and fn. omitted; see *id.* at pp. 1250-1251 [discussing *Gilmer* ]; accord, *Lang v. Burlington Northern R. Co.* (D.Minn.1993) 835 F.Supp. 1104.)

And in *Rhode v. E & T Investments, Inc.* (M.D.Ala.1998) 6 F.Supp.2d 1322, the court applied *Gilmer* to a dispute involving the purchase of a mobilehome. There, the purchase agreement contained an arbitration clause, and the parties also executed a separate arbitration agreement. The buyer filed a civil action against the seller and the manufacturer of the home, alleging breach of contract, among other things. The defendants moved to compel arbitration. In response, the buyer argued that the arbitration provisions were unconscionable. He predicted that "if all manufacturers and dealers [of mobile homes] require the execution [of an arbitration agreement] as a condition precedent to closing the sale, the consumer is put into the unenviable position of either having to acquiesce to the seller's will or live in a tent." (*Id.* at p. 1328.) The court rejected the unconscionability argument, concluding that the buyer "fail[ed] to allege any facts to support the finding that arbitration would preclude [him] from bringing his claims against Defendants or that an arbitrator could not award [the] full panoply of relief available [under the] law." (*Ibid.*)

Turning our attention to California case law, we find the same trend. In *24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 78 Cal.Rptr.2d 533, the plaintiff employee signed an arbitration **679 agreement and certified that she had read the employer's personnel handbook, which described the arbitration process in detail. The employee later filed suit, alleging that she had been constructively discharged as a result of sexual harassment. In an effort to avoid arbitration, she relied on the CAA, arguing *1125 that the arbitration agreement was unconscionable.[FN15] The court found the agreement to be valid, explaining:

> FN15. To be specific, the employee invoked section 1281 of the Code of Civil Procedure, which, like section 2 of the FAA, provides that arbitration agreements are valid, enforceable, and irrevocable, save upon such grounds as exist for the revocation of any contract.

[20] "[U]nconscionability has both a procedural and a substantive element .... The procedural element focuses on the unequal bargaining positions and hidden terms common in the context of adhesion contracts.... While courts have defined the substantive element in various ways, it traditionally involves contract terms that are so one-sided as to 'shock the conscience,' or that impose harsh or oppressive terms....[FN16]

> FN16. "[T]here is a 'sliding scale relationship between the two concepts [of procedural and substantive unconscionability]: the greater the degree of substantive unconscionability, the less the degree of procedural unconscionability that is required to annul the contract or clause....' " (*Ilkhchooyi v. Best* (1995) 37 Cal.App.4th 395, 410, 45 Cal.Rptr.2d 766, citations omitted.)

"[The plaintiff's] attempt to invalidate the arbitration clause for unconscionability rests primarily on the undisputed fact that it was presented to her as part of an adhesion contract, i.e., ' " 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' "...' ... Even assuming the circumstances

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4                                                                -66-

74 Cal.App.4th 1105
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal
D.A.R. 9559
(Cite as: 74 Cal.App.4th 1105)

here amount to procedural unconscionability, [the plaintiff] must still show the existence of a factual issue as to substantive unconscionability to defeat summary judgment ... She has not done so.... [¶] Nor does she suggest any concrete reason why the terms of the agreement are unduly harsh, oppressive or one-sided." (*24 Hour Fitness, Inc. v. Superior Court, supra,* 66 Cal.App.4th at pp. 1212-1213, 78 Cal.Rptr.2d 533, citations omitted; see *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 925, fn. 9, 216 Cal.Rptr. 345, 702 P.2d 503 [discussing analytical framework of unconscionability doctrine].) [FN17]

FN17. In *24 Hour Fitness,* the court distinguished *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 60 Cal.Rptr.2d 138, stating: "In *Stirlen,* the unconscionable arbitration clause relegated all employee claims to arbitration while allowing the employer to enforce its rights in court ...; restricted the discovery available to employees, but not [the] employer ...; and unilaterally deprived employees, but not [the] employer, of significant statutory and common law remedies .... Here, in contrast, the arbitration clause applies equally to employer and employee; allows both parties substantially the same array of discovery procedures available in civil actions; and does not create an imbalance in remedies potentially available to either side." (66 Cal.App.4th at p. 1213, 78 Cal.Rptr.2d 533, citations omitted.)

In the same vein, the plaintiff employees in *Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 53 Cal.Rptr.2d 515 and *Spellman v. Securities, Annuities & Ins. Services, Inc.* (1992) 8 Cal.App.4th 452, 10 Cal.Rptr.2d 427, executed a Form U-4 as a condition of employment. After they were *1126 discharged, they each filed a civil action alleging wrongful termination under state law. The courts held that the FAA required the claims to be arbitrated.

California courts have also addressed the enforceability of arbitration agreements between securities brokers and their clients. (*Macaulay v. Norlander* (1992) 12 Cal.App.4th 1, 15 Cal.Rptr.2d 204; *Strotz v. Dean Witter Reynolds, Inc.* (1990) 223 Cal.App.3d 208, 272 Cal.Rptr. 680, overruled on other grounds in **680 *Rosenthal v. Great Western*

*Fin. Securities Corp., supra,* 14 Cal.4th at p. 423, 58 Cal.Rptr.2d 875, 926 P.2d 1061.) In *Macaulay,* a brokerage firm required all of its clients to sign an agreement containing an arbitration clause. Two clients, who had signed the agreement, filed civil actions alleging that they had been defrauded. The firm petitioned the superior court to compel arbitration of the disputes. The superior court denied the petition. The Court of Appeal reversed, noting that " '[i]n the context of adhesion contracts, the courts have held that the inclusion of an arbitration provision is not per se unconscionable, particularly in a commercial transaction....' " (12 Cal.App.4th at p. 6, 15 Cal.Rptr.2d 204, citation omitted.)

In *Strotz, supra,* another broker/client case, the court stated: "Where an agreement to arbitrate exists, the parties' mutual promises to forego a judicial determination and to arbitrate their disputes provide consideration for each other. Both parties give up the same rights and thus neither gains an advantage over the other." (223 Cal.App.3d at p. 216, 272 Cal.Rptr. 680.) The *Strotz* court acknowledged that "there may be arbitration provisions which do give an advantage to one party.... In those cases, however, it is not the requirement of arbitration alone which makes the provision unfair but rather the place or manner in which the arbitration is to occur." (*Id.* at p. 216, fn. 7, 272 Cal.Rptr. 680.) Consequently, "the fact that one party later seeks to avoid his agreement to arbitrate cannot alone preclude enforcement of the agreement." (*Id.* at p. 216, 272 Cal.Rptr. 680.)

Finally, in *Izzi v. Mesquite Country Club* (1986) 186 Cal.App.3d 1309, 231 Cal.Rptr. 315, the court enforced an arbitration clause contained in a purchase agreement for a condominium, stating: "Even assuming arguendo the purchase agreement was adhesive in nature, we would still view it as enforceable. There is nothing in the circumstances of this case from which it appears the arbitration provision conflicts with the reasonable expectations of an ordinary person or is unduly oppressive or unconscionable.... The rules of the American Arbitration Association specified by the clause as *1127 governing the resolution of disputes are generally regarded to be neutral and fair. [FN18] In other words, even if defendants did have bargaining power superior to that of plaintiffs, the application of the arbitration clause to this dispute does not engender any unjust advantage to defendants. The invocation of the adhesion doctrine is unwarranted on these facts." (*Id.* at p. 1318, 231 Cal.Rptr. 315, citation and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4                                    -67-

74 Cal.App.4th 1105

74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

Page 18

**(Cite as: 74 Cal.App.4th 1105)**

fn. omitted.)<u>FN19</u>

FN18. In the present case, the Keesal Young arbitration agreement called for the application of the "commercial rules" of the American Arbitration Association ("AAA"). However, effective June 1, 1996, approximately one year before Lagatree was terminated, the AAA adopted special rules to govern the arbitration of employment disputes (National Arbitration Rules for the Resolution of Employment Disputes (AAA 1996)). As stated therein, "[t]he parties shall be deemed to have made *these* rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association ... [and if] an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules." (*Id.,* rule 1, at p. 8, italics added.) The new rules were adopted to "ensure[ ] fairness and equity for the resolution of workplace disputes" and to "administer cases in accordance with ... due process standards ...." (*Id.,* Introduction, at p. 3.)

FN19. Because Lagatree knew what he was being asked to sign, there is no contention that the arbitration agreements "[did] not fall within the reasonable expectations of the weaker or 'adhering' party ...." (*Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 820, 171 Cal.Rptr. 604, 623 P.2d 165.)

**D. Validity of the Arbitration Agreements**

As we have seen, the cases uniformly agree that a compulsory predispute arbitration agreement is not rendered unenforceable just because it is required as a condition of employment or offered on a "take it or leave it" basis. An employee **681 who signs such an agreement is obligated to submit employment-related disputes to arbitration; if he refuses to do so, the courts stand ready to compel arbitration. Yet, as Lagatree would have it, he can refuse to sign an arbitration agreement, be discharged, and strike gold with a wrongful termination suit. The law does not permit such an absurd result.

As stated, if a claim of wrongful termination in violation of public policy is based on a right or duty

that can be bargained away, the claim is not rooted in a substantial public policy, absent other factors to the contrary. As one commentator has noted: "The pertinent question is whether, in the overall mix, the nature of the forum for future disputes is a subject that may be determined by contract or whether this term belongs to the nonwaivable, nonmodifiable category and, hence, is outside of the realm of contract." (Estreicher, *Predispute Agreements to Arbitrate Statutory Employment Claims* (1997) 72 N.Y.U. L.Rev. 1344, 1354.) We think it plain that, under both federal and state law, an employee's rights to a jury trial and a judicial forum can be validly waived by agreement, even where the waiver is required as a *1128 condition of employment. As a result, those rights do not implicate a substantial public policy, absent other factors to the contrary. Here, we find that other factors reinforce the conclusion that a public policy claim should not be allowed.

To date, wrongful termination cases involving public policy violations have typically concerned employer conduct that burdened the public good with an actual detriment and conferred absolutely no benefit on the public. By way of example, in *Tameny v. Atlantic Richfield Co., supra,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330, the employer insisted that an employee participate in an illegal price-fixing scheme; in *Green v. Ralee Engineering Co., supra,* 19 Cal.4th 66, 78 Cal.Rptr.2d 16, 960 P.2d 1046, the employer retaliated against an employee for complaining to management that the company was making defective aircraft parts; in *Rojo v. Kliger* (1990) 52 Cal.3d 65, 276 Cal.Rptr. 130, 801 P.2d 373, the employer was accused of sex discrimination; in *Petermann v. International Brotherhood of Teamsters, supra,* 174 Cal.App.2d 184, 344 P.2d 25, the employer instructed an employee to perjure himself before a state legislative committee; and in *Hentzel v. Singer Co.* (1982) 138 Cal.App.3d 290, 188 Cal.Rptr. 159, the employer discharged an employee for protesting unsafe working conditions. In all of these cases, "general social policies [were] advanced" by permitting a wrongful termination claim in violation of public policy. (*Green v. Ralee Engineering Co., supra,* 19 Cal.4th at p. 75, 78 Cal.Rptr.2d 16, 960 P.2d 1046.)

Here, general social policies will be advanced by *not* allowing a wrongful termination claim. This is so because public policy favors the resolution of disputes through arbitration. To impose liability in a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4    -68-

74 Cal.App.4th 1105

74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

Page 19

**(Cite as: 74 Cal.App.4th 1105)**

case such as this would thwart that policy.

By enacting the CAA, "the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' " (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9, 10 Cal.Rptr.2d 183, 832 P.2d 899.)"Because of the relatively low cost and efficiency of the arbitration process, an individual [employee] involved in a typical [employment] dispute frequently will find an arbitral forum more accessible than the more expensive and cumbersome court system." (*Moore v. Conliffe* (1994) 7 Cal.4th 634, 657, 29 Cal.Rptr.2d 152, 871 P.2d 204.) "[A]rbitration has become an accepted and favored method of resolving disputes ..., praised by the courts as an expeditious and economical method of relieving overburdened civil calendars ...." (*Madden v. Kaiser Foundation Hospitals, supra,* 17 Cal.3d at pp. 706-707, 131 Cal.Rptr. 882, 552 P.2d 1178.) In short, arbitration is viewed as a "common, expeditious, and judicially favored method [of resolving disputes]."**682(*Id.* at p. 707, 131 Cal.Rptr. 882, 552 P.2d 1178; accord, *Mitsubishi Motors v. Soler Chrysler-Plymouth, supra,* 473 U.S. at p. 633, 105 S.Ct. at p. 3357.)

*1129 Lagatree points out that, although courts often laud the benefits of arbitration, " 'the policy favoring arbitration cannot displace the necessity for a *voluntary* agreement to arbitrate.' " (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 739, 222 Cal.Rptr. 1, 710 P.2d 833, italics added; accord, *Lawrence v. Walzer & Gabrielson* (1989) 207 Cal.App.3d 1501, 1505, 256 Cal.Rptr. 6.) "Arbitration ... is a matter of consent, not coercion ...." (*Volt Info. Sciences v. Leland Stanford Jr. U., supra,* 489 U.S. at p. 479, 109 S.Ct. 1248.) But, as *Gilmer* and its progeny make clear, the compulsory nature of a predispute arbitration agreement does not render the agreement unenforceable on grounds of coercion or for lack of voluntariness.

In *Seus v. John Nuveen & Co., Inc., supra,* 146 F.3d 175, the court addressed the question of whether the plaintiff had knowingly and voluntarily agreed to arbitrate her statutory discrimination claims arising under federal law. The court said: "By 'knowing' and 'voluntary,' [the plaintiff] means more than with an understanding that a binding agreement is being entered and without fraud or duress. Determining whether an agreement to arbitrate is 'knowing' and 'voluntary,' in her view, requires an inquiry into such

matters as the specificity of the language of the agreement, the plaintiff's education and experience, plaintiff's opportunity for deliberation and negotiation, and whether plaintiff was encouraged to consult counsel. She does not contend that this heightened 'knowing and voluntary' standard is a *generally applicable principle of contract law.* ... Applying that standard here would be inconsistent with the FAA and *Gilmer.* Nothing short of a showing of fraud, duress, mistake or some other ground recognized by the law *applicable to contracts generally* would have excused the district court from enforcing [the plaintiff's] agreement." (*Id.* at pp. 183-184, italics added.)

