63 P.3d 979
29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145
**(Cite as: 29 Cal.4th 1064, 63 P.3d 979)**

FN2. We have extended this rationale of *Gilmer* to state legislative enactments and restricted the arbitration of certain statutory causes of action serving a transcendent public purpose as determined by a state legislature. (See *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066, 1083, 90 Cal.Rptr.2d 334, 988 P.2d 67(*Broughton* ).) While I reluctantly concede that *Broughton* is binding until the United States Supreme Court decides otherwise (but see *Broughton, supra,* 1066, 1088-1103, 90 Cal.Rptr.2d 334 (dis. opn. of Chin, J.)), neither this court nor the United States Supreme Court has ever suggested that a federal or state court may, on its own initiative, restrict the arbitration of a common law cause of action.

Similarly, California's arbitration scheme precludes California courts from restricting arbitrations in the absence of an express legislative intent to do so. "Title 9 of the Code of Civil Procedure ... represents a comprehensive statutory scheme regulating private arbitration in this state." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9, 10 Cal.Rptr.2d 183, 832 P.2d 899.)This scheme establishes "that arbitration agreements will be enforced *in accordance with their terms.*" (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 836, fn. 10, 88 Cal.Rptr.2d 366, 982 P.2d 229.) Absent certain statutorily enumerated grounds not relevant here (see Code Civ. Proc., § 1281.2), courts must enforce an arbitration agreement *as written.* While the Legislature may create exceptions to this strong statutory policy in favor of arbitration and selectively limit arbitrations, we may not. (See *Armendariz, supra,* 24 Cal.4th at p. 98, 99 Cal.Rptr.2d 745, 6 P.3d 669 [recognizing that the Legislature may "selectively prohibit[ ] arbitration in certain areas"].)

Nonetheless, the majority does just that. A *Tameny* claim is a common law cause of action created by this court-and not by the Legislature. (See \*1093*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 71, 78 Cal.Rptr.2d 16, 960 P.2d 1046(*Green* ) ["Although our Legislature has determined that an employment contract is generally terminable at either party's will ..., *we have created a narrow exception to this rule* by recognizing that an employer's right to discharge an at-will employee is

subject to limits that fundamental public policy impose." (italics added, fn. omitted) ].) Thus, *Tameny* claims are a judicial-and not a legislative-construct, and the public policy underlying these claims "is inconsequential as a measure of [the Legislature's] interest in the stated policy." (*Brown, supra,* 257 F.3d at p. 826.) As a result, the majority's extension of *Armendariz* violates the FAA and our own statutory arbitration scheme.

The statutes the majority cites to establish the unwaivability of *Tameny* claims are inapposite. Civil Code section 3513, by its terms, applies only to laws enacted by the Legislature. Meanwhile, Civil Code section 1668 merely declares that contracts that "directly or indirectly ... exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against" public policy. An arbitration agreement does not, however, exempt anyone from responsibility for his or her wrongdoing. Rather, the agreement merely changes the forum in which the determination of responsibility is made. (See *Gilmer, supra,* 500 U.S. at p. 26, 111 S.Ct. 1647 [parties compelled to arbitrate their claims merely " 'submit[ ] to their resolution in an arbitral, rather than a judicial, forum' "].) Thus, Civil Code section 1668 does not evince a legislative intent to impose any restrictions on the arbitration of *Tameny* claims.

In any event, the majority's focus on the unwaivability of *Tameny* claims is misplaced. To evade FAA preemption, the majority purports to apply a generally applicable contract defense by "refusing to enforce a contractual term ... that ... would force a party to forgo unwaivable public rights...." (Maj. opn., *ante,* 130 Cal.Rptr.2d at p. 904, 63 P.3d at p. 989.) Thus, the majority sees "no reason under *Armendariz's* logic to distinguish between \*\*\*916 unwaivable statutory rights and unwaivable rights derived from common law." (*Id.* at p. 904, 63 P.3d at p. 989.) The majority's logic, however, is specious. The majority finds an agreement to arbitrate *Tameny* claims violative of public policy absent satisfaction of the *Cole/Armendariz* requirements *solely* because of alleged deficiencies unique to an arbitral forum established by an otherwise valid agreement. In doing so, the majority necessarily premises its holding on plaintiff's purported inability to vindicate his common law claim in the arbitral\*\*999 forum and creates a rule specific to arbitration agreements. As such, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5

63 P.3d 979                                                                                     Page 21
29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily
Journal D.A.R. 2145
(Cite as: 29 Cal.4th 1064, 63 P.3d 979)

majority's holding rests on a "suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants" rejected long ago. (*1094*Rodriguez de Quijas v. Shearson/Am. Exp.* (1989) 490 U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526.) This is true regardless of whether the claim is waivable or not.

Thus, the unwaivability of *Tameny* claims is a red herring. The crucial question is whether there is any evidence of a congressional (see *Gilmer, supra,* 500 U.S. at p. 26, 111 S.Ct. 1647) or legislative intent (see *Broughton, supra,* 21 Cal.4th at p. 1083, 90 Cal.Rptr.2d 334, 988 P.2d 67) to place restrictions on the arbitration of *Tameny* claims. While the unwaivability of a statutory right established by the statute's text, history, or purpose may evidence such an intent (see *Cole, supra,* 105 F.3d at p. 1482;*Armendariz, supra,* 24 Cal.4th at p. 100, 99 Cal.Rptr.2d 745, 6 P.3d 669), a judicial finding of unwaivability for public policy reasons cannot. Indeed, the public policy exception the majority adopts subjects most, if not all, tort claims to the *Cole/Armendariz* requirements. "All claims not based on contract-including, for example, ... defamation and tortious interference claims ...-implement values that society has in one way or another thought deserving." (*Brown, supra,* 257 F.3d at p. 826.) Under this public policy rationale, "it is hard to see what falls outside it." (*Ibid.*) For example, under the majority's logic, any arbitration of an intentional tort claim must abide by the *Cole/Armendariz* requirements because such claims are unwaivable under Civil Code section 1668.

In this respect, this case is no different from *Mastrobuono.* In *Mastrobuono,* the United States Supreme Court held that the FAA preempted a judicially created rule prohibiting arbitrators from awarding punitive damages even though a state court created the rule for public policy reasons. (*Mastrobuono, supra,* 514 U.S. at pp. 55, 58, 115 S.Ct. 1212.) The same reasoning precludes our application of the judicially created *Cole/ Armendariz* requirements to the arbitration of *Tameny* claims. By creating a rule applicable only to arbitration provisions, the majority necessarily violates the FAA. (See *Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 ["Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration provisions"].)

Our extension of *Armendariz* to *Tameny* claims therefore usurps Congress's authority to establish "the supreme law of the land" (U.S. Const., art. VI, cl.2) and the Legislature's "responsibility to declare the public policy of the state"(*Green, supra,* 19 Cal.4th at p. 71, 78 Cal.Rptr.2d 16, 960 P.2d 1046). Moreover, by imposing arbitration-specific restrictions that have no congressional or legislative basis, the majority not only undermines the "liberal federal policy favoring arbitration" (*Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765), but also contravenes California's "strong public policy in favor of arbitration as a speedy and *1095 relatively ***917 inexpensive means of dispute resolution"(*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 322, 197 Cal.Rptr. 581, 673 P.2d 251). Even if *Tameny* claims cannot be effectively vindicated absent imposition of the *Cole/Armendariz* requirements, both Congress and our Legislature have declined to impose them. By disregarding their intentions, the majority appears intent on turning "the judicial clock backwards to an era of hostility toward arbitration." (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 714, 131 Cal.Rptr. 882, 552 P.2d 1178.) Indeed, this court appears to be "chip[ping] away at" United States Supreme Court precedents broadly construing the scope of the FAA "by indirection," despite the high court's admonition against doing so. (*Circuit City Stores, Inc. v. Adams* (2001) 532 U.S. 105, 122, 121 S.Ct. 1302, 149 L.Ed.2d 234.) I therefore urge the high court to clarify once and for all whether our approach to arbitration law comports with its precedents.

WE CONCUR: BAXTER and CHIN, JJ.
Cal.,2003.
Little v. Auto Stiegler, Inc.
29 Cal.4th 1064, 63 P.3d 979, 130 Cal.Rptr.2d 892, 19 IER Cases 1239, 03 Cal. Daily Op. Serv. 1684, 2003 Daily Journal D.A.R. 2145

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5                                                                                        -96-

# TAB 6

Westlaw.

96 Cal.App.4th 167                                                    Page 1
96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805
(Cite as: 96 Cal.App.4th 167)

▷Mercuro v. Superior Court
Cal.App. 2 Dist.,2002.

Court of Appeal, Second District, Division 7,
California.
Fred MERCURO et al., Petitioners,
v.
The SUPERIOR COURT of Los Angeles County,
Respondent;
Countrywide Securities Corporation, Real Party in
Interest.
No. B153355.

Feb. 13, 2002.
Rehearing Denied March 11, 2002.
Review Denied May 15, 2002.

Former employee and wife brought employment-
related tort claim against former employer, and
former employer moved to compel arbitration
pursuant to arbitration agreement. The Superior
Court, Los Angeles County, No. BC247459,Morris
B. Jones, J., granted the motion to compel arbitration.
Former employee and wife applied for writ of
mandate. The Court of Appeal, Johnson, Acting P.J.,
held that: (1) agreement was procedurally
unconscionable due to former employer's threats to
former employee; (2) agreement was unfairly one-
sided and thus substantively unconscionable; (3) fact
that former employer was a "repeat player" in
arbitration system did not by itself make agreement
unconscionable; (4) provision for fee sharing in
agreement rendered agreement unenforceable; (5)
limited discovery provisions under agreement did not
render agreement invalid; (6) agreement could not be
cured by severing unconscionable and illegal
provisions; and (7) arbitration procedures contained
in National Association of Securities Dealers
(NASD) application, known as a U-4, did not compel
arbitration.

Writ granted.
West Headnotes
[1] T ⚖══374(1)

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(H)  Review, Conclusiveness, and
Enforcement of Award

        25Tk366 Appeal or Other Proceedings for
Review
        25Tk374 Scope and Standards of
Review
            25Tk374(1) k. In General. Most
Cited Cases
    (Formerly 33k73.7(4) Arbitration)
If the extrinsic evidence is undisputed, the Court of
Appeal reviews an arbitration contract de novo to
determine whether it is legally enforceable.

[2] Contracts 95 ⚖══1

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and Grounds of Contractual
Obligation. Most Cited Cases
The doctrine of unconscionability has a procedural
and a substantive element.

[3] Contracts 95 ⚖══1

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and Grounds of Contractual
Obligation. Most Cited Cases
Although both procedural and substantive elements
of unconscionability must appear in order to
invalidate a contract or one of its individual terms,
they need not be present in the same degree; the more
substantively oppressive the contract term, the less
evidence of procedural unconscionability is required
to come to the conclusion that the term is
unenforceable, and vice versa.