As one federal court has accurately noted: "Arbitration clauses such as the one in *Gilmer* are, for the average employee, not the product of bargaining but a non-negotiable adhesion contract. Consent to the arbitration clause is the price for obtaining or retaining employment." (*Krahel v. Owens-Brockway Glass Container, Inc.* (D.Or.1997) 971 F.Supp. 440, 448.) Even so, the courts have characterized the arbitration agreement in *Gilmer*-despite its compulsory nature-as consensual and voluntary. (See, e.g., *Penny v. United Parcel Service* (6th Cir.1997) 128 F.3d 408, 412;*Nichols v. General Motors Co.* (S.D.Ohio 1997) 978 F.Supp. 743, 748;*Gray v. Toshiba America Consumer Products, Inc.* (M.D.Tenn.1997) 959 F.Supp. 805, 809; see also *Securities Industry Ass'n v. Connolly* (D.Mass.1988) 703 F.Supp. 146, 152-153 [holding, pre-*Gilmer,* that state law requirement of voluntariness cannot interfere with validity of mandatory arbitration agreement] affd. (1st Cir.1989) 883 F.2d 1114.)

*1130 Of significance, our own Supreme Court has observed: "In *Gilmer,* a securities representative had been *required* by his employer to register with the New York Stock Exchange. The registration application included an agreement to arbitrate any dispute arising out of the employment or termination of the employment ... [¶] ... [¶] ... The court reasoned that the plaintiff had agreed *voluntarily* to arbitrate his statutory claim .... [¶] ... [¶] ... In *Gilmer,* the court emphasized that *by agreeing* to arbitrate[,] the plaintiff had traded the more extensive procedures available in the federal court for the simplicity, informality, and expedition of arbitration." (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 331-332, 48 Cal.Rptr.2d 87, 906 P.2d 1242, italics added.) Accordingly, we reject Lagatree's assertion that a compulsory arbitration agreement is invalid for lack

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4                                                    -69-

74 Cal.App.4th 1105

Page 20

74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

**(Cite as: 74 Cal.App.4th 1105)**

of consent or voluntariness.

**\*\*683** Finally, Lagatree argues that an employee cannot be terminated for refusing to sign an unenforceable agreement. Specifically, he argues that the Keesal Young arbitration agreement was unenforceable because it made arbitration so costly that employees could not afford to pursue a claim.[FN20] His argument focuses on two provisions in the Keesal Young agreement. We address them in turn.

> FN20. Lagatree does not challenge the Luce Forward agreement on this ground. (See fn. 30, *post.*)

First, the agreement stated that arbitration would be conducted in accordance with the rules of the AAA. (See fn. 18, *ante.*) Lagatree argues that the administrative fees imposed by the AAA are so high that they effectively preclude an employee from initiating arbitration. We disagree. Although the AAA rules do establish administrative fees (which include filing fees, hearing fees, and hearing room rental fees), rule 35 provides that "[t]he AAA may, in the event of extreme hardship on any party, defer or reduce the administrative fees." (National Arbitration Rules for the Resolution of Employment Disputes, *supra,* rule 35, at p. 27.) Consequently, we perceive no unfairness with regard to the AAA administrative fees.[FN21]

> FN21. We also find that the AAA rules governing discovery and remedies are fair to claimants. "The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute." (National Arbitration Rules for the Resolution of Employment Disputes, *supra,* rule 7, at pp. 12-13.) And "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable, including, but not limited to, any remedy or relief that would have been available to the parties had the matter been heard in court." (*Id.,* rule 32, at pp. 25-26.)

Second, Lagatree takes issue with the provision in the Keesal Young agreement that "the entire cost of the arbitration ... shall be borne by the losing party."

Because the agreement called for a panel of three retired \*1131 superior court judges, so the argument goes, a claimant had to be prepared to pay $1,500 an hour in arbitrator fees if he ultimately lost the arbitration. As Lagatree sees it, Keesal Young required its employees to agree to arbitration, but failed to provide an affordable forum in which they could seek relief.

In support of that contention, Lagatree relies on *Cole v. Burns Intern. Security Services, supra,* 105 F.3d 1465. There, the District of Columbia Circuit held that, in an employment-related arbitration, an employer cannot require an employee to pay any portion of the arbitrator fees. (*Id.* at pp. 1483-1486.) The court stated:

"These fees would be prohibitively expensive for an employee ..., especially after being fired from his job, and it is unacceptable to require [him] to pay arbitrators' fees, because such fees are unlike anything that he would have to pay to pursue his statutory claims in court.... [¶] Arbitration will occur in this case only because it has been mandated by the employer as a condition of employment. Absent this requirement, the employee would be free to pursue his claims in court without having to pay for the services of a judge. In such a circumstance-where arbitration has been imposed by the employer and occurs only at the option of the employer-arbitrators' fees should be borne solely by the employer." (*Id.* at p. 1484.)[FN22]

> FN22. The arbitration agreement in *Cole,* unlike the one here, gave only the employer the right to seek arbitration. (105 F.3d at p. 1469.) If an employee filed a civil action, the employer had 60 days within which to move for arbitration. (*Ibid.*) If the employer filed a civil action, the employee had no authority to compel arbitration. (*Ibid.*) We also note that *Cole* addressed the imposition of arbitrator fees in a dispute involving *statutory* claims. For purposes of this appeal, we assume that *Cole's* analysis applies to common law claims for wrongful termination in violation of public policy.

**\*\*684**[21] Of course, the question before us is not whether a particular provision in the Keesal Young arbitration agreement would be enforceable today. Rather, the question is whether Keesal Young violated a public policy that was "not only

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

Case 3:07-cv-02412-JM-JMA    Document 7-2    Filed 01/03/2008    Page 25 of 49

74 Cal.App.4th 1105
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559
**(Cite as: 74 Cal.App.4th 1105)**

'fundamental' and 'substantial,' but also 'well established' at the time of [Lagatree's ] discharge." (*Stevenson v. Superior Court, supra*, 16 Cal.4th at p. 889, 66 Cal.Rptr.2d 888, 941 P.2d 1157, italics added; accord, *Foley, supra*, 47 Cal.3d at p. 668, 254 Cal.Rptr. 211, 765 P.2d 373.) The public policy at issue must be " '... tether[ed] ... to specific constitutional or statutory provisions ... to ensure that employers have *adequate notice* of the conduct that will subject them to tort liability to the employees they discharge ....' " (*Stevenson v. Superior Court, supra*, 16 Cal.4th at p. 889, 66 Cal.Rptr.2d 888, 941 P.2d 1157, italics added.) " '... Th[e] determination [of whether an employer has violated public policy] depends in large part on whether the public policy alleged is *sufficiently clear* to provide the basis for such a potent remedy.' " (*Ibid.,* italics added.) Here, in order to make that determination, we look to the state of the law as it existed in June 1997, when Keesal Young discharged Lagatree. (See *Luck v. Southern Pacific Transportation Co., supra*, 218 Cal.App.3d at p. 29, 267 Cal.Rptr. 618.)

*1132 Our survey of arbitration cases convinces us that, as of June 1997, there was not a well-established policy in California against imposing arbitrator fees on the losing party in an employment-related arbitration. On the contrary, the law authorized the use of such cost-shifting measures. Since 1961, with the enactment of the CAA (see Stats.1961, ch. 461, § 2, pp. 1540-1552), the payment of arbitrator fees has been governed by section 1284.2 of the Code of Civil Procedure (see *Austin v. Allstate Ins. Co.* (1993) 16 Cal.App.4th 1812, 1815, 21 Cal.Rptr.2d 56). That statute states: "Unless the arbitration agreement otherwise provides or the parties to the arbitration otherwise agree, each party to the arbitration shall pay his pro rata share of the expenses and fees of the neutral arbitrator, together with other expenses of the arbitration incurred or approved by the neutral arbitrator, not including counsel fees or witness fees or other expenses incurred by a party for his own benefit." (Code Civ. Proc., § 1284.2 ("section 1284.2"), added by Stats.1961, ch. 461, § 2, p. 1545.)[FN23]

FN23. The CAA provides that an arbitration shall be conducted by a single neutral arbitrator unless the parties' agreement states otherwise. (Code Civ. Proc., § 1282, subd. (a).)

In *Tipton v. Systron Donner Corp.* (1979) 99 Cal.App.3d 501, 160 Cal.Rptr. 303, the court applied section 1284.2 in the context of an employment dispute. There, an employee had been discharged, and he challenged his termination through arbitration. The dispute was heard by a panel of three arbitrators.[FN24] The parties' agreement stated that " 'all costs, including those incurred in the court proceedings, shall be assessed against and borne by the disaffirming party.' " (*Id.* at p. 507, 160 Cal.Rptr. 303.) In a 2-to-1 decision, the arbitrators found that there was good cause for the termination. In confirming the arbitration award, the trial court awarded costs to the employer for both the arbitration and the court proceedings. The trial court also ruled that the employee was liable for all of the neutral arbitrator's fees. On appeal, the employee challenged the award of costs, arguing that the fees of the neutral arbitrator-approximately $10,000-should have been split between the parties. The Court of Appeal rejected that argument, finding that, under section 1284.2 and the parties' agreement, the trial court had properly imposed the entire cost of the neutral arbitrator on the **685 employee. (*Id.* at pp. 507-508, 160 Cal.Rptr. 303.)[FN25]

FN24. In accordance with the arbitration agreement, each side chose one arbitrator. Because the two arbitrators could not agree on an outcome, they selected a third, neutral arbitrator.

FN25. The employee paid his half of the fees directly to the arbitrator and, as ordered by the trial court, reimbursed the employer for the other half. (99 Cal.App.3d at pp. 507-508, 160 Cal.Rptr. 303.)

In *Dickinson v. Kaiser Foundation Hospitals* (1980) 112 Cal.App.3d 952, 169 Cal.Rptr. 493, the claimant brought a medical malpractice claim against a hospital. Pursuant to the parties' agreement, the dispute was submitted to arbitration. The arbitration panel, consisting of three arbitrators, *1133 awarded the claimant $655,200 in damages but directed that the parties bear their own costs. In confirmation proceedings before the trial court, the claimant requested that the award be "corrected" to reflect that he was entitled to costs of approximately $9,000. The trial court rejected the request and entered judgment on the award. The Court of Appeal affirmed, stating that, under the CAA (§ 1284.2), the parties were to bear their own costs unless they had agreed otherwise. Because there was no such agreement, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

-71-

74 Cal.App.4th 1105
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal
D.A.R. 9559
(Cite as: 74 Cal.App.4th 1105)

Page 22

claimant was not entitled to costs. (112 Cal.App.3d at p. 954, 169 Cal.Rptr. 493; see also _Kauffman v. Shearson Hayden Stone, Inc._ (1982) 128 Cal.App.3d 809, 180 Cal.Rptr. 566 [affirming order awarding half of arbitrator fees to prevailing party].)

Thus, by enacting section 1284.2, "[t]he Legislature has ... established a policy that arbitration costs are to be paid by the party incurring them [unless the parties agree otherwise]. Under this statutory scheme, [a party] is not entitled to the costs [he or] she incurred in arbitration [absent an agreement to the contrary]. We recognize that there will be instances of unavoidably high arbitration expenses disproportionate to the amount recoverable ..., resulting in inadequate compensation to the claimants, and are sympathetic to those finding themselves in that position. We believe however, that any relief in this regard must be provided by the Legislature." (_Austin v. Allstate Ins. Co., supra,_ 16 Cal.App.4th at p. 1817, 21 Cal.Rptr.2d 56.)[FN26]

> FN26. By its own terms, section 1284.2 governs the fees of "neutral" arbitrators, which the CAA defines as arbitrators who are "selected jointly by the parties or by the arbitrators selected by the parties ...." (Code Civ. Proc., § 1280, subd. (d).) In his suit against Keesal Young, Lagatree alleged that disputes were to be resolved by a panel of three arbitrators, but he did not allege how the arbitrators were to be chosen or whether any of them would be selected jointly by the parties. Lagatree has not asserted that nonneutral arbitrators would be used, nor has he challenged the arbitration agreement on that basis. (See _Graham v. Scissor-Tail, Inc., supra,_ 28 Cal.3d at pp. 821-828, 171 Cal.Rptr. 604, 623 P.2d 165.) As a result, we do not address any issues concerning the use of nonneutral arbitrators. (See _Graham v. Lenzi_ (1995) 37 Cal.App.4th 248, 259, fn. 10, 43 Cal.Rptr.2d 407;_MST Farms v. C.G. 1464_ (1988) 204 Cal.App.3d 304, 306, 251 Cal.Rptr. 72.)

Against this backdrop of state law, we have the February 1997 decision of the District of Columbia Circuit in _Cole v. Burns Intern. Security Services, supra,_ 105 F.3d 1465, which was handed down approximately five months before Lagatree was terminated at Keesal Young. As far as we can tell, _Cole_ was the first decision to hold that arbitrator fees

in an employment-related arbitration cannot be imposed on an employee.

Assuming that _Cole_ made its way to California in five months, we doubt that employers here would have viewed it as a source of well-established public policy. For one thing, the language in _Cole_ did not readily lend itself to common law claims for wrongful termination. By way of example, the *1134_Cole_ court stated: "[I]n _Gilmer_ [, _supra,_ 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26,] the Supreme Court endorsed a system of arbitration in which employees are not required to pay for the arbitrator assigned to hear their statutory claims.... Under _Gilmer,_ arbitration is supposed to be a reasonable substitute for a judicial forum. Therefore, it would undermine Congress's intent to prevent employees who are seeking to vindicate**686 statutory rights from gaining access to a judicial forum and then require them to pay for the services of an arbitrator when they would never be required to pay for a judge in court." (_Cole v. Burns Intern. Security Services, supra,_ 105 F.3d at p. 1484.)

[22] Further, we question whether _Cole_ -a nonbinding decision from another jurisdiction-could support a well-established public policy under California law.[FN27] The subsequent judicial treatment of _Cole_ illustrates the pitfalls of relying on a single non-California case in attempting to determine state public policy.