[4] Contracts 95 ⚖══1

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and Grounds of Contractual
Obligation. Most Cited Cases
Procedural unconscionability turns on adhesiveness;
a set of circumstances in which the weaker or
"adhering" party is presented a contract drafted by
the stronger party on a take it or leave it basis.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6                                                    -97-

96 Cal.App.4th 167

96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805

(Cite as: 96 Cal.App.4th 167)

Page 2

**[5] Contracts 95 🗝1**

95 Contracts
   95I Requisites and Validity
      95I(A) Nature and Essentials in General
         95k1 k. Nature and Grounds of Contractual
Obligation. Most Cited Cases
Procedural unconscionability focuses on the oppressiveness of the stronger party's conduct.

**[6] T 🗝134(6)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk131 Requisites and Validity
            25Tk134 Validity
               25Tk134(6) k. Unconscionability.
Most Cited Cases
   (Formerly 33k6.2 Arbitration)
Former employer used oppressive tactics to get former employee to sign arbitration agreement, and agreement was procedurally unconscionable, where management threatened former employee by telling him, among other threats, that he did not have the option of not signing the agreement if he wanted to make a living and that the company would drive him out and he would have trouble finding other employment if he did not sign the agreement, and former employee, who was 52 years old and had just moved to state in the past year, was not in a position to give up his job.

**[7] T 🗝134(6)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk131 Requisites and Validity
            25Tk134 Validity
               25Tk134(6) k. Unconscionability.
Most Cited Cases
   (Formerly 33k6.2 Arbitration)
Arbitration agreement which required arbitration of most claims of interest to employees but exempting from arbitration most claims of interest to employer was unfairly one-sided, and thus substantively unconscionable; agreement specifically covered breach of contract, tort claims, discrimination, and claims for violation of statutes, but excluded "claims for injunctive and/or other equitable relief for intellectual property violations, unfair competition and/or the use and/or unauthorized disclosure of trade secrets or confidential information."

**[8] T 🗝134(6)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk131 Requisites and Validity
            25Tk134 Validity
               25Tk134(6) k. Unconscionability.
Most Cited Cases
   (Formerly 33k6.2 Arbitration)
Fact that former employer was a "repeat player" in arbitration system did not render arbitration agreement with former employee unconscionable for failing to guarantee a neutral arbitrator, although agreement, although size of former employer, its parent corporation, and affiliates, compared to relatively few authorized arbitrators in district made it likely that former employer would repeatedly appear before the same group of arbitrators and gain advantages such as knowledge of the arbitrators' temperaments, procedural preferences, styles and the like.

**[9] T 🗝134(1)**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk131 Requisites and Validity
            25Tk134 Validity
               25Tk134(1) k. In General. Most
Cited Cases
   (Formerly 33k6.2 Arbitration)
Arbitration agreement's provision for sharing the arbitrator's fees prevented former employee from having an adequate opportunity to vindicate his rights through claims of age and disability discrimination, along with labor code violations, and thus agreement was unenforceable; provision originally required former employee to pay an equal share of the costs unique to arbitration, including the arbitrator's fee, and former employer's modification of provision still required former employee to pay if he lost. West's Ann.Cal.Labor Code §§ 230.8, 970.

**[10] T 🗝124**

25T Alternative Dispute Resolution

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6                                                                    -98-

96 Cal.App.4th 167
96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805
**(Cite as: 96 Cal.App.4th 167)**

Page 3

25TII Arbitration
 25TII(A) Nature and Form of Proceeding
  25Tk118 Matters Which May Be Subject to Arbitration Under Law
   25Tk124 k. Employment Disputes. Most Cited Cases
  (Formerly 33k3.3 Arbitration)
Arbitration agreements which apply to an employee's unwaiveable rights under a statute enacted for a public reason are subject to "particular scrutiny," and must, at a minimum, provide for neutral arbitrators, adequate discovery, a written award subject to limited judicial review, the same types of relief which would be available from a court, and the employees are not required to bear any type of expense they would not be required to bear if their claims were brought in a court.

**[11] Labor and Employment 231H ⚷4**

231H Labor and Employment
 231HI In General
  231Hk2 Constitutional and Statutory Provisions
   231Hk4 k. Purpose and Construction in General. Most Cited Cases
  (Formerly 232Ak7.1 Labor Relations)
Public purpose of statute prohibiting employers from misrepresenting the terms and conditions of employment to induce a person to change residences to take the job is to protect the community from the harm inflicted when a fraudulently induced employment ceases and the former employee is left in the community without roots or resources and becomes a charge on the community. West's Ann.Cal.Labor Code § 970.

**[12] T ⚷269**

25T Alternative Dispute Resolution
 25TII Arbitration
  25TII(F) Arbitration Proceedings
   25Tk269 k. Costs. Most Cited Cases
  (Formerly 33k42 Arbitration)
In arbitration between an employer and an employee, the employer must pay all types of costs that are unique to arbitration, including the arbitrator's fee.

**[13] T ⚷134(1)**

25T Alternative Dispute Resolution
 25TII Arbitration

25TII(B) Agreements to Arbitrate
 25Tk131 Requisites and Validity
  25Tk134 Validity
   25Tk134(1) k. In General. Most Cited Cases
  (Formerly 33k6.2 Arbitration)
Discovery provisions in arbitration agreement between former employee and former employer did not necessarily prevent former employee from vindicating his statutory rights, thus rendering the agreement invalid, although former employee was limited to a total of "30 discovery requests of any kind, including subparts;" limit also worked to prevent former employer from burying former employee with discovery requests, and limits could be extended by arbitrator with "good cause."

**[14] Contracts 95 ⚷1**

95 Contracts
 95I Requisites and Validity
  95I(A) Nature and Essentials in General
   95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases

**Contracts 95 ⚷137(1)**

95 Contracts
 95I Requisites and Validity
  95I(F) Legality of Object and of Consideration
   95k135 Effect of Illegality
    95k137 Partial Illegality
     95k137(1) k. In General. Most Cited Cases

**Contracts 95 ⚷138(1)**

95 Contracts
 95I Requisites and Validity
  95I(F) Legality of Object and of Consideration
   95k135 Effect of Illegality
    95k138 Relief of Parties
     95k138(1) k. Enforcement of Contract in General. Most Cited Cases
If a court finds a contract unconscionable or illegal, it may refuse to enforce the contract, it may sever the offending clause, or it may limit the application of the offending clause so as to avoid the unconscionable or illegal result.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6                                                    -99-

**[15] Contracts 95 ☞1**

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and Grounds of Contractual
Obligation. Most Cited Cases

**Contracts 95 ☞137(1)**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of
Consideration
            95k135 Effect of Illegality
                95k137 Partial Illegality
                    95k137(1) k. In General. Most Cited
Cases

**Contracts 95 ☞138(1)**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of
Consideration
            95k135 Effect of Illegality
                95k138 Relief of Parties
                    95k138(1) k. Enforcement of
Contract in General. Most Cited Cases
As a general rule, if the central purpose of a contract
is "permeated" or "tainted" with unconscionability or
illegality then the contract as a whole cannot be
enforced; if, on the other hand, the unconscionability
or illegality is collateral to the main purpose of the
contract, and the offending provisions can be excised
from the contract by means of severance or limitation
then the remainder of the contract can be enforced.

**[16] T ☞134(6)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk134 Validity
                    25Tk134(6) k. Unconscionability.
Most Cited Cases
    (Formerly 33k6.2 Arbitration)

**T ☞140**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk140 k. Severability. Most Cited Cases
    (Formerly 33k6.2 Arbitration)
Arbitration agreement between former employee and
former employer was permeated with
unconscionability and illegality and could not be
cured by merely extirpating the offending provisions;
court would have to eliminate the provisions
governing what claims are arbitrable, how fees and
costs will be allocated and what organization will
conduct the arbitrations, which would leave virtually
nothing of substance to the agreement.

**[17] T ☞421**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk418 Employees of Exchanges or
Dealer Associations
                25Tk421 k. Performance, Breach,
Enforcement, and Contest of Agreement. Most Cited
Cases
    (Formerly 33k92 Arbitration, 160k11(12))
Arbitration procedures contained in National
Association of Securities Dealers (NASD)
application, known as a U-4 form, did not compel
former employee and his wife to arbitrate claims
against former employer for discrimination; there
was no evidence that former employer was a member
of NASD either when U-4 was executed or when it
sought arbitration of former employee's claim, wife
was never a NASD member, and former employee's
discrimination claims were only arbitrable under the
NASD Code of Arbitration if parties had otherwise
agreed to arbitrate it, which they had not.

**673*171** Melanie A. Calvert, Pasadena, for
Petitioners.
No appearance for Respondent.
Steptoe & Johnson, Karen A. Rooney and Larry J.
Schmadeka, Los Angeles, for Real Party in Interest.
JOHNSON, Acting P.J.
Petitioners Fred and Melissa Mercuro seek a writ of
mandate overturning the trial court's order
compelling them to arbitrate their employment-
related tort claims against Fred Mercuro's former
employer, Countrywide Securities Corporation. We
issued an alternative writ of mandate. Having
considered the parties' further briefing and oral
argument, we grant the writ.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6                                                                    -100-

96 Cal.App.4th 167                                                                                                    Page 5
96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805
**(Cite as: 96 Cal.App.4th 167)**

FACTS AND PROCEEDINGS BELOW

The material facts are not in dispute.

Fred Mercuro worked in the sales division of Countrywide Securities Corporation from April 1996 to March 2000. After leaving Countrywide, Mercuro filed an action charging it with numerous employment-related torts including age and disability discrimination, fraud, and wrongful termination in violation of public policy. Mercuro's wife joined as a plaintiff in the causes of action for fraudulent inducement and negligent misrepresentation. Countrywide filed a motion to compel the Mercuros to arbitrate all the causes of action in the complaint pursuant to arbitration agreements signed by Fred Mercuro. **674 Melissa Mercuro did not sign either of these agreements.

In order to be employed as a securities broker for Countrywide the Securities and Exchange Commission required Mercuro to apply for a license from the National Association of Securities Dealers (NASD). Accordingly, Mercuro completed and signed the NASD application, commonly known as form U-4. Form U-4 contains a clause in which the applicant agrees to arbitrate covered disputes arising between him and his firm in *172 accordance with the NASD constitution, by-laws and rules. Countrywide never gave Mercuro a copy of the NASD constitution, by-laws or rules nor did anyone at Countrywide advise him the NASD arbitration agreement required him to arbitrate employment disputes including statutory claims of employment discrimination. Furthermore, Mercuro was unaware of any practice in the industry which required arbitration of employment disputes. He believed he was only agreeing to arbitrate disputes arising from his handling of securities and neither understood nor agreed to arbitrate employment disputes with Countrywide.