> FN27. Although decisions of the United States Supreme Court are not binding with respect to state law (see _Kelly v. Vons Companies, Inc._ (1998) 67 Cal.App.4th 1329, 1337, 79 Cal.Rptr.2d 763), they are entitled to "respectful consideration" (_People v. Guiton_ (1993) 4 Cal.4th 1116, 1126, 17 Cal.Rptr.2d 365, 847 P.2d 45). We express no view as to whether such a decision could support a public policy claim under California law. (Cf. _Silberg v. Anderson_ (1990) 50 Cal.3d 205, 213-214, 266 Cal.Rptr. 638, 786 P.2d 365;_Rifkind & Sterling, Inc. v. Rifkind_ (1994) 28 Cal.App.4th 1282, 1289-1293, 33 Cal.Rptr.2d 828;_Meanley v. McColgan_ (1942) 49 Cal.App.2d 203, 209, 121 P.2d 45.)

At least two federal circuits, the tenth and eleventh, have followed _Cole._(_Shankle v. B-G Maintenance_

74 Cal.App.4th 1105

74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

(Cite as: 74 Cal.App.4th 1105)

Page 23

*Management of Colorado* (10th Cir.1999) 163 F.3d 1230, 1234-1235;*Paladino v. Avnet Computer Technologies, Inc.* (11th Cir.1998) 134 F.3d 1054, 1062). However, in a more recent decision, the Eleventh Circuit strongly suggested that *Cole* might not apply where, as here, the arbitration agreement requires that all fees and costs be paid by the losing party (as opposed to imposing all or a portion of them on the employee even if he prevails). (*Randolph v. Green Tree Financial Corp.-Alabama* (11th Cir.1999) 178 F.3d 1149, 1158; see also *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, supra,* 170 F.3d at pp. 15-16 [arbitration agreement may be valid if it mandates award of fees and costs to prevailing party].)

The First and Seventh Circuits have also discussed *Cole,* but have concluded that a challenge to arbitrator fees should not be made unless and until such expenses have actually been imposed on a claimant. (*Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, supra,* 170 F.3d at pp. 15-16;*Koveleskie v. SBC Capital Markets, Inc., supra,* 167 F.3d at p. 366.) In those circuits, "the *possibility* that a plaintiff may be required to pay arbitration fees is not, by itself, a sufficient reason to invalidate an agreement to *1135 arbitrate ... because the arbitral panel may not in fact require the plaintiff to pay fees and, if a plaintiff believes that excessive fees have been levied against him or her, judicial review of the imposition of the fees is available after arbitration." (*Arakawa v. Japan Network Group* (S.D.N.Y.1999) 56 F.Supp.2d 349, 354, italics added; see *Howard v. Anderson* (S.D.N.Y.1999) 36 F.Supp.2d 183, 186-187.)[FN28]

> FN28. Plainly, under the Keesal Young agreement, if an employee were to prevail at the arbitration, he would not have to pay any portion of the arbitrator fees.

So, we state the obvious. As the post-*Cole* decisions indicate, a rule of law announced in one case may be modified, limited, or distinguished in later cases. For our purposes, it is sufficient to point out that the holding in *Cole,* as subsequently applied by the First and Seventh Circuits and as suggested by the Eleventh Circuit, would not support a public policy claim against Keesal Young.[FN29]

> FN29. Interestingly, in *Cole* itself, the court held that the arbitration agreement was valid. There, the agreement was silent as to

the allocation of arbitrator fees. (105 F.3d at pp. 1468, 1480-1481, 1485-1486.) The court stated: "[W]e hold that [the employee] could not be required to agree to arbitrate his public law claims as a condition of employment if the arbitration agreement required him to pay all or part of the arbitrator's fees and expenses. In light of this holding, we find that the arbitration agreement in this case is valid and enforceable. We do so because we interpret the agreement as requiring [the employer] to pay all of the arbitrator's fees...." (105 F.3d at p. 1485.)

**687 Moreover, in light of California law on the subject of arbitrator fees (i.e., section 1284.2 and the cases construing it), employers did not have "adequate notice" in June 1997 that a cost-shifting provision would violate a "clear" public policy. (*Stevenson v. Superior Court, supra,* 16 Cal.4th at p. 889, 66 Cal.Rptr.2d 888, 941 P.2d 1157.) Indeed, in *Tipton v. Systron Donner Corp., supra,* 99 Cal.App.3d 501, 160 Cal.Rptr. 303, the court enforced just such a provision. In addition, the provision in the Keesal Young agreement was mutual: It imposed arbitrator fees on the "losing party," be it the employer or the employee. In that sense, the provision was indistinguishable from a clause requiring the losing party to pay the prevailing party's attorneys' fees and costs-a clause that was undeniably valid. (See *DiMarco v. Chaney* (1995) 31 Cal.App.4th 1809, 37 Cal.Rptr.2d 558; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 1999) ¶¶ 5:430-5:431, 5:434-5:434.1, rev. 1, 1999, pp. 5-167, 5-170.)

In any event, we need not take a poll among employers or stretch the bounds of judicial notice to conclude that, in June 1997, California did not have a well-established policy against imposing arbitrator fees on the losing party in an employment-related arbitration.

[23][24] Nothing in *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 84 Cal.Rptr.2d 425, 975 P.2d 622, handed down by the *1136 Supreme Court four months ago, compels a different conclusion. There, the court held that, under the due process clause, a public school teacher threatened with suspension or dismissal cannot be required to pay half the cost of the administrative law judge ("ALJ") who hears the teacher's challenge to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4                                                                                    -73-

74 Cal.App.4th 1105

74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

Page 24

**(Cite as: 74 Cal.App.4th 1105)**

the proposed action. The court found unconstitutional section 44944, subdivision (e), of the Education Code, which imposed half the cost of the ALJ on a teacher who did not prevail in the administrative proceeding or who prevailed at the administrative level but lost in a subsequent judicial challenge to the ALJ's decision. In reaching that conclusion, the four-member majority relied in part on *Cole v. Burns Intern. Security Services, supra,* 105 F.3d 1465. (See *California Teachers Assn. v. State of California, supra,* 20 Cal.4th at pp. 333, 355-356, 84 Cal.Rptr.2d 425, 975 P.2d 622.) Assuming arguendo that the high court now views *Cole* as the law in California, we note that the issue of liability here is governed by public policy as it existed two years ago.[FN30]

> FN30. After the reply briefs were filed in this case, the parties submitted supplemental letter briefs discussing the effect on this appeal, if any, of the Supreme Court's decision in *California Teachers Assn. v. State of California, supra,* 20 Cal.4th 327, 84 Cal.Rptr.2d 425, 975 P.2d 622. Relying on *Cole,* Lagatree argued for the first time that the Luce Forward arbitration agreement was invalid because it was silent as to (1) the allocation of arbitrator fees and (2) the availability of prehearing discovery. However, Lagatree cannot raise those issues for the first time in a letter brief. (See *Herman v. Los Angeles County Metropolitan Transportation Authority* (1999) 71 Cal.App.4th 819, 822, fn. 3, 84 Cal.Rptr.2d 144; *Trustees of Capital Wholesale Electric etc. Fund v. Shearson Lehman Brothers, Inc.* (1990) 221 Cal.App.3d 617, 626-627, 270 Cal.Rptr. 566.) This is especially so, given that Lagatree relied on *Cole* extensively in his briefs on the Keesal Young appeal but cited *Cole* only once in his briefs on the Luce Forward appeal-to explain why *Cole,* as interpreted by Luce Forward, was *not* applicable. In any event, as *Cole* demonstrates, an arbitration agreement that is silent on an issue is still valid because it can be interpreted in favor of the employee. (See fn. 29, *ante.*)

**E. Remaining Theories of Liability**

[25] Lagatree argues that predispute arbitration provisions imposed as a condition of employment have the purpose and effect of lessening an employer's liability for its future wrongful conduct, thereby violating Civil Code section 1668's prohibition on exculpatory clauses. (See fn. 2, *ante.*)

As one court has commented: " 'Traditionally, the law has looked carefully and **688 with some skepticism at those who attempt to contract away their legal liability for the commission of torts. This general policy of the common law found legislative expression early in California history with the enactment of Civil Code section 1668. This section made it clear a party could not contract away liability for his fraudulent or intentional acts or for his negligent violations of statutory law....' " (*Baker Pacific Corp. v. Suttles* (1990) 220 Cal.App.3d 1148, 1153, 269 Cal.Rptr. 709.)

Lagatree's contention that a compulsory arbitration provision ipso facto constitutes an invalid exculpatory clause is foreclosed as a matter of law. *1137 "Such generalized attacks on arbitration 'res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants,' and as such, they are 'far out of step with our current strong endorsement of ... this method of resolving disputes.' " (*Gilmer, supra,* 500 U.S. at p. 30, 111 S.Ct. 1647.) " '[B]y agreeing to arbitrate a ... claim, a party does not forgo the substantive rights afforded by the [cause of action]; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " (*Id.* at p. 26, 111 S.Ct. 1647.) It follows that a compulsory arbitration provision does not affect an employer's liability for future wrongdoing. Potential liability remains the same; only the forum is changed.[FN31]

> FN31. Lagatree asserts that disputed issues of fact precluded the resolution of his claim under Civil Code section 1668. Not so. In both complaints, Lagatree merely alleged in conclusory fashion that compulsory predispute arbitration agreements lessen an employer's liability for future misconduct. However, the language of the arbitration agreements proves otherwise. Nothing in *Farnham v. Superior Court* (1997) 60 Cal.App.4th 69, 70 Cal.Rptr.2d 85, upon which Lagatree relies, is to the contrary.

Lastly, Lagatree acknowledges that his claim under the Unfair Competition Law (Bus. & Prof.Code, §§ 17200-17209) rests on the same alleged violation of public policy that supports the wrongful termination

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

74 Cal.App.4th 1105

Page 25
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559
**(Cite as: 74 Cal.App.4th 1105)**

claim. Because we have concluded that there was no violation of public policy, the unfair competition claim fails as well.

## DISPOSITION

The judgments are affirmed.

SPENCER, P.J., and ORTEGA, J., concur.
Cal.App. 2 Dist.,1999.
Lagatree v. Luce, Forward, Hamilton & Scripps
74 Cal.App.4th 1105, 88 Cal.Rptr.2d 664, 15 IER Cases 865, 99 Cal. Daily Op. Serv. 7593, 1999 Daily Journal D.A.R. 9559

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 4

# TAB 5

Westlaw.

63 P.3d 979
Page 1
29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145
**(Cite as: 29 Cal.4th 1064, 63 P.3d 979)**

▷Little v. Auto Stiegler, Inc.
Cal.,2003.

Supreme Court of California
Alexander M. LITTLE, Plaintiff and Respondent,
v.
AUTO STIEGLER, INC., Defendant and Appellant.
No. S101435.

Feb. 27, 2003.

Employee brought discrimination and wrongful termination claims against employer, and employer sought to compel arbitration. The Superior Court, Los Angeles County, No. BC230809, S. Patricia Spear, J., denied employer's motion to compel arbitration. Employer appealed. The Court of Appeal reversed and remanded with directions to order arbitration. The Supreme Court, Moreno, J., granted review, superseding opinion of the Court of Appeal, and held that: (1) appellate arbitration provision for arbitration awards over $50,000 was unconscionable; (2) that provision would be severed and rest of arbitration agreement enforced; (3) a suit claiming wrongful termination in violation of public policy was subject to requirements of *Armendariz* decision; and (4) Federal Arbitration Act (FAA) did not preempt state arbitration costsharing standards and, thus, employer would be required to pay all types of costs that were unique to arbitration.

Affirmed in part, reversed in part, and remanded.

Baxter, J., filed a concurring and dissenting opinion, in which Chin and Brown, JJ., joined.

Brown, J., filed a concurring and dissenting opinion, in which Baxter and Chin, JJ., joined.

Opinion, 112 Cal.Rptr.2d 56, superseded.
West Headnotes
**[1] T ☞134(6)**

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(B) Agreements to Arbitrate
      25Tk131 Requisites and Validity
       25Tk134 Validity

       25Tk134(6) k. Unconscionability. Most Cited Cases
    (Formerly 33k73.1 Arbitration)
Provision in mandatory employment arbitration agreement permitting either party to "appeal" an arbitration award of more than $50,000 to a second arbitrator was unconscionably one-sided in favor of employer and could not be enforced; employer imposed on employee an adhesive arbitration agreement with $50,000 threshold that inordinately benefited employer and could not be justified by legitimate commercial need other than employer's desire to maximize its advantage in arbitration process.

**[2] Contracts 95 ☞1**

95 Contracts
   95I Requisites and Validity
     95I(A) Nature and Essentials in General
      95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
The doctrine of unconscionability has both a "procedural" and a "substantive" element, the former focusing on oppression or surprise due to unequal bargaining power, and the latter on overly harsh or one-sided results.

**[3] Contracts 95 ☞1**

95 Contracts
   95I Requisites and Validity
     95I(A) Nature and Essentials in General
      95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.

**[4] T ☞134(6)**

25T Alternative Dispute Resolution
   25TII Arbitration
     25TII(B) Agreements to Arbitrate
      25Tk131 Requisites and Validity
       25Tk134 Validity

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                                                -76-

63 P.3d 979
Page 2
29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145
(Cite as: 29 Cal.4th 1064, 63 P.3d 979)

25Tk134(6)  k.  Unconscionability.
Most Cited Cases
   (Formerly 33k6.2 Arbitration)

**Contracts 95 🗝1**

95 Contracts
   95I Requisites and Validity
      95I(A) Nature and Essentials in General
         95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
Substantively unconscionable contract terms may take various forms, but may generally be described as unfairly one-sided; one such form is the arbitration agreement's lack of a modicum of bilaterality, wherein the employee's claims against the employer, but not the employer's claims against the employee, are subject to arbitration, and another kind of substantively unconscionable provision occurs when the party imposing arbitration mandates a post-arbitration proceeding, either judicial or arbitral, wholly or largely to its benefit at the expense of the party on which the arbitration is imposed.

**[5] T 🗝134(6)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk131 Requisites and Validity
            25Tk134 Validity
               25Tk134(6)  k.  Unconscionability.
Most Cited Cases
   (Formerly 33k6.2 Arbitration)
Although parties may justify an asymmetrical arbitration agreement when there is a legitimate commercial need, that need must be other than the employer's desire to maximize its advantage in the arbitration process.