In March or April 1997, Countrywide asked all its sales personnel to sign a contract agreeing to arbitrate certain disputes which might arise between them and the company. The agreement covered some employment-related claims including employment discrimination but excluded others such as injunctive or other equitable relief for unfair competition, unauthorized disclosure of trade secrets or violation of intellectual property rights. The agreement contained specific provisions in which the employee acknowledged he or she "knowingly and voluntarily" waived his or her right to a jury trial and agreed to certain limitations on his or her ability to conduct discovery. Countrywide offered its employees 25 shares of its stock or an extra vacation day as consideration for signing the agreement.

Mercuro had several discussions about the Countrywide arbitration agreement with Countrywide's upper management including Jonas Roth, Executive Director of Sales, and David Sambol, Chief Executive Officer. Mercuro told Roth and Sambol he was not going to sign the agreement. He explained the extra vacation day was of no value to him and 25 shares of company stock were inadequate consideration for giving up the right to a jury trial should a dispute arise between him and Countrywide.

Roth told Mercuro he "did not have the option of not signing the agreement." According to Roth, Sambol expected every sales person to sign and "if they did not sign the agreement they would find it difficult to make a living at Countrywide." Roth further stated Sambol was already angry at Mercuro and Mercuro's refusal to sign the agreement "would not go well with Sambol;" in fact, it "would put him through the roof."

Several days later, Mercuro had a chance meeting with Sambol and the subject of the arbitration agreement came up. Sambol asked Mercuro why he was the only salesperson who had not signed the agreement. Mercuro responded he did not believe "the arbitration agreement to be in [his] best *173 interest." Sambol told Mercuro that perhaps the explanation was Mercuro "was not generationally compatible with the other salesmen."

Later the same day, Roth told Mercuro that Sandy Samuelson, the corporate attorney "was livid about [Mercuro's] refusal to sign the arbitration agreement" and Sambol was "furious" because Mercuro's refusal to sign made him "look bad." According to Roth, Sambol told him he never should have hired "this S.O.B" and hiring Mercuro "had caused him considerable **675 grief." Sambol also told Roth if Mercuro did not sign the arbitration agreement he would be "cut off" and made to "pay big time." Roth said this meant Sambol would remove Mercuro's accounts, refuse to approve his road trips "and take whatever action was necessary to drive [him] out."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6                                                                                                    -101-

96 Cal.App.4th 167
96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805
(Cite as: 96 Cal.App.4th 167)

Page 6

Mercuro sought the advice of Dale Ledbetter, Countrywide's Chief Operating Officer. Ledbetter agreed with Mercuro "it was unfair to coerce [his] agreement to arbitrate" but counseled Mercuro to "consider the realities of the situation." Ledbetter confirmed "senior management was, indeed, very angry" about Mercuro's refusal to sign the arbitration agreement. Mercuro testified Ledbetter told him "Sambol and Roth would drive me out, making it all but impossible for me to earn a living, that I would be living in California with no income and litigating a court case which would take years to resolve." In the same conversation, Ledbetter warned Mercuro: "[P]rospective employers would likely discover any lawsuit filed against Countrywide and that I would have difficulty in obtaining other employment." Ledbetter also advised Mercuro: "[I]n reality, the arbitration agreement probably would not hold up in court."

In explaining why he gave in and signed the arbitration agreement, Mercuro stated: "Roth continued to beat on me for several more days, making it clear that I had to sign [the agreement] in order to save my job at Countrywide.... I felt so desperate that I finally signed the agreement...." He asserted he only signed the agreement under "duress and coercion" and did not "voluntarily consent to relinquish my rights to sue Countrywide for employment disputes, including statutory claims."

After a brief hearing, the trial court granted Countrywide's motion to compel arbitration and stayed proceedings in the Mercuros' lawsuit. The court did not address Mercuro's evidence of coercion or his legal arguments on the unconscionability of the agreements. It simply found Mercuro "did in fact know what he was agreeing to." This writ petition followed.

*174 DISCUSSION

I. COUNTRYWIDE'S ARBITRATION AGREEMENT IS UNENFORCEABLE BECAUSE IT IS UNCONSCIONABLE AND PREVENTS MERCURO FROM VINDICATING HIS UNWAIVABLE STATUTORY RIGHTS, AND THE OFFENDING PROVISIONS ARE NOT SEVERABLE.

[1] Where, as here, the extrinsic evidence is undisputed we review the arbitration contract de novo

to determine whether it is legally enforceable.[FN1]

>   FN1. Flores v. Transamerica HomeFirst, Inc. (2001) 93 Cal.App.4th 846, 851, 113 Cal.Rptr.2d 376.

In this case our review is controlled by our Supreme Court's decision in Armendariz v. Foundation Health Psychcare Services, Inc.[FN2] In Armendariz, the court concluded the arbitration agreement in question was procedurally and substantively unconscionable. In addition, the agreement failed to provide an adequate forum for the vindication of the employees' statutory rights under the Fair Employment and Housing Act (FEHA). We apply the Armendariz analysis here.

>   FN2. Armendariz v. Foundation Health Psychcare Services, Inc. (2000) 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669.

A. Countrywide's Arbitration Agreement Is Procedurally And Substantively Unconscionable.

[2][3] Under California law, the doctrine of unconscionability has a procedural **676 and a substantive element. Both elements must appear in order to invalidate a contract or one of its individual terms.[FN3] These elements, however, need not be present in the same degree. "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."[FN4]

>   FN3. Armendariz, 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669.

>   FN4. Armendariz, 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669.

[4][5] Procedural unconscionability turns on adhesiveness-a set of circumstances in which the weaker or "adhering" party is presented a contract drafted by the stronger party on a take it or leave it basis.[FN5] To put it another way, procedural unconscionability focuses on the oppressiveness of the stronger party's conduct.[FN6]

>   FN5. Armendariz, 24 Cal.4th at p. 113, 99 Cal.Rptr.2d 745, 6 P.3d 669.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6                                                                        -102-

96 Cal.App.4th 167
96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805
(Cite as: 96 Cal.App.4th 167)

Page 7

FN6.*Armendariz,* 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669.

[6] There can be no doubt in this case Countrywide used oppressive tactics to secure Mercuro's signature on the arbitration agreement. Upper *175 management told Mercuro he "did not have the option of not signing the agreement" if he wanted "to make a living at Countrywide." He was also told if he did not sign the agreement he would be "cut off" and made to "pay big time." Countrywide would strip him of his accounts, refuse to approve his travel requests "and take whatever action was necessary to drive [him] out." Even the company official who seemed somewhat sympathetic to Mercuro's position warned him if he did not sign the agreement Countrywide would "drive [him] out" and "[he] would have difficulty in obtaining other employment." In other words, Countrywide would not directly fire Mercuro for refusing to sign the agreement. This would be awkward in view of Countrywide's position the agreement was voluntary. Instead, it would make things so difficult for Mercuro he would be forced to resign and then it would blackball him from the securities industry in order to "make[ ] it all but impossible for [him] to earn a living." FN7

FN7. Countrywide objected to the evidence of these statements on the grounds of lack of foundation, legal conclusion, hearsay and speculation. The trial court did not rule on the objections. We find them to be without merit.

The economic pressure Countrywide exerted on Mercuro through these threats was particularly acute since Mercuro was 52 years of age at the time, had just moved to California from Florida in the past year, and had only been with Countrywide for approximately a year. He obviously was not in a position to give up his job over an arbitration agreement which might not ever come in to play.

Given Countrywide's highly oppressive conduct in securing Mercuro's consent to its arbitration agreement, he need only make a minimal showing of the agreement's substantive unconscionability. FN8

FN8.*Armendariz,* 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669.

[7] Mercuro makes two arguments going to the substantive unconscionability, i.e., basic fairness, of the arbitration agreement. The agreement is unfairly one-sided in requiring arbitration of most claims of interest to employees but exempting from arbitration most claims of interest to Countrywide. FN9 In addition, the agreement fails to guarantee a neutral arbitrator. FN10

FN9. See *Armendariz,* 24 Cal.4th at p. 117, 99 Cal.Rptr.2d 745, 6 P.3d 669.

FN10. See *Armendariz,* 24 Cal.4th at p. 103, 99 Cal.Rptr.2d 745, 6 P.3d 669.

**677 The arbitration agreement specifically covers claims for breach of express or implied contracts or covenants, tort claims, claims of discrimination based on race, sex, age or disability, and claims for violation of any federal, state or other governmental constitution, statute, ordinance, regulation or public *176 policy. Thus the agreement compels arbitration of the claims employees are most likely to bring against Countrywide. On the other hand, the agreement specifically excludes "claims for injunctive and/or other equitable relief for intellectual property violations, unfair competition and/or the use and/or unauthorized disclosure of trade secrets or confidential information...." Thus the agreement exempts from arbitration the claims Countrywide is most likely to bring against its employees.

In *Armendariz,* the court observed substantive unconscionability may manifest itself if the form of "an agreement requiring arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party." FN11 This is what we have here: Countrywide requires the weaker parties-its employees-to arbitrate their most common claims while choosing to litigate in the courts its own claims against its employees.

FN11.*Armendariz,* 24 Cal.4th at p. 119, 99 Cal.Rptr.2d 745, 6 P.3d 669.

In defense of its arbitration agreement, Countrywide points out the agreement does not require arbitration of every conceivable claim an employee might have. For example, the agreement does not cover claims for workers' compensation, unemployment benefits or benefits under an employee pension plan which has its own arbitration procedure.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6                                                                        -103-

96 Cal.App.4th 167

96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805
**(Cite as: 96 Cal.App.4th 167)**

These exceptions do not turn what is essentially a unilateral arbitration agreement into a bilateral one. Workers' compensation and unemployment benefits are governed by their own adjudicatory systems; neither is a proper subject matter for arbitration.[FN12] Claims for pension benefits are only exempt from the arbitration agreement if they are covered by some other arbitration agreement.

> FN12. See generally Lab.Code, § 5300 et seq.; Unemp. Ins.Code, § 1951 et seq.

Countrywide further argues the agreement is not unconscionable because the exception for intellectual property claims applies to it *and* its employees. This is not the case. The exception for intellectual property claims only applies if the claim is accompanied by a request for injunctive or other equitable relief. An employee terminated for stealing trade secrets, for example, must arbitrate his wrongful termination claim under the agreement but Countrywide can avoid a corresponding obligation to arbitrate its trade secrets claim against the employee by the simple expedient of requesting injunctive or declaratory relief. As the court stated in *Armendariz,* an arbitration agreement "lacks basic fairness and mutuality if it requires one *177 contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences."[FN13]

> FN13.*Armendariz,* 24 Cal.4th at p. 120, 99 Cal.Rptr.2d 745, 6 P.3d 669.