**[6] Contracts 95 🗝137(1)**

95 Contracts
   95I Requisites and Validity
      95I(F) Legality of Object and of Consideration
         95k135 Effect of Illegality
            95k137 Partial Illegality
               95k137(1) k. In General. Most Cited Cases
If the central purpose of a contract is tainted with illegality, then the contract as a whole cannot be enforced, but, if the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate.

**[7] T 🗝134(6)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk131 Requisites and Validity
            25Tk134 Validity
               25Tk134(6)  k.  Unconscionability.
Most Cited Cases
   (Formerly 33k7.2 Arbitration)

**T 🗝140**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk140 k. Severability. Most Cited Cases
   (Formerly 33k7.2 Arbitration)
Unconscionable provision in mandatory employment arbitration agreement permitting either party to "appeal" an arbitration award of more than $50,000 to a second arbitrator would be severed from remainder of valid arbitration agreement; there was no indication that the state of the law was sufficiently clear at the time the arbitration agreement was signed to lead to conclusion that appellate arbitration provision was drafted in bad faith.

**[8] T 🗝182(1)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(D) Performance, Breach, Enforcement, and Contest
         25Tk177 Right to Enforcement and Defenses in General
            25Tk182 Waiver or Estoppel
               25Tk182(1) k. In General. Most Cited Cases
   (Formerly 33k23.3(1) Arbitration)
Employee's suit claiming wrongful termination in violation of public policy was subject to requirements of *Armendariz* decision regarding application of general state law contract principles on the unwaivability of public rights to the unique context of arbitration.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                    -77-

63 P.3d 979                                                                    Page 3
29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145
(Cite as: 29 Cal.4th 1064, 63 P.3d 979)

[9] **Labor and Employment 231H ⚖759**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
           231Hk759 k. Public Policy Considerations in General. Most Cited Cases
      (Formerly 255k30(1.10) Master and Servant)
The public policy exception to the at-will employment rule must be based on policies carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions.

[10] **Labor and Employment 231H ⚖759**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
           231Hk759 k. Public Policy Considerations in General. Most Cited Cases
      (Formerly 255k30(1.10) Master and Servant)
The public policy that is the basis for claim for wrongful termination in violation of public policy must be "public" in that it affects society at large, rather than the individual, must have been articulated at the time of discharge, and must be fundamental and substantial; thus, a legitimate *Tameny* claim is designed to protect a public interest and therefore cannot be contravened by a private agreement.

[11] **Labor and Employment 231H ⚖34(1)**

231H Labor and Employment
    231HI In General
        231Hk31 Contracts
           231Hk34 Formation; Requisites and Validity
             231Hk34(1) k. In General. Most Cited Cases
      (Formerly 255k30(1.10) Master and Servant)

**Labor and Employment 231H ⚖759**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
           231Hk759 k. Public Policy Considerations in General. Most Cited Cases
      (Formerly 255k30(1.10) Master and Servant)
An employment agreement that required employees to waive claims that they were terminated in violation of public policy would itself be contrary to public policy.

[12] **T ⚖134(1)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
           25Tk131 Requisites and Validity
             25Tk134 Validity
                25Tk134(1) k. In General. Most Cited Cases
      (Formerly 33k6.2 Arbitration)
Because an employer cannot ask the employee to waive claims for wrongful termination in violation of public policy, it cannot impose on the arbitration of these claims such burdens or procedural shortcomings as to preclude their vindication.

[13] **T ⚖134(1)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
           25Tk131 Requisites and Validity
             25Tk134 Validity
                25Tk134(1) k. In General. Most Cited Cases
      (Formerly 33k6.2 Arbitration)
As with unwaivable statutory claims, special arbitration requirements for *Tameny* claims of wrongful termination contrary to public policy would generally not apply in situations in which an employer and an employee knowingly and voluntarily enter into an arbitration agreement after a dispute has arisen; in those cases, employees are free to determine what trade-offs between arbitral efficiency and formal procedural protections best safeguard their rights.

[14] **Compromise and Settlement 89 ⚖9**

89 Compromise and Settlement
    89I In General
        89k7 Validity
           89k9 k. Legality of Consideration. Most Cited Cases
      (Formerly 33k6.2)
An employee may settle a claim of wrongful termination contrary to public policy, notwithstanding prohibition on arbitration provisions resulting in de facto waiver of unwaivable rights.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                                                    -78-

63 P.3d 979
29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145
**(Cite as: 29 Cal.4th 1064, 63 P.3d 979)**

Page 4

**[15]** T 🗝269

25T Alternative Dispute Resolution
 25TII Arbitration
  25TII(F) Arbitration Proceedings
   25Tk269 k. Costs. Most Cited Cases
  (Formerly 33k42 Arbitration)
An agreement to arbitrate a claim of wrongful termination contrary to public policy must be interpreted to implicitly include an agreement to proportion costs in a manner that is reasonable for the employee/claimant, to prevent the de facto waiver of unwaivable rights contrary to provisions of the Civil Code. West's Ann.Cal.Civ.Code §§ 1668, 3513.

**[16]** T 🗝235

25T Alternative Dispute Resolution
 25TII Arbitration
  25TII(E) Arbitrators
   25Tk228 Nature and Extent of Authority
    25Tk235 k. Scope of Relief. Most Cited Cases
  (Formerly 33k29.6 Arbitration)

T 🗝251

25T Alternative Dispute Resolution
 25TII Arbitration
  25TII(F) Arbitration Proceedings
   25Tk251 k. Mode and Course of Proceedings in General. Most Cited Cases
  (Formerly 33k31 Arbitration)

T 🗝252

25T Alternative Dispute Resolution
 25TII Arbitration
  25TII(F) Arbitration Proceedings
   25Tk252 k. Discovery and Depositions. Most Cited Cases
  (Formerly 33k31 Arbitration)

T 🗝269

25T Alternative Dispute Resolution
 25TII Arbitration
  25TII(F) Arbitration Proceedings
   25Tk269 k. Costs. Most Cited Cases
  (Formerly 33k31 Arbitration)

Plaintiff/employee seeking to arbitrate *Tameny* claim for wrongful termination in violation of public policy should have benefit of same minimal protections as for Fair Employment and Housing Act (FEHA) claims as means of ensuring that they can effectively prosecute such a claim in arbitral forum; these include availability of damages remedies equal to those available in *Tameny* suit brought in court, including punitive damages, discovery sufficient to adequately arbitrate *Tameny* claim, written arbitration decision and judicial review sufficient to ensure that arbitrators have complied with the law respecting such claims, and allocation of arbitration costs so that they will not unduly burden employee. West's Ann.Cal.Gov.Code § 12900 et seq.

**[17]** T 🗝269

25T Alternative Dispute Resolution
 25TII Arbitration
  25TII(F) Arbitration Proceedings
   25Tk269 k. Costs. Most Cited Cases
  (Formerly 33k42 Arbitration)
Court, in compelling arbitration on employee's *Tameny* claim for wrongful termination in violation of public policy, should require employer to pay all types of costs that were unique to arbitration.

**[18]** T 🗝134(1)

25T Alternative Dispute Resolution
 25TII Arbitration
  25TII(B) Agreements to Arbitrate
   25Tk131 Requisites and Validity
    25Tk134 Validity
     25Tk134(1) k. In General. Most Cited Cases
  (Formerly 33k6.2 Arbitration)
Silence about costs in an arbitration agreement is not grounds for denying a motion to compel arbitration.

**[19]** T 🗝114

25T Alternative Dispute Resolution
 25TII Arbitration
  25TII(A) Nature and Form of Proceeding
   25Tk114 k. Constitutional and Statutory Provisions and Rules of Court. Most Cited Cases
  (Formerly 33k2.2 Arbitration)

**States 360** 🗝18.15

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5

-79-

63 P.3d 979
29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145
(Cite as: 29 Cal.4th 1064, 63 P.3d 979)

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases
Federal Arbitration Act (FAA) does not require states to comply with federal arbitration costsharing standards for ensuring that the vindication of public rights will not be stymied by burdensome arbitration costs 9 U.S.C.A. § 1 et seq.

***895*1068**981 Fisher & Phillips, Christopher C. Hoffman and Jeffrey R. Thurrell, Irvine, for Defendant and Appellant.
Fine, Boggs, Cope & Perkins, Ned A. Fine, John P. Boggs, Half Moon Bay, and Michael K. Perkins for California Motorcar Dealers Association as Amicus Curiae on behalf of Defendant and Appellant.
Winston & Strawn and Lee T. Paterson, Los Angeles, for The Employers Group as Amicus Curiae on behalf of Defendant and Appellant.
Maxie, Rheinheimer, Stephens & Vrevich and Darin L. Wessel, San Diego, as Amici Curiae on behalf of Defendant and Appellant.
Moskowitz, Brestoff, Winston & Blinderman, Nelson E. Brestoff and Dennis A. Winston, Los Angeles, for Plaintiff and Respondent.
McGuinn, Hillsman & Palefsky, Cliff M. Palefsky, Keith Ehrman, San Francisco; Pine & Pine and Norman Pine, Encino, for **982 California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiff and Respondent.
MORENO, J.
In this case, we consider four interlocking questions: (1) Is a provision in a mandatory employment arbitration agreement that permits either party to "appeal" an arbitration award of more than $50,000 to a second arbitrator, unconscionable; (2) if it is unconscionable, then should that unconscionable provision be severed from the rest of the arbitration agreement and the agreement enforced, or is the entire agreement invalid; (3) if the former, then in reviewing the rest of the arbitration agreement, do the minimum requirements for arbitration of unwaivable statutory claims that we *1069 set forth in Armendariz v. Foundation Health Psychcare Services, Inc. (2000) 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669(Armendariz ) apply also to claims that an employee was terminated in violation of public policy; (4) if yes, then must one of those requirements-that the employer imposing mandatory arbitration-on the employee must pay all costs unique to arbitration be reconsidered and revised in light of a post-Armendariz United States Supreme Court decision on arbitration costsharing, ***896Green Tree Financial Corp.-Ala. v. Randolph (2000) 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373(Green Tree )?

We conclude as follows: (1) the appellate arbitration provision for arbitration awards over $50,000 is unconscionable; (2) that provision should be severed and the rest of the arbitration agreement enforced; (3) a suit claiming wrongful termination in violation of public policy should be subject to the requirements set forth in Armendariz; and (4)Green Tree does not require that we modify Armendariz's cost requirements. We accordingly partly reverse the Court of Appeal's judgment.

## I. STATEMENT OF FACTS

Alexander M. Little worked for Auto Stiegler, Inc., an automobile dealership. Little eventually rose to become Auto Stiegler's service manager. He alleges that he was demoted, then terminated, for investigating and reporting warranty fraud. He filed an action against defendant for tortious demotion in violation of public policy; tortious termination in violation of public policy; breach of an implied contract of continued employment; and breach of the implied covenant of good faith and fair dealing. In the first through third causes of action, he sought compensatory and punitive damages. In the fourth cause of action, plaintiff sought only contract breach damages. He sought no relief under the California Fair Employment and Housing Act (FEHA). (Gov.Code, § 12900 et seq.)

Little signed three nearly identical arbitration agreements while employed by defendant in June 1995, October 1996, and January 1997. The most recent of the three stated as follows: "I agree that any claim, dispute, or controversy (including, but not limited to, any and all claims of discrimination and harassment) which would otherwise require or allow resort to any court or other governmental dispute resolution forum between myself and the Company (or its owners, directors, and officers, and parties affiliated with its employee benefit and health plans) arising from, related to, or having any relationship or connection whatsoever with my seeking employment with, employment by, or other association with the Company, whether based on tort, contract, statutory, or equitable law, or otherwise, shall be *1070 submitted to and determined exclusively by binding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5

63 P.3d 979

Page 6

29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145

**(Cite as: 29 Cal.4th 1064, 63 P.3d 979)**

arbitration under the Federal Arbitration Act, in conformity with the procedures of the California Arbitration Act (Cal.Code Civ. Proc. Sec 1280 et seq., including section 1283.05 and all of the act's other mandatory and permissive rights to discovery); provided, however, that: In addition to requirements imposed by law, any arbitrator herein shall be a retired California Superior Court Judge and shall be subject to disqualification on the same grounds as would apply to a judge of such court. To the extent applicable in civil actions in California courts, the following shall apply and be observed: all rules of pleading (including the right of demurrer), all rules of evidence, all rights to resolution of the dispute by means of motions for summary judgment, judgment on the pleadings, and judgment under Code of Civil Procedure **983 section 631.8. Resolution of the dispute shall be based solely upon the law governing the claims and defenses pleaded, and the arbitrator may not invoke any basis other than such controlling law, including but not limited to, notions of 'just cause.' As reasonably required to allow full use and benefit of this agreement's modifications to the act's procedures, the arbitration shall extend the times set by the act for the giving of notices and setting of hearings. Awards exceeding $50,000.00 shall include the arbitrator's written reasoned opinion and, at either party's written request within 20 days after issuance of the award, shall be subject to reversal and remand, modification,***897 or reduction following review of the record and arguments of the parties by a second arbitrator who shall, as far as practicable, proceed according to the law and procedures applicable to appellate review by the California Court of Appeal of a civil judgment following court trial. I understand by agreeing to this binding arbitration provision, both I and the Company give up our rights to trial by jury."

Auto Stiegler's initial motion to compel arbitration was granted. Following our decision in *Armendariz,* the trial court, upon plaintiff's request for reconsideration, denied defendant's motion to compel arbitration. The trial court ruled: "The court believes that the arbitration clause in issue does not meet the standards set forth by the Supreme Court and it should not be enforced. The clauses of the arbitration agreement that do not comport with the requirements of the Armendariz [decision] include the clauses that: [¶] 1. Require the Plaintiff to share the costs; [¶] 2. Provide for no judicial review. The court deems this fatal, as judicial review of all decisions is not the same as limited review by another arbitrator of only

certain awards; [¶] 3. Limit the remedies available to the complainant [*sic*] [to] possibly exclude equitable as opposed to legal remedies, to which he might otherwise be entitled. [¶] 4. Lack of mutuality of remedy, in that this clause, unlike the one in *Armendariz* does not obviously bind the employer to likewise enforce its right in the arbitration forum."