Finally, Countrywide asserts it has a reasonable business justification for not arbitrating claims for injunctive or other equitable relief in cases involving intellectual property violations, unfair competition and unauthorized disclosure of trade secrets or confidential information. Monetary damages for the misappropriation of **678 intellectual property assets are often difficult to calculate, it contends, and would not protect it from further misappropriation of such assets. Therefore, speedy and effective relief from the misappropriation of intellectual property assets can only be had in the court system.

We find this argument unpersuasive for several reasons.

First, it is just argument with no evidence to support

it as required under *Armendariz.*[FN14]

> FN14.*Armendariz,* 24 Cal.4th at p. 117, 99 Cal.Rptr.2d 745, 6 P.3d 669, citing with approval *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1536-1537, 60 Cal.Rptr.2d 138.

More importantly, this same argument was made and rejected in *Stirlen v. Supercuts, Inc.*[FN15] Supercuts contended it needed immediate access to injunctive relief from the courts in order to protect its intellectual property rights. The Court of Appeal pointed out, however, the emergency judicial relief Supercuts asserted it must have was available to a party compelled to arbitrate a dispute. Code of Civil Procedure section 1281.8, subdivision (b) provides in relevant part: "A party to an arbitration agreement may file [in court] an application for a provisional remedy in connection with an arbitrable controversy, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without provisional relief." "Provisional relief" as used in the statute includes preliminary injunctions and temporary restraining orders.[FN16]

> FN15.*Stirlen v. Supercuts, Inc.,* 51 Cal.App.4th at p. 1537, 60 Cal.Rptr.2d 138.

> FN16.Code Civ. Proc., § 1281.8, subd. (a)(3).

Furthermore, even assuming "business realities" would justify exempting claims for injunctive relief to protect intellectual property rights, the exemption sweeps too broadly because it covers not only claims for injunctive relief but claims for *any* equitable relief involving intellectual property issues. As the court observed in *Stirlen v. Supercuts, Inc.,* arbitrators in *178 California commonly provide such equitable relief as specific performance, reformation and rescission.[FN17]

> FN17.*Stirlen v. Supercuts, Inc.,* 51 Cal.App.4th at p. 1537, fn. 9, 60 Cal.Rptr.2d 138; and see *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 373, 36 Cal.Rptr.2d 581, 885 P.2d 994.

[8] Mercuro also contends the arbitration is fatally flawed because it does not guarantee a neutral arbitrator which, our Supreme Court has held, "is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6
-104-

96 Cal.App.4th 167
96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805
**(Cite as: 96 Cal.App.4th 167)**

Page 9

essential to ensuring the integrity of the arbitration process." [FN18]

> FN18.*Armendariz,* 24 Cal.4th at p. 103, 99 Cal.Rptr.2d 745, 6 P.3d 669.

Claims under the agreement are to be arbitrated by the National Arbitration Forum (NAF) and the hearings are to be held within the federal judicial district in which the employee was last employed by the company. The record contains a declaration by Countrywide's attorney submitting resumes of the NAF arbitrators in California. By our count, only eight NAF arbitrators have offices in the Central District of California.

Mercuro argues the size of Countrywide, its parent corporation and all its affiliates compared to the relatively few available NAF arbitrators means employees such as he will be victims of the "repeat player effect." The fact an employer repeatedly appears before the same group of arbitrators conveys distinct advantages over the individual employee. These advantages include knowledge of the arbitrators' temperaments, procedural preferences, styles and the like and the **679 arbitrators' cultivation of further business by taking a "split the difference" approach to damages. [FN19] In *Armendariz,* the court acknowledged "[v]arious studies show that arbitration is advantageous to employers ... because it reduces the size of the award that the employee is likely to get, particularly if the employer is a 'repeat player' in the arbitration system." [FN20]

> FN19.*Armendariz,* 24 Cal.4th at p. 115, 99 Cal.Rptr.2d 745, 6 P.3d 669; and see Isbell, *Compulsory Arbitration of Employment Agreements: Beneficient Shield or Sword of Oppression? Armendariz v. Foundation Health Psychcare Services, Inc.* (2001) 22 Whittier L.Rev. 1107, 1142-1144; Bingham, *Employment Arbitration: The Repeat Player Effect* (1997) 1 Employee Rts. & Employment Poly. J. 189.

> FN20.*Armendariz,* 24 Cal.4th at p. 115, 99 Cal.Rptr.2d 745, 6 P.3d 669.

While our Supreme Court has taken notice of the "repeat player effect," the court has never declared this factor renders the arbitration agreement unconscionable per se. [FN21] The court apparently

believes the provisions of Code of Civil Procedure section 1281.6 will keep the proceedings "honest" *179 and neutral. [FN22] The first sentence in section 1281.6, however, states: "If the arbitration agreement provides a method of appointing an arbitrator, that method shall be followed." The Countrywide agreement provides the arbitrator will be selected by NAF. Therefore the weaker party's participation in the selection of the arbitrator, which is sometimes available under the statute, does not arise under the Countrywide agreement. [FN23]

> FN21. See *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 985, 64 Cal.Rptr.2d 843, 938 P.2d 903;*Armendariz,* 24 Cal.4th at p. 115, 99 Cal.Rptr.2d 745, 6 P.3d 669.

> FN22.*Engalla v. Permanente Medical Group, Inc.,* 15 Cal.4th at pp. 985-986, 64 Cal.Rptr.2d 843, 938 P.2d 903.

> FN23. Unlike plaintiff in the present case, the employees in *Armendariz* and the patient in *Engalla* were permitted to participate in the selection of their arbitrators. (*Armendariz,* 24 Cal.4th at p. 92, 99 Cal.Rptr.2d 745, 6 P.3d 669;*Engalla,* 15 Cal.4th at pp. 963-964, 64 Cal.Rptr.2d 843, 938 P.2d 903.)

We too are not prepared to say without more evidence the "repeat player effect" is enough to render an arbitration agreement unconscionable. However, given the low threshold of substantive unconscionability in this case we find the lack of mutuality as to arbitrable claims together with the disadvantages to the employee in using NAF as the arbitration provider renders the Countrywide arbitration agreement substantively unconscionable.

*B. Countrywide's Arbitration Agreement Prevents Mercuro From Vindicating His Unwaivable Statutory Rights.*

[9] As a separate and adequate ground for overturning the trial court's order compelling arbitration, we hold the arbitration agreement's provision for sharing the arbitrator's fees prevents Mercuro from having an adequate opportunity to vindicate his unwaivable statutory rights under FEHA and the Labor Code.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6                                                                    -105-

96 Cal.App.4th 167

96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805

**(Cite as: 96 Cal.App.4th 167)**

In *Armendariz,* the plaintiffs sued their former employer under FEHA for sexual harassment. The high court held FEHA claims were arbitrable but, because the statutory rights under FEHA were "established for a public reason" and therefore not waivable, arbitration agreements which encompass those rights "must be subject to particular scrutiny." [FN24] In determining whether arbitration is an adequate forum for securing an employee's rights under **680 FEHA the court held an arbitration agreement must, at a minimum, provide for neutral arbitrators, adequate discovery, a written award subject to limited judicial review, the same types of relief which would be available from a court, and the employees must not be required to bear any type of expense they would not be required to bear if their claims were brought in a court.[FN25]

> FN24.*Armendariz,* 24 Cal.4th at p. 100, 99 Cal.Rptr.2d 745, 6 P.3d 669.

> FN25.*Armendariz,* 24 Cal.4th at pp. 103-113, 99 Cal.Rptr.2d 745, 6 P.3d 669.

In the present case Mercuro alleged causes of action under FEHA for age and disability discrimination. He also alleged causes of action under *180Labor Code section 970, which prohibits employers from misrepresenting the terms and conditions of employment to induce a person to change residences to take the job, and Labor Code section 230.8, which prohibits an employer from discriminating against its employees for taking time off to participate in their children's school activities.

> *1. Armendariz is not limited to FEHA claims.*

[10] Initially, we see no reason why *Armendariz's* "particular scrutiny" of arbitration agreements should be confined to claims under FEHA. Rather, under the Supreme Court's analysis, such scrutiny should apply to the enforcement of rights under any statute enacted "for a public reason."[FN26]

> FN26. In arriving at its conclusion arbitration of FEHA claims was subject to "particular scrutiny," the Supreme Court in *Armendariz* relied in part on Civil Code section 3513, which states "a law established for a public reason cannot be contravened by a private agreement." The

court also relied on Civil Code section 1668, which provides agreements whose object, directly or indirectly, is to exempt anyone from responsibility for his own wrongdoing "are against the policy of the law." *Armendariz,* 24 Cal.4th at p. 100, 99 Cal.Rptr.2d 745, 6 P.3d 669. We note the court's opinion itself suggests its minimum requirements for arbitration of statutory claims apply to claims under the Consumer Legal Remedies Act (Civ.Code, § 1750 et seq.). *Armendariz,* 24 Cal.4th at p. 101, 99 Cal.Rptr.2d 745, 6 P.3d 669.

[11] The Legislature enacted Labor Code section 230.8 in part because it found "[p]arents represent the single most important citizen group in terms of school support" and "[t]he building of a network of parent volunteers to support children in public schools is central to the well-being of the entire community." [FN27]Labor Code section 970 also has a public purpose: to protect the community from the harm inflicted when a fraudulently induced employment ceases and the former employee is left in the community without roots or resources and becomes a charge on the community.[FN28] We conclude, therefore, the five essentials of an arbitration agreement discussed in *Armendariz* apply to Mercuro's claims under FEHA and Labor Code sections 230.8 and 970.

> FN27. Stats.1994, ch. 1290, § 2, subdivisions (e), (f).

> FN28. See *Tyco Industries, Inc. v. Superior Court* (1985) 164 Cal.App.3d 148, 159, 211 Cal.Rptr. 540.

In addition to the lack of a neutral arbitrator,[FN29] Mercuro maintains the Countrywide arbitration agreement prevents him from fully vindicating his statutory causes of action in the arbitration because he is required to pay half the arbitrator's fee and his discovery is unreasonably limited in violation of the rules for arbitrating statutory claims set out in *Armendariz.*

> FN29. See discussion *above*at pp. 678 - 679.

> *181 2. Arbitration fees are unlawfully imposed on Mercuro.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6

Page 11

[12] In *Armendariz,* the court held that at least with respect to arbitration of **681 statutory claims, the employee cannot be required "to bear any *type* of expense that the employee would not be required to bear if he or she were free to bring the action in court." [FN30] This means "the employer [must] pay all types of costs that are unique to arbitration," including the arbitrator's fee. [FN31]

> FN30. *Armendariz,* 24 Cal.4th at pp. 110-111, 99 Cal.Rptr.2d 745, 6 P.3d 669; emphasis in original.