**\*1071** The Court of Appeal reversed. It held that the *Armendariz* requirements did not apply to nonstatutory claims. Further, it rejected the claim that the arbitration agreement was unconscionable. It focused on *Armendariz's* discussion of whether both parties were bound to arbitrate, and concluded that the arbitration agreements did in fact bind both parties. The Court of Appeal did not consider whether the arbitration "appeal" triggered by an award of greater than $50,000 was unconscionable. Finally, the court concluded that under the United States Supreme Court's decision in *Green Tree,* silence as to who would bear the costs of arbitration was not a basis for invalidating the agreement. We granted review.

## II. DISCUSSION

### A. Unconscionability of Appellate Arbitration Provision

[1] As recounted, the arbitration agreement provided that "[a]wards exceeding $50,000.00 shall include the arbitrator's written reasoned opinion and, at either party's written request within 20 days after issuance of the award, shall be subject to reversal and remand, modification, or reduction following review of the record and arguments of the parties by a second arbitrator who shall, as far as practicable, proceed according to the law and procedures applicable to appellate review by the California Court of Appeal of a civil judgment following court trial." Little contends this provision is unconscionable. We agree.

[2][3] To briefly recapitulate the principles of unconscionability, the doctrine has " 'both a "procedural" and a "substantive" element,' the former focusing on " 'oppression" ' or ' "surprise" ' due to unequal bargaining power, the latter on ' "overly harsh" ' or ' "one-sided" ' results." (*Armendariz, supra,* 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669.) The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, " ' "which, imposed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5

63 P.3d 979

29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145

**(Cite as: 29 Cal.4th 1064, 63 P.3d 979)**

Page 7

and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " (*Id.* at p. 113, 99 Cal.Rptr.2d 745, 6 P.3d 669.) "[I]n the case of preemployment arbitration contracts,***898 the economic pressure exerted by employers **984 on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement." (*Id.* at p. 115, 99 Cal.Rptr.2d 745, 6 P.3d 669.) It is clear in the present case that Auto Stiegler imposed on Little an adhesive arbitration agreement.

[4] Substantively unconscionable terms may take various forms, but may generally be described as unfairly one-sided. One such form, as in *1072*Armendariz,* is the arbitration agreement's lack of a " 'modicum of bilaterality,' " wherein the employee's claims against the employer, but not the employer's claims against the employee, are subject to arbitration. (*Armendariz, supra,* 24 Cal.4th at p. 119, 99 Cal.Rptr.2d 745, 6 P.3d 669.) Another kind of substantively unconscionable provision occurs when the party imposing arbitration mandates a post-arbitration proceeding, either judicial or arbitral, wholly or largely to its benefit at the expense of the party on which the arbitration is imposed. Two Court of Appeal cases have addressed this kind of unconscionability.

In *Beynon v. Garden Grove Medical Group* (1980) 100 Cal.App.3d 698, 161 Cal.Rptr. 146(*Beynon* ), the medical group imposed on its patients a mandatory arbitration agreement. Paragraph B of the agreement authorized the medical group, but not the patient, to reject the first arbitration award and submit the dispute to a second arbitration panel. The court held the provision unconscionable. "That the provisions of paragraph B unreasonably limit the obligations of the health plan and health care provider and defeat the reasonable expectations of one enrolling in the plan is manifest. The term arbitration normally imports a dispute resolution procedure which is speedy, economical and 'bears equally' on the parties. [Citation.] The provisions of paragraph B, however, are weighted in favor of the health plan and provider of services and against members and can render arbitration an expensive and protracted proceeding. By granting to only the health plan or health care provider the unilateral right to reject an arbitration

award without cause and to require rearbitration, paragraph B enables the health plan and health care provider to transform arbitration into virtually a 'heads I win, tails you lose' proposition." (*Beynon, supra,* 100 Cal.App.3d at p. 706, 161 Cal.Rptr. 146.)

*Saika v. Gold* (1996) 49 Cal.App.4th 1074, 56 Cal.Rptr.2d 922(*Saika* ), also arose in the doctor/patient setting. The arbitration agreement in that case had a provision that permitted either party to reject an arbitration award of $25,000 or greater and request a trial de novo in superior court. The Court of Appeal refused to enforce the provision and instead directed the trial court to confirm the $325,000 award in the patient's favor. The court rejected the doctor's argument that the case was distinguishable from *Beynon* because the challenged arbitration provision permitted *either* party to request a trial de novo if the award exceeded the stated amount. "[I]n the vernacular of late 20th century America, let us 'get real.' As a practical matter, the benefit which the trial de novo clause confers on patients is nothing more than a chimera. The odds that an award will *both* (a) clear the $25,000 threshold but (b) *still* be so low that the *patient* would *want* to have a trial de novo are so small as to be negligible. Unless we are to assume that arbitrators in medical malpractice cases regularly and capriciously make awards substantially below what justice requires-and that is an assumption which we will not *1073 indulge-***899 the cases where the trial de novo clause could possibly benefit the patient are going to be rare indeed." (*Saika, supra,* 49 Cal.App.4th at p. 1080, 56 Cal.Rptr.2d 922.) The court concluded that "the rejection clause meant the arbitration agreement really did not function as an *arbitration* agreement. The promise of an inexpensive, speedy resolution to the claim evaporated with one party's unilateral ability to avoid results it did not like. [¶] We have already referred to the strong public policy favoring arbitration. That policy is manifestly undermined by provisions in arbitration clauses which seek to make the arbitration process itself an offensive weapon in one party's arsenal." (*Id.* at p. 1081, 56 Cal.Rptr.2d 922.)

Auto Stiegler and its amici curiae make several arguments to distinguish this case **985 from *Beynon* and *Saika.* First, they claim that the arbitration appeal provision applied evenhandedly to both parties and that, unlike the doctor/patient relationship in *Saika,* there is at least the possibility that an employer may be the plaintiff, for example in cases of misappropriation of trade secrets. (See, e.g.,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5

-82-

63 P.3d 979
Page 8
29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145
(Cite as: 29 Cal.4th 1064, 63 Cal.4th 979)

*Brennan v. Tremco Inc.* (2001) 25 Cal.4th 310, 105 Cal.Rptr.2d 790, 20 P.3d 1086.) But if that is the case, they fail to explain adequately the reasons for the $50,000 award threshold. From a plaintiff's perspective, the decision to resort to arbitral appeal would be made not according to the amount of the arbitration award but the potential value of the arbitration claim compared to the costs of the appeal. If the plaintiff and his or her attorney estimate that the potential value of the claim is substantial, and the arbitrator rules that the plaintiff takes nothing because of its erroneous understanding of a point of law, then it is rational for the plaintiff to appeal. Thus, the $50,000 threshold inordinately benefits defendants. Given the fact that Auto Stiegler was the party imposing the arbitration agreement and the $50,000 threshold, it is reasonable to conclude it imposed the threshold with the knowledge or belief that it would generally be the defendant.

[5] Although parties may justify an asymmetrical arbitration agreement when there is a "legitimate commercial need" (*Armendariz, supra,* 24 Cal.4th at p. 117, 99 Cal.Rptr.2d 745, 6 P.3d 669), that need must be "other than the employer's desire to maximize its advantage" in the arbitration process. (*Id.* at p. 120, 99 Cal.Rptr.2d 745, 6 P.3d 669.) There is no such justification for the $50,000 threshold. The explanation for the threshold offered by amicus curiae Maxie, Rheinheimer, Stephens & Vrevich-that an award in which there is less than that amount in controversy would not be worth going through the extra step of appellate arbitral review-makes sense only from a defendant's standpoint and cannot withstand scrutiny.

Auto Stiegler also argues that an arbitration appeal is less objectionable than a second arbitration, as in *Beynon,* or a trial de novo, as in *Saika,* *1074 because it is not permitting a wholly new proceeding, making the first arbitration illusory, but only permitting limited appellate review of the arbitral award. We fail to perceive a significant difference. Each of these provisions is geared toward giving the arbitral defendant a substantial opportunity to overturn a sizable arbitration award. Indeed, in some respects appellate review is more favorable to the employer attempting to protect its interests. It is unlikely that an arbitrator who merely acts in an appellate capacity will increase an award against the employer, whereas a trial or arbitration de novo at least runs the risk that the employer would become liable for an even larger sum than that awarded in the initial arbitration.

***900 We therefore conclude that the arbitral appeal provision in this particular agreement is unconscionably one-sided and may not be enforced. We next turn to the question whether this provision may be severed and the rest of the arbitration agreement enforced, or whether the entire agreement should be invalidated.

*B. Is the Unconscionable Portion of the Agreement Severable?*

[6] In *Armendariz,* we reviewed the principles regarding the severance of illegal terms from an arbitration agreement. As we stated: "Two reasons for severing or restricting illegal terms rather than voiding the entire contract appear implicit in case law. The first is to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement-particularly when there has been full or partial performance of the contract. [Citations.] Second, more generally, the doctrine of severance attempts to conserve a contractual relationship if to do so would not be condoning an illegal scheme. [Citations.] The overarching inquiry is whether ' "the interests of justice ... would be furthered" ' by severance. [Citation.] Moreover, courts must have the *capacity* to cure the unlawful contract through severance or restriction of the offending clause, which ... is not invariably the case." (*Armendariz, supra,* 24 Cal.4th at pp. 123-124, 99 Cal.Rptr.2d 745, 6 P.3d 669.) Accordingly, **986 "[c]ourts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." (*Id.* at p. 124, 99 Cal.Rptr.2d 745, 6 P.3d 669.)

In *Armendariz,* we found two factors weighed against severance of the unlawful provisions. "First, the arbitration agreement contains more than one unlawful provision; it has both an unlawful damages provision and an unconscionably unilateral arbitration clause. Such multiple defects indicate a *1075 systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage.... [¶] Second, in the case of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                                    -83-

63 P.3d 979

29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145

Page 9

**(Cite as: 29 Cal.4th 1064, 63 P.3d 979)**

agreement's lack of mutuality, ... permeation [by an unlawful purpose] is indicated by the fact that there is no single provision a court can strike or restrict in order to remove the unconscionable taint from the agreement. Rather, the court would have to, in effect, reform the contract, not through severance or restriction, but by augmenting it with additional terms. Civil Code section 1670.5 does not authorize such reformation by augmentation, nor does the arbitration statute. Code of Civil Procedure section 1281.2 authorizes the court to refuse arbitration if grounds for revocation exist, not to reform the agreement to make it lawful. Nor do courts have any such power under their inherent limited authority to reform contracts. [Citations.]" (*Armendariz, supra,* 24 Cal.4th at pp. 124-125, 99 Cal.Rptr.2d 745, 6 P.3d 669.)

[7] Neither of these factors is operative in the present case. There is only a single provision that is unconscionable, the one-sided arbitration appeal.[FN1] And no contract***901 reformation is required-the offending provision can be severed and the rest of the arbitration agreement left intact. Thus, the courts in *Beynon* and *Saika,* considering similar provisions, severed them and enforced the rest of the arbitration agreement. (*Beynon, supra,* 100 Cal.App.3d at p. 713, 161 Cal.Rptr. 146;*Saika, supra,* 49 Cal.App.4th at p. 1082, 56 Cal.Rptr.2d 922.)

> FN1. We note that the other three grounds the trial court found in this case for refusing to enforce the arbitration agreement, described in the statement of facts above, do not appear to be valid. First, the fact that an arbitration agreement does not explicitly provide for judicial review is no basis for invalidating it. (*Armendariz, supra,* 24 Cal.4th at p. 107, 99 Cal.Rptr.2d 745, 6 P.3d 669.) Second, unlike in *Armendariz,* nothing in the language of the present agreement limits remedies and no limitation should be implied. Finally, unlike the agreement in *Armendariz,* which explicitly limited the scope of the arbitration agreement to wrongful termination claims and therefore implicitly excluded the employer's claims against the employee (*id.* at pp. 92, 120, 99 Cal.Rptr.2d 745, 6 P.3d 669), the arbitration agreement in the present case contained no such limitation, instead applying to "any claim, dispute, or controversy ... between [the employee] and the Company."

Amicus curiae California Employment Lawyers Association points to other provisions in the agreement that are, in its view, contrary to public policy or unconscionable. Essentially, amicus curiae objects to the incorporation of legal formalities into Auto Stiegler's arbitration agreement: its mandate that the rules of pleading and evidence shall be observed, that the arbitrator shall only rely on governing law and not informal principles of "just cause," and that traditional judicial motions such as demurrer and summary judgment be available to the parties. They claim that such procedures detract from the inherent informality of arbitration. Without more, however, we cannot say that these provisions, which make arbitration more closely follow judicial procedures, are unconscionably one-sided. It is not at all obvious that such provisions would inordinately benefit Auto Stiegler rather than Little. To the extent that the availability of dispositive pre-arbitration motions favor Auto Stiegler as defendant, they confer no more of an advantage than would be the case had the action been brought in court.

Moreover, there is no indication that the state of the law was "sufficiently clear at the time the arbitration agreement was signed to lead to the conclusion that this [appellate arbitration provision] was drafted in bad faith." *1076(*Armendariz, supra,* 24 Cal.4th at pp. 124-125, fn. 13, 99 Cal.Rptr.2d 745, 6 P.3d 669.) There is enough of a difference between the appellate arbitration provision, drafted in the employment context, and the de novo trial and arbitration provisions in the doctor/patient setting in *Beynon* and *Saika,***987 to preclude a determination that the provision was directly contrary to settled law and therefore inferentially drafted in bad faith.

We therefore conclude that Auto Stiegler's arbitration agreement is valid and enforceable once the unconscionable appellate arbitration provision is deleted. Whether a court should refuse to enforce it on other grounds will be considered below.

*C. Is Arbitration of a Tameny Claim Subject to the Minimal Procedural Requirements Set Forth in Armendariz?*

[8] In *Tameny v. Atlantic Richfield Co.* (1980) 27

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5

63 P.3d 979
Page 10
29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145
**(Cite as: 29 Cal.4th 1064, 63 P.3d 979)**

Cal.3d 167, 178, 164 Cal.Rptr. 839, 610 P.2d 1330, [*Tameny*] we recognized that although employers have the power to terminate employees at will, they may not terminate an employee for a reason that is contrary to public policy. Little claims that arbitration of *Tameny* claims are subject to the minimum requirements set forth in *Armendariz,* reviewed below. We agree.