> FN31. *Armendariz,* 24 Cal.4th at p. 113, 99 Cal.Rptr.2d 745, 6 P.3d 669.

Countrywide concedes the provision in the arbitration contract requiring the employee to pay an equal share of the costs unique to arbitration, including the arbitrator's fee, is unlawful under *Armendariz.* It maintains, however, it has modified this fee provision to comply with *Armendariz* [FN32] and, in any event, the offending provision can be severed from the remainder of the contract. [FN33]

> FN32. This purported modification provides Countrywide will pay the costs of arbitration other than $125.00 of the filing fee.

> FN33. See *Swiderski v. Milberg, Weiss, Bershad, Hynes & Lerach* (2001) 94 Cal.App.4th 719, 750, 114 Cal.Rptr.2d 513 in which the court stated in dictum a provision in an arbitration agreement requiring the employee to bear an equal share of the arbitrator's fees and administrative costs could be severed to save the agreement's enforceability.

We find the purported modification fails to cure the defect caused by imposing arbitration fees on the employee.

Countrywide asserts it modified the fee provision of the contract through a letter from its counsel to Mercuro's counsel after Mercuro's lawsuit was filed. The agreement provides, however, it "can be modified or revoked only by a writing signed by the employee and an executive officer of the company ...." Mercuro did not sign the letter and Countrywide does not assert its counsel is an executive officer of the company. Therefore, the purported modification

is invalid and the original fee provision remains a part of the contract. [FN34]

> FN34. Cf. *Stirlen v. Supercuts, Inc.,* 51 Cal.App.4th at pp. 1535-1536, 60 Cal.Rptr.2d 138 [employer could not unilaterally modify arbitration agreement which, by its terms, was modifiable "only by an agreement in writing signed by the parties"].

Even if the purported modification is operative, it does not necessarily relieve Mercuro from having to pay for the services of a judge to hear his claims. Countrywide concedes the modification only excuses Mercuro from paying his share of the arbitration costs up front. Mercuro could wind up paying the entire cost of the arbitration, including the arbitrator's fee, should *182 he lose. In this case, the arbitrator's fee alone could easily exceed $10,000. [FN35] Back-loading this cost to the employee does not solve the problem the Supreme Court was addressing in *Armendariz:* "the *risk* that the claimant may have to bear substantial costs" to have his statutory claims adjudicated. [FN36] Such a system still poses "a significant risk that employees will have to bear large costs to **682 vindicate their statutory right against workplace discrimination, and therefore chills the exercise of that right." [FN37]

> FN35. NAF's fee for arbitrating a case in the $250,000 to $499,999 range is $2250 for the initial session and $2000 for each additional session. Mercuro's complaint seeks general damages of at least $250,000 for lost wages, commissions and employment benefits. He seeks additional damages for emotional distress plus punitive damages, prejudgment interest and attorney fees.

> FN36. *Armendariz,* 24 Cal.4th at p. 110, 99 Cal.Rptr.2d 745, 6 P.3d 669 (emphasis in original) and see *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 84 Cal.Rptr.2d 425, 975 P.2d 622, holding it was a denial of due process to require a teacher who loses an administrative challenge to her dismissal to pay one-half of the administrative law judge's fees.

> FN37. *Armendariz,* 24 Cal.4th at p. 110, 99 Cal.Rptr.2d 745, 6 P.3d 669.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6

96 Cal.App.4th 167
96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805
(Cite as: 96 Cal.App.4th 167)

Finally, as we discuss more fully below, severing the unlawful fee provisions from the contract would not solve the problem because the contract is "permeated" by unconscionability and could only be saved, if at all, by a reformation beyond our authority.[FN38]

> FN38. Cf. _Armendariz, 24 Cal.4th at pp. 122-125, 99 Cal.Rptr.2d 745, 6 P.3d 669._

### 3. Mercuro's discovery is not necessarily unfairly limited.

In _Armendariz,_ the Supreme Court acknowledged "adequate discovery is indispensable for the vindication of FEHA claims." [FN39] Accordingly, the court held, employees "are at least entitled to discovery sufficient to adequately arbitrate their statutory claim, including access to essential documents and witnesses, as determined by the arbitrator(s) and subject to limited judicial review pursuant to Code of Civil Procedure section 1286.2." [FN40]

> FN39._Armendariz, 24 Cal.4th at p. 104, 99 Cal.Rptr.2d 745, 6 P.3d 669._
>
> FN40._Armendariz, 24 Cal.4th at p. 106, 99 Cal.Rptr.2d 745, 6 P.3d 669,_ fn. omitted. Code of Civil Procedure section 1286.2 sets out the grounds for vacating an arbitration award.

[13] The discovery provisions in Countrywide's arbitration agreement state "each side shall be limited to three depositions and an aggregate of 30 discovery requests of any kind, including sub-parts, except as mutually agreed to by the parties." [FN41] Furthermore, "[a] deposition of a corporate representative shall be limited to no more than four designated subjects." The agreement also provides "[a]ny disputes concerning discovery shall be resolved by the arbitrator, with a presumption against increasing the aggregate limit on requests, additional discovery requests shall be granted only upon a showing of good cause."

> FN41. Discovery of each party's experts is excluded from these limitations.

*183 Mercuro contends these discovery provisions do not afford him a reasonable opportunity to prove his statutory claims because they are arbitrary, unreasonable and one-sided. It must be conceded Mercuro's concern over the discovery provisions is not totally unreasonable. Nevertheless, without evidence showing how these provisions are applied in practice, we are not prepared to say they would necessarily prevent Mercuro from vindicating his statutory rights.

Mercuro is limited to a total of "30 discovery requests of any kind, including subparts." He is also restricted to three depositions, and these count toward the aggregate 30 discovery request limit. In his petition Mercuro indicates he will need to depose Roth, Ledbetter and Sambol to obtain evidence supporting his age discrimination claim. This will leave Mercuro with just 27 discovery requests (to be divided between interrogatories, including subparts, requests for production of documents and requests for admissions) with which to obtain evidence to support his claims of age discrimination, disability discrimination, misrepresentation under Labor Code section 970 and denial of time off under Labor Code section 230.8 and to refute whatever affirmative defenses Countrywide may raise to these claims. The arbitrator has discretion to increase the aggregate number of discovery requests but only if the employee shows "good cause" and overcomes the "presumption**683 against increasing the aggregate limit of requests."

While the amount of discovery permitted under the arbitration agreement appears inconsistent with the general discovery practice in employment litigation, the limits are applicable to both employer and employee so at least they have the virtue of mutuality. Furthermore, the 30 discovery request limit may work to the employee's advantage by preventing the employer from burying the employee under a mountain of discovery. We also note the discovery limits can be extended by the arbitrator for good cause.

Countrywide has not explained its purpose in adding a specific "presumption against increasing the aggregate limit" of discovery requests to the requirement to show good cause for additional discovery. If this presumption was intended to signal the arbitrator the party seeking additional discovery must show _super_ good cause it might work more to the disadvantage of the employee than the employer. This is because the employer already has in its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6                                    -108-

96 Cal.App.4th 167
96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805
**(Cite as: 96 Cal.App.4th 167)**

possession many of the documents relevant to an employment discrimination case as well as having in its employ many of the relevant witnesses.[FN42] Therefore, compared to the employee, the employer has far less need for discovery in order to prepare for arbitration. Of course, in some cases this imbalance in information may provide the good cause the employee needs in order to exceed the 30 discovery request limit.

> FN42.*Armendariz,* 24 Cal.4th at p. 104, 99 Cal.Rptr.2d 745, 6 P.3d 669.

**\*184** Mercuro interprets the arbitration agreement to mean that in deposing Roth, Ledbetter and Sambol he is limited to questioning each deponent on "no more than four designated subjects." This is not necessarily so. The four subject limitation only applies to the depositions of "corporate representatives." This provision may have been intended to parallel Code of Civil Procedure section 2025, subdivision (d)(6) in which the deposition notice is directed to the person in a corporation most knowledgeable on a subject matter "described with reasonable particularity." Admittedly, if Mercuro should wish to inquire into four separate subjects and each subject has its own most knowledgeable person Mercuro would run up against the three deposition limit. This, however, would appear to be the kind of situation in which good cause would exist for allowing additional depositions.

Finally, we note "adequate" discovery does not mean unfettered discovery and *Armendariz* itself recognizes an arbitration agreement may require "something *less than* the full panoply of discovery provided in Code of Civil Procedure section 1283.05." [FN43] Ultimately it is up to the arbitrator and the reviewing court to balance the need for simplicity in arbitration with the discovery needs of the parties.[FN44]

> FN43.*Armendariz,* 24 Cal.4th at pp. 105-106, 99 Cal.Rptr.2d 745, 6 P.3d 669; emphasis in original.

> FN44. See *Armendariz,* 24 Cal.4th at p. 106, fn. 11, 99 Cal.Rptr.2d 745, 6 P.3d 669.

For the reasons given above, we are unable to say the Countrywide arbitration agreement does not afford adequate discovery rights to employees seeking to

vindicate statutory rights as required under *Armendariz.*

### C. *The Offending Provisions Of The Arbitration Agreement Cannot Be Severed Or Limited.*

[14][15] When a court finds a contract unconscionable or illegal it has several options. It may refuse to enforce the contract; it may sever the offending clause; **\*\*684** or it may limit the application of the offending clause so as to avoid the unconscionable or illegal result.[FN45] As a general rule, if the central purpose of the contract is "permeated" or "tainted" with unconscionability or illegality then the contract as a whole cannot be enforced. If, on the other hand, the unconscionability or illegality is collateral to the main purpose of the contract, and the offending provisions can be excised from the contract **\*185** by means of severance or limitation, then the remainder of the contract can be enforced.[FN46]

> FN45.Civ.Code, § 1670.5, subd. (a); *Armendariz,* 24 Cal.4th at pp. 121-122, 99 Cal.Rptr.2d 745, 6 P.3d 669.

> FN46.*Armendariz,* 24 Cal.4th at pp. 122, 124, 99 Cal.Rptr.2d 745, 6 P.3d 669.

In *Armendariz,* the Supreme Court concluded the arbitration agreement before it could not be enforced because it was "permeated by an unlawful purpose" and could not be saved by merely removing or restricting its unconscionable provisions.[FN47] The unlawful purpose was not the requirement employees arbitrate their statutory discrimination claims. The court held such claims are arbitrable if certain minimal requirements are met.[FN48] Rather, the unlawful purpose, as demonstrated by the contract's lack of mutuality, was "to impose arbitration on an employee ... as an inferior forum that works to the employer's advantage." [FN49] This lack of mutuality could not be cured by striking or removing the contract's unconscionable provisions but only by augmenting the contract with additional terms which, the court held, it lacked the power to do.[FN50]

> FN47.*Armendariz,* 24 Cal.4th at pp. 124-125, 99 Cal.Rptr.2d 745, 6 P.3d 669.