In *Armendariz,* we held that arbitration of claims under the FEHA is subject to certain minimal requirements: (1) the arbitration agreement may not limit the damages normally available under the statute (*Armendariz, supra,* 24 Cal.4th at p. 103, 99 Cal.Rptr.2d 745, 6 P.3d 669); (2) there must be discovery "sufficient to adequately arbitrate their statutory claim"(*id.* at p. 106, 99 Cal.Rptr.2d 745, 6 P.3d 669);***902 (3) there must be a written arbitration decision and judicial review " 'sufficient to ensure the arbitrators comply with the requirements of the statute' " (*ibid.*); and (4) the employer must "pay all types of costs that are unique to arbitration"(*id.* at p. 113, 99 Cal.Rptr.2d 745, 6 P.3d 669).

These requirements were founded on the premise that certain statutory rights are unwaivable. "This unwaivability derives from two statutes that are themselves derived from public policy. First, Civil Code section 1668 states: 'All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.' 'Agreements whose object, directly or indirectly, is to exempt [their] parties from violation of the law are against public policy and may not be enforced.' [Citation.] Second, Civil Code section 3513 states, 'Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be *1077 contravened by a private agreement.' [Citations.]" (*Armendariz, supra,* 24 Cal.4th at p. 100, 99 Cal.Rptr.2d 745, 6 P.3d 669.) We concluded that the FEHA was enacted for public reasons and the rights it conferred on employees were unwaivable. (*Id.* at pp. 100-101, 99 Cal.Rptr.2d 745, 6 P.3d 669.) We then concluded that the above requirements were necessary to enable an employee to vindicate these unwaivable rights in an arbitration forum.

[9][10][11][12] A *Tameny* claim is almost by definition unwaivable. "[The] public policy exception

to the at-will employment rule must be based on policies 'carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions....' "(*Silo v. CHW Medical Foundation* (2002) 27 Cal.4th 1097, 1104, 119 Cal.Rptr.2d 698, 45 P.3d 1162.) Moreover, the public policy that is the basis for such a claim must be " ' "public" in that it "affects society at large" rather than the individual, must have been articulated at the time of discharge, and must be " 'fundamental' " and " 'substantial.' " ' " (*Ibid.*) Thus, a legitimate *Tameny* claim is designed to protect a public interest and therefore " 'cannot be contravened by a private agreement.' " (*Armendariz, supra,* 24 Cal.4th at p. 100, 99 Cal.Rptr.2d 745, 6 P.3d 669.) In other words, an employment agreement that required employees to waive claims that they were terminated in violation of public policy would itself be contrary to public policy. Accordingly, because an employer cannot ask the employee to waive *Tameny* claims, it also cannot impose on the arbitration of these claims such burdens or procedural shortcomings as to preclude their vindication. Thus, the *Armendariz* requirements are as appropriate to the arbitration of *Tameny* claims as to unwaivable statutory claims.

**988 Auto Stiegler cites *Brown v. Wheat First Securities, Inc.* (D.C.Cir.2001) 257 F.3d 821(*Brown* ), which came to a contrary conclusion with respect to a claim for termination in violation of public policy under District of Columbia law. The court held that *Cole v. Burns Intern. Security Services* (D.C. Cir.1997) 105 F.3d 1465(*Cole* ), a case on which *Armendariz* relied, and which set forth requirements for arbitrating claims under title VII of the Civil Rights Act of 1964 similar to the *Armendariz* requirements, should be limited to federal statutory claims, not state tort claims derived from common law. In *Brown,* an employee of a securities firm was allegedly terminated for alerting the Securities and Exchange Commission to illegal activities occurring at his employer's**903 firm. He claimed to fall within the "whistleblower" exception to the employment-at-will rule under District of Columbia common law. He refused to participate in subsequent arbitration and moved to vacate the arbitration award on the grounds that he was to be charged substantial arbitration fees, contrary to *Cole.*

The *Brown* court, which consisted of a different panel of the District of Columbia Circuit Court of Appeals than had decided *Cole,* began by reviewing the latter decision. As the *Brown* court summarized it, *Cole*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                                                                    -85-

63 P.3d 979
29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily
Journal D.A.R. 2145
(Cite as: 29 Cal.4th 1064, 63 P.3d 979)

acknowledged "that the Supreme Court in *1078 *Gilmer v. Interstate/Johnson Lane Corp.* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) [ (*Gilmer* ) ], had 'made clear that, as a general rule, statutory claims are fully subject to binding arbitration,' [citations][.] [But] we also noted that '*Gilmer* cannot be read as holding that an arbitration agreement is enforceable no matter what rights it waives or what burdens it imposes,' [citation]. The arbitration agreement will be valid 'so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum.' [Citations.] As to fees, we found that 'it would undermine Congress's intent to prevent employees who are seeking to vindicate statutory rights from gaining access to a judicial forum and then require them to pay for the services of an arbitrator when they would never be required to pay for a judge in court.' [Citation.] Accordingly we interpreted the arbitration agreement as requiring the employer to pay the arbitrator's fees." (*Brown, supra,* 257 F.3d at pp. 824-825.)

The *Brown* court, in rejecting the extension of *Cole* to nonstatutory claims, pointed to language in *Cole* limiting its holding to such claims. The court further stated: "We also see no basis for extending *Cole.* As we have explained, our central rationale-respecting congressional intent-does not extend beyond the statutory context. Moreover, by enacting the Federal Arbitration Act, Congress 'manifest[ed] a "liberal federal policy favoring arbitration agreements." ' [Citations]. The Act also pre-empted state restrictions on the enforcement of arbitration agreements. [Citations]. *Gilmer,* as we've seen, framed the question as whether dispute resolution under the FAA was consistent with the federal right-creating statute in question. [Citation.] For a common law claim under District of Columbia law, any such inconsistency would be resolved in favor of the only federal law involved, the FAA."(*Brown, supra,* 257 F.3d at pp. 825-826.)

We disagree with the *Brown* court, at least insofar as its decision would be interpreted to preclude extension of the *Armendariz* requirements to *Tameny* claims. First, although *Cole* was a Title VII case properly focused on mandatory arbitration of federal statutory rights, its rationale extends beyond that context generally to unwaivable rights conferred for a public benefit. The statement in *Gilmer* that provides the point of departure in *Cole*-" '[b]y agreeing to arbitrate a statutory claim, [an employee] does not

forgo the substantive rights afforded by the statute; [he] only submits to their resolution in an arbitral, rather than a judicial, forum' "(*Cole, supra,* 105 F.3d at p. 1481, quoting *Gilmer, supra,* 500 U.S. at p. 26, 111 S.Ct. 1647)-would apply equally to nonstatutory public rights.

[13][14] The *Brown* court's apparent position that only *federal* statutory rights may be subject to *Cole's* requirements, because any attempt to place conditions on arbitration based on state law would be preempted by the Federal *1079 Arbitration Act (FAA), is incorrect. The FAA provides that arbitration **989 agreements are "valid, irrevocable, and enforceable, save upon ***904 such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) Thus, " '[a] state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [the text of §2 of the FAA].' " (*Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 685, 116 S.Ct. 1652, 134 L.Ed.2d 902.) But under section 2 of the FAA, a state court may refuse to enforce an arbitration agreement based on "generally applicable contract defenses, such as fraud, duress, or unconscionability." (*Doctor's Associates, Inc., supra,* 517 U.S. at p. 687, 116 S.Ct. 1652.) One such long-standing ground for refusing to enforce a contractual term is that it would force a party to forgo unwaivable public rights, as reviewed above. (See, e.g., *Baker Pacific Corp. v. Suttles* (1990) 220 Cal.App.3d 1148, 1153-1154, 269 Cal.Rptr. 709 [mandatory employee waiver of all employer liability for asbestos exposure contrary to public policy].)[FN2]

FN2. We note the prohibition against exculpatory contracts contrary to public policy is generally invoked in the context of contracts of adhesion. (See, e.g., *Baker Pacific Corp. v. Suttles, supra,* 220 Cal.App.3d at p. 1151, 269 Cal.Rptr. 709;*Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 99-100, 32 Cal.Rptr. 33, 383 P.2d 441.) Thus, as with unwaivable statutory claims, special arbitration requirements for *Tameny* claims "would generally not apply in situations in which an employer and an employee knowingly and voluntarily enter into an arbitration agreement after a dispute has arisen. In those cases, employees are free to determine what trade-offs between arbitral

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                                                -86-

63 P.3d 979
29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145

Page 12

**(Cite as: 29 Cal.4th 1064, 63 P.3d 979)**

efficiency and formal procedural protections best safeguard their ... rights." (_Armendariz, supra,_ 24 Cal.4th at p. 103, fn. 8, 99 Cal.Rptr.2d 745, 6 P.3d 669.)Nor would our conclusion that waiver of the right is contrary to public policy preclude a party from settling a claim based on that right. (See, e.g., _Jefferson v. Department of Youth Authority_ (2002) 28 Cal.4th 299, 121 Cal.Rptr.2d 391, 48 P.3d 423 [approving an agreement and release settling a FEHA claim].)

Thus, while we recognize that a party compelled to arbitrate such rights does not waive them, but merely " 'submits to their resolution in an arbitral, rather than a judicial, forum' "(_Gilmer, supra,_ 500 U.S. at p. 26, 111 S.Ct. 1647), arbitration cannot be misused to accomplish a de facto waiver of these rights. Accordingly, although the _Armendariz_ requirements specifically concern arbitration agreements, they do not do so out of a generalized mistrust of arbitration per se (see _Doctor's Associates, Inc., supra,_ 517 U.S. at p. 687, 116 S.Ct. 1652), but from a recognition that _some_ arbitration agreements and proceedings may harbor terms, conditions and practices that undermine the vindication of unwaivable rights. The _Armendariz_ requirements are therefore applications of general state law contract principles regarding the unwaivability of public rights to the unique context of arbitration, and accordingly are not preempted by the FAA. And, as discussed above, there is no reason under _Armendariz's_ logic to distinguish between unwaivable statutory rights and unwaivable rights derived from common law.

*1080 We recognize that "[i]n enacting § 2 of the [FAA], Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." (_Southland Corp. v. Keating_ (1984) 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (_Southland_ ).) The object of the _Armendariz_ requirements, however, is not to compel the substitution of adjudication for arbitration, but rather to ensure minimum standards of fairness in arbitration so that employees subject to mandatory arbitration agreements can vindicate***905 their public rights in an arbitral forum.

Specifically, with regard to arbitration costs at issue in this case and in _Brown,_ the principle that

arbitration costs may prevent arbitration claimants from effectively pursuing their public rights would apply with equal force to _Tameny_ claims as to FEHA claims or to federal statutory claims. Nothing in the FAA prevents states from controlling arbitration costs imposed by adhesive contracts so that the remedy of prosecuting state statutory or common law public rights through arbitration is not rendered illusory. The _Armendariz_ cost-shifting requirement is unique to arbitration only to the extent that arbitration, alone among contract provisions, may potentially require litigants to expend **990 large sums to pay for the costs of the hearing that will decide his or her statutory other public rights. In other words, it is not the arbitration agreement itself but the imposition of arbitration forum costs that under certain circumstances violates state law.

Moreover, _Armendariz's_ cost rule does not "require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." (_Southland, supra,_ 465 U.S. at p. 10, 104 S.Ct. 852) Rather, we simply required that employers pay arbitration forum costs under certain circumstances as a condition of arbitration. Nothing in the United States Supreme Court case law leads us to believe that a state requirement shifting arbitration costs in mandatory employment agreements to the employer pursuant to established state law contract doctrine violates the FAA.

[15] Furthermore, Code of Civil Procedure section 1284.2, which provides that each party pay a pro rata share of arbitration costs unless the agreement provides otherwise, does not alter our conclusion. We held in _Armendariz_ that this statute does not preclude the judicial imposition of proportionally greater costs on the employer in the case of FEHA claims. (_Armendariz, supra,_ 24 Cal.4th at p. 112, 99 Cal.Rptr.2d 745, 6 P.3d 669.) We reasoned that "the agreement to arbitrate a statutory claim is implicitly an agreement to abide by the substantive remedial provisions of the statute" and that the FEHA implicitly prohibited large arbitration costs that would stand as an obstacle to successfully pursuing rights conferred on the employee. (_Ibid._ ) We similarly conclude that an *1081 agreement to arbitrate a claim of wrongful termination contrary to public policy must be interpreted to implicitly include an agreement to proportion costs in a manner that is reasonable for the employee/claimant, in order to prevent the de facto waiver of unwaivable rights contrary to Civil Code sections 1668 and 3513,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                                                                                          -87-

63 P.3d 979

29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145

Page 13

**(Cite as: 29 Cal.4th 1064, 63 P.3d 979)**

discussed above. Code of Civil Procedure section 1284.2's default provision does not compel a contrary conclusion.

[16] Therefore, we conclude that a plaintiff/employee seeking to arbitrate a _Tameny_ claim should have the benefit of the same minimal protections as for FEHA claims as a means of ensuring that they can effectively prosecute such a claim in the arbitral forum.[FN3] These include the ***906 availability of damages remedies equal to those available in a _Tameny_ suit brought in court, including punitive damages (_Commodore Home Systems, Inc. v. Superior Court_ (1982) 32 Cal.3d 211, 220, 185 Cal.Rptr. 270, 649 P.2d 912); discovery sufficient to adequately arbitrate _Tameny_ claims; a written arbitration decision and judicial review sufficient to ensure that arbitrators have complied with the law respecting such claims; and allocation of arbitration costs so that they will not unduly burden the employee.

> FN3. Auto Stiegler also cites _Brennan v. Tremco Inc., supra,_ 25 Cal.4th 310, 105 Cal.Rptr.2d 790, 20 P.3d 1086, in support of its position that _Tameny_ claims are not subject to the _Armendariz_ requirements. In _Brennan,_ we held that no suit for malicious prosecution may be maintained for an action that the parties resolve through contractual arbitration. In discussing the reasons for this rule, the court stated: "the nature of private arbitration does not always allow for a ready determination of whether or why the prior action actually terminated in the malicious prosecution plaintiff's favor. Except for statutory claims [citing _Armendariz_ ], an arbitrator need not explain the basis of an award." (_Brennan, supra,_ at p. 317, 105 Cal.Rptr.2d 790, 20 P.3d 1086.)_Brennan_ did not consider the extension of _Armendariz_ to _Tameny_ claims, and may not be relied upon by Auto Stiegler. (_People v. Superior Court (Zamudio)_ (2000) 23 Cal.4th 183, 198, 96 Cal.Rptr.2d 463, 999 P.2d 686 [" 'cases are not authority for propositions not considered' " ].) Nor does our extension of _Armendariz_ to _Tameny_ claims undermine _Brennan's_ point that in most arbitrations, the arbitrator need not explain the basis for the award.