> FN48.*Armendariz,* 24 Cal.4th at pp. 90-91, 99 Cal.Rptr.2d 745, 6 P.3d 669.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6

96 Cal.App.4th 167

Page 14

96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805
**(Cite as: 96 Cal.App.4th 167)**

FN49.*Armendariz,* 24 Cal.4th at p. 124, 99 Cal.Rptr.2d 745, 6 P.3d 669.

FN50.*Armendariz,* 24 Cal.4th at p. 125, 99 Cal.Rptr.2d 745, 6 P.3d 669.

[16] Here, we reach the same conclusion as did the *Armendariz* court. The Countrywide arbitration agreement is unenforceable because it is permeated with unconscionability and illegality and it cannot be cured by merely extirpating the offending provisions-we would have to rewrite the contract which we lack the power to do.

In this case we find the threats and cajoling by Countrywide management to obtain Mercuro's signature on the arbitration agreement together with the lack of mutuality as to arbitrable claims, the unlawful fee-sharing provision and the disadvantages to the employee in using NAF as the arbitrator "indicate a systematic effort to impose arbitration on an employee ... as an inferior forum that works to the employer's advantage." FN51

FN51.*Armendariz,* 24 Cal.4th at p. 124, 99 Cal.Rptr.2d 745, 6 P.3d 669.

We cannot save the contract by simply hacking off the provisions governing what claims are arbitrable, how fees and costs will be allocated and what organization will conduct the arbitrations. If we did so there would be virtually nothing of substance left to the contract. Instead, we would need to **\*186** rewrite those provisions according to what *we* believed was fair and equitable. This, of course, we cannot do. FN52

FN52.*Armendariz,* 24 Cal.4th at p. 125, 99 Cal.Rptr.2d 745, 6 P.3d 669.

## II. *COUNTRYWIDE FAILED TO PRODUCE EVIDENCE SHOWING IT WAS ENTITLED TO COMPEL ARBITRATION UNDER THE NASD RULES.*

[17] Countrywide argues even if its own arbitration contract is unenforceable **\*\*685** it can compel arbitration of the Mercuros' claims under the terms contained in form U-4, which Mercuro signed when joining Countrywide. This argument fails for several reasons.

The U-4 states in relevant part: "I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm ... that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated...." Countrywide contends by signing this agreement Mercuro agreed to arbitrate any employment disputes under the rules of the NASD.

With one important exception noted below, the NASD rules provide for arbitration of any claims "arising out of the employment or termination of employment of associated person(s) with any member." FN53 The term "member" means a member of NASD, e.g., a brokerage firm. The term "associated person" means "any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such member ...", e.g., a sales director. FN54 Under the NASD rules, arbitration can be compelled only as to claims by "(1) a member against another member; (2) a member against a person associated with a member or a person associated with a member against a member; and (3) a person associated with a member against a person associated with a member." FN55

FN53. NADA Code of Arbitration, rule 10101.

FN54. NASD by-laws, Art. I, subd. (q), quoted in *Paul Revere Variable Annuity Ins. v. Kirschhofer* (1st Cir.2000) 226 F.3d 15, 19.

FN55. NASD Code of Arbitration, rule 10201, subd. (a).

Countrywide provided no evidence it was a member of NASD either at the time Mercuro executed the U-4 or at the time it sought to compel arbitration of the Mercuros' claims. Therefore, its motion to compel arbitration under the NASD rules must be rejected. FN56

FN56. See *Paul Revere Variable Annuity Ins. v. Kirschhofer,* 226 F.3d at p. 19. Mercuro's spouse, Melissa Mercuro, could not be compelled to arbitrate her claims against Countrywide in any case. Ms. Mercuro is not and never has been a member of NASD or a person associated with a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6                                                                    -110-

96 Cal.App.4th 167
96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805
(Cite as: 96 Cal.App.4th 167)

Page 15

member.

Even if Countrywide could produce evidence of its NASD membership, it would not be entitled to arbitration of Mercuro's statutory discrimination *187 claims. The NASD Code of Arbitration states in rule 10201, subdivision (b): "A claim alleging employment discrimination, including a sexual harassment claim, in violation of a statute is not required to be arbitrated. Such a claim may be arbitrated only if the parties have agreed to arbitrate it, either before or after the dispute arose." Because we have held the Countrywide arbitration agreement is unenforceable, there is no agreement between the parties to arbitrate Mercuro's statutory age and disability discrimination claims.

### DISPOSITION

Let a peremptory writ of mandate issue directing the trial court to vacate its August 3, 2001 order compelling arbitration in Los Angeles County Superior Court case number BC247459. Costs are awarded to petitioners.

We concur: WOODS and PERLUSS, JJ.
Cal.App. 2 Dist.,2002.
Mercuro v. Superior Court
96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 02 Cal. Daily Op. Serv. 1491, 2002 Daily Journal D.A.R. 1805

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6                                    -111-

TAB 7

Westlaw.

227 Cal.App.3d 1578
227 Cal.App.3d 1578, 278 Cal.Rptr. 570
**(Cite as: 227 Cal.App.3d 1578)**

Page 1

▷West v. Henderson
Cal.App. 3 Dist.,1991.

Court of Appeal, Third District, California.
Sylvia WEST, Cross-Complainant and Appellant,
v.
Ron HENDERSON, et al., Cross-Defendants and
Respondents.
**No. C007537.**

Feb. 28, 1991.
Rehearing Denied March 26, 1991.

Owner brought action for breach of lease against
lessee. Lessee cross-complained against owner and
leasing agent. The Superior Court of Sacramento
County, No. 504698, Jeffrey L. Gunther, J., dismissed
cross complaint after determining that lessee had not
brought her action within six-month limitation period
provided for in lease. Lessee appealed. The Court of
Appeal, Nicholson, J., held that: (1) parol evidence
rule prevented rescission of lease because alleged
fraudulent misrepresentations were contradicted in
subsequent written lease, and (2) limitation of action
provision in lease would not be set aside on basis of
unconscionability.

Affirmed.
West Headnotes
**[1] Evidence 157 ☞434(6)**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting
Writings
        157XI(B) Invalidating Written Instrument
            157k434 Fraud
                157k434(6) k. In Leases. Most Cited
Cases
Parol evidence rule precluded admission of lessee's
evidence of three alleged prior representations made
by leasing agent to induce her into signing of lease to
show fraud in inducement; lease included integration
clause stating no prior agreement on any matter
covered in lease would be effective, and provisions in
lease contradicted alleged prior agreements. West's
Ann.Cal.C.C.P. § 1856(a, g).

**[2] Landlord and Tenant 233 ☞20**

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(A) Requisites and Validity
            233k20 k. Nature of the Contract. Most
Cited Cases
Circumstances involved in signing of lease with
limitation of actions provision was not oppressive,
for purposes of determining whether provision would
be set aside as being unconscionable, even though
lessee had no previous business experience and was
not represented by attorney; lessee did not contend
that she did not have time to consult with attorney,
and lease stated "consult your attorney" above
signature lines. West's Ann.Cal.Civ.Code § 1670.5.

**[3] Landlord and Tenant 233 ☞20**

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(A) Requisites and Validity
            233k20 k. Nature of the Contract. Most
Cited Cases
Lease containing limitation of actions provision was
not adhesion contract; lessee failed to provide any
evidence that limitation of actions provision was
standard in other commercial lease agreements.

**[4] Landlord and Tenant 233 ☞20**

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(A) Requisites and Validity
            233k20 k. Nature of the Contract. Most
Cited Cases
Evidence failed to establish that lessee held inferior
bargaining power as compared to leasing agent, for
purpose of determining whether lease containing
limitation of action provision was unconscionable;
there was lack of evidence concerning other lease
agreement. West's Ann.Cal.Civ.Code § 1670.5.

**[5] Landlord and Tenant 233 ☞20**

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(A) Requisites and Validity
            233k20 k. Nature of the Contract. Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 7                    -112-

227 Cal.App.3d 1578
227 Cal.App.3d 1578, 278 Cal.Rptr. 570
**(Cite as: 227 Cal.App.3d 1578)**

Page 2

Cited Cases
Sheer bulk of issues dealt with in lease which was 20 pages long did not render agreement on any single issue unfairly surprising, for purpose of determining whether lease was unconscionable. West's Ann.Cal.Civ.Code § 1670.5.

**[6] Landlord and Tenant 233 ⊂⟩20**

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(A) Requisites and Validity
            233k20 k. Nature of the Contract. Most Cited Cases
Limitation of actions provision in commercial lease was so unclear as to unfairly surprise lessee, for purpose of determining whether lease was unconscionable. West's Ann.Cal.Civ.Code § 1670.5(a).

**[7] Landlord and Tenant 233 ⊂⟩20**

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(A) Requisites and Validity
            233k20 k. Nature of the Contract. Most Cited Cases
Six-month period within which lessee was required to commence action for any alleged wrong was not so unreasonable as to be found unconscionable, even though lease did not so limit lessor; pending litigation initiated by lessee could inhibit lessor's ability to lease property to another party, while pending litigation by lessor against lessee would probably not have same consequences. West's Ann.Cal.Civ.Code § 1670.5(a).

**[8] Landlord and Tenant 233 ⊂⟩20**

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(A) Requisites and Validity
            233k20 k. Nature of the Contract. Most Cited Cases
Limitation of actions provision in lease which allowed for bringing of action by lessor after six-month limitation of actions provision for action by lessee had run and allowed lessor to be immune from any defense raised by lessee would not be found unconscionable due to limitation of defenses, in breach of lease action; limitation of defenses was irrelevant because it was not being asserted and could

be subjected to separate unconscionability review. West's Ann.Cal.Civ.Code § 1670.5.

**[9] Limitation of Actions 241 ⊂⟩100(12)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
            241k98 Fraud as Ground for Relief
                241k100 Discovery of Fraud
                    241k100(12) k. What Constitutes Discovery of Fraud. Most Cited Cases
Latest date on which lessee's fraudulent inducement cause of action began to run was when lessee vacated leased premises; only three allegations of fraud lessee presented were representations concerning sign near street, five-year lease, and former employer's status as guarantor. West's Ann.Cal.C.C.P. § 338(d).