We have already rejected the contentions that the

arbitration agreement in the present case limited Little's remedies or his ability to obtain adequate judicial review. Nor is it evident from the agreement that Little will be unable to obtain adequate discovery. Little argues, however, that there is a risk of burdensome costs being imposed on him, contrary to _Armendariz._ We consider this arguments in the next part of our opinion.[FN4]

> FN4. Auto Stiegler argues that even if _Armendariz_ is extended to _Tameny_ claims, Little's complaint does not state facts sufficient to allege a _Tameny_ cause of action. Neither the trial court nor the Court of Appeal addressed this issue, and we express no view on the matter. On remand, Auto Stiegler will have an opportunity to reassert this argument.

**\*\*991_D. Cost Sharing and Arbitration of Tameny Claims_**

[17] Little argues that the arbitration agreement's silence on the issue of costs means that he would be statutorily compelled to share costs under \*1082Code of Civil Procedure section 1284.2, and that the imposition of such costs renders the arbitration agreement unenforceable. _Armendariz_ did not conclude that an arbitration agreement silent on costs was unenforceable. On the contrary, we held we would infer from such silence an agreement that "the employer must bear the arbitration forum costs" and that "[t]he absence of specific provisions on arbitration costs would ... not be grounds for denying the enforcement of an arbitration agreement." (_Armendariz, supra,_ 24 Cal.4th at p. 113, 99 Cal.Rptr.2d 745, 6 P.3d 669.)

The California Motorcar Dealers Association, amicus curiae on behalf of Auto Stiegler, argues that our holding on costs in _Armendariz_ has been supplanted by the United States Supreme Court's holding in _Green Tree, supra,_ 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373. Because the allocation of arbitration costs will be at issue on remand, we address the relationship between _Armendariz_ and _Green Tree._

In _Green Tree,_ the plaintiff, purchaser of a mobilehome, sued her lender on various federal statutory grounds, including violation of the Truth in Lending Act (TILA) (15 USC § 1601 et seq.) for failing to disclose certain finance charges. (_Green_

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                    -88-

63 P.3d 979

29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145

(Cite as: 29 Cal.4th 1064, 63 P.3d 979)

Page 14

*Tree, supra,* 531 U.S. at pp. 82-83, 121 S.Ct. 513.) The buyer's agreement with the lender contained a binding arbitration clause that included all statutory claims. The agreement was silent on the issue of who would pay the costs of arbitration. The district court granted the lender's motion to compel arbitration but the court of appeals reversed, holding that the agreement posed the risk that the plaintiff's ***907 "ability to vindicate her statutory rights would be undone by 'steep' arbitration costs, and therefore was unenforceable." (*Id.* at p. 84, 121 S.Ct. 513.)

The United States Supreme Court reversed. It first reaffirmed its longstanding position that statutory claims are arbitrable under the FAA absent the expression of congressional intent "to preclude a waiver of judicial remedies for the statutory rights at issue." (*Green Tree, supra,* 531 U.S. at p. 90, 121 S.Ct. 513.) Finding no such expression in the TILA, the court proceeded to address the borrower's argument that silence on the matter of arbitration costs created an unacceptable risk that she might have to pay prohibitive costs and therefore not be able to vindicate her statutory rights through arbitration. The court stated: "It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter. As the Court of Appeals recognized, 'We lack ... information about how claimants fare under Green Tree's arbitration clause.' [Citation.] The record *1083 reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The 'risk' that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." (*Id.* at pp. 90-91, 121 S.Ct. 513, fn. omitted.)

The court further explained: "To invalidate the agreement on that basis would undermine the 'liberal federal policy favoring arbitration agreements.' [Citation.] It would also conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration. [Citations.] We have held that the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue. [Citations.] Similarly, we believe that where, as here,

a party seeks to invalidate an arbitration agreement on the ground that arbitration would be *prohibitively expensive,* that party bears the burden of showing the likelihood of incurring such costs. Randolph did not meet that burden. How detailed the showing of prohibitive expense must be before**992 the party seeking arbitration must come forward with contrary evidence is a matter we need not discuss; for in this case neither during discovery nor when the case was presented on the merits was there any timely showing at all on the point. The Court of Appeals therefore erred in deciding that the arbitration agreement's silence with respect to costs and fees rendered it unenforceable." (*Green Tree, supra,* 531 U.S. at pp. 91-92, 121 S.Ct. 513, italics added, fn. omitted.)

Although *Green Tree* was not an employment case, most courts interpreting it have done so in the employment context. These courts have arrived at divergent meanings of the "prohibitively expensive" standard. Some courts have interpreted that term narrowly and maintain that it does not affect the validity of the categorical position set forth in *Cole, supra,* 105 F.3d 1465 that the employer should pay the costs of a mandatory employment arbitration of statutory claims. (See e.g., *Circuit City Stores, Inc. v. Adams* (9th Cir. 2002) 279 F.3d 889;*Cooper v. MRM Inv. Co.* (M.D.Tenn.) 199 F.Supp.2d 771, 781;*Ball v. SFX Broadcasting, Inc.* (N.D.N.Y.) 165 F.Supp.2d 230.) Other courts have held that *Green Tree* represents a departure from *Cole's* categorical position, and ***908 requires a case-by-case analysis based on such factors as the employee's ability to pay the arbitration fees and the differential between projected arbitration and litigation fees. (See, e.g., *Blair v. Scott Specialty Gases* (3d Cir.2002) 283 F.3d 595, 609(*Blair* );*Nelson v. Insignia/ESG, Inc.* (D.D.C.2002) 215 F.Supp.2d 143;*Bradford v. Rockwell Semiconductor Systems, Inc.* (4th Cir.2001) 238 F.3d 549(*Bradford* ).) Still other courts have held the information presented by the employee before arbitration was too speculative to warrant invalidation of the *1084 arbitration agreement, while retaining jurisdiction to reconsider the cost issue after arbitration. (See, e.g., *Mildworm v. Ashcroft* (E.D.N.Y.2002) 200 F.Supp.2d 171;*Boyd v. Town of Hayneville, AL.* (M.D. Ala. 2001) 144 F.Supp.2d 1272.)

[18][19]*Armendariz* and *Green Tree* agree on two fundamental tenets. First, silence about costs in an arbitration agreement is not grounds for denying a motion to compel arbitration. Second, arbitration

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                                                                          -89-

63 P.3d 979

29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145

(Cite as: 29 Cal.4th 1064, 63 P.3d 979)

Page 15

costs can present significant barriers to the vindication of statutory rights. Nonetheless, there may be a significant difference between the two cases. Although _Green Tree_ did not elaborate on the kinds of cost-sharing arrangements that would be unenforceable, dicta in that case, and several federal cases cited above interpreting it, suggest that federal law requires only that employers not impose "prohibitively expensive" arbitration costs on the employee (_Green Tree, supra_, 531 U.S. at p. 92, 121 S.Ct. 513), and that determination of whether such costs have been imposed are to be made on a case-by-case basis. _Armendariz_, on the other hand, categorically imposes costs unique to arbitration on employers when unwaivable rights pursuant to a mandatory employment arbitration agreement are at stake. Assuming that _Green Tree_ and _Armendariz_ pose solutions to the problem of arbitration costs that are in some respects different, we do not agree with amicus curiae that the FAA requires states to comply with federal arbitration cost-sharing standards.

As reviewed in the previous part of this opinion, Armendariz's cost-shifting requirement is not preempted by the FAA. It is not a barrier to the enforcement of arbitration agreements, nor does it improperly disfavor arbitration in comparison to other contract clauses. Rather, it is derived from state contract law principles regarding the unwaivability of certain public rights in the context of a contract of adhesion. We do not discern from the United States Supreme Court's jurisprudence on FAA preemption a requirement that state law conform precisely with federal law as to the manner in which such public rights are protected.

Furthermore, we considered and rejected in _Armendariz_ a case-by-case approach to arbitration costs similar to that suggested by courts interpreting _Green Tree_ based on the differential between projected arbitration and litigation fees. (_Blair, supra_, 283 F.3d at p. 609;_Bradford, supra_, 238 F.3d at p. 556.)As we stated: "To be sure, it would be ideal to devise a method by which the employee is put in exactly the same position in arbitration, costwise, as he or she would be in litigation. But the factors going into that **993 calculus refuse to admit ready quantification. Turning a motion to compel arbitration into a mini-trial on the comparative costs and benefits of arbitration and litigation for a particular employee would not only be burdensome *1085 on the trial court and the parties, but would likely yield speculative answers." (_Armendariz,_

_supra_, 24 Cal.4th at p. 111, 99 Cal.Rptr.2d 745, 6 P.3d 669.) The individualized consideration of employees' ability to pay arbitration costs that courts interpreting _Green Tree_ contemplate (see ***909_Blair, supra_, 283 F.3d at p. 609;_Bradford, supra_, 238 F.3d at p. 556) would further complicate the case-by-case calculation of prohibitive expense. We also rejected in _Armendariz_ the notion that "there [would] be an advantage to apportioning arbitration costs at the conclusion of the arbitration rather than at the outset. Without clearly articulated guidelines, such a postarbitration apportionment would create a sense of risk and uncertainty among employees that could discourage the arbitration of meritorious claims." (_Armendariz, supra_, 24 Cal.4th at p. 111, 99 Cal.Rptr.2d 745, 6 P.3d 669.) We see no reason to reevaluate these conclusions in light of _Green Tree_ and its progeny.

In short, for reasons stated above, we do not believe that the FAA requires state courts to adopt precisely the same means as federal courts to ensure that the vindication of public rights will not be stymied by burdensome arbitration costs. We continue to believe that _Armendariz_ represents the soundest approach to the problem of arbitration costs in the context of mandatory employment arbitration. We therefore conclude that on remand the court compelling arbitration should require the employer to pay in this case "all types of costs that are unique to arbitration." (_Armendariz, supra_, 24 Cal.4th at p. 113, 99 Cal.Rptr.2d 745, 6 P.3d 669.)

### III. DISPOSITION

The judgment of the Court of Appeal is reversed insofar as it (1) permits enforcement of a clause allowing arbitral review only of awards greater than $50,000 and (2) requires arbitration of Little's _Tameny_ claim, assuming he has adequately alleged such a claim, without requiring Auto Stiegler to pay arbitration forum costs as set forth in _Armendariz_. The cause is remanded to the Court of Appeal with instructions to direct the superior court to conduct further proceedings consistent with the views expressed in this opinion. In all other respects, the Court of Appeal's judgment is affirmed.

WE CONCUR: GEORGE, C.J., KENNARD and WERDEGAR, JJ.CONCURRING AND DISSENTING OPINION BY BAXTER, J.

I agree with the majority that the "over $50,000" clause in the arbitration agreement was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                                                    -90-

63 P.3d 979

Page 16

29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145

**(Cite as: 29 Cal.4th 1064, 63 P.3d 979)**

unconscionable, and therefore unenforceable, but was severable. On the other hand, I agree with Justice Brown that the special procedural rules for contractual arbitration of statutory claims, as set forth in *1086*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669*(Armendariz* ), should not be extended to so-called *Tameny* claims that an employee was wrongfully terminated in violation of public policy (see *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330).[FN1]

> FN1. Throughout this opinion, I use the terms "contractual arbitration," "arbitration contract," and "arbitration clause" to refer to agreements for mandatory arbitration of disputes that may arise *in the future.* As the majority indicate, different considerations apply to parties' agreements to arbitrate disputes that have already arisen.

I also dissent from the majority's decision to retain rules, first announced in *Armendariz,* for allocation of the costs of mandatory arbitration of statutory claims.[FN2] In my view, intervening United States Supreme***910 Court authority sharply undermines the soundness of *Armendariz's* approach, and should prompt us to alter our analysis of the cost issue.

> FN2. I use the term "statutory claims" throughout the following discussion because, like Justice Brown, I would not extend the cost protections of *Armendariz* beyond rights arising directly from statute to other causes of action, such as *Tameny* claims, which the majority may consider "nonwaivable."

**994 To recap briefly: Code of Civil Procedure section 1284.2[FN3] states that unless the arbitral parties agree otherwise, arbitration costs shall be shared pro rata. Though section 1284.2 is an implied term of every arbitration agreement silent on costs, *Armendariz* deemed it preempted in part by the need to ensure that financial considerations would not deter an employee who had agreed to mandatory arbitration from using that forum to pursue a statutory claim of discrimination under the Fair Employment and Housing Act (FEHA). To resolve this problem, *Armendariz* held that notwithstanding section 1284.2, and regardless of any particularized showing of hardship or need, FEHA impliedly

requires an employer to pay all the employee's "forum costs" of contractual arbitration of a FEHA claim. (*Armendariz, supra,* 24 Cal.4th 83, 107 113, 99 Cal.Rptr.2d 745, 6 P.3d 669.)

> FN3. All further unlabeled statutory references are to the Code of Civil Procedure.

Thereafter, the United States Supreme Court decided *Green Tree Financial Corp.-Ala. v. Randolph* (2000) 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373*(Green Tree* ).*Green Tree* held that where Congress has evinced no intent to limit the arbitrability of a particular federal statutory claim, a party seeking to avoid mandatory contractual arbitration of such a claim has the burden of showing that the costs of arbitration he is likely to incur will render that forum "prohibitively expensive." (*Id.* at p. 92, 121 S.Ct. 513.) To deny contractual arbitration on the mere risk of undue cost, said *Green Tree,*"would undermine the 'liberal federal policy favoring arbitration agreements ...' [citation] [and] would also conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the *1087 claims at issue are unsuitable for arbitration. [Citations.]" (*Id.* at p. 91, 121 S.Ct. 513.) Central to *Green Tree's* analysis, of course, was the rule of the Federal Arbitration Act (FAA; 9 U.S.C. § 2) that arbitration agreements involving interstate commerce may be invalidated only on grounds applicable to contracts generally. (*Green Tree, supra,* at p. 89.)