**571*1581** Burger & Flaherty, Michael Flaherty, Karen R. Leder, Sacramento, and Kevin P. Whiteford, for cross-complainant and appellant.
Robert J. Binns, Sacramento, for cross-defendants and respondents.
NICHOLSON, Associate Justice.
Sylvia West's sandwich shop failed, and she moved out of the Sunray Plaza pad she had leased. The owner of Sunray Plaza sued for breach of the lease, and West cross-complained against the owner and The Henderson Group (Henderson), the leasing agent. Her cross-complaint was dismissed after the court determined West had not brought her action within the six-month limitation period provided for in the lease. On appeal, she argues the contractual limitation of actions is inapplicable because she seeks to rescind the lease based on Henderson's fraud in the inducement. In the alternative, she contends the six-month limitation of actions is unconscionable and should not be enforced.

We affirm the judgment against West. The parol evidence rule prevents her rescission of the lease because Henderson's alleged fraudulent misrepresentations are contradicted in the subsequent written lease. Furthermore, for reasons discussed later, the six-month limitation of actions was not unconscionable. Since the contractual limitation of actions was enforceable, the court properly concluded it barred West's action.

FACTS

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

227 Cal.App.3d 1578
227 Cal.App.3d 1578, 278 Cal.Rptr. 570
(Cite as: 227 Cal.App.3d 1578)

Page 3

In early 1985, West decided to open a sandwich shop in the Sunrise area of Sacramento. She found Sunray Plaza under construction and contacted **\*1582** Henderson about leasing a pad. Henderson gave West a draft of the lease and notified her she would need a guarantor for the lease. Henderson eventually gave West a final lease which she took home and signed. She contacted her friend and former employer, James Johnston, who agreed to guarantee the lease. He also signed the lease as a principal. West finally returned the signed lease to Henderson. Although encouraged to do so by a prominent admonition in the lease, she did not consult an attorney concerning the terms of the lease before signing it.

The lease included a six-month limitation period for any action brought by West: "Any claim, demand, right or defense of any kind by Tenant which is based upon or arises in any connection with this Lease or the negotiations prior to its execution, shall be barred unless Tenant commences an action thereon, or interposes in a legal proceeding**\*572** a defense by reason thereof, within six (6) months after the date of the inaction or ommission [sic] or the date of the occurrence of the event or of the action to which the claim, demand, right or defense relates, whichever applies."

West opened the sandwich shop on August 28, 1985. However, the business was not profitable and closed on October 31, 1986.

On September 30, 1988, the owner of Sunray Plaza commenced an action against West and Johnston for unpaid rent. West cross-complained against Henderson and others alleging fraud and other causes of action. The court granted summary judgment in favor of Henderson on West's cross-complaint.<u>FN1</u> This appeal challenges only the judgment entered against West on her cross-complaint.<u>FN2</u>

    <u>FN1.</u> James Johnston, originally listed as an appellant in this case, has been dismissed on the court's own motion because he was not a party to the judgment below.

    <u>FN2.</u> The appeal has been dismissed with respect to all respondents except The Henderson Group and Ron Henderson, who are referred to collectively as "Henderson" in this opinion.

Henderson requests this court to take judicial notice of the stipulated judgment subsequently entered against West and Johnston on the original complaint. Since the judgment on the original complaint is not relevant to this appeal, we deny the request.

## DISCUSSION

West's main contention on appeal is the court erred by applying the six-month limitation of actions found in the lease to bar West's causes of action in her cross-complaint. West contends the limitation is unenforceable because she seeks to rescind the contract based on fraud in the inducement and because the limitation of actions provision is unconscionable under <u>Civil Code section 1670.5</u> which gives courts authority to refuse to enforce or limit enforcement of unconscionable contracts or provisions in contracts.

**\*1583 A. Standard of Review**

The trial court may grant a motion for summary judgment only "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (<u>Code Civ.Proc., § 437c</u>, subd. (c).) "[A] defendant moving for summary judgment has the burden of negating every alternative theory of liability presented by the pleadings...." (<u>Bell v. Industrial Vangas, Inc.</u> (1981) 30 Cal.3d 268, 271, fn. 1, 179 Cal.Rptr. 30, 637 P.2d 266.) Any doubts as to whether the motion should be granted must be resolved in favor of the party opposing the motion. (<u>Miller v. Bechtel Corp.</u> (1983) 33 Cal.3d 868, 874, 191 Cal.Rptr. 619, 663 P.2d 177.) On appeal, we review the motion independently applying the same standard under <u>Code of Civil Procedure section 437c</u> the trial court must apply. (<u>ITT Telecom Products Corp. v. Dooley</u> (1989) 214 Cal.App.3d 307, 311, 262 Cal.Rptr. 773.)

B. Fraud in the Inducement

Viewing the facts most favorably to West, Henderson misrepresented three facts which West relied on in signing the lease. First, the lease would be for five years with two five-year options, rather than fifteen years. Second, Johnston would be a guarantor, rather than a primary obligor. And third, Henderson would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 7
-114-

227 Cal.App.3d 1578
227 Cal.App.3d 1578, 278 Cal.Rptr. 570
**(Cite as: 227 Cal.App.3d 1578)**

Page 4

erect a sign near the street with the names of the businesses on the sign. Contrary to these representations, the term of the lease West signed was 15 years and included Johnston as a tenant, not a guarantor. In addition, West alleges the promised sign could not be erected because it would have violated a county ordinance. Alleging fraud in the inducement, West seeks to rescind the lease, including the limitation of actions provision. However, Henderson asserts West cannot show fraud in the inducement because the parol evidence rule prevents introduction of the representations made before West signed the lease.

"Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as **573 are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." (Code Civ.Proc., § 1856, subd. (a).) The fraud exception to this parol evidence rule states: "This section does not exclude other evidence ... to establish illegality or fraud." (Code Civ.Proc., § 1856, subd. (g).) Despite this pronouncement concerning the inapplicability of the parol evidence rule to evidence of fraud, the California Supreme Court has declared the fraud exception does not apply if the evidence is offered to show a promise contradicting the written agreement. (*Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258, 263, 48 P.2d 659.) The *Pendergrass* decision, though criticized at times by some districts of the *1584 Court of Appeal, remains the law. (*Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1990) 216 Cal.App.3d 388, 418-421, 264 Cal.Rptr. 779.)

[1] The lease includes an integration clause stating no prior agreement on any matter covered in the lease shall be effective.[FN3] The lease names Johnston as a tenant and sets the term at 15 years. These provisions contradict the prior agreements for a five-year lease with Johnston as a guarantor. The lease also prohibited any sign not approved in writing by the landlord. West's claim the prior agreement was for Henderson to put a sign near the street at the landlord's expense contradicts the lease provision stating West would pay for all signs. Furthermore, the lease gives West the obligation of obtaining "all necessary permits and approvals" for signs which West did not do.

FN3. Paragraph 31.J of the lease states: "This Lease contains all of the agreements

of the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior agreements or understanding pertaining to any such matters shall be effective for any purpose...."

West cites our decision in *Cobbledick-Kibbe Glass Co. v. Pugh* (1958) 161 Cal.App.2d 123, 326 P.2d 197, as support for the admissibility of her evidence of fraud. In *Cobbledick-Kibbe,* a glass supplier sold glass to a florist for a refrigerated floral display. The supplier told the florist there would be no problem with condensation on the glass display. However, on the back of the contract, the supplier disclaimed responsibility for condensation problems. The court, failing to acknowledge the *Pendergrass* rule, admitted the prior representations because the action was for fraud, not breach of contract. (*Id.* at p. 126,326 P.2d 197.) Under the *Pendergrass* rule, the prior representations are admissible only if they are independent of or consistent with the written agreement. (*Pendergrass, supra,* 4 Cal.2d at p. 263, 48 P.2d 659; *Simmons v. Cal. Institute of Technology* (1949) 34 Cal.2d 264, 274-275, 209 P.2d 581.) In *Cobbledick-Kibbe,* the oral representations directly conflicted with the supplier's disclaimer of responsibility for condensation. Since *Cobbledick-Kibbe* conflicts with *Pendergrass,* the Supreme Court's decision in *Pendergrass* prevails.[FN4]

FN4. While West argues we should apply *Cobbledick-Kibbe* and Henderson argues we should apply *Pendergrass,* neither party cites to the recent decision in *Continental Airlines, supra,* 216 Cal.App.3d 388, 264 Cal.Rptr. 779, which quite accurately reviews the parol evidence rule's application in fraud cases and makes apparent *Pendergrass* is the controlling authority in this case. Even though *Continental Airlines* was decided over a year before oral argument on this case, neither party was able to discuss this instructive case with the court at oral argument.

West's evidence of the three prior representations made by Henderson to induce her signing of the lease are not admissible. Having concluded West cannot prove fraud in the inducement, no further analysis is necessary as to whether rescission is available. Accordingly, the trial *1585 court properly found West could not rescind the lease due to fraud in the inducement.[FN5]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN5. In her reply brief, West raises for the first time the issues of fraud in the execution and mistake as attempts to nullify the lease. However, we will not consider issues raised for the first time in the reply brief. (*Balboa Ins. Co. v. Aguirre* (1983) 149 Cal.App.3d 1002, 1010, 197 Cal.Rptr. 250.)

C. Unconscionability of the Limitation of Actions Provision

West next claims the limitation of actions provision of the lease is unconscionable **574 and, therefore, should not be enforced. (Civ.Code, § 1670.5.) While this alleged unconscionability merits our consideration, we first recognize the courts have deemed similar provisions "reasonable." (*Capehart v. Heady* (1962) 206 Cal.App.2d 386, 23 Cal.Rptr. 851 [three-month limitation]; *Beeson v. Schloss* (1920) 183 Cal. 618, 192 P. 292 [six-month limitation]; *Tebbets v. Fidelity and Casualty Co.* (1909) 155 Cal. 137, 99 P. 501 [three-month limitation].)

In *Capehart,* the lessee sued the lessor for damages arising from the lessor's breach of the lease. As a defense, the lessor pointed out the provision in the lease limiting the period during which the lessee could bring an action to three months from the offending act. The trial court enforced the limitation of actions provision and sustained the lessor's demurrer. (206 Cal.App.2d at pp. 387-388, 23 Cal.Rptr. 851.) On appeal, the court applied the test for determining whether the provision was valid by asking whether the provision was "so unreasonable as to show imposition or undue advantage." (*Id.* at p. 388, 23 Cal.Rptr. 851.) The court noted the lease was presented on a " 'take it or leave it' " basis and the limitation of actions provision limited only the lessee. Nonetheless, the court upheld enforcement of the provision because it was clear and distinct and because the lessee agreed to it. (*Id.* at pp. 390-391, 23 Cal.Rptr. 851.)

In 1979, the Legislature passed Civil Code section 1670.5. Subdivision (a) of section 1670.5 provides: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any

unconscionable clause as to avoid any unconscionable result." The legislative committee comment states section 1670.5 was enacted "to police explicitly against the contracts or clauses which they find to be unconscionable." There are no reported decisions in which California courts have applied section 1670.5 to a contractual limitation of actions.