Despite *Green Tree,* the instant majority retain *Armendariz's* "employer always pays" cost formula. The majority say *Green Tree* does not strictly require us to alter *Armendariz's* application of California contract law to the issue of arbitration costs. On that technical point, the majority may or may not be correct. As *Green Tree* makes clear, however, the FAA, which governs both federal and state arbitration law, was adopted " 'to reverse the longstanding judicial hostility to arbitration agreements ... and to place [such] agreements upon the same footing as other contracts.' " (*Green Tree, supra,* 531 U.S. 79, 89, 121 S.Ct. 513, 148 L.Ed.2d 373, quoting *Gilmer v. Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26(*Gilmer* ).) *Green Tree* holds in essence that even where the vindication of statutory rights is at stake, when courts interfere with an arbitration agreement by *presuming* undue cost to one party, they exhibit particular "hostility" and suspicion toward

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                    -91-

63 P.3d 979

29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145

**(Cite as: 29 Cal.4th 1064, 63 P.3d 979)**

Page 17

contractual arbitration, which the FAA was intended to prevent.

At direct odds with this principle is the current California requirement that the employer must always pay the employee's "forum costs" of arbitrating a statutory claim, regardless of actual need, and contrary to a California law that implies a cost-sharing term in every arbitration contract***911 unless the parties expressly agree otherwise. I believe *Green Tree* warrants reconsideration of the *Armendariz* majority's views on cost allocation.

It should be noted that in articulating California's minimum requirements for mandatory contractual arbitration of statutory claims, *Armendariz* placed primary reliance on a federal case, *Cole v. Burns Intern. Security Services* (D.C.Cir.1997) 105 F.3d 1465(*Cole* ). Among other things, *Cole* concluded that an employee could not be forced by contract to arbitrate federal statutory rights if also required to pay any part of the arbitrator's fee. (*Id.* at p. 1485.)*Armendariz* quoted with approval *Cole's* assertion that in *Gilmer, supra,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26, the high court had " 'endorsed a system of [mandatory contractual] arbitration [of federal statutory claims] in which employees are not required to pay for the arbitrator [and/t]here [was] no reason to think that the **995 Court would have approved arbitration in the absence of this arrangement.' " (*Armendariz, supra, 24 Cal.4th 83,* 107-108, 99 Cal.Rptr.2d 745, 6 P.3d 669, quoting *1088*Cole, supra,* at p. 1484.)[FN4]*Green Tree* has since destroyed that assumption. While the *Green Tree* majority did not expressly disapprove *Cole,* they essentially negated *Cole's* conclusions about the cost-sharing requirements of a valid scheme for arbitration of federal statutory claims.

> FN4.*Cole* conceded that cost allocation was not an issue in *Gilmer, supra,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26. This, *Cole* explained, was because the arbitration in *Gilmer,* between a brokerage firm and its employee, was subject to a standard securities industry practice that the employer pays the arbitrator's fees. (*Cole, supra,* 105 F.3d 1465, 1483.)

Under the circumstances, I would overrule *Armendariz's* arbitrary cost allocation formula. In its place, I would adopt *Green Tree's* principle that if a party resists mandatory contractual arbitration of a statutory claim on grounds of undue cost, he must make a timely, particularized showing of the expected expense, and must also demonstrate that, in his particular case, this cost would make arbitration prohibitively expensive as compared to court litigation. Evidence on this issue could be presented to the court deciding a motion to compel arbitration. If the party opposing arbitration demonstrated prohibitive expense, the court could grant the motion to compel upon the condition that the proponent of arbitration accept, with the caveat discussed below, a more equitable allocation of costs.

I close with one final point. In light of the strong policy favoring arbitration on the terms agreed by the parties, interference with the arbitration contract's cost provisions, express or implied by statute, should be countenanced only to the degree actually necessary to assure that mandatory resort to the arbitral forum has not deterred vindication of a statutory claim. For this reason, whatever pre-arbitration reallocation of costs may be necessary to ensure that the claimant is not deterred in advance, this allocation should be tentative only, and should be subject to readjustment once the true expenses and rewards of the arbitral proceeding are known.

In hindsight, it may become apparent that the actual costs of arbitration, with its faster, simpler, and more economical procedures, were less than the probable expenses of resolving the same claim in court. Even if they were greater, the difference may prove so minimal, given the claimant's general financial ability or the magnitude of his final recovery, that forcing the other party to absorb all the claimant's forum costs, contrary to their ***912 agreement, is an unfair interference with contractual arbitration. Under these circumstances, the party who "fronted" costs for the claimant should be reimbursed for the excess.

*1089 I see no reason why the arbitrator cannot, subject to appropriate judicial review, reassess the cost allocation at the conclusion of the proceedings.[FN5] "When apportioning costs, the arbitrator should consider the magnitude of the costs unique to arbitration, the ability of the employee to pay a share of these costs, and the overall expense of the arbitration as compared to a court proceeding."(*Armendariz, supra, 24 Cal.4th 83, 129, 99 Cal.Rptr.2d 745, 6 P.3d 669* (conc. opn. of Brown, J.).) As indicated above, the amount actually recovered by the claimant in arbitration should also be a relevant consideration. "Ultimately, any

63 P.3d 979

29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145

**(Cite as: 29 Cal.4th 1064, 63 P.3d 979)**

Page 18

apportionment should ensure that the costs imposed on the employee, if known at the onset of litigation, would *not* have deterred her from enforcing her statutory rights or stopped her from effectively vindicating these rights. [Citations.]" (*Ibid.*)

> FN5. I assume that when granting a motion to compel contractual arbitration (§ 1281.2), the superior court could condition its order *both* on a tentative reallocation of costs, and on the parties' agreement that the court would retain power to review any readjustment later ordered by the arbitrator. Moreover, a power to review cost readjustments should also be within the court's jurisdiction in the event either party moves to vacate the arbitration award. (§ 1285 et seq.)

Believing *Armendariz* was dispositive, the employee in this case (Little) never sought to make a showing of prohibitive expense. Believing *Green Tree* was dispositive, the Court of Appeal simply held that the arbitration agreement's silence on costs was no bar to its **996 unconditional enforcement. As I have indicated, I would overrule *Armendariz* to the extent it is inconsistent with *Green Tree.* Thus, if I believed Little's *Tameny* claim were entitled to *Armendariz* protections, I would support a remand to allow Little to make the requisite showing.

I would reverse the judgment of the Court of Appeal insofar as it permits enforcement of a clause allowing arbitral review only of awards greater than $50,000, and would affirm the Court of Appeal's judgment in all other respects. If I agreed with the majority that *Armendariz* protections applied to *Tameny* claims-which I do not-I would additionally reverse the Court of Appeal's judgment insofar as it requires Little to arbitrate this claim without allowing him to demonstrate that pro rata sharing of forum costs would make arbitration prohibitively expensive for him, and I would remand to the Court of Appeal with directions to instruct the trial court to conduct further proceedings consistent with the views expressed in this opinion.

WE   CONCUR:   CHIN   and   BROWN, JJ.CONCURRING AND DISSENTING OPINION BY BROWN, J.

Like the majority, I find the appellate arbitration provision in the arbitration agreement unconscionable. (Maj. opn., *ante,* 130 Cal.Rptr.2d at p. 896, 63 P.3d at p. 982.)I also agree that this "provision should be ***1090 severed and the rest of the arbitration agreement enforced." (*Ibid.*) I, however, disagree with the majority's application of the requirements set forth in *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669(*Armendariz* ) to an action alleging wrongful termination in violation of public policy (*Tameny* claim) (see ***913*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 178, 164 Cal.Rptr. 839, 610 P.2d 1330).[FN1] Unlike the majority, I found *Brown v. Wheat First Securities, Inc.* (2001) 257 F.3d 821(*Brown* ) persuasive and would not apply *Armendariz* to *Tameny* claims.

> FN1. For the reasons stated in Justice Baxter's concurring and dissenting opinion, *ante,* I also disagree with the majority's refusal to modify *Armendariz's* cost requirements in light of *Green Tree Financial Corp.-Ala. v. Randolph* (2000) 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373.

"In *Armendariz,* we held that arbitration of claims under the [California Fair Employment and Housing Act (FEHA) (Gov.Code, § 12900 et seq.) ] is subject to certain minimal requirements...." (Maj. opn., *ante,* 130 Cal.Rptr.2d at p. 901, 63 P.3d at p. 987.) We imposed these requirements despite the preemptive scope of the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.) based on "[t]he United States Supreme Court's dictum that a party, in agreeing to arbitrate a statutory claim, 'does not forgo the substantive rights afforded by the statute [but] only submits to their resolution in an arbitral ... forum.' " (*Armendariz, supra,* 24 Cal.4th at p. 99, 99 Cal.Rptr.2d 745, 6 P.3d 669, quoting *Mitsubishi Motors v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444(*Mitsubishi* ).) Because the Legislature enacted FEHA with the express intention of safeguarding certain rights for the benefit of the public at large, we concluded that neither federal nor state arbitration laws preclude our imposition of restrictions on the arbitration of FEHA claims. (See *Armendariz, supra,* 24 Cal.4th at pp. 100-101, 99 Cal.Rptr.2d 745, 6 P.3d 669.) In doing so, we carefully limited our holding to arbitrations of *statutory* claims.

Our heavy reliance on *Cole v. Burns Intern. Security Services* (D.C.Cir.1997) 105 F.3d 1465(*Cole* )

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                                                        -93-

63 P.3d 979
Page 19

29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145

(Cite as: 29 Cal.4th 1064, 63 P.3d 979)

demonstrates the limited scope of our holding in *Armendariz.* (See *Armendariz, supra,* 24 Cal.4th at pp. 101-102, 99 Cal.Rptr.2d 745, 6 P.3d 669.) In *Cole,* the District of Columbia Circuit Court of Appeals imposed the same requirements we imposed in *Armendariz* (*Cole/Armendariz* requirements) to the arbitration of claims under title VII of the Civil Rights Act of 1964 (Title VII). (*Cole, supra,* 105 F.3d at p. 1482.) It imposed these requirements because of the importance of respecting *congressional* intent as expressed in "public statutes like the [Age Employment in Discrimination Act] and Title VII."(*Cole,* at p. 1482.) Ascertaining the unwaivability of the rights conferred by these public statutes from their text, history, and purpose and **997 citing this unwaivability as evidence of congressional intent, the court found that *1091 Congress intended to provide certain procedural protections to employees seeking to vindicate these rights. (*Ibid.*) Thus, *Cole* did not impose additional requirements on the arbitration of these statutory claims based solely on their unwaivability or public policy concerns.

The District of Columbia Circuit Court of Appeals made this expressly clear in *Brown.* In *Brown,* the court refused to impose the *Cole/ Armendariz* requirements on the arbitration of a common law claim virtually identical to the *Tameny* claim at issue here. (*Brown, supra,* 257 F.3d at p. 825.) As the court explained, *Cole* was limited "at vital points to statutory rights"(*Brown,* at p. 825), and "our central rationale-respecting congressional intent-does not extend beyond the statutory context"(*ibid.*). The court further noted that the FAA preempts "state restrictions on the enforcement of arbitration agreements" and necessarily precludes courts from restricting the arbitration of common ***914 law claims. (*Brown,* at p. 826.) Finally, the court observed that the creation of judicially crafted public policy exceptions to the FAA would, as a practical matter, subject the arbitration of most, if not all, tort and contract claims to the *Cole/ Armendariz* requirements. (*Ibid.*)

Notwithstanding the majority's arguments to the contrary, I believe *Brown* should guide our decision here. As explained above, we carefully limited the application of *Armendariz* to statutory rights. (See *ante,* 130 Cal.Rptr.2d at p. 913, 63 P.3d at p. 996.) And our rationale for imposing the *Cole/ Armendariz* requirements on the arbitration of FEHA claims-respecting legislative intent-does not extend beyond

the statutory context. (See *ibid.*)

Indeed, we are precluded from doing so by both Congress and our own Legislature. Congress enacted the FAA " 'to assure those who desired arbitration and whose contracts related to interstate commerce that their expectations would not be undermined ... by state courts....' "(*Southland Corp. v. Keating* (1984) 465 U.S. 1, 13, 104 S.Ct. 852, 79 L.Ed.2d 1.) Recognizing "the widespread unwillingness of state courts to enforce arbitration agreements"(*ibid.*), Congress intended the FAA "to be a broad enactment appropriate in scope to meet the large problems Congress was addressing"(465 U.S. at p. 14, 104 S.Ct. 852)-i.e., judicial hostility to arbitration-and "unencumbered by state-law constraints" (*id.* at p. 13, 104 S.Ct. 852). As such, the FAA preempts all state laws and rules disfavoring arbitration. (See *Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265, 272, 115 S.Ct. 834, 130 L.Ed.2d 753.)

Of course, Congress is free to circumscribe the scope of its enactments. (*Shearson/American Express Inc. v. McMahon* (1987) 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185.) Consistent with this principle, the *1092 United States Supreme Court has recognized that the FAA does not govern if " 'Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.' " (*Gilmer v. Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26(*Gilmer* ), quoting *Mitsubishi, supra,* 473 U.S. at p. 628, 105 S.Ct. 3346.) Such an intention may, however, be discerned *only* from "the text [of a federal statute], its legislative history, or an 'inherent conflict' between arbitration and" that statute's underlying purposes. (*Gilmer, supra,* 500 U.S. at p. 26, 111 S.Ct. 1647, quoting *McMahon, supra,* 482 U.S. at p. 227, 107 S.Ct. 2332.) Thus, in the absence of a statute evidencing a clear congressional intent to restrict arbitration, the FAA controls and precludes courts from imposing their own arbitration-specific restrictions.[FN2] (See **998*Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 55, 58, 115 S.Ct. 1212, 131 L.Ed.2d 76(*Mastrobuono* ) [holding that the FAA precludes the enforcement of a *judicially created rule* despite its basis in public policy]; see also ***915*McMahon, supra,* 482 U.S. at p. 227, 107 S.Ct. 2332 [to defeat application of the FAA, the parties opposing arbitration "must demonstrate that Congress intended to make an exception to the [FAA] for claims arising under" statute, "an intention discernible from the text,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5