The enactment of section 1670.5 expands our scrutiny of limitation of actions provisions from an analysis of the reasonableness of the provision to *1586 the broader analysis of the conscionability of the provision. While the *Capehart* decision is relevant to our scrutiny of the provision in this case, we must apply the test for unconscionability as announced by the cases which have applied section 1670.5 to contract provisions other than those limiting actions. (See *A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 485-493, 186 Cal.Rptr. 114.)

"[U]nconscionability has both a 'procedural' and a 'substantive' element." (*A & M Produce Co., supra,* 135 Cal.App.3d at p. 486, 186 Cal.Rptr. 114.) "The procedural element focuses on two factors: 'oppression' and 'surprise.' [Citations.] 'Oppression' arises from an inequality of bargaining power which results in no real negotiation and 'an absence of meaningful choice.' [Citations.] 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." (*Ibid.*) The substantive element focuses on whether the contract or provision is overly-harsh or one-sided and without justification. (*Id.* at p. 487, 186 Cal.Rptr. 114.)

[2] We do not regard the circumstances involved in signing the lease with the limitation of actions as oppressive. While West had no previous business experience and was not represented by an attorney, she does not assert she did not have the time to consult with an attorney. In fact, the lease stated, "CONSULT YOUR ATTORNEY," above the signature lines.

[3] West asserts the lease was an adhesion contract. An adhesion contract "signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." (*Neal v. State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694, 10 Cal.Rptr.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 7

-116-

227 Cal.App.3d 1578
227 Cal.App.3d 1578, 278 Cal.Rptr. 570
(Cite as: 227 Cal.App.3d 1578)

781.) This definition of an adhesion contract is comparable to **575 the definition of oppression as stated above. Thus, a finding a contract is adhesive might, arguably, justify a finding the same contract is oppressive for the purpose of unconscionability review. However, the lease was not an adhesion contract. West has failed to provide any evidence the limitation of actions provision is standard in other commercial lease agreements, an element necessary to a finding the contract is adhesive. (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 711, 131 Cal.Rptr. 882, 551 P.2d 1178.)

[4] This same lack of evidence concerning other lease agreements prevents us from concluding West held inferior bargaining power. If she could go to another lessor and get more favorable terms, she held a strong negotiating position against Henderson. (*Shadoan v. World Savings & Loan Assn.* (1990) 219 Cal.App.3d 97, 103, 268 Cal.Rptr. 207.)

*1587 The only oppression on West we perceive in the circumstances surrounding the signing of the lease was self-imposed. West was not in pursuit of life's necessities; this was a business venture. Knowing her own inexperience, she signed the lease without consulting an attorney (despite a prominent admonition in the lease to do so) and without investigating the suitability of the lease provisions for her business purposes.

[5] Alleging unfair surprise as another way of satisfying the procedural element of unconscionability, West states the lease is twenty single-spaced pages and the limitation of actions provision is "an eighty-six word sentence designed to befuddle both the novice and the law school graduate alike." Twenty single-spaced pages contain a considerable number of terms and conditions; however, a commercial lease such as this necessarily entails agreement on many issues. The sheer bulk of those issues does not, alone, render agreement on any single issue unfairly surprising.

[6] Similarly, a long sentence is not necessarily incomprehensible. Indeed, Civil Code section 1670.5, subdivision (a), upon which West relies is a 65-word sentence. West's opening brief contains many lengthy sentences, including a sentence of over 90 words which we think is quite clear. While we agree longer sentences are generally harder to understand and should be avoided, we do not agree the limitation of actions provision here was unclear enough to unfairly

surprise West.

While not a model of clarity, the limitation of actions provision states in pertinent part: "Any claim ... of any kind by Tenant ... shall be barred unless Tenant commences an action ... within six (6) months after ... the event...." A lessee reasonably attempting to protect her rights and serve her own best interests could have, quite easily, discerned the effect of this provision. Henderson never made any conflicting representation concerning a limitations period, and the provision appeared on the very page West signed. Even so, West claims she did not read that, or any other provision, before signing the lease. As this case demonstrates, loose business practices, such as failure to read, investigate, and negotiate a commercial contract, often impose significant and costly consequences. West apparently saw no reason to protect her own interests at the outset. We will not do so at this late stage. Parties to commercial contracts fail to read them at their own peril.[FN6]

> FN6. "One who signs or accepts a written instrument without reading it with care is likely to be surprised and grieved at its contents later on." (3 Corbin, Contracts (1960) § 607, p. 656.)

While West has made a poor showing of procedural unconscionability, we will go on to a substantive analysis because a compelling showing *1588 of substantive unconscionability could, foreseeably, overcome the weaker showing of procedural unconscionability. (*A & M Produce Co., supra,* 135 Cal.App.3d at p. 487, 186 Cal.Rptr. 114.)

[7] Substantive unconscionability relates to the effect of the contract or provision. The effect here is to limit West, but not the lessor, to a six-month period within which she must commence an action for any alleged wrong. The lack of mutuality makes the provision suspect under our analysis. We see no reason why the six-**576 month period could not have been drafted to apply to both parties. Accordingly, there should be some justification for this one-sidedness.

In discussing the reasonableness of a three-month period in *Capehart,* the court noted the undesirability of tying up property during litigation as a justification for a three-month limitation period applicable only to the lessee. (*Capehart, supra,* 206 Cal.App.2d at p. 390, 23 Cal.Rptr. 851.) Pending litigation initiated by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 7                                                                    -117-

the lessee could inhibit the lessor's ability to lease the property to another party, while pending litigation by the lessor against the lessee would probably not have the same consequences. We believe this reasoning sufficiently justifies the bargained-for six-month limitation on West.

[8] To support her position the limitation on actions was unconscionable, West presents a hypothetical situation. Under the limitation of actions provision, the lessor could bring an action after the six-month period had run and be immune to any defense raised by the lessee. While this possible liability without defenses seems unjustifiably inequitable, we reject this hypothetical observation as a reason to find the provision substantively unconscionable. Civil Code section 1670.5 gives a court power to refuse to enforce an offending clause. Thus, if a lessor were to bring an action against a lessee and assert this provision as a bar to any defense on the part of the lessee, a court could refuse to enforce it. The limitation of defenses is irrelevant to this case because it is not being asserted against West and could be subject to unconscionability review separately.

The Legislature, in enacting section 1670.5, has molded a powerful tool for the courts to prevent oppression and unfair surprise. However, used unwisely, this tool can cause chaos and uncertainty. Seneca said, "Men [and women] consider some things to be unjust because they did not deserve them, some merely because they did not expect them." (A Dictionary of Legal Quotations (1987) p. 58.) West's expectations would have been more realistic if she had but read the lease. We conclude the limitation of actions provision of the lease was not unconscionable when West signed the lease. She assented to a shorter period for bringing actions, and she is now bound.

*1589 D. Running of Time for Commencing an Action

[9] In a footnote, West argues the court improperly calculated the accrual of her fraud cause of action by determining the period within which she could bring an action began to run when she vacated the shop. She contends the discovery provision of Code of Civil Procedure section 338, subdivision (d), should have been applied to begin the period for bringing an action for fraud when she discovered the fraud, which she asserts occurred "within a few weeks of the date

West's cross-complaint was filed." [FN7] The only three allegations of fraud she has presented for our review are the representations concerning the sign near the street, the five-year lease, and Johnston's status as a guarantor. Even assuming the statutory discovery rule may properly be applied in this case, the trial court correctly determined the latest date West could have discovered the facts constituting fraud was when she vacated the shop. Almost two years passed between the time she vacated and the filing of the original complaint in this action. West's contention lacks merit.

> FN7. Code of Civil Procedure section 338, subdivision (d), provides for a three-year statute of limitations in "[a]n action for relief on the ground of fraud or mistake. The cause of action in that case is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."

Conclusion

Since Henderson has successfully raised the limitation of actions provision in the lease as a defense, it has carried its "burden of negating every alternative theory of liability presented by the pleadings...." (Bell, supra, 30 Cal.3d at p. 271, fn. 1, 179 Cal.Rptr. 30, 637 P.2d 266.) The trial court **577 properly granted the motion for summary judgment.

Disposition

The judgment is affirmed.

SIMS, Acting P.J., and MARLER, J., concur.
Cal.App. 3 Dist.,1991.
West v. Henderson
227 Cal.App.3d 1578, 278 Cal.Rptr. 570

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 7    -118-

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

1. At the time of service I was at least 18 years of age and **not a party to this legal action**.

2. My business address is 1925 Century Park East, Suite 500, Los Angeles, California 90067-2506.

3. I served copies of the following documents (specify the exact title of each document served):

   **COMPENDIUM OF NON-FEDERAL AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PURSUANT TO FRCP 12(b)(6), OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT PURSUANT TO FRCP 56**

4. I served the documents listed above in item 3 on the following persons at the addresses listed:

   **Attorney for Plaintiff:**

   **Douglas E. Geyman**              **Tel: (619) 322-3533**
   **Law Office of Douglas E. Geyman    Fax:**
   **750 B Street, Suite 2635**
   **San Diego, California 92101**

5. a. ☐ **By personal service**. I personally delivered the documents on the date shown below to the persons at the addresses listed above in item 4. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office. (2) For a party delivery was made to the party or by leaving the documents at the party's residence between the hours of eight in the morning and six in the evening with some person not less than 18 years of age.

   b. ☒ **By United States mail**. I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 4 and *(specify one)*:

   (1) ☐ deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid on the date shown below, or

   (2) ☒ placed the envelope for collection and mailing on the date shown below, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at , California.

c. ☐ **By overnight delivery.** I enclosed the documents on the date shown below in an envelope or package provided by an overnight delivery carrier and addressed to the person at the addresses in item 4. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. ☐ **By messenger service.** I served the documents on the date shown below by placing them in an envelope or package addressed to the person on the addresses listed in item 4 and providing them to a professional messenger service for service. (A declaration by the messenger must accompany this proof of service or be contained in the Declaration of Messenger below.)

e. ☐ **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents on the date shown below to the fax numbers of the persons listed in item 4. No error was reported by the fax machine that I used. A copy of the fax transmission, which I printed out, is attached.

f. ☐ **By e-mail or electronic transmission.** Based on an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent on the date shown below to the e-mail addresses of the persons listed in item 4. I did not receive within a reasonable time after the transmission any electronic message or other indication that the transmission was unsuccessful.

6. I served the documents by the means described in item 5 on *(date)*: January 3, 2008.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| 1/3/08 | Ava Smith | *Ava Smith* |
|--------|-----------|-------------|
| DATE | (TYPE OR PRINT NAME) | (SIGNATURE OF DECLARANT) |

LA:468416v1

Thompson v. Turner Construction Company
Case No. 07 CV 2412 JM (JMA